ROBBINS GELLER RUDMAN
  & DOWD LLP
DANIELLE S. MYERS (259916)
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
bcochran@rgrdlaw.com
        – and –
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| IVAN BARON, Individually and on Behalf of All Others Similarly Situated, | ) ) ) Case No. 2:21-cv-6918 |
| Plaintiff, | ) CLASS ACTION ) |
| vs. | ) COMPLAINT FOR VIOLATIONS OF ) THE FEDERAL SECURITIES LAWS |
| HYRECAR INC., JOSEPH FURNARI and ROBERT SCOTT BROGI, | ) ) ) |
| Defendants. | ) ) DEMAND FOR JURY TRIAL |

1    Plaintiff Ivan Baron ("plaintiff"), individually and on behalf of all other persons
2  similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint
3  against defendants, alleges the following based upon personal knowledge as to
4  plaintiff and plaintiff's own acts, and upon information and belief as to all other
5  matters based on the investigation conducted by and through plaintiff's attorneys,
6  which included, among other things, a review of certain U.S. Securities and Exchange
7  Commission ("SEC") filings, public statements, and press releases by HyreCar Inc.
8  ("HyreCar" or the "Company"), as well as media reports about the Company and the
9  facts alleged herein.[1]  Plaintiff believes that substantial evidentiary support will exist
10  for the allegations set forth herein after a reasonable opportunity for discovery.

11                              **JURISDICTION AND VENUE**

12    1.    Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934
13  ("Exchange Act").  The claims asserted herein arise under §§10(b) and 20(a) of the
14  Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated
15  thereunder.  This Court has jurisdiction over the subject matter of this action under 28
16  U.S.C. §1331 and §27 of the Exchange Act.

17    2.    Venue is proper in this District pursuant to §27 of the Exchange Act and
18  28 U.S.C. §1391(b) because the Company conducts business and is headquartered in
19  this District, and the events and omissions giving rise to the claims asserted herein
20  occurred in substantial part in this District, including the dissemination of false and
21  misleading statements in and from this District.

22    3.    In connection with the acts alleged in this complaint, defendants, directly
23  or indirectly, used the means and instrumentalities of interstate commerce, including,
24  but not limited to, the mails, interstate telephone communications, and the facilities of
25  the national securities markets.

26

27  ─────────────────────
28  [1]    Emphasis has been added unless otherwise noted.

- 1 -

## NATURE OF THE ACTION

4.     This is a securities class action on behalf of all purchasers of HyreCar securities between May 14, 2021 and August 10, 2021, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against HyreCar and certain of the Company's current and former senior executives under §§10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

## PARTIES

5.     Plaintiff Ivan Baron, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased HyreCar securities at artificially inflated prices during the Class Period and suffered damages as a result of defendants' misconduct as alleged herein.

6.     Defendant HyreCar is a Delaware corporation with its headquarters in Los Angeles, California.  The Company's common stock is listed on the NasdaqGS ("NASDAQ") under the ticker symbol HYRE.  HyreCar conducted its initial public offering ("IPO") and began trading on the NASDAQ in June 2018.

7.     Defendant Joseph Furnari served as HyreCar's Chief Executive Officer ("CEO") and one of its directors during the Class Period.  Furnari has served as CEO of HyreCar since January 2017.  From May 2016 until his appointment as CEO, Furnari served as the Company's Chief Financial Officer ("CFO").

8.     Defendant Robert Scott Brogi served as CFO of HyreCar from September 2018 to July 2021, when he unexpectedly "retired" at age 56.

9.     Defendants referenced above in ¶¶7-8 are referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are referred to herein as "defendants."

10.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, plans, and present and future business prospects.  In

1  addition, the Individual Defendants were involved in drafting, producing, reviewing

2  and/or disseminating the false and misleading statements and information alleged

3  herein, and were aware of, or recklessly disregarded, the false and misleading

4  statements being issued regarding the Company, and approved or ratified these

5  statements, in violation of the federal securities laws.

6       11.   As officers and controlling persons of a publicly held company whose

7  securities are registered with the SEC pursuant to the Exchange Act and traded on the

8  NASDAQ, which is governed by the provisions of the federal securities laws, the

9  Individual Defendants each had a duty to promptly disseminate accurate, truthful, and

10  complete information with respect to the Company's operations, business, services,

11  expenditures, insurance claims and related processes, and present and future business

12  prospects.  In addition, the Individual Defendants each had a duty to correct any

13  previously issued statements that were materially misleading or untrue, so that the

14  market price of the Company's publicly traded shares would be based upon truthful,

15  accurate and complete information.  Defendants' false and/or misleading

16  misrepresentations and omissions during the Class Period violated these specific

17  requirements and obligations.

18       12.   The Individual Defendants, because of their positions of control and

19  authority as officers and/or directors of the Company, were able to, and did, control

20  the contents of various SEC filings, press releases and other public statements

21  pertaining to the Company. Each Individual Defendant was provided with copies of

22  the documents alleged herein to be false and/or misleading before or shortly after their

23  issuance, participated in conference calls with investors during which false and/or

24  misleading statements were made, and/or had the ability and/or opportunity to prevent

25  their issuance or cause them to be corrected.  Accordingly, each Individual Defendant

26  is responsible for the accuracy of the public statements detailed herein and is,

27  therefore, primarily liable for the representations contained therein.

28

**BACKGROUND**

**The Company**

13.     Defendant HyreCar operates a web-based marketplace that allows car and fleet owners to rent their cars to Uber, Lyft and other gig economy service drivers. HyreCar operates a platform that connects gig drivers with automobiles, while also providing insurance and tactical support.

14.     HyreCar generates revenue by taking a fee out of each rental processed on HyreCar's platform.  Each rental transaction represents a driver renting a car from a car owner.  Drivers pay a daily rental rate set by the car owner, plus a 10% HyreCar Driver Fee as well as direct daily insurance costs.  Owners receive their daily rental rate minus a 15%-25% HyreCar Owner Fee.  As of December 31, 2020, the average daily rental rate of a HyreCar vehicle nationally was approximately $36, plus a 10% HyreCar Driver Fee ($3.60), and a daily direct insurance fee of $13, totaling $52.60 in total daily gross billings paid by the driver via a credit card transaction.  On average, approximately 80% of the daily rental or $28.80 is transferred to the owner via the Company's merchant processing partner.  HyreCar earns revenues from the two revenue share fees (one from the driver and one from the owner) as well as fees for driver insurance, which, in the above example would total approximately $24.16 per day (using the 21% average for owner fees), with the insurance fee representing a large (if not majority) percentage of the revenue generated by each transaction.

15.     In the Company's most recent annual report, HyreCar highlighted the insurance policies it sells as offering a "competitive advantage," stating in pertinent part as follows:

> ***We believe we have a competitive advantage with our commercial automobile insurance policy that covers both Owners and Drivers***.  The policy is specifically designed to cover the period of time in which a Driver is operating an Owner's vehicle while not actively operating a vehicle on a ride-sharing platform, such as Uber or Lyft.

- 4 -

During the periods when Drivers are actively operating on a ride-sharing platform, the insurance subordinates to the state mandated insurance provided by the third party ride-sharing business. To our knowledge, we are the only provider of this car-matching service utilizing this unique insurance product.

16.     HyreCar provides insurance policies through a combination of self-insurance and third-party insurance policies. The two-sided nature of the Company's platform means that it needs to insure both the driver and the owner. Prior to any rental, the driver and owner are provided an insurance identification card that lists the driver's name and the vehicle identification number. Insurance is typically generated for the rental until the owner confirms drop-off of the rented vehicle by the driver. The Company manages rentals through its platform, providing visibility into the nature and severity of claims incidence.

17.     HyreCar provides a unique insurance product that is triggered based on where the driver is at in the ride process and is used to fill coverage gaps left by state-mandated insurance policies. This tailored approach purportedly allowed HyreCar to keep its liability and insurance costs low. The Company explains how its insurance program works as follows:

For insurance purposes a vehicle rental is broken into four distinct driving periods. Period 0 is when the Driver has picked a vehicle up from the Owner and is driving with the Uber or Lyft app turned-off. Period 1 is when the Driver has the Uber or Lyft app turned-on but has not yet accepted a fare. Period 2 is when the Driver has accepted a fare and is on the way to pick-up a passenger. Period 3 is when a passenger is in the vehicle. The HyreCar policy is specifically written to cover periods in which the Drivers are operating HyreCar vehicles OFF the Uber or Lyft platform (period 0). During the periods when Drivers are operating ON the Uber or Lyft platform (periods 1, 2 and 3), the

HyreCar liability insurance subordinates to state mandated insurance provided by Uber and Lyft. ***This enables us to keep insurance costs and liability low by leveraging state mandated insurance policies provided by the TNCs***.

18.    HyreCar processes the insurance claims it receives from owners and drivers via a third-party administrator. Effective March 1, 2021, the Company entered into a two-year claim adjusting agreement with Sedgwick, an insurance claim processing partner for many companies in rideshare transportation and food delivery. The agreement includes an escrow account requirement of $1,750,000 to be held by Sedgwick for claim payments. This escrow account is replenished by the Company on a quarterly basis dependent on the actual claims paid during that quarter. This new relationship allowed HyreCar to centralize its claims administration and indicated that Company management was intensely focused on claims incidence and insurance costs.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

19.    The Class Period begins on May 14, 2021. On the prior day, after the market had closed, HyreCar issued a press release which stated that the Company had achieved "Record First Quarter 2021 Financial Results" for the quarter ended March 31, 2021 ("Q1 2021"). The release stated that HyreCar's insurance deposits had more than doubled during the quarter to $1.7 million, while the amount of the Company's insurance reserve (which indicates the amount of claims incurred but not yet paid) had declined more than 17% since year end to $1.7 million.

20.    Also at that time, HyreCar held an earnings call, led by defendants Furnari and Brogi, with analysts and investors to discuss the Company's Q1 2021 results. In his prepared remarks, defendant Furnari highlighted the Company's purportedly favorable level of insurance claims, stating: "Dynamic pricing, combined

1  with increasing gross profit from normalized claims and increased affiliate revenue,
2  puts us on a target to reach EBITDA neutral in the second half of 2021."

3       21.     Similarly, during his prepared remarks, defendant Brogi stated that
4  HyreCar had recently enacted "price enhancements" to better reflect insurance risk
5  data which were positively impacting the Company's revenue from operations, stating
6  in pertinent part as follows:

> After holding steady on pricing for several years, ***we tested and then
> enacted some price enhancements early in the second quarter to both
> our driver and insurance fees to better reflect the new competitive
> environment and align reimbursement rates with new driver risk
> scoring data.  The combination of these 2 pricing elements should
> drive significant net revenue and gross margin improvements through
> 2021***.  And increase our daily average net revenue from the $24 to $25 a
> day we've seen historically to the $27 to $28 a day range.
>
> Cost of sales increased for the quarter ended March 31, 2021, to
> $4.7 million from $3.6 million the prior year as insurance expenses
> continue to account for the majority of cost of goods sold primarily due
> to some seasonal shifts in insurance costs to support higher levels of car
> supply through the winter quarter.
>
> Accordingly, gross profit for the 3 months ended March 31, 2021,
> was $2.7 million, increasing 26% from $2.1 million in the year ago
> period ended March 31, 2020.  This is an improvement from last year's
> gross profit margin of 33% for the 12 months ending December 31,
> 2020, and flat sequentially from 37% in the first quarter of 2020. ***Due to
> the second quarter pricing changes, we expect our progress toward the
> gross margin near-term goal of 45% to 50% we have discussed
> previously to accelerate***.

22.    In response to an analyst question, defendant Brogi claimed that HyreCar price enhancements centered around better assessing driver insurance risk which offered the Company "additional upside," stating in pertinent part as follows:

> *The part that we're – that has some additional upside to it, it's kind of the risk adjustment piece, right?  There's a driver fee component and a risk or insurance component.  And it's dependent on the mix of drivers within some different risk pools*.
>
> *But I think it's pretty safe to assume that it's going to be at least 10% increase to that sort of per day contribution*.  So yes, going from 9 million to 10 million per 1,000 cars, that's a good basic way to think about it.  And hopefully, *we can do a little bit better than that*.

23.    Also after hours on May 13, 2021, HyreCar filed with the SEC its results for Q1 2021 on Form 10-Q (the "1Q21 10-Q").  The 1Q21 10-Q was signed by defendants Furnari and Brogi, who attested that the filing did not contain any false or misleading statements and was free from fraud.  The 1Q21 10-Q contained the same information as the Q1 2021 press release regarding HyreCar's insurance deposits and insurance reserves.  The 1Q21 10-Q further highlighted the purported completeness of HyreCar's insurance reserves and the "low risk" that the Company would suffer a higher claims incidence than reported, stating in pertinent part as follows:

> *Insurance Reserve and Insurance Deposits*
>
> The Company records a loss reserve for physical damage and other liability coverage caused to owner vehicles up to the Company's insurance deductibles or relevant limits.  *This reserve represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported and are recorded on a non-discounted basis.  The lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment.   The adequacy of the reserve is monitored*

1  *quarterly and is subject to adjustment in the future based upon*
2  *changes in claims experience, including the number of incidents for*
3  *which the Company is ultimately responsible and changes in the cost*
4  *per claim, or changes to the Company's insurance policy which*
5  *dictates what amounts of a claim will be paid by the Company*.
6  Effective March 1, 2021 the Company entered into a two-year claim
7  adjusting agreement with Sedgwick which included an escrow account
8  requirement of $1,750,000 to be held by Sedgwick for claim payments.
9  This escrow account is replenished by the Company on a quarterly basis
10  dependent on the actual claims paid during that quarter.  As of March 31,
11  2021 and December 31, 2020, $1,747,134 and $2,113,039 was included
12  in the accompanying consolidated balance sheets, respectively, related to
13  the loss reserve, where the expense is included in costs of revenues.

14  24.   The statements referenced in ¶¶19-23 above were materially false and/or
15  misleading when made because they failed to disclose the following adverse facts
16  pertaining to the Company's business, operations and financial condition, which were
17  known to or recklessly disregarded by defendants as follows:

18       (a)   that HyreCar had materially understated its insurance reserves;

19       (b)   that HyreCar had systematically failed to pay valid insurance
20  claims incurred prior to the Class Period;

21       (c)   that HyreCar had incurred significant expenses transitioning to its
22  new third-party insurance claims administrator and processing claims incurred from
23  prior periods;

24       (d)   that HyreCar had failed to appropriately price risk in its insurance
25  products and was experiencing elevated claims incidence as a result;

26       (e)   that HyreCar had been forced to dramatically reform its claims
27  underwriting, policies and procedures in response to unacceptably high claims
28  severity and customer complaints; and

- 9 -

(f)    that, as a result of (a)-(e) above, HyreCar's operations and prospects were misrepresented because the Company was not on track to meet the financial estimates provided to investors during the Class Period, and such estimates lacked a reasonable basis in fact, including HyreCar's purported gross margin, EBITDA and net loss trajectories.

25.    Then, on August 10, 2021, after the market had closed, HyreCar issued a press release announcing deeply disappointing results for the quarterly period ended June 30, 2021 ("Q2 2021"), including net losses of $9.3 million compared to losses of $3.8 million in the same period the prior year.  Furthermore, the Company's adjusted EBITDA loss for Q2 2021 was $7.1 million (four times higher than the $1.7 million adjusted EBITDA loss experienced in the second quarter of 2020) and its gross profit for Q2 2021 was just $0.8 million (less than one third the Company's gross profit in the second quarter of 2020), with a gross profit margin of just 24%.

26.    Contemporaneously with the release, HyreCar filed with the SEC a Form 10-Q which disclosed that the Company had incurred skyrocketing costs of revenue during the quarter primarily as a result of significantly higher insurance claims incidence – including claims before March 31, 2021 "in excess of the reserves."  The Form 10-Q stated in pertinent part as follows:

Cost of revenue totaled $8.3 million for the three months ended June 30, 2021, an increase of $5.2 million or 170.6% from $3.1 million recognized during the three months ended June 30, 2020.  About $2.4 million are due to the attributable increase in insurance premiums and claims from expanded rental day volume, and normalization for the quarter ended June 30, 2020 volatility.  ***The remainder of the cost increase was primarily driven up by additional insurance claims of $2.8 million of which approximately $1.2 million was attributed to one-off new developments on claims and incidental payments incurred prior to March 31, 2021 in excess of the reserves and accruals***.  Some

of those one-offs resulted from settling claims incurred prior to March 1, 2021 under our previous insurance claims processing partner.  Another $0.2 million of one-off expenses were related to technical transitional difficulties to the new claims processing partners platform which have been resolved.

27.     Also at that time, HyreCar held an earnings call, led by defendants Furnari and Brogi, with analysts and investors to discuss the Company's Q2 2021 results.  During the call, HyreCar executives revealed that the Company had been forced to revamp its claims processes and procedures and improve its risk price adjustments for policies issued by the Company.  Essentially, HyreCar had failed to appropriately price risk on past policies and had failed to pay out a substantial number of claims incurred before the Class Period.  For example, Serge de Bock (HyreCar's new CFO following defendant Brogi's abrupt July 2021 retirement) stated in pertinent part as follows:

> Accordingly, gross profit for the current quarter was $0.8 million, representing a gross margin of 8.9%.  Adjusted for one-off expenses related to the claims portfolio transition, our gross margin was 24.3%. ***We optimized our new process and pricing and have already identified several tangible opportunities to improve claims profitability, either by process improvements, geographical and risk price adjustment, or adequate pricing for our premium coverage offerings.  One of these opportunities relates to reassessing our deductibles on physical damage claim and providing incentives for drivers with low claims experience. We want to strike the right balance between customer experience and cost***.  We believe we can aim for low 30s gross profit margin in Q3, in line with fiscal year 2020, and an improved profit margin of mid-30s in Q4 through pursuing and affecting these initiatives without impacting our growth or driver and owner retention.

*We are also collaborating with our insurance partners to leverage data and improve our driver and car screening processes to both reduce claims outcomes and claims premium through risk control and to continue our path towards 40% plus gross margin in the later half of 2022 and beyond.  Specifically, during our discussions with our insurance partners, we estimated that we could reduce insurance premium over time by up to 20% by identifying and filtering more effectively high-risk drivers*.

28.     Later, in response to an analyst question, de Bock elaborated on the extensive efforts that HyreCar had been engaged in to reform its claims processes, stating in pertinent part as follows:

So the bridging to last year gross margin that was at 33% for the whole year, comes from us changing our processes.  We want to improve customer satisfaction, customer retention.  So we made it a little bit easier for folks to kind of go through the claims process.  *Now we try to find the right balance between direct costs and being able to have customers being happy and have a good retention impact*.  And as we get through, this is just a first few months with our new insurance processing partners.

*We're already hammering out.  We're doing a deep dive, hammering out the details on the claims process.  We already identified a few areas that we can fix or just improve.  We're doing a good trade out there*.  And we believe we can get back the margin above 30% directly in Q3 through those efforts.  But it's going to take a little time for us to kind of get back as we transition between partners and we understand the claims better.  And then another angle is read data.  We collect a lot of data in our claims process, and we were trying to understand better what makes a good driver as we mature, and we're

- 12 -

able to do that, we'll be able to pick drivers more effectively.  And then in turn, that's going to turn into less claims and lower insurance premiums.  So we're trying to get a favorable wheel going in terms of getting data adjust and then reduce our expenses.  ***But as we get through the transition, the new processes took a little bit of toll on a direct profitability***.

29.    Unsatisfied with this answer, another analyst asked de Bock to explain how HyreCar's claims could "have risen so dramatically in the last couple of quarters."  De Bock responded that the Company was responding to some "alarming trends" in claims incidents and was reforming inefficient practices that had harmed profitability, such as with respect to subrogation, stating in pertinent part as follows:

Yes, absolutely.  I think this quarter, we had $1.4 million in one-off expenses from the transition, but also ***we're changing our process and implementing faster payment process that work more customer-friendly, led to faster payouts, and sometimes payout is a little higher than what we've seen in the past.  We identified a few things we need to do to be able to curtail that***.  We're going to focus on deductible as one portion to be able to have a good handle on the amount and volume of claims coming in.  And then we also have a few things, including, for instance, our subrogation practices.  We got a little loser on subrogation practices in Q2.  ***We were paying our customers and then trying to chase back the money***.  I think here, we put new more guard rails in those cases.

We only subrogating certain instances, for instance, and that will help us drive some of the claims back.  We also looked at different trends for different states.  ***We identified a couple of states where we saw more alarming trends*** and also a different profile of drivers, and we immediately action to curtail that in Q3.  And that's going to show up

partially in Q3 and then in Q4.  And I think that's – with more data, and I think that's going to be a trend you're going to see.  We have more data, more dashboards, we're able to discern and analyze the data more quickly and react very quickly to trends.  And I think that's going to help us be more efficient, effective and generate more profit in the future.

30.   When asked whether HyreCar was actually on track to achieve 45% to 50% gross margins in the near term as previously represented, de Bock essentially withdrew this goal, calling it a "shoot for the sky" aim and stating that "shooting for margin upwards of 40%" was more realistic.

31.   On this news, the price of HyreCar stock fell ***nearly 50%*** in a single day to close at $9.85 per share on August 11, 2021, on abnormally high volume of over 5.8 million shares traded.

32.   As a result of defendants' wrongful acts and omissions, and the precipitous declines in the market value of HyreCar securities, plaintiff and other members of the Class (defined below) have suffered significant losses and damages for which they seek redress through this action.

## ADDITIONAL SCIENTER ALLEGATIONS

33.   As alleged herein, defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and/or misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding HyreCar, and their control over and/or receipt and/or modification of HyreCar's materially false and/or misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

34.     Defendants knew and/or recklessly disregarded the false and/or misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

35.     The Individual Defendants, because of their positions with HyreCar, controlled the contents of HyreCar's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and/or misleading.

36.     Indeed, the Individual Defendants held themselves out to investors as the persons most knowledgeable to discuss the Company's insurance products, reserves and claims severity and incidence, and continuously kept themselves apprised of these aspects of HyreCar's business, operations and financial results as part of their primary job responsibilities.  Insurance revenues and claims incidents are major components of the Company's cash flows and financial results and management was particularly focused on these trends during the Class Period as evidenced by the switch to Sedgwick in March 2021.  Furthermore, because the fraud alleged herein relates to the core operations of HyreCar, which is a relatively small company with a total of 86 full-time employees as of December 31, 2020, knowledge of the facts underlying the fraud may be imputed to the Individual Defendants based on their positions with the Company.  As a result, each of the defendants is responsible for the accuracy of

HyreCar's corporate statements and is, therefore, responsible and liable for the representations contained therein.

37.    Defendants' scienter is also corroborated by the suspicious sales of Company stock by Company insiders.  The sales are suspicious in that they were unusual in their size, unusual in comparison to the insider's prior trading history, and unusually timed to maximize profits at artificially inflated prices.   Following defendants' materially false and misleading statements on the first day of the Class Period, the price of HyreCar stock rocketed upwards 45% on May 14, 2021.  This preceded an unprecedented spate of insider selling at the Company, totaling more than $13 million in gross proceeds.

38.    For example, defendant CEO Furnari sold 300,000 shares of Company stock on July 21, 2021 through July 23, 2021, reaping gross proceeds of more than $5.2 million.  Prior thereto, Furnari had not sold any Company shares since the Company's IPO in June 2018.

39.    Michael Furnari, the Company's Chief Business Development Officer since October 2017 and the brother of defendant CEO Furnari, also engaged in suspicious insider selling.  Michael Furnari sold 299,900 shares of Company stock on July 21, 2021 through July 23, 2021, reaping gross proceeds of nearly $5.2 million. Prior thereto, Michael Furnari had not sold any Company shares since the Company's IPO in June 2018.

40.    Defendant CFO Brogi likewise engaged in suspicious insider selling. Brogi sold 72,329 shares of Company stock on May 20, 2021 and May 24, 2021, reaping gross proceeds of over $1.2 million.  Prior thereto, Brogi had not sold any Company shares since joining the Company in September 2018.

41.    Grace Mellis, Chairman of the Company's Board of Directors during the Class Period, engaged in suspicious insider trading as well.  Mellis sold 50,000 Company shares on May 24, 2021 and June 3, 2021, reaping gross proceeds of nearly

1   $875,000.   Prior thereto, Mellis had not sold any Company shares since the

2   Company's IPO.

3   42.   Henry Park, the Company's Chief Operating Officer during the Class

4   Period, engaged in suspicious insider trading too.  Park sold 35,000 Company shares

5   on May 19, 2021 and May 20, 2021, reaping gross proceeds of over $578,000.  Prior

6   thereto, Park had not sold any Company shares since joining the Company in October

7   2018.

8   43.   Additionally, on June 23, 2021, the Company announced the unexpected

9   "retirement" of defendant CFO Brogi, at only age 56.  Brogi was replaced as CFO on

10   July 5, 2021.   Brogi's unexpected departure from the Company under the

11   circumstances described herein further evidences defendants' scienter.

**NO SAFE HARBOR**

13   44.   HyreCar's "Safe Harbor" warnings accompanying its reportedly forward-

14   looking statements ("FLS") issued during the Class Period were ineffective to shield

15   those statements from liability.  To the extent that projected revenues and earnings

16   were included in the Company's financial reports prepared in accordance with

17   Generally Accepted Accounting Principles, including those filed with the SEC on

18   Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15

19   U.S.C. §78u-5(b)(2)(A).

20   45.   Defendants are also liable for any false or misleading FLS pleaded

21   because, at the time each FLS was made, the speaker knew the FLS was false or

22   misleading and the FLS was authorized and/or approved by an executive officer of

23   HyreCar who knew that the FLS was false.  None of the historic or present tense

24   statements made by defendants were assumptions underlying or relating to any plan,

25   projection or statement of future economic performance, as they were not stated to be

26   such assumptions underlying or relating to any projection or statement of future

27   economic performance when made, nor were any of the projections or forecasts made

28

by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

46. At all relevant times, the market for HyreCar securities was an efficient market for the following reasons, among others:

(a) HyreCar stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) according to the Company's Form 10-Q for the quarter ended June 30, 2021, HyreCar had more than 21.2 million shares outstanding as of August 10, 2021;

(c) as a regulated issuer, HyreCar filed periodic public reports with the SEC;

(d) HyreCar regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e) unexpected material news about HyreCar was rapidly reflected in and incorporated into prices for the Company's securities during the Class Period.

47. As a result of the foregoing, the market for HyreCar securities promptly digested current information regarding HyreCar from publicly available sources and reflected such information in the price of HyreCar securities. Under these circumstances, all purchasers of HyreCar securities during the Class Period suffered similar injury through their purchases of HyreCar securities at artificially inflated prices, and a presumption of reliance applies.

48. A presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' omissions of material fact for which there was a duty to disclose.

1

## LOSS CAUSATION/ECONOMIC LOSS

2      49.     During the Class Period, as detailed herein, defendants made false and
3  misleading statements and engaged in a scheme to deceive the market and a course of
4  conduct that artificially inflated the price of HyreCar securities and operated as a fraud
5  or deceit on Class Period purchasers of HyreCar securities by misrepresenting the
6  value of the Company's business and prospects by concealing negative aspects of the
7  Company's   insurance   products   and   claims   incidence.     As   defendants'
8  misrepresentations and fraudulent conduct became apparent to the market, the price of
9  the Company's securities fell precipitously as the prior artificial inflation came out of
10  the stock's price.  As a result of their purchases of HyreCar securities during the Class
11  Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages,
12  under the federal securities laws.

13

## CLASS ACTION ALLEGATIONS

14      50.     Plaintiff brings this action as a class action pursuant to Federal Rule of
15  Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the
16  securities of HyreCar during the Class Period (the "Class").  Excluded from the Class
17  are defendants, the officers and directors of the Company at all relevant times,
18  members of their immediate families and their legal representatives, heirs, successors
19  or assigns, and any entity in which defendants have or had a controlling interest.

20      51.     The members of the Class are so numerous that joinder of all members is
21  impracticable.  Throughout the Class Period, HyreCar common stock was actively
22  traded on the NASDAQ.  While the exact number of Class members is unknown to
23  plaintiff at this time and can only be ascertained through appropriate discovery,
24  HyreCar reported more than 21.2 million shares outstanding as of August 10, 2021,
25  which shares are likely held by hundreds, if not thousands, of putative Class members.
26  Record owners and other members of the Class may be identified from records
27  maintained by HyreCar or its transfer agent and may be notified of the pendency of

28

this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

53.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether defendants violated the Exchange Act as alleged herein;

(b)    whether defendants' statements misrepresented material facts about the business, operations and prospects of HyreCar;

(c)    whether the prices of HyreCar securities were artificially inflated during the Class Period;

(d)    whether defendants acted with scienter; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

55.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5**
**Against All Defendants**

56.  Plaintiff incorporates ¶¶1-55 by reference.

57.  During the Class Period, defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and/or misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.  Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of HyreCar securities during the Class Period.

59.  Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for HyreCar securities. Plaintiff and the Class would not have purchased HyreCar securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

**COUNT II**

**For Violation of §20(a) of the Exchange Act**
**Against All Defendants**

60.  Plaintiff incorporates ¶¶1-59 by reference.

61.  Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company and/or ownership of HyreCar stock, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct

complained of herein.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Declaring that defendants are liable pursuant to the Exchange Act;

C.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Awarding such other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 27, 2021

ROBBINS GELLER RUDMAN
& DOWD LLP
DANIELLE S. MYERS
BRIAN E. COCHRAN

*s/ Brian E. Cochran*

BRIAN E. COCHRAN

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
dmyers@rgrdlaw.com
bcochran@rgrdlaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
RICHARD GONNELLO
420 Lexington Avenue, Suite 1832
New York, NY  10170
Telephone:  212/432-5100
rgonnello@rgrdlaw.com

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

Ivan M. Baron ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of August, 2021.

_____
Ivan M. Baron

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/09/2021 | 1,000 | $19.68 |
| 07/12/2021 | 1,000 | $20.58 |
| 07/21/2021 | 500 | $17.85 |
| 07/21/2021 | 1,000 | $17.34 |
| 07/22/2021 | 500 | $18.46 |
| 07/26/2021 | 1,000 | $16.74 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 05/14/2021 | 250 | $11.07 |
| 05/14/2021 | 200 | $11.07 |
| 05/14/2021 | 200 | $11.07 |
| 05/14/2021 | 100 | $11.07 |
| 05/14/2021 | 100 | $11.08 |
| 05/14/2021 | 200 | $11.07 |
| 05/14/2021 | 200 | $11.07 |
| 07/09/2021 | 500 | $20.44 |
| 07/23/2021 | 1,500 | $16.17 |
| 07/23/2021 | 63 | $16.17 |
| 07/23/2021 | 100 | $16.17 |
| 07/23/2021 | 100 | $16.17 |
| 07/23/2021 | 37 | $16.18 |
| 07/23/2021 | 100 | $16.19 |
| 07/23/2021 | 100 | $16.20 |
| 08/05/2021 | 2,000 | $17.10 |
| 08/05/2021 | 100 | $17.13 |
| 08/05/2021 | 100 | $17.15 |
| 08/05/2021 | 100 | $17.13 |
| 08/05/2021 | 100 | $17.14 |
| 08/05/2021 | 100 | $17.13 |

Prices listed are rounded to two decimal places.

*Opening position of 1,250 shares.