Robert V. Prongay (SBN 270796)
Ex Kano S. Sams II (SBN 192936)
Raymond D. Sulentic (SBN 316913)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel for Lead Plaintiff Turton Inc.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN BARON, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:21-cv-06918-PA-JC |
| Plaintiff, | **CLASS ACTION** |
| v. | **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| HYRECAR INC., JOSEPH FURNARI and ROBERT SCOTT BROGI, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

AMENDED COMPLAINT

# **<u>TABLE OF CONTENTS</u>**

I.     NATURE OF THE ACTION AND OVERVIEW ........................................... 1

II.    JURISDICTION AND VENUE ................................................................... 5

III.   PARTIES ................................................................................................... 6

IV.    SUBSTANTIVE ALLEGATIONS ............................................................. 6

       A.    Background ..................................................................................... 6

       B.    Defendants' Insurance Expense Suppression And Earnings
             Management ................................................................................... 8

             1.    Defendants Conceal True Nature Of HyreCar's Purported Third
                   Party Administrator ............................................................. 8

             2.    HyreCar Turned To Conflicted-Party Genoteq After Its Prior TPA
                   Ceased Doing Business With HyreCar (Apparently Due To
                   HyreCar's Delayed Payments To Claimants) ........................... 10

             3.    HyreCar's Delays In Payment Were Based On Budgetary
                   Considerations And Other Criteria Irrelevant To the Underlying
                   Claims .............................................................................. 12

             4.    To Minimize The Effect Of The Surging Claims, Defendants
                   Closed Accounts ................................................................ 15

             5.    HyreCar's Delay In Payments Created A Surging Backlog Of
                   Claims, and Thus A Looming True Up Event ........................... 17

             6.    Reams Of Consumer Complaints To The Better Business Bureau
                   Corroborate The CWs' Depiction Of Genoteq And HyreCar .... 19

             7.    HyreCar Also Withheld Payments Owed To Owners Who Had
                   Renters Incur Tolls Or Tickets ............................................ 23

             8.    On Top of Suppressing Insurance Payouts HyreCar Also
                   Recklessly Permitted High Risk Drivers To Rent Vehicles To
                   Show Near-Term Revenue Growth ....................................... 24

i

C.   During the Class Period HyreCar Also Made False And Misleading Statements About Its Insurance, Gross Margins, Scalability And Risk Pricing...................................................28

   1.   Rather Than Admitting Insurance Was An Escalating Liability, Defendants Continued To Conceal This Risk And Instead Touted Insurance As A Strength............................................29

   2.   Defendants Also Misrepresented The Level Of Risk Carried by Drivers On The Company's Platform .........................................33

   3.   Defendants Also Misrepresented HyreCar's Operating Leverage, And Its Ability To Scale and Reach Breakeven.........................35

D.   The Truth Begins To Emerge ................................................37

V.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS...................................................44

   1.   Statements Related to the Company's February 3, 2021 8-K ....44

   2.   Statements Related to the Company's February 4, 2021 Prospectus........................................................................45

   3.   Statements Related to The Company's Q4 2020 Earnings Call.51

   4.   Statements Related To The Company's 2020 10-K ..................53

   5.   Statements from the Company's Q1 2021 Press release............57

   6.   Statements From the Company's Q1 2021 10-Q .......................59

   7.   Statements Related To The Company's June 2021 Investor Presentation ........................................................................60

VI.   ADDITIONAL SCIENTER ALLEGATIONS................................................61

VII.   LOSS CAUSATION..........................................................................64

VIII.   CLASS ACTION ALLEGATIONS .................................................65

AMENDED COMPLAINT

IX.    UNDISCLOSED ADVERSE FACTS ............................................................ 67

X.     APPLICABILITY OF PRESUMPTION OF RELIANCE ............................ 67

XI.    NO SAFE HARBOR ................................................................................... 69

XII.   COUNT ONE ............................................................................................. 70

XIII.  COUNT TWO ............................................................................................ 73

XIV.   PRAYER FOR RELIEF ............................................................................. 74

XV.    JURY TRIAL DEMANDED ...................................................................... 74

Lead Plaintiff Turton Inc. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by HyreCar Inc. ("HyreCar" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by HyreCar; (c) interviews of former Company employees; and (d) review of other publicly available information concerning HyreCar.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.     This is a securities class action on behalf of all purchasers of HyreCar securities between February 3, 2021 and August 17, 2021, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against HyreCar and certain of the Company's current and former senior executives under Sections 10(b), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     This is a paradigmatic securities fraud case where a tightly-controlled public company, led by the Individual Defendants,[1] raised money from shareholders, and used a conflicted party to help manage earnings through expense concealment and suppression—which enabled the Company to delay reporting insurance losses for just long enough for insiders to cash out through perfectly-timed sales. Defendants also made multiple misrepresentations of the same throughout the Class Period. Once the truth surfaced, the stock cratered by over 50% in a few days, thereby damaging investors.

---

[1] Defendant Joseph Furnari ("Furnari") and Defendant Robert Scott Brogi ("Brogi") are referred to  as the "Individual Defendants."

3.     The fraud here involves public company, HyreCar. HyreCar operates a peer-to-peer (PTP) platform where owners of vehicles can rent their cars directly to consumers who want to rent them. The general idea is that a car owner can collect passive income on a vehicle that might otherwise sit idle, while the renter of that vehicle sidesteps the middleperson and can rent a car at a lower price than they could ordinarily through a traditional car rental agency.

4.     Much like a traditional car rental agency, HyreCar required drivers to maintain insurance to protect the car owner's property. HyreCar also required drivers to use HyreCar's own insurance plan (which was partially self-funded). HyreCar charged drivers an added fee for this service that was intended to provide additional protection for drivers.

5.     When HyreCar charged renters that fee, it boosted the Company's revenue. By contrast, when HyreCar paid an insurance claim, that payout created an expense. So, there was natural tension between more renters – which boosted revenue – and insurance claims expenses, which offset that revenue. Estimates of future payouts also created an insurance reserve.

6.     Much *unlike* a traditional car rental dealer, however, HyreCar did not consistently pay out on its insurance claims to vehicles that were damaged or stolen. For instance, it delayed so many claims that it has over 287 complaints or negative reviews under the Better Business Bureau (BBB). Payments to consumers were so delayed or refused that employee of HyreCar's claim processor began to receive death threats. Claims payments to consumers was so bad that the Company actually threw a party when its BBB rating moved up from "F" to "D", "we were celebrating failure, essentially", one former employee recounted. Though there was at least one customer who was repaid in a timely way: Joe Furnari, HyreCar's CEO. According to another former employee of HyreCar's claims processor, HyreCar's CEO had cars in HyreCar fleet. The same former employee stated (with a laugh), "of course, if his cars got wrecked, his cars got paid."

AMENDED COMPLAINT

7.     Apart from Furnari, other HyreCar claimants did not do so well, and, as HyreCar fell further behind on its claims owed to customers, around the middle of 2019, HyreCar's then existing claims administrator ended its relationship with HyreCar. At that point, Defendants engaged a newly formed conflicted party, Genoteq, to manage its claims.

8.     Unbeknownst to investors, however, was that Genoteq was conflicted because it was a tiny entity that had just recently been formed by David Haley, who also: (1) sat on HyreCar's Strategic Advisory Board; (2) held a minority position in HyreCar; (3) entered into a JV with the Hyrecar; and (4) owned a company called ABI, which was HyreCar's sole insurance broker. HyreCar paid ABI millions per year for insurance brokerage services and also paid $50 per claim to Genoteq to purportedly process claims. In other words, Haley had a strong incentive to keep HyreCar happy irrespective of the various duties that an insurance broker and third party claims administrator (TPA) may owe other parties, like the insurance claimant.

9.     Genoteq appears to be a newly created entity with no operating history few employees, and no experience in claims adjustment was hardly a suitable company to be handling the volume of claims that HyreCar faced. As such, once Genoteq was in place, HyreCar could continue making insurance payments based not on a claim's validity, but on considerations such as the Company's budget with increasing frequency among others. According to hundreds of consumer complaints, HyreCar altogether ignored consumers whose vehicles had been damaged.

10.    The above dynamic had myriad effects on HyreCar's financial statements, the most significant of which is that the perpetual delay, or suppression in timely payment of insurance claims created a snowballing backlog of insurance liability. Even so, Defendants made various representations to investors during the Class Period about the purported "strength" of insurance platform, and that "the lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment."

11.     But eventually HyreCar's massive backlog of unpaid claims would need to be paid and thus recognized as an expense on HyreCar's financials. In other words, there was a growing insurance expense true up that loomed because of the constant delay in paying claims. And when that true up happened (which was all at once), HyreCar's stock got decimated.

12.     Defendants also fundamentally misrepresented Genoteq's involvement. Rather than disclosing the true  nature of Genoteq and HyreCar's conflicted relationship, HyreCar stated in its SEC filings that HyreCar's insurance reserves were based on "both currently available information to estimate the insurance reserves as well as *third party claims adjuster data* provided on existing claims", which was patently false because Genoteq was not a truly independent third-party.

13.     This claims suppression dynamic became unsustainable and eventually the Company replaced ABI with AON, a well-known and reputable broker and risk manager. Soon after, HyreCar replaced Genoteq, suggesting AON was uncomfortable with the conflicted party arrangement. Shortly after those two things happened, Brogi, HyreCar's CFO, resigned -- claiming he was "retiring."

14.     Before the looming insurance expense true up was revealed, HyreCar's COO, CEO, the CEO's brother, and HyreCar's Board chair all made perfectly-timed stock sales, reaping millions in profit, and avoided millions in losses.

15.     On August 11, 2021, HyreCar reported quarterly results, wherein it announced deeply disappointing results for the quarterly period ended June 30, 2021 ("Q2 2021"), including net losses of $9.3 million compared to losses of $3.8 million in the same period the prior year. Along with the release, HyreCar filed with the SEC a Form 10-Q that disclosed that the Company had incurred skyrocketing costs of revenue during the quarter mainly due to significantly higher insurance claims incidence – including claims before March 31, 2021 "in excess of the reserves." The 10-Q also disclosed that "*The remainder of the cost increase was primarily driven up by additional insurance claims of $2.8 million of which approximately $1.2*

*million was attributed to one-off new developments on claims and incidental payments incurred prior to March 31, 2021 in excess of the reserves and accruals.*"

16.     On all this news, HyreCar's stock fell ***nearly 50%*** in a single day to close at $9.85 per share on August 11, 2021, on abnormally high volume of over 5.8 million shares traded, thereby damaging investors.

17.     HyreCar shares continued to fall for several trading days on this news including by $0.03 per share on August 12, 2021, $0.03 per share on August 13, 2021, $0.21 per share on August 16, 2021, and $0.38 per share on August 17, 2021.

18.     By the close of trading on August 17, 2021, HyreCar shares closed at $9.20 per share, or 52% lower than its close of $19.12 on August 10, 2021, thereby damaging investors.

19.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages. Accordingly, Plaintiff brings securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.     JURISDICTION AND VENUE

20.     Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under, and pursuant to, Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

21.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

22.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial

part, in this District. In addition, the Company's principal executive offices are in this District.

23.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange in this District.

## III.   PARTIES

24.     Plaintiff Turton Inc., as set forth in its accompanying Certification, which is incorporated by reference, purchased HyreCar securities at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' misconduct as alleged below.

25.     Defendant HyreCar is a Delaware corporation with its headquarters in Los Angeles, California. The Company's common stock is listed on the NasdaqGS ("NASDAQ") under the ticker symbol HYRE. HyreCar conducted its initial public offering ("IPO") and began trading on the NASDAQ in June 2018

26.     Defendant Joseph Furnari ("Furnari served as HyreCar's Chief Executive Officer ("CEO")) and one of its directors during the Class Period. Furnari has served as CEO of HyreCar since January 2017. From May 2016 until his appointment as CEO, Furnari served as the Company's Chief Financial Officer ("CFO").

27.     Defendant Robert Scott Brogi ("Brogi") served as CFO of HyreCar from September 2018 to July 2021, when he unexpectedly "retired" at age 56. The Individual Defendants and the Company are referred to  as "Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A.     Background

28.     Defendant HyreCar operates a web-based marketplace that allows car and fleet owners to rent their cars to Uber, Lyft and other gig economy service drivers.

HyreCar operates a platform that connects gig drivers with automobiles while also providing insurance and tactical support.

29.    HyreCar also provides a way for an owner of a vehicle to generate passive income from his or her car by renting it directly to interested renters for a fee—much like one rents a car from a rental car provider, except HyreCar eliminates the middleperson like a peer-to-peer.

30.    HyreCar generates revenue by taking a fee out of each rental processed on HyreCar's platform. Each rental transaction represents a driver renting a car from a car owner. Drivers pay a daily rental rate set by the car owner, plus a 10% HyreCar Driver Fee as well as direct daily insurance costs. Owners receive their daily rental rate minus a 15%-25% HyreCar Owner Fee. As of December 31, 2020, the average daily rental rate of a HyreCar vehicle nationally was about $36, plus a 10% HyreCar Driver Fee ($3.60), and a daily direct insurance fee of $13, totaling $52.60 in total daily gross billings paid by the driver via a credit card transaction. On average, about 80% of the daily rental or $28.80 is transferred to the owner via the Company's merchant processing partner. HyreCar earns revenues from the two revenue share fees (one from the driver and one from the owner) as well as fees for driver insurance, which, in the above example would total around $24.16 per day (using the 21% average for owner fees), with the insurance fee representing a large (if not majority) percentage of the revenue generated by each transaction.

31.    HyreCar uses self-insurance for a portion of its claims. When a vehicle on its platform gets into an accident, HyreCar uses a claims adjuster and administrator (a TPA) to both review the claim and process it. To process that payment HyreCar, as the self-insuring entity (with supplemental insurance from a reinsurance provider), will put funds into an account, and then the TPA will distribute those funds to the claimant. In other words, if the funds are not turned over to the TPA, the TPA cannot pay the claimant.

1       32.     Furnari became HyreCar's CEO in January 2017. Shortly after becoming

2    CEO, Furnari's brother, Michael Furnari, was elevated from Director of Sales (a

3    position he held since May 2016), to Chief Business Development Officer in October

4    2017.

5       33.     In April and May 2017, just over a year before the Company's June 2018

6    IPO, Furnari and David Haley ("Haley") invested $100,000 and $200,000,

7    respectively, into Notes ("the 2017 Notes") with embedded warrants[2] that converted

8    into HyreCar shares at $2.10 per share.

9    **B.     Defendants' Insurance Expense Suppression And Earnings Management**

10

11      **1.     Defendants Conceal True Nature Of HyreCar's Purported Third Party Administrator**

12      34.     Following the joint investment in the 2017 Notes, Haley and HyreCar

13   entered into a joint venture, which was announced on October 3, 2018. In that press

14   release, the Company stated that:

15          [The] strategic joint venture with Dave Haley, CEO of American
            Business Insurance Services (ABI), and Peter Foley, CEO of
16          LILCHA Holdings. An extension of an ongoing partnership, this
            venture will focus on creating an insurance captive designed
17          specifically for carsharing in the ridesharing space.

18          "Peter and Dave have been with HyreCar from the beginning,
            and this announcement cements our relationship with two of the
19          most well-respected industry veterans in the commercial auto
            insurance business," says Joe Furnari, CEO of HyreCar. "This
20          collaboration confirms HyreCar's continued commitment to the
            ridesharing industry and providing scalable InsurTech solutons
21          for users on the platform."

22          This joint venture allows the company flexibility to reduce
            insurance risk, increase profit margins and provide tailored
23          insurance solutions to the on-demand economy.

24          "I am thrilled to be working with Joe and Dave in this new and
            exciting sector," says Foley. "After more than 35 years in the
25          insurance industry, I am excited to be a part of some new and
            exciting opportunities that will drive innovation for HyreCar and
26          ridesharing."

27   _____

28   [2] A warrant is essentially a call option, which gives the holder the right but not the obligation to buy shares of HyreCar at a predetermined price.

"We've seen a lot of changes in the livery (for-hire) services over the last few years," said Haley. "HyreCar seems well positioned to take advantage of the trends we see emerging in the industry."

35.     Subsequent SEC filings, including those issued during the Class Period,[3] state that HyreCar would rely on a purported "third-party" claims adjuster ("TPA") to estimate its insurance reserves. This representation was false because the purported TPA, Genoteq, was not a truly independent third-party. It was not a truly an independent third party because HyreCar and Genoteq maintained a conflicted relationship. The relationship was conflicted because Haley was, according to Company filings, both a minority shareholder in HyreCar and a member of the Company's Strategic Advisory Board. On top of those dual roles with HyreCar, Haley also owns ABI, HyreCar's sole insurance broker, and Genoteq, HyreCar's purported third-party claims adjuster and claims administrator ("TPA").

36.     Moreover, according to CW9–a Genoteq Claims Assistant, and Manager's Assistant, who worked at Genoteq from July 2020 through October 2021[4]– Furnari and Haley were good friends. CW9 stated "I know for a fact that they [Haley and Furnari] did barbeques together with their families, golfed together, went on trips together." CW9 continued, "They were friends, just as much as they were in business." According to CW9, Genoteq received $50 for every claim which it processed for HyreCar.

37.     The true structure of the relationships between the respective entities is as follows:

---

[3] Such as the 2019 10-K, which was incorporated by reference into the February 4, 2021 prospectus.

[4] CW9 was intimately familiar with and reviewed correspondence of Genoteq Manager Stacy Ashton between the fall of 2019 and spring of 2020.

38.     As shown above, the relationship between the above entities was not arm's length, but rather, a conflicted relationship that extended to Genoteq.

39.     According to HyreCar's Form 10-K for the year ended December 31, 2019 ("the 2019 10-K"), HyreCar paid ABI $5.0 and $4.3 million, or 31.6% and 44.0% of revenue, respectively, during the years ended 2019 and 2018, respectively.

40.     CW9 continued, "I know the ins and outs of both businesses…. Genoteq was funded by Dave [Haley] and ABI. Our salaries [at Genoteq] and everything – down to plates and forks. Stacy [Ashton] would submit our payroll to Tera at ABI and she would approve it."

### 2. HyreCar Turned To Conflicted-Party Genoteq After Its Prior TPA Ceased Doing Business With HyreCar (Apparently Due To HyreCar's Delayed Payments To Claimants)

41.     Before HyreCar engaged Genoteq as its conflicted TPA, HyreCar used a different TPA. On information and belief, at some point during 2019, HyreCar's prior TPA ceased doing business with HyreCar. According to CW9, the prior TPA was

purchased by another company around, when the new owner of HyreCar's former TPA took over, the new owner dropped HyreCar because HyreCar was not paying its claims. Based on Plaintiffs' research, Plaintiffs are informed and believe that the acquisition took placed during the middle of 2019.

42.     Then, according to CW9, Haley formed Genoteq to operate as HyreCar's conflicted TPA. CW9 stated "Dave [Haley], because he's good friends with Joe Furnari, opened Genoteq, and he and [Genoteq Manager] Stacy [Ashton] started taking claims for HyreCar."

43.     According to its website, Genoteq purports to be a "Third-Party Claims Administration (Claims TPA) specializing in the handling and adjusting of insurance claims for risks within the transportation industry."

44.     Before the October 2018 Joint Venture with Haley ("the 2018 JV"), Genoteq did not have an operating history, and consisted of just a handful of employees. Indeed, according to Genoteq's license on file with the Louisiana Department of Insurance, Genoteq's License Issuance Date was May 14, 2019, meaning it was formed just months after the 2018 JV.

45.     Genoteq is (and at all times was) a tiny entity with just a few employees. CW7, a Billing and Claims Specialist who worked at HyreCar from September 2018 through May 2020, stated that "There were a handful of people [at Genoteq who] we'd work closely with. A handful of adjusters." Similarly, CW1, an Account Manager at HyreCar from July 2019 through March 2020, stated that Genoteq "was a small office in Louisiana. It had like four people." Genoteq's current LinkedIn page lists just two employees.

46.     The combination of Genoteq's small size with it being owned by Haley made Genoteq both: (a) ill-equipped to handle the high volume of claims that HyreCar would cycle through; and (b), well-suited for HyreCar and Haley to manage and suppress claim payouts based on budgetary or earnings considerations. Indeed, the conflicted relationship between HyreCar and Genoteq was so blurred that CW3, a

11

Sales Representative who worked at HyreCar between August 2019 and August 2021, remarked that "I'm pretty sure Genoteq was our company" because "we'd have Genoteq members in our meetings."

47.     After Genoteq was installed, the insurance claim payment delays worsened considerably, and Defendants gained more control over the timing of the payouts.

48.     CW1, an Account Manager at HyreCar from July 2019 through March 2020 stated, "we would basically tell people, when they uploaded vehicles, 'You're covered' – and [yet] we weren't paying any of it." And although some exceptions were made for a bigger HyreCar account, "nonetheless, we weren't paying. They just weren't being paid at all."

49.     These delays were made possible in part by HyreCar's use of self-insurance for a portion of its claims. HyreCar provides insurance policies through a combination of self-insurance and third-party insurance policies. According to CW9, such policies are referred to as "ISO" policies. CW9 explained:

> With ISO policies, your client – HyreCar – is funding its own claims. The regulations for the Department of Insurance – they don't really have regulations. [For example], For California, you have to pay within five days. But with ISO, there's nobody who's really regulating these policies for the Department of Insurance for any state. Which is kind of why, when I was at Genoteq, we would get a ton of Department of Insurance complaints, but they were never held responsible – because they didn't have a normal insurance policy.

**3.      HyreCar's Delays In Payment Were Based On Budgetary Considerations And Other Criteria Irrelevant To the Underlying Claims**

50.     According to CW5, a Customer Support Specialist[5] who worked at

---

[5] While CW5's title was that of a Customer Support Specialist, CW5 noted that during CW5's tenure at HyreCar, CW5 participated in a variety of functions including

HyreCar between August 2019 and November 2020, Genoteq would first decide whether "we're going to cover them [or not and if so,] we'll give them this amount." Then, after Genoteq would provide its initial feedback, HyreCar Head of Dealer Development, Jordan Neidig ran an initial pass at "whether the claim gets paid out."

51.     According to CW9 HyreCar Head of Dealer Development Neidig and Genoteq Manager Stacy Ashton "had a meeting every Friday to discuss claims and paying them…. I know they talked about everything under the moon. They were friends."

52.     The reason for Neidig, and indeed HyreCar's involvement in the claims administration process was "***was to delay processing claims as much as possible,***"[6] according to CW4, an Operational Risk Manager from July 2017 through September 2018. CW4 also stated:

> The CEO, Joe, would provide a claim budget to the COO, Elizabeth [Reynolds]– and then she would give it to me, because I was a manager in her department. And we would just have to ***pay claims out of the budget given by the CEO.*** And he knew very well it wouldn't be enough, and we were rolling claims over every month. We would have a spreadsheet of rollover claims each month.

53.     Similarly, CW10, the Manager of Genoteq between 2019 and the time of this filing stated "HyreCar reviewed every claim, and they had to approve them before they were paid." When asked who at HyreCar issued approvals, CW10 responded, "I don't know if they're still there but it would be the operations director or vice president – and accounting, most definitely. ***The CFO was involved***, I'm sure."

54.     CW7 likewise stated that after Genoteq's initial review that Brogi would "pretty much give us the green light in terms of paying claims . . . ***[which] was based***

---

working with the operations team, handling claims, and some customer service. Much of CW5's day was spent fielding calls from vehicle owners.

[6] Unless otherwise noted, all emphasis is added.

***on our budget – like if we could afford it that month***." When CW7 was asked how CW7 knew that Brogi set the budget, CW7 stated that CW7's manager, Anthony Rodriquez would bring it to Brogi's attention and that once HyreCar's limit "tapped out", "they wouldn't pay any claims."

55.   CW5 also stated that "[t]here were times when [managers] would say there were no funds for refunds or rebates. ***We were told to not disclose that***, you know, if people called asking about their refund or rebate." When CW5 was asked who told CW5 this, CW5 responded Anthony Rodriquez, who was the senior most manager on the operations team, and assistant director James Avery, who both remain at HyreCar.

56.   CW5 also stated:

> They would say, like, 'Hey, if people call about refunds or rebates, we're out of funds for that. Make sure you don't process anything'…. It would happen from time to time. Maybe we'd go for a couple weeks, then be ok, then they'd say, 'Hey, we're out of funds again; you know the drill.' It was on-and-off every now and then until I left the company.

57.   CW4 stated that "[c]laims issues were well known to operations. It was not a secret." According to CW4, the decision-makers over claims remain at the company included Senior Vice President of product, Megan Behrens, Vice President of Strategic Growth, Nil Yenice, Collection Agent Mindy Yanez, and COO Elizabeth Reynolds, who reported directly to Reynolds until 2018.

58.   CW1 also remarked on the discretionary nature of when HyreCar would pay claims. CW1 stated "HyreCar didn't want to pay – didn't have enough money to pay – and wanted to keep it in its account to gain interest or whatever." When asked how CW1 knew this, CW1 reported, "I sat right by the claims department. People would tell me on a daily basis, 'This person's money is here; we're just waiting to pay it.'"

59.    CW8, a Genoteq Associate who worked at Genoteq from March 2020 through June 2020, stated that "people would call in and complain and complain and complain and complain, because their claims weren't getting handled in a timely manner." CW8 estimated that roughly half of HyreCar's claims rolled over every month.

60.    CW9 explained that "HyreCar was responsible for funding claims – and they never did – and, when they did, they would pick and choose who to pay. So we had claims over seven or eight months old, because HyreCar chose not to pay them."

61.    CW9 added the following about the timing and details of the size of HyreCar's building backlog of unpaid claims:

> HyreCar was responsible for funding claims – and they never did – and, when they did, they would pick and choose who to pay. So we had claims over seven or eight months old, because *HyreCar chose not to pay them*. . . I remember, at one point, we had over $500,000 in claims to be paid out, over a span of seven or eight months. And they'd deposit maybe $100,000 and send ABI a spreadsheet of what checks to pay. I personally read that policy. In the policy, they were supposed to fund the account every two weeks. But it's just as much ABI and Genoteq's fault because they always let HyreCar work around it and do whatever it wanted. They were never trying to get HyreCar to pay – I guess because Dave was friends with Joe Furnari. I don't know why they allowed it.

62.    At the time of the March 1, 2021 transition to Sedgwick, CW9 estimated that Genoteq's runoff HyreCar claims totaled "anywhere from $700,000 to a million."

### 4.    To Minimize The Effect Of The Surging Claims, Defendants Closed Accounts

63.    According to CW9, who saw emails between Jordan Neidig of HyreCar and Stacy Ashton of Genoteq, HyreCar worked with Genoteq to mark outstanding claims as "closed" to minimize the appearance of outstanding claims.

64.    CW9 Stated: "Probably starting August 1, [2020, Genoteq] closed every single HyreCar file – and when [Genoteq] got whatever we were waiting for – like a

police report or a title sent in from an owner – we'd reopen the file, add the information and re-close it." When asked what the purpose of closing files in August was, CW9 responded "so that HyreCar could report that there were no runoff claims."

65.    CW9 continued, 'I think there were close to 100 or 125 files that were closed – which, in the claims world, that's a lot to sweep under the rug…. Because there were a few that were $25,000 a piece, there were probably 100,000 to $250,000 just in vehicle claims – not to mention death claims, where the family's going to sue."

66.    When asked who issued the instruction to close these claims, CW9 responded, "I believe it was Jordan [Neidig] - the claims manager – and the CEO and CFO of HyreCar. Like, this came all the way from the top."

67.    CW9 knew this because:

> When we were instructed to close all the files, we were asking why – because it was kind of a big deal. And [Genoteq Manager Stacy Ashton] said, '***Joe [Furnari] and Scott [Brogi] told them they wanted to close the files***, and they promised to pay all the claims in general. . . the whole time that I was there, they were always promising that they were going to pay the claim within two weeks. They said they would fund the account and it never happened.
>
> * * *
>
> Jordan [Neidig] was on the emails as well, but I think it was all of them – the CEO, the CFO, the COO – on those emails and phone calls. They were told directly. They knew the circumstances the whole time…. Stacy [Ashton] would show us and tell us in our meetings. She was an oversharer, if you will.

68.    When asked who at HyreCar decided by how much to fund the claims account, CW9 responded, "Scott – the CFO. He was the one in charge of all the money at HyreCar. He determined how much we got and when we got it – and he made a lot of empty promises, as well."

69.    When CW9 was asked if CW9 was sure this had come from Brogi, CW9 replied:

Jordan would ask how much was pending and would cc Scott. Stacy would say, "This is how much is pending." I guess he didn't want to put it in writing but Scott would tell Jordan, "We'll give this amount of money," and Jordan would reply, "Scott said we're going to give this amount of money," and attach a spreadsheet of what was to be paid.

70.     CW9 knew this because CW9 was Genoteq Manager Stacy Ashton's assistant for a short period. CW9 explained, "I would be in [Stacy Ashton's] office and, like anybody in somebody's office, I would see emails on the screen. I knew, because of me seeing it and her telling us – you could say either way, because that's what it was."

### 5.     HyreCar's Delay In Payments Created A Surging Backlog Of Claims, and Thus A Looming True Up Event

71.     One result of Defendants' delay in paying claims was that it snowballed: growing bigger as the backlog of claims received even more new claims – like compounded interest, in reverse.

72.     CW2, a Genoteq representative from early 2019 through October 2020 who communicated with Jordan Neidig and Megan Behrens at HyreCar stated that "we would continue getting complaints about claims not being paid" and estimated that Genoteq rolled over "nothing less than 300 claims per month."

73.     Similarly, CW11, a Genoteq adjuster assistant from September 2020 through May 2021, stated that HyreCar "would take forever to make payments. We'd have a million dollars sitting in claims, needing to be paid, and they hadn't been paid in months." CW11 further stated that "what Ms. Stacy Ashton explained to us – because we'd have millions of calls like, 'Where's my money,' and we were like, 'It's not us, its HyreCar - because each state had a limit of time to pay out. Genoteq and HyreCar never met that limit – unless you got lucky. It would take months - and we had owners like, 'Where's my money at?' And we were like, 'We genuinely don't know.'"

74.     CW6 a HyreCar employee who held various roles[7] over the course of CW6's tenure from August 2019 through August 2021, stated that when CW6 began to cover HyreCar vehicle owners in 2020, CW6's accounts would tell CW6 that the vehicle "owners were supposed to be paid out in mid-2019" but still had not been.

75.     CW9 stated that the largest backlog of claims that CW9 observed at HyreCar "was probably $1.2 to 1.3 million."

76.     CW9 reported that HyreCar had an average of $500,000 in claims per month. However, CW9 continued, "If you go months without paying, that's how you get to the $1.3 million that you owe." CW9 stated:

> From October 2020 to March 2021, we were getting flooded with claims. It was outrageous. I think there were 5 or so adjusters working on HyreCar's claims, and at any point they would have anywhere from 250 to 400 claims each. Every day, I would set up about 20 claims, and I was one of five claims assistants. We would work weekends and stay late, just to set up claims.

77.     CW11 estimated the unpaid backlog in March 2021 "in the millions." CW11 stated "One day it was like $2 million that needed to be paid out. Ms. Stacy would hound them and [HyreCar] would j*ust pay it when they felt like it, and not pay the full thing*."

78.     The surging claims at Genoteq, (a tiny company), led to multiple CWs who worked there to receive death threats from angry consumers over the delay. For instance, CW9 stated that the staff was subject to "death threats every day; people cursing us out." CW9 noted that these calls were recorded and shared with HyreCar but that "HyreCar didn't care."

79.     Multiple CWs also expressed concern over the legality over numerous facets of Genoteq and HyreCar's operations. For instance, related to the conflicted relationship between HyreCar and Genoteq, CW1 stated  that managers all knew that

---

[7] Including Junior Accounting Manager; Utilization Specialist; and Sales Executive.

such an arrangement was either "illegal – or maybe it wasn't illegal, but we knew it was unethical."

80.   CW8 also noted that Genoteq had "a lot of illegal stuff going on there" such as Genoteq employees who were not licensed in New York processing claims in New York.

81.   CW11 similarly stated that "from September to December 2021, nobody in the office had an adjuster's license. It all went under Stacy Ashton's name."

82.   The unethical practices above played a part of Defendants' scheme, which was, at bottom, an attempt to suppress insurance claim payouts; and deny or delay valid claims as long as possible so that the Company could report lower costs (specifically insurance reserves, and insurance costs) and thus higher profit margins, which, in turn, helped boost the Company's stock price.

### 6.   Reams Of Consumer Complaints To The Better Business Bureau Corroborate The CWs' Depiction Of Genoteq And HyreCar

83.   Dozens upon dozens of consumer complaints and reviews submitted to the Better Business Bureau ("BBB") corroborate the CWs' accounts above and similarly describe Genoteq's inability or unwillingness to properly process claims as well as the resulting obfuscation on HyreCar's part that Genoteq enabled.

84.   For instance, in a September 2, 2020 complaint on the BBB website, a HyreCar vehicle owner noted weeks of being ignored by HyreCar:

> Hello, I rented out my car through Hyrecar and Driver ( Renter) abandoned my car at random place, so I had to drive a hour to recover the vehicle and of course car was full of trash and the key was missing. But I wasn't worried much since I have an Insurance with Hyrecar. But **when I submit my claims, Hyrecar completely ignoring my claims**, never answers back to emails, when I call their automatic robot keep saying "representatives will call you back" which never happened. It's been over 2 weeks without any response from Hyrecar. **I feel like this company scammed me by forced to buy insurance policy that doesn't even exists**.

85.   In a response to the above that came almost a month-and-a-half later on October 15, 2020, HyreCar essentially admitted that it could not handle the volume of complaints about its insurance practices: "[w]e apologize for the delay in processing of this claim. We have experienced a large influx of open requests in the recent months and are currently working to expedite these services. Payment has been made at this time and the customer should receive the amount within 3-5 business days."

86.   An August 26, 2020 BBB complaint echoes that above:

> I rented out my car via their platform and chose the premium coverage that covers things like smoking, gas, tolls etc but have failed to honor that. . . I had my first rental and so far, it's going to be last because . . . HyreCar has not lived up to their promise. . . . I have yet to receive any penny from HyreCar regards the extra costs. Only thing I received was the daily rental. At this point it has cost me more to rent the car out than I have made. ***It's been almost two months*** when I submitted my claim . . .ever since then I have been following up and getting some bogus excuses why my claim has not been handled . . . And mind you, I paid for the premium plan that is suppose[d] to cover all that. Last I heard from them was July 16, 2020 after I had tried to reach them in multiple times. I called and called and called, all the numbers I had and texted them, like they have texted me and no answers. So I called from blocked number, guess what, they responded immediately. ***And that's the last time I heard from them, telling me that they can't give me a timeline***. That is not professional at all. I have lost my job and now I'm not even getting the costs that occurred during HyreCar platform rental, ***basically they are keeping my money interest free***. Huge corporation sledding on poor people backs.

87.   The above customer followed his August 26, 2020 complaint with another complaint on September 10, 2020 saying, "I have not heard from HyreCar to resolve this claim either." Finally, on October 1, 2020***, 96 days after the above customer first contacted HyreCar about a denied claim,*** HyreCar responded and

approved the payout and blaming the pandemic (when fewer people were driving) for the delay:

> At this time the reimbursement request has been approved for the Covered Items, and submitted to the financial department for issuance and should be available to you by Oct 6. We apologize for the delay in processing your request, and we appreciate your patience as we work to resolve the growing number of requests we received due to the pandemic.

88. HyreCar's claims denial was persistent and continued during the Class Period as evidenced by the following BBB complaint filed on March 9, 2021:

> I am a car owner with a dozen cars and purchased a new 2018 Sonata to rent on the HyreCar platform. The car was totaled in Feb of 2019, and HyreCar has yet to settle the claim. They presently owe me $[redacted] on this claim and I've spoken to 20 different people about this and nobody takes responsibility to resolve the issue. . . .***The Loss occurred in February of 2019, and the car was deemed a total loss***. . . so HyreCar should have paid me [] but never did. It is my understanding that [redacted] never sent the payout request, so HyreCar never paid it.

89. After HyreCar responded 10 days later that the above claim had been "escalated to the finance department", the consumer further responded on April 7, 2021 that "***Its been in manager review for over 2 years now. I'm still waiting for the check.***"

90. Additional customer complaints about not receiving timely claim payouts (or not getting payouts altogether) include:

- Anton B, who on March 3, 2020, reported to the BBB that HyreCar "just dropped my claim, so I haven't even the damage repair fixed. My overall loss is more than 5,000k, plus the car I cant sell now!" Anton B warned other consumers that "They are scammers."

- Ted M, who on January 22, 2020 reported to the BB that "My car was rented through Hyrecar. it got into an accident on July 2019. The car was

totaled and as of today January 2020, I haven't received any-payment. Despite the fact that the car had insurance, they are ignoring me and they don't even return my phone calls or my emails. I lost my car by renting it through Hyrecar. ***This company is a fraud and it shouldn't be in business***."

- Kevin G, who on July 27, 2019 stated: "It's one thing to be a victim of a bad renter; it's another thing to be victimized again. Only this time it's by Hyrecar. . . Even if an event is covered, you may not even get a response from them, much less see a resolve. . . An investigation into the company needs to be done. ***They are obviously stealing from owners by denying claims*** or creating a policy in which a claim (cleaning policy, for example) isn't worth the trouble. Hyrecar, you are charging for a protection plan you have no intention of paying out!"

- Benjamin P, who on July 15, 2019 complained that "I have called HyreCar multiple times to try and get my claim resolved. It is impossible to get through. My car is still in the shop after a month and I cannot get in contact with HyreCar. Doesn't get any worse than this. HyreCar should be shut down."

- Matt K, who on March 8, 2019 stated that "I have called them for over 3 weeks trying to get a receipt to submit to my insurance company for the rental amount and t***hey can't produce a normal receipt*** with the price broke down."

91.    The smattering of complaints above represent a small fraction of the total complaints about HyreCar's failure to make claim payments that appear on the BBB website. Between December 12, 2018 and October 29, 2021, the BBB shows 203 total complaints about HyreCar, roughly 87% of which generally deal with nonreceipt of funds, delayed funds, or other issues with reimbursement from HyreCar for an expense the claimant feels is owed.

92.     CW1 recounted that "I remember [in the summer of 2019] we went from an F to a D on our BBB rating, and we had a party…. We were celebrating failure, essentially." In other words, the inference from the CWs statements suggests that the BBB review excerpts above – which were themselves just a sampling of HyreCar's 287 BBB reviews – represent just a fraction of the overall claims which HyreCar denied because not every consumer whose claim is denied elects to file a BBB complaint.

### 7.     HyreCar Also Withheld Payments Owed To Owners Who Had Renters Incur Tolls Or Tickets

93.     On top of denying or delaying insurance claim payments to vehicle owners for damaged vehicles, HyreCar also refused to refund owners whose renters incurred various tolls or tickets, contrary to HyreCar's stated policy as explained by the below consumer who posted to the BBB's website on September 15, 2020:

> ***Deceptive and Unethical Business Practices*** Hyrecar's policy as outlined in the "protection plans" clearly states that they will reimburse owners for any toll and traffic violations to 100% of the cost incurred. On the basis of this policy, I paid for the toll charges out of pocket ***and was reassured that I would be reimbursed***. ***Over the last 12 months, I've spent over 100 hours of my time in pursuing Hyrecar to issue reimbursements***. Had I known that this company engaged in such unethical business practices ***as falsifying information***, creating illegal policies that intentionally harm consumers, I would not have pursued a business relationship with this company. I have paid over ******* dollars in charges which the company has kept. This is against their own policies and against the service terms and conditions. The company's actions have caused the significant monetary loss. I have attempted to resolve this matter by contacting Hyrecar multiple times per week since April 2019 on date requesting them to comply with the policy and provide the desired resolution (refund/money credited to my account for paid tolls). The response I received was no response/lack of response. ***Furthermore, the company is actively engaging in deceptive trade practices by misleading customers into fraudulent accounts***. . .

94.     HyreCar's purposeful denial of toll fees was, like its insurance claim denials, an ongoing issue. For example, a BBB complaint filed on January 20, 2021 states:

> *I am waiting for 3 months already for the reimbursement of the toll fee*. They keep on saying that it is on process but until now, no update. A user booked my car on Hyrecar for 98 days, the car was registered on TxTag for autopay for convenience since I'm also using this car from time to time. . . I reach out to Hyrecar to help me in reaching out to this user so the remaining balance will be settled but they are uncooperative . . .I escalated this problem to Hyrecar and they assigned an account manager to handle the case but it turns out that doesn't help at all. I started reaching to them on October 17 but until now all they can say *is that they already forwarded my case to the finance department* and wait for an email confirmation that the payment has been added to my account.

95.     The next day, HyreCar issued a response to the complaint above, where HyreCar apologized and reimbursed the above complainant.

### 8.   On Top of Suppressing Insurance Payouts HyreCar Also Recklessly Permitted High Risk Drivers To Rent Vehicles To Show Near-Term Revenue Growth

96.     Together with the above scheme, HyreCar, at Furnari's direction, also knowingly permitted drivers who would otherwise be unqualified to rent from HyreCar in order to boost revenue. For instance, CW4 stated that Mike Funari would unlock accounts of drivers who had gotten into accidents, "*just to hit rental numbers*." CW4 and Furnari "would get into spats about it." When asked if this activity had caused more insurance claims, CW4 responded: "Absolutely. They had one or two claims for accidents in other cars and then they put them in another car. It was all about active rentals."

97.     CW4 further stated that CW4 had brought this concern up with CEO Furnari in weekly meetings and in his office but that CW4 was told "sales were more

important than anything." CW4 remarked, "Employees called it the 'Furnari slide.' You know it happens quite often, when employees give it a name."

98.   CW1 likewise noted the understood importance of getting new cars onto the platform. CW1 was told to even promise owners of damaged vehicles that their outstanding claims would be more likely to be processed if they uploaded more vehicles onto HyreCar's platform to rent out. "***We were told to BS on the phone to get what we wanted out of the conversation: more cars uploaded onto the platform***. We ***were making false promises***, saying, 'Hey, your claim will be taken care of; the money should hit your account any day' – just ***making false promises to get what we wanted***." CW1 continued, "We would have meetings regarding payouts, which basically went like this: 'If they're willing to upload more cars, we'll give them a piece of the money they're owed."

99.   Reviews and complaints on the BBB as well as CW accounts further establish that HyreCar was either reckless in conducting driver background checks, or knowingly permitting drivers with criminal backgrounds to rent cars to boost HyreCar revenue. For example, CW5 stated, "I've been questioning how they were bringing in drivers. They said they conducted backgrounds before having renters, but I saw times where drivers were arrested during an active rental. There were cases where somebody would rent in one state, drive to another and abandon the car – and HyreCar wouldn't pay for that."

100.   CW7 stated that HyreCar had "an alarming number of calls from owners with cars being damaged and stolen." As to the background check, CW7 stated that "the background check part wasn't super clear."

101.   CW9 Stated this was a matter of course for HyreCar:

> Oh, they did it all the time. We had renters with five or six accidents. We could see how many times the driver had been in an accident. ***We'd see where the renter has stolen multiple vehicles and sold parts and they're let back in the system***. It was the same with total loss vehicles. Also, renters were supposed to

pay for background checks *and they stopped it. They blamed it on COVID, but they never started it again*. People with multiple felonies, including stolen vehicles, were let on the platform – and they'd turn around and do the same thing. There were so many theft claims, and a lot of times it was the renter stealing the vehicle.

102.    CW10, who managed Genoteq from May 2019 through the time of this filing, stated "Oh yeah. I would see names come across and I'd be like, 'He did it again? He had another one?' And I'd send an email over, like, 'Pull this guy! He's not allowed to drive!'"

103.    CW10 would send this email to HyreCar's claims department.

104.    A BBB review submitted by Kwame S on June 17, 2021, stated, "I rented my car through them and *the driver had a criminal driving record.* I found this out when the car was impounded by the police."

105.    A September 28, 2019, BBB review by George P similarly stated "[t]hey fail to conduct a proper background test, as a result [of] numerous vehicles of ours [that] ended up in the police stations as evidence or simply because *renters were wanted by officials prior to renting them out*."

106.    A third BBB review from March 26, 2021 stated: "[a]nother time a renter did not return my car on time we called them [but there was] no answer[.] Hyrecar told me call the police [and] I located my car through the GPS that I have installed called the police I got it towed to my house, the officers run the driver information and told me *she had a lot of arrest[s] not too long ago!* I find that funny because they [HyreCar] told me they do a background check before they let anyone to use their apps!"

107.    A fourth HyreCar owner had his car "destroyed" after renting it on HyreCar and later did his own background check only to find out that "one of the people who destroyed my car . . . *was a convicted felon with a rap sheet*" who was

AMENDED COMPLAINT

1    married to "a convicted child molester", according to a March 5, 2019 review on the

2    BBB by Kristian L.

3        108.   Apart from the obvious impact HyreCar's claim processing delays had

4    on consumers, it also distorted HyreCar's reported financials in myriad ways. For

5    instance, by delaying payouts and denying valid claims, HyreCar initially reported

6    lower costs than would have (and should have) been the case had it not withheld valid

7    claims owed to its users. That lower expense early on, in turn, led investors to believe

8    that HyreCar was company with higher profit margins than it really had – and more

9    specifically, higher gross profits (which is calculated as sales minus cost of sales).

10       109.   Moreover, by permitting otherwise unqualified drivers onto the platform,

11   HyreCar initially showed a bump in revenue, that was both: (a) artificial – because

12   many drivers never should have qualified had they not been "unlocked" by

13   Defendants; and (b) likely to lead to future insurance claims in later periods because

14   persons convicted of felonies are more likely to steal cars than those that have not

15   been. In other words, the insurance expense true-up that would and eventually did

16   result stemmed from Defendants' reckless reliance on a conflicted party to process its

17   claims and perform purported "third-party" adjusting services.

18       110.   This looming insurance cost true-up was nevertheless concealed by

19   Defendants for much of the Class Period. Defendants' ability to continue their

20   scheme, however, began to hit resistance in May 2021, when the Company announced

21   that it "completed its integration" with Sedgwick, a claim processing partner that

22   replaced Genoteq.

23       111.   According to CW9, after the transfer to Sedgwick, Jordan Neidig,

24   "talked a lot to [Genoteq Manager Stacy] Ashton….Every conversation with

25   executives of HyreCar, [Stacy Ashton] would tell us [employees of Genoteq]

26   everything they said, or show us the email." CW9 explained that Stacy Ashton would

27   always ask how it was going with Sedgwick and Neidig would always say, "Oh, it's

28   not that great. We don't really like them'" CW9 further stated that Neidig told Ashton

(who then told CW9) that Neidig stated "claims still weren't getting funded . . . He'd say to Stacy, 'I know, I'm trying, it sucks.'"

112.  CW9 stated that after the May 2021 transition from Genoteq to Sedgwick that "We were in contact with Sedgwick quite often, because of confusion about who the adjuster was during the transition – and we got a lot of info from them too. They'd say, 'Oh, they're not really paying these claims.'"

113.  Roughly a month later, on June 15, 2020, HyreCar engaged AON to replace ABI as its insurance broker. AON also served as HyreCar's risk partner.

114.  Less than two weeks after ABI was dismissed, Brogi resigned as CFO.

**C.  During the Class Period HyreCar Also Made False And Misleading Statements About Its Insurance, Gross Margins, Scalability And Risk Pricing**

115.  While May and June 2020 began to mark the beginning of the end of Defendants' ability to continue their claim suppression, they still sought to conceal the effects on HyreCar's financials through various false and/or misleading statements.

116.  For example, Defendants broadly misrepresented three aspects of HyreCar's business—all of which were impacted in one way or another by their contemporaneous scheme. These three areas include: (1) HyreCar's insurance expenses, including (a) how insurance reserves were estimated, (b) the nature of the relationship between HyreCar and Genoteq, and (c) how Defendants' reckless reliance on a nondisclosed conflicted party to estimate reserves impacted the reliability of such reserves; (2) the general risk of the drivers present on HyreCar's platform and how that concealed risk would impact future insurance claims and thus expenses on the Company's income statement; and (3) HyreCar's gross profits, and thus its ability to scale through operating leverage (which it did not have).

1

2

### 1.   Rather Than Admitting Insurance Was An Escalating Liability, Defendants Continued To Conceal This Risk And Instead Touted Insurance As A Strength

3   117.   Throughout the Class Period, Defendants misrepresented the nature of

4   HyreCar's relationship with ABI and Genoteq, including by touting its relationship

5   with ABI as "a strength" and by misrepresenting that HyreCar relied on a "third-

6   party" for information to estimate its insurance reserves when Genoteq was not a

7   third-party but a conflicted party.

8   118.   For instance, in the Company's February 4, 2021 prospectus–which

9   incorporated the Company's Annual Report filed on form 10-K with the SEC for the

10   year ended December 31, 2019 ("the 2019 10-K) by refence–stated within its "Our

11   strengths" section that, "ABI is a top broker in the United States for the Taxi and

12   Livery business" and "Mr. David Haley, president of ABI, sits on our strategic

13   advisory board", while omitting that Haley also owned Genoteq and that HyreCar was

14   recklessly relying on Genoteq to both process its claims and provide data that HyreCar

15   used to estimate its insurance reserves. The 2019 10-K also described HyreCar's

16   insurance platform as "enable[ing] us to **keep insurance costs and liability low** by

17   leveraging state mandated insurance policies provided by the TNCs."

18   119.   A few months later, on March 31, 2021, the Company announced its

19   financial results for the fourth quarter and full year ending December 31, 2020 and

20   also held an earnings call to discuss its results. During the Q4 2020 earnings call, CEO

21   Furnari was asked if the claims issue was "onetime in nature" or if it would recur.

22   And in response, CEO Furnari suggested that insurance costs should decline going

23   forward as claims has been brought "completely current."

24

25   MARK ARGENTO: I just wanted to dig in a little bit on

26   the gross profit. I know, Scott, you mentioned you anticipate getting back to that 45% to 50% level. Is that something that you

27   think happens relatively imminently or what's kind of the ramp to that level?

28

AMENDED COMPLAINT

1    ROBERT SCOTT BROGI: Yes. I think we'll grow into
2    that over the next couple of quarters. I think it's going to be
3    dependent on 2 primary things. *We talked a little bit about the*
*velocity of claims payments in late 2020*. And again, with car
4    supply tight, a lot of that was to get cars back on the platform as
5    quickly as possible, right? So that we can continue to drive those
rental days. So you've got that piece happening. And then I think
6    there's been a lot going on around some of the new other revenue
7    sources that we have, and that's both subscription revenue as well
as referral income. I know we just recently announced the new
8    TrueCar relationship. *So we think the combination of returning*
9    *to more normal levels on the claims side,* *having brought that*
*now kind of completely current* as well as starting to have some
10   of those other revenue sources kicking in, you've got kind of 2
11   levers there to really start to drive GP on a going-forward basis.
So I think we've got a good chance of getting there over the next
12   couple of quarters.

13   MARK ARGENTO: Do you see that the claims issue, is
14   that kind of more onetime in nature or is that something that
you're going to see kind of pop up from time to time? Or is that
15   something you can kind of make more of a spread over the
16   quarters on a more normalized basis?

17   JOSEPH FURNARI: Yes. I mean, it's a really good
18   question, Mark. I think what we've been seeing is we put a lot of
effort into the front end of the process here in 2021. So I *don't*
19   *think we've formally announced it, but we did have a selection*
20   *process for a new third-party administrator*. So that we could
bring both the PD claims and the liability claims together, *so that*
21   *you're having a really efficient determination of responsibility*.
22   And then again, dealing with those claims quickly, so that you
can get those cars back on the platform. I know Brian Allen has
23   been nudging us both repeatedly over the last couple of weeks as
24   he gets text from car suppliers around the country who are really
excited about that new TPA process that we've put in place. So I
25   think there was a little bit of catch-up that we needed to do to
26   really shrink that turnaround cycle, *and we've done that*
*dramatically*. *And then now on the going-forward basis, with*
27   *the improvements in the TPA, I think we're going to see an*
28   *actual reduction in some of those expenses going forward.*

AMENDED COMPLAINT

1

2   120.   Of course, as would later be revealed but was unknown at the time,

3   claims were not brought current but were still being suppressed at the time of CFO

4   Brogi's above statement. The non-current nature of the growing unpaid claims also

5   created a material risk of a looming expense true-up that would ultimately decimate

6   HyreCar's stock.

7   121.   Elsewhere in the Q4 2020 earnings call, Defendants sought to lay blame

8   for growing insurance expenses on exogenous factors, which, according to Brogi was

9   "***primarily due to some seasonal shifts in insurance costs*** to support higher levels of

10   car supply through the winter quarter."

11   122.   This statement too was false and misleading. The growth in insurance

12   costs was really the result of: (a) a swelling backlog of claims that had swelled from

13   prior quarters due to Defendants' reckless reliance on conflicted-party Genoteq to

14   process claims and this growing backlog was spilling over to Q4 2020; (b) the natural

15   correlations between insurance costs and high risk drivers; and (c) the foreseeable

16   result of recklessly permitting high-risk drivers, including those with criminal records

17   onto HyreCar's platform.

18   123.   The next day, the Company issued its annual report for the period ending

19   December 31, 2020 ("the 2020 10-K"). In the 2020 10-K, the Company stated with

20   respect to its critical accounting policies that "The lag time in reported claims is

21   minimal and as such ***represents a low risk of unreported claims being excluded from***

22   ***the loss reserve assessment***." It also stated that in estimating its reserves, it "makes

23   certain assumptions based on both currently available information to estimate the

24   insurance reserves as well ***as third party claims adjuster data*** provided on existing

25   claims."

26   124.   Both of the above statements were patently false and misleading. The

27   purported "third party claims adjuster" was not a third party, but the exact opposite:

28

31

it was a conflicted party controlled by Dave Haley, who the Company had a JV with, and appears to have been formed for the purpose of suppressing claims.

125.   In portraying HyreCar as "a third party claims adjuster", Defendants conveyed to investors that HyreCar's insurance reserve estimates carried a marker of reliability, when that was not the case. It is material to investors whether it is a truly independent third-party or a conflicted party who is purportedly providing data that informs how the Company estimates its insurance liability.

126.   A few months later, Defendants again made misleading characterizations of the Company's insurance expense. For instance, on May 13, 2021, HyreCar issued a press release which stated that the Company had achieved "Record First Quarter 2021 Financial Results" for the quarter ended March 31, 2021 ("Q1 2021"). The Q1 2021 release stated that HyreCar's insurance deposits had more than doubled during the quarter to $1.7 million, while the amount of the Company's insurance reserve (which indicates the amount of claims incurred but not yet paid) **had declined more than 17%** since year end to $1.7 million.

127.   Also at that time, HyreCar held an earnings call, led by CEO Furnari and CFO Brogi, with analysts and investors to discuss the Company's Q1 2021 results. During the Q1 2021 earnings call, Brogi stated:

> Cost of sales increased for the quarter ended March 31, 2021 to $4.7 million from $3.6 million the prior year as insurance expenses continue to account for the majority of cost of goods sold **primarily due to some seasonal shifts in insurance costs to support higher levels of car supply through the winter quarter**. Accordingly, gross profit for the three months ended March 31, 2021 was $2.7 million increasing 26% from $2.1 million in the year-ago period ended March 31, 2020. This is an improvement from last year's gross profit margin of 33% for the 12 months ending December 31, 2020 and flat sequentially from 37% in the first quarter of 2020. Due to the second quarter pricing changes, **we expect our progress toward the gross profit margin near-term goal of 45% to 50% we have discussed previously to accelerate**.

128.   A portion of the statements above are identical to what CFO Brogi said the prior quarter when he *again* blamed the growing insurance costs from claims that had been suppressed from prior periods on "some seasonal shifts in insurance costs to support higher levels of car supply through the winter quarter."

129.   Defendants' false and misleading statements about HyreCar's insurance liability would continue, including during a June 2021 Investor Presentation where Defendants described the Company's "unique insurance program" as being a "Key Company Metric." The same presentation promised that "Improvements in insurance program with new partners AON and Apollo reduces costs moving forward" and that the Company "Expect[s] GPM [i.e. Gross Profit Margin, or Sales minus cost of sales] [of] 44-50% in the near-term with new efficiencies in insurance programs. . ."

**2.      Defendants Also Misrepresented The Level Of Risk Carried by Drivers On The Company's Platform**

130.   As alleged above and corroborated by both customer complaints and multiple CW statements, HyreCar was recklessly permitting high risk drivers on its platform just to show higher sales growth. And with knowledge of the same, the Individual Defendants also made false and/or misleading statements throughout the Class Period about the risk that the Company's driver selection criteria had on insurance claims and thus HyreCar's earnings.

131.   For instance, during the Q4 2020 earnings call, CFO Brogi claimed that the Company was "doing a better job at bringing in *customers that are going to be good drivers.*"

> And then from a kind of a risk underwriting perspective, I think we're doing a better job at bringing in customers that are going to be good drivers *and aren't going to drive up expensive physical damage bills, et cetera*. And so those 2 -- and that number of 29% growth really points to the fact that of all the hard work is really exemplary of all the hard work that the marketing and technology and product and operations teams are doing there. So that's why we highlight that number.

132.   During the Q1 2021 earnings call, Defendants also touted its purported "***Sourcing [of] a vetted supply of drivers*** in local environments [which] is a key factor in our sustained growth"

133.   On the same call, Defendants discussed "price enhancements" which Defendants assured investors would better reflect insurance risk data and were positively impacting the Company's revenue from operations. For example, Defendants were asked about the Company's recent announcement that it had adjusted insurance pricing based on risk scores. In response, Brogi stated "Yes. Hey Casey, it's Scott. I think that's probably a good basic way to think about it. We're -- the part that we're -- ***that has some additional upside to it is kind of the risk adjustment piece***, right. There's a driver fee component and a risk or insurance component and it's dependent on the mix of drivers within some different risk pools."

134.   In explaining the risk pricing further, CFO Brogi continued:

> I mean it's definitely being a little bit more selective, right, because certainly there's a car supply issue. . .And so CIO part of it's reflecting that and then part of it's just better data on the risk side so ***that is part of our driver vetting process, which is a lot of the value that car suppliers or the car owners see in HyreCar*** that we're providing them better information and better drivers. So yes, I think it is those things coming together as you said.

135.   Later in the Q1 2021 call, Brogi stated:

> After holding steady on pricing for several years, we tested and then enacted some price enhancements early in the second quarter to both our driver and insurance fees to better reflect the new competitive environment and ***align reimbursement rates with new driver risk scoring data. The combination of these 2 pricing elements should drive significant net revenue and gross margin improvements through 2021***. And increase our daily average net revenue from the $24 to $25 a day we've seen historically to the $27 to $28 a day range. Cost of sales increased for the quarter ended March 31, 2021, to $4.7 million from $3.6 million the prior year as insurance expenses continue to account

for the majority of cost of goods sold primarily due to some seasonal shifts in insurance costs to support higher levels of car supply through the winter quarter.

Accordingly, gross profit for the 3 months ended March 31, 2021, was $2.7 million, increasing 26% from $2.1 million in the year ago period ended March 31, 2020. This is an improvement from last year's gross profit margin of 33% for the 12 months ending December 31, 2020, and flat sequentially from 37% in the first quarter of 2020. ***Due to the second quarter pricing changes, we expect our progress toward the gross margin near-term goal of 45% to 50% we have discussed previously to accelerate***.

### 3. Defendants Also Misrepresented HyreCar's Operating Leverage, And Its Ability To Scale and Reach Breakeven

136. Defendants' scheme distorted HyreCar's ability to reach economies of scale as it grew (also referred to as "scalability"), in large part by understating and indeed suppressing, the true cost of insurance in HyreCar's platform which was aided by Defendants' reckless reliance on conflicted-party Genoteq to process claims. Put differently, the suppressed insurance costs that reflected Genoteq and HyreCar's denial and delay in paying claims initially made HyreCar appear to have more operating leverage[8] than was really the case.

137. Investors ascribe great value on business models with operating leverage because such businesses' profits grow at a faster rate than do businesses that lack such operating leverage. Investors also consider operating leverage a material and important metric because it demonstrates the ability of a company to grow earnings at an increasing rate as sales accelerate and fixed costs remain relatively stable.

---

[8] Operating leverage is a financial term of art that measures the degree to which a firm or project can increase operating income by increasing revenue. A business that generates sales with a high gross margin and low variable costs has high operating leverage.

138.   HyreCar touted its operating leverage and scalability, which it did not have. But HyreCar led investors to believe that it did – as long as it placed more new cars on its platform. More specifically, HyreCar represented to investors that its breakeven point was roughly 4,500 cars based on its reported gross profits (which investors did not know had been distorted due to Defendants' concealed claim suppression scheme enabled by HyreCar's reckless reliance on Genoteq).

139.   But HyreCar's insurance costs foreclosed it from having operating leverage. And this would have been apparent to investors but for Defendants' scheme to: (a) suppress insurance costs; and (b) permit reckless drivers that would ultimately lead to higher claims. In reality, HyreCar's insurance costs increased proportionately to its new drivers added: meaning it had much lower operating leverage, or scalability than investors understood.

140.   HyreCar cannot grow revenues without the accompanying expense that comes with insuring high-risk drivers on its platform.[9]

141.   Even so, HyreCar frequently touted its scalability and operating leverage. For instance, on the Q4 2020 earnings call, CFO Brogi stated: "[g]ross profit margin was 33% for the 12 months ending December 31, 2020, down from 38% in the year ago period ending December 31, 2019, as we accelerated insurance claims to shrink processing time and get more cars on the platform sooner" and "*[w]e anticipate increasing operating leverage into 2021 as we significantly increase revenue*."

142.   Later on the same call, Brogi was asked about operating expenses, and he responded by saying "[w]e've had some investments on the technology side as well to further automate the platform so that were in a position to be able to scale faster here in 2021. So I think that's more the range that we think we're looking at. And

_____

[9] If the vehicles were uninsured, the business could not operate – as either a matter of law (because motorists cannot drive without insurance) or as a matter of general business risk management (because the liability risk of allowing cars to be rented on one's platform without insurance would be a nonstarter for investors).

then if you kind of extend that logic and look at a breakeven point from there. You're still going to be in that range where 4,500 cars should get us to breakeven as we've talked about in the past."

143.   Then, in the Q1 2021 earnings call, Defendants were asked "[o]bviously you're going to have some massive operating leverage as you breakeven through 5,000 cars so you're going to have some scale there and some profitability. I mean so -- and when I look at the market cap, you're trading at $180 million right now. So you're trading -- for a company that's going to grow revenues 400% and breaking through profitability, you're trading at 1.0 times revenue. Is that-- am I doing the math right?"

144.   In response, CEO Furnari said "Yes, I think so" and CFO Brogi said "that's about right."

145.   Similarly, a June 2021 Investor Presentation noted the Company's "Growing Scalable Domestic Business Model" as a *Key Company Metric*. Under the Growing Scalable Business Model statement, the Company further referred to its "unique insurance program" as one of the three prongs supportive of its purported scalable business model. The same presentation again referred to its purported "Growing Scalable Platform" as one of its key financial highlights.

### D.     The Truth Begins To Emerge

146.   On August 10, 2021, after the market had closed, HyreCar issued a press release announcing deeply disappointing results for the quarterly period ended June 30, 2021 ("Q2 2021"), including net losses of $9.3 million compared to losses of $3.8 million in the same period the prior year. Furthermore, the Company's adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") loss for Q2 2021 was $7.1 million (four times higher than the $1.7 million adjusted EBITDA loss experienced in the second quarter of 2020) and its gross profit for Q2 2021 was just $0.8 million (less than one third the Company's gross profit in the second quarter of 2020), with a gross profit margin of just 24%.

147.   Along with the release, HyreCar filed with the SEC a Form 10-Q that disclosed that the Company had incurred skyrocketing costs of revenue during the quarter mainly due to significantly higher insurance claims incidence – including claims before March 31, 2021 "in excess of the reserves." The Form 10-Q stated as follows:

> Cost of revenue totaled $8.3 million for the three months ended June 30, 2021, an increase of $5.2 million or 170.6% from $3.1 million recognized during the three months ended June 30, 2020. About $2.4 million are due to the attributable increase in insurance premiums and claims from expanded rental day volume, and normalization for the quarter ended June 30, 2020 volatility. ***The remainder of the cost increase was primarily driven up by additional insurance claims of $2.8 million of which approximately $1.2 million was attributed to one-off new developments on claims and incidental payments incurred prior to March 31, 2021 in excess of the reserves and accruals***. Some of those one-offs resulted from settling claims incurred prior to March 1, 2021 under our previous insurance claims processing partner. Another $0.2 million of one-off expenses were related to technical transitional difficulties to the new claims processing partners platform which have been resolved.

148.   The above corrective disclosure effectively served as a true-up for prior periods insurance reserves and expenses that had been purposefully under-reserved or suppressed through Defendants' scheme to delay payouts to valid claimants.

149.   Also at that time, HyreCar held an earnings call, led by CEO Furnari and CFO Brogi, with analysts and investors to discuss the Company's Q2 2021 results. During the earnings call, in prepared remarks, Defendants noted:

> Now on to the cost side. Cost of revenue increased in Q2 to $8.3 million from $3.1 million year-over-year, with insurance was premium and claims, accounting for the vast majority of the cost. While the insurance premium increased relatively proportionally to the increase in rental days, ***claims expenses have exceeded that***, mostly because we centralized our claim portfolio with ***a new single processing partner*** with the goal to improve customer experience. We settle lot of claims, migrated platforms,

and performed a deep dive into insurance reserves to date. We add $1.4 million in one-time expenses related to transition **and to claims development incurred from prior** periods. At the same time, **we observed a sharp decrease in customer complaints related to the claims process.** We are assessing the ROI of various portion of the process and aim to find the right balance between customer retention and direct costs.

150.   The above statements revealed that: (1) insurance costs had been understated in prior periods and the inference is that the prior processor (*i.e.*, Genoteq) contributed to that; (2) that claims had been delayed; and (3) that the Company did not have the same degree of operating leverage that it had claimed because even though the insurance premium increased relatively proportionally to the increase in rental days, "**claims expenses have exceeded that**"[10].

151.   During the call, HyreCar executives also revealed that the Company had been forced to revamp its claims processes and procedures and improve its risk price adjustments for policies issued by the Company and that such revamping would have the effect of severely compressing margins. Essentially, because of its scheme with Genoteq and ABI to knowingly and/or recklessly permit high risk drives just to grow revenue (*i.e.*, the so-called "Furnari slide"), HyreCar had failed to appropriately price risk on past policies on top of failing to pay out a substantial number of claims incurred before the second quarter 2021. For example, Serge De Bock (HyreCar's new CFO following defendant Brogi's abrupt July 2021 retirement) stated as follows:

Accordingly, gross profit for the current quarter was $0.8 million, representing a gross margin of 8.9%. Adjusted for one-off expenses related to the claims portfolio transition, our gross margin was 24.3%. We optimized our new process and pricing and **have already identified several tangible opportunities to improve claims profitability**, either by process improvements, geographical and risk price adjustment, or adequate pricing for

[10] Which effectively means that the cost of insurance grew faster than the revenue generated from each incremental driver.

our premium coverage offerings. One of these opportunities relates to ***reassessing our deductibles on physical damage claim and providing incentives for drivers with low claims experienc***e. We want to strike the right balance between customer experience and cost. We believe we can aim for low 30s gross profit margin in Q3, in line with fiscal year 2020, and an improved profit margin of mid-30s in Q4 through pursuing and affecting these initiatives without impacting our growth or driver and owner retention.

***We are also collaborating with our insurance partners to leverage data and improve our driver and car screening processes to both reduce claims outcomes and claims premium through risk control*** and to continue our path towards 40% plus gross margin in the later half of 2022 and beyond. ***Specifically, during our discussions with our insurance partners, we estimated that we could reduce insurance premium over time by up to 20% by identifying and filtering more effectively high-risk drivers***.

152.    Later, in response to another an analyst question, De Bock elaborated on the extensive efforts that HyreCar had been engaged in to reform its claims processes, stating as follows:

Mike Grondahl: Got it. And then just secondly, it sounds like there was some insurance transition claims of $1.4 million. And if you subtracted that, you got a gross margin of like 24%, but that still seemed down from where you were running. I guess, help reconcile that a little bit more.

Serge De Bock: Absolutely. So the $1.4 million represents a truly one-off items that impacted us from prior periods or just purely transition items, like, for instance, we had about 200k that came from an API that broke between our -- in our transition between claims insurance processing partners. So those are purely one-off items. So the bridging to last year gross margin that was at 33% for the whole year comes from us changing our processes. We want to improve customer satisfaction, customer retention. So we made it a little bit easier for folks to kind of go through the claims process.

AMENDED COMPLAINT

\* \* \*

Now we're trying to find the right balance between direct costs and being able to have customers being happy and have a good retention impact. And as we get through, this is just a few **-- first few months with our new insurance processing partners**. We're already hammering out. We're doing a deep dive, hammering out the details on the claims process. We already identified a few areas that we can fix or just improve. We're doing a good trade out there, and we believe we can get back the margin above 30% directly in Q3 through those efforts. But it's going to take a little time for us to kind of get back as we transition between partners and we understand the claims better.

And then another angle is read data. We collect a lot of data in our claims process, and **we were trying to understand better what makes a good driver as we mature**, and we're able to do that. We'll be able to pick drivers more effectively, and then in turn, that's going to turn into less claims and lower insurance premiums. So we're trying to get a favorable wheel going in terms of getting data, adjust, and then reduce our expenses. But as we get through the transition, the new processes took a little bit of toll in -- on our direct profitability.

153.    Later, in response to another an analyst question, De Bock elaborated on the extensive efforts that HyreCar had been engaged in to reform its claims processes, stating as follows:

So the bridging to last year gross margin that was at 33% for the whole year, comes from us changing our processes. We want to improve customer satisfaction, customer retention. So we made it a little bit easier for folks to kind of go through the claims process. **Now we try to find the right balance between direct costs and being able to have customers being happy and have a good retention impact**. And as we get through, this is just a first few months with our new insurance processing partners.

We're already hammering out. We're doing a deep dive, hammering out the details on the claims process. **We already identified a few areas that we can fix or just improv**e. We're doing a good trade out there. And we believe we can get back the margin above 30% directly in Q3 through those efforts. But **it's**

*going to take a little time for us to kind of get back as we transition between partners* and we *understand the claims better.* And then *another angle is read data*. We collect a lot of data in our claims process, and we were trying to understand better what makes a good driver as we mature, and we're able to do that, we'll be able to pick drivers more effectively. And then in turn, that's going to turn into less claims and lower insurance premiums. So we're trying to get a favorable wheel going in terms of getting data adjust and then reduce our expenses. *But as we get through the transition, the new processes took a little bit of toll on a direct profitability*.

\* \* \*

And here, I think we are in the middle of a review, and I alluded that in the beginning of the call of reviewing the different pricing options, including deductibles, to offer something that's [priced] right. I think we have more opportunity to generate revenue based on increased pricing overall, *but principally also on being able to select the right drivers and being able to leverage all the data we have to select the right drivers, and again, being able to selecting the right drivers*, get the cost of claims down and help us on the profitability side, while not impairing our growth. And I think that's what we're going to be focused on to be able to get the cost down and also being able to set price appropriately based on risk profile.

154.    Another analyst asked De Bock to explain how HyreCar's claims could "have risen so dramatically in the last couple of quarters." De Bock responded that the Company was responding to some "alarming trends" in claims incidents and was reforming past practices, such as with respect to delaying payouts of claims, stating as follows:

Yes, absolutely. I think this quarter, we had $1.4 million in one-off expenses from the transition, *but also we're changing our process and implementing faster payment process* that work more customer-friendly, *led to faster payouts*, and sometimes *payout is a little higher than what we've seen in the past. We identified a few things we need to do to be able to curtail that*. We're going to focus on deductible as one portion to be able to

have a good handle on the amount and volume of claims coming in. And then we also have a few things, including, for instance, our subrogation practices. We got a little loser on subrogation practices in Q2. We were paying our customers and then trying to chase back the money. I think here, we put new more guard rails in those cases.

We only subrogating certain instances, for instance, and that will help us drive some of the claims back. We also looked at different trends for different states. ***We identified a couple of states where we saw more alarming trends*** and also a different profile of drivers, and ***we immediately action to curtail that in Q3***. And that's going to show up partially in Q3 and then in Q4. And I think that's – with more data, and I think that's going to be a trend you're going to see. We have more data, more dashboards, we're able to discern and analyze the data more quickly and react very quickly to trends. And I think that's going to help us be more efficient, effective and generate more profit in the future.

155.   When asked whether HyreCar was on track to achieve 45% to 50% gross margins in the near term as represented, De Bock essentially withdrew this goal, calling it a "shoot for the sky" aim and stating that "shooting for margin upwards of 40%" was more realistic.

156.   On all this news, the price of HyreCar stock fell ***nearly 50%*** in a single day to close at $9.85 per share on August 11, 2021, on abnormally high volume of over 5.8 million shares traded.

157.   Following the earnings release, analysts at Ladenburg Thalman downgraded shares from a buy to a neutral in part because of "[g]ross margins [which] were down significantly (at 9%) due to the ongoing restructuring of the insurance claims processes with a single payor." The Ladenburg Thalman analysts also noted that "[t]hough management expects gross margins to rebound to the low 30%, the new gross margin range for 2022 is roughly 40% (well below previous guidance from management)."

158.   While Wall Street analysts downgraded HyreCar shares, retail investors responded with furor on the investment forum Stock Twits. One user, Clapbomb789 stated, "now you know why the ceo dumped all those shares!" on August 10, 2021 at 4:15 pm eastern.

159.   The next day, Stock Twits user ChicagoMan stated: "$HYRE CEO sold 45% of his total shares in the last 3 months for 60-70% more than what they are worth now" at 12:13 pm; and "Insiders in the 3 months (sic) have sold more than $10M in shares, or about 5% of the current Mkt Cap" at 12:16 pm. The same user also stated, "clearly something blew up on the insurance side of things this Q. why they did not disclose that as a material event close to when it happened in quarter, as typically required by the SEC is an open question. . ."

160.   Stock Twits user Invisiblehand_ tweeted "terrible scam company, today should be ugly" at 8:51 am eastern time on August 11, 2021.

161.   On August 12, 2021, as the stock continued its slide, Stock Twits user Maunil wrote, "how can the director sell on Aug 09 just before a 50% drop without any consequences*, this is criminal*" at 5:10 pm.

## V.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

### 1.   Statements Related to the Company's February 3, 2021 8-K

162.   After the close of trading on February 3, 2021, the Company's issued an interim report on Form 8-K filed with the SEC. In it, the Company stated that for the three months ended December 31, 2020 it anticipated a range of revenue between $6.6 to $6.8 million and adjusted EBITDA between ($3.6 million) and ($3.1 million).

163.   The  statements in ¶162 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because they understated expenses of between $700,000 to $1.25 million related to unpaid claims.

**2.  Statements Related to the Company's February 4, 2021 Prospectus**

164.  In the Company's February 4, 2021 prospectus, Defendants stated that the risk factors incorporated by reference the Company's 2019 10-K. In the 2019 10-K, the Company stated within its "Our strengths" section:

*Insurance Coverage*

A key component to our business is our commercial auto insurance coverage. The two-sided nature of our platform means that we need to insure both the Driver and the Owner. Prior to any rental the Driver and Owner are provided an insurance ID card that lists the driver's name and the vehicle identification number. Insurance is typically generated twenty-four hours in advance of the commencement of the rental through to when the Owner confirms drop-off of the rented vehicle by the Driver. The vehicle pick-up and drop-off is all managed through our platform. An Owner takes pictures of his or her vehicle prior to pressing the "Confirm Pick-up" button on the HyreCar mobile app. (If pictures are not taken and the button is not pressed, it provides grounds for a claim denial; subsequent liability and/or physical damage rests solely on the Driver and Owner.) After the rental is completed, the Owner presses the "Confirm Drop-off" button on the HyreCar mobile app and the rental ends.

***American Business Insurance Services ("ABI") is our insurance broker*** and YRisk is our mobility-focused managing general underwriter, YRisk was sold by our incumbent insurance company American International Group (NYSE: AIG) to The Hartford (NYSE: HIG) in December 2018 and is currently a subsidiary of HIG. We moved our annual car insurance policy to The Hartford for the plan year from April 2019 to May 2020 under superior pricing and terms. ***ABI handles all of our back-end insurance generation and processing through an API connection with HyreCar databases. ABI is a top broker in the United States for the Taxi and Livery business. Mr. David Haley, president of ABI, sits on our strategic advisory board***.

For insurance purposes a vehicle rental is broken into four distinct driving periods. Period 0 is when the Driver has picked

a vehicle up from the Owner and is driving with the Uber or Lyft app turned-off. Period 1 is when the Driver has the Uber or Lyft app turned-on but has not yet accepted a fare. Period 2 is when the Driver has accepted a fare and is on the way to pick-up a passenger. Period 3 is when a passenger is in the vehicle. The HyreCar policy is specifically written to cover periods in which the Drivers are operating HyreCar vehicles OFF the Uber or Lyft platform (period 0). During the periods when Drivers are operating ON the Uber or Lyft platform (periods 1, 2 and 3), the HyreCar insurance subordinates to state mandated insurance provided by Uber and Lyft. ***This enables us to keep insurance costs and liability low by leveraging state mandated insurance policies provided by the TNCs***.

165.    The emphasized statements in ¶164 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) in describing ABI as the Company's "insurance broker" without also disclosing that ABI owned the Company's purported third-party claims administrator and adjuster, Genoteq, Defendants misled investors about the nature of the relationship between HyreCar and ABI and also concealed the relationship between HyreCar and Genoteq; (2) by describing ABI as its "insurance broker" without also disclosing that ABI installed Genoteq to aid in the delay and suppression of insurance claims—Defendants concealed a material risk that insurance reserves would be materially understated and thus create an inevitable need to true up such understatement during future periods; and (3) the foregoing, viewed separately or collectively, renders Defendants' description of its Insurance Coverage as "a strength" materially false and/or misleading because Defendants' reckless reliance on conflicted party Genoteq to process its insurance claims and provide data used to determine insurance reserve calculations, was a *risk* for the Company, not a *strength*.

166.    In the 2019 10-K, the Company stated within its Critical Accounting Policies:

*Insurance Reserve*

The Company records a loss reserve for insurance deductible or physical damage that the Company pays to car owners based on the Company's policy in relation to the insurance policy in effect at the time. This reserve represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported and are recorded on a non-discounted basis. ***The lag time in reported claims is minimal*** and as ***such represents a low risk of unreported claims being excluded from the loss reserve assessment***. The adequacy of the reserve is monitored quarterly and is subject to adjustment in the future based ***upon changes in claims experience, including the number of incidents for which the Company is ultimately responsible and changes in the cost per claim, or changes to the Company's policy as to what amounts of the deductible or claim will be paid by the Company***.

Liability insurance claims may take several years to completely settle, and the Company has limited historical loss experience. Because of the limited operational history, the Company makes certain assumptions based on currently available information to estimate the reserves as ***well as third party claims adjuster data provided on existing claims***. A number of factors can affect the actual cost of a claim, including the length of time the claim remains open, economic and healthcare cost trends and the results of related litigation. Furthermore, claims may emerge in future periods for events that occurred in a prior period that differs from expectations. Accordingly, actual losses may vary significantly from the estimated amounts reported in the consolidated financial statements. Reserves are continually reviewed ***and adjusted as necessary as experience develops or new information becomes known***. However, ultimate results may differ from the Company's estimates, which could result in losses over the Company's reserved amounts. ***Such adjustments are recorded in general and administrative expenses.***

167.   The emphasized statements in ¶166 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the

statement not misleading because: (1) the Company failed to disclose that insurance reserves were being suppressed by Defendants' failure to pay claimants valid claims and that as a result of such suppression, the Company would (and eventually did) true up such under reserved amounts through a looming and foreseeable true-up which would materially depress earnings per share; (2) in listing discrete factors that impact insurance reserves without disclosing that insurance reserves could also be impacted by management's refusal to pay valid claims was misleading; (3) in acknowledging the Company's limited operating history, while concealing Genoteq's limited operating history (which was even more limited than HyreCar's), the above statement misleadingly suggested that the purported "third-party" (i.e., Genoteq) did not in fact have a limited operating history which was false and/or misleading, and in addition, by omitting Genoteq's limited operating history, the above statement about Genoteq's contributions to insurance reverse estimates was a misleading half-truth; (4) the Company's description of its insurance reserve adjustments as "general and administrative" expenses, was false and/or misleading (i) because such costs recurred so often that should have been classified as "cost of sales" not general and administrative expenses as they were later classified once ABI and Genoteq were replaced and Brogi resigned; and (4) in stating that the Company was making assumptions about its insurance reserve levels based on purported "third party claims adjuster data" that statement was both (i) objectively false because ABI and thus Genoteq were conflicted parties, not third parties; (ii) subjectively misleading because the purported third-party was a mere three or four person operation owned by a conflicted party and installed by the Company to drastically underreport claims; (iii) even without any purposefully underreporting, the failure to disclose the conflict of interest in relying on a conflicted party for claims adjustment data was misleading.

168.   Also within the Significant Accounting policies within the 2019 10-K, the Company stated:

*Other Concentrations*

The Company has historically relied on a single insurance broker and one underwriter to provide all automobile insurance on vehicles in service over the last few years. There are multiple brokers and carriers who issue this type of insurance coverage, and the Company is regularly making reviewing leading insurers in the transportation and mobility sectors as this is an important part of our operations. ***The company does not believe the loss of our current broker or underwriter would have a material effect on our operations***.

169.   The statements in ¶168 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) the Company failed to disclose the existence of the concentration of having just one claims administrator (Genoteq), and that such a claims administrator was owned by a related party (ABI); (2) the Company failed to disclose not just the existence of Genoteq, but its role in Defendants' scheme to suppress claim payouts; (3) the Company's statement that loss of ABI would not have a material effect on its operations was knowingly false because Defendants knew, or were reckless in not knowing, that no other insurance broker would permit HyreCar to suppress claim payouts to customers as Genoteq did.

170.   The 2019 10-K also stated that the Company's 2019 revenue was $15,854,924 and its operating expenses totaled $18,701,939.

171.   The statements in ¶171 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because they understated insurance expenses, and thus also understated operating expenses (and, by extension, operating losses). The statement was also misleading because it was not prepared in accordance with GAAP nor with the Company's critical accounting policy and also painted a materially misleading picture of the Company's operating trends.

172.   The 2019 10-K also stated:

*Insurance Opportunity*

A large percentage of our cost of revenues is direct insurance expense, which we pay to the insurance company. The premiums are broken into two categories, liability insurance and physical damage*. **The unique nature of our insurance enables us to keep insurance costs and liability low*** by leveraging state mandated insurance policies provided by the Transportation Network Companies.

In addition to self-insurance, the company is also working with our Managing General Underwriter ("MGU") to develop new and innovative insurance products. The company has proposed a new type of owner "lay-up" insurance and higher insurance level for fleet vehicle owners on the HyreCar platform. Lay-up insurance replaces the need for an owner's personal auto insurance policy and would represent significant cost savings when compared to other insurance options available in the market today. Offering this type of insurance product benefits the company in multiple verticals, including reduced insurance claim expense, greater customer retention and stickiness to the HyreCar platform. Our MGU has begun piloting lay-up insurance to vehicle owners.

173.   The statements in ¶172 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) HyreCar's ability to keep its insurance costs low resulted not for the reasons the Company provided above, but rather, from the Company's reckless reliance on Genoteq which was both ill-equipped to process HyreCar's claim volume and also turned a blind eye to HyreCar's purposeful delay of claim reimbursement; (2), which means that any opportunity for HyreCar to keep its insurance costs low was either false, or misleading because to the extent that HyreCar's expenses were low, that low level of costs was temporary and due to HyreCar's delay of claim payments which was unsustainable and created a looming expense true up that eventually decimated HyreCar's stock.

Finally, the 2019 10-K described various related party transactions, wherein it stated that:

> *Insurance*
> The president of the Company's primary insurance broker is also a minority stockholder and holder of warrants from the 2017 Notes. As of December 31, 2019 and 2018, the Company had outstanding balances to the insurer totaling $101,167 and $275,290, included in accounts payable, respectively. During the years ended December 31, 2019 and 2018, the Company paid the insurer approximately $5,008,000 and $4,304,000, respectively

174. The statements in ¶173 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) the statements above misleadingly refer to the Company's primary insurance broker (ABI) while omitting that the owner of ABI, Haley also owns and controls Genoteq which was the Company's purported third-party adjuster and sole claims administrator; and (2) fails to disclose the conflicted transactions between ABI and Genoteq and between Genoteq and HyreCar.

### 3.   <u>Statements Related to The Company's Q4 2020 Earnings Call</u>

175. On March 30, 2021, the Company held an earnings call to discuss its fourth quarter and full year 2020 results. In it, Defendants stated:

> MARK NICHOLAS ARGENTO: I just wanted to dig in a little bit on the gross profit. I know, Scott, you mentioned you anticipate getting back to that 45% to 50% level. Is that something that you think happens relatively imminently or what's kind of the ramp to that level?
>
> ROBERT SCOTT BROGI: Yes. I think we'll grow into that over the next couple of quarters. I think it's going to be ***dependent on 2 primary things***. ***We talked a little bit about the velocity of claims payments in late 2020***. ***And again, with car supply tight, a lot of that was to get cars back on the platform as quickly as possible, right***? So that we can continue to drive those rental days. So you've got that piece happening. And then I think there's

been a lot going on around some of the new other revenue sources that we have, and that's both subscription revenue as well as referral income. I know we just recently announced the new TrueCar relationship. So *we think the combination of returning to more normal levels on the claims side, having brought that now kind of completely current* as well as starting to have some of those other revenue sources kicking in, you've got kind of 2 levers there to really start to drive GP on a going-forward basis. So I think we've got a good chance of getting there over the next couple of quarters.

MARK NICHOLAS ARGENTO: Do you see that the claims issue, is that kind of more onetime in nature or is that something that you're going to see kind of pop up from time to time? Or is that something you can kind of make more of a spread over the quarters on a more normalized basis?

JOSEPH FURNARI: Yes. I mean, it's a really good question, Mark. I think what we've been seeing is we put a lot of effort into the front end of the process here in 2021. So I *don't think we've formally announced it, but we did have a selection process for a new third-party administrator*. So that we could bring both the PD claims and the liability claims together, *so that you're having a really efficient determination of responsibility*. And then again, dealing with those claims quickly, so that you can get those cars back on the platform. I know Brian Allen has been nudging us both repeatedly over the last couple of weeks as he gets text from car suppliers around the country *who are really excited about that new TPA process that we've put in place*. So I think *there was a little bit of catch-up* that we needed to do to really shrink that turnaround cycle, and we've done that dramatically. And then now on the going-forward basis, with the improvements in the TPA, I think we're going to see an actual reduction in some of those expenses going forward.

176. The emphasized statements in ¶175 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) the prior "third-party" administrator was no "third party" at all, but rather a conflicted party; (2) claims were not brought current

but were still being suppressed at the time of Brogi's above statement; and (3) the non-current nature of the building claims also created a material risk of a looming expense true-up which would ultimately decimate HyreCar's stock.

177.   Elsewhere in the Q4 2020 earnings call, Defendants sought to lay blame for growing insurance expenses on exogenous factors, which, according to CFO Brogi was "***primarily due to some seasonal shifts in insurance costs*** to support higher levels of car supply through the winter quarter" which was false because the growth in insurance costs was really the result of: (a) building claims that had been suppressed in prior quarters and were spilling over to Q4 2020; (b) the natural correlations between insurance and drivers; and (c) the foreseeable result of permitting high-risk drivers, including those with criminal records onto HyreCar's platform.

178.   Brogi also stated on the Q4 2020 earnings call that "[g]ross profit margin was 33% for the 12 months ending December 31, 2020, down from 38% in the year ago period ending December 31, 2019, ***as we accelerated insurance claims to shrink processing time*** and get more cars on the platform sooner" and "***[w]e anticipate increasing operating leverage into 2021 as we significantly increase revenue***."

179.   The emphasized statements in ¶¶177-78 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) gross profit would have decreased even more had Defendants not artificially suppressed claims; (2) as a result, the Company did not have the ability to increase operating leverage as revenue grew as it represented.

### 4.   Statements Related To The Company's 2020 10-K

180.   On March 31, 2021, the Company released its form 10-K for the year ended December 31, 2020 ("the 2020 10-K"). In it, the Company stated with respect to its critical accounting policies that:

*Insurance Reserve*

The Company records a loss reserve for physical damage and other liability coverage caused to owner vehicles up to the Company's insurance deductibles. This reserve represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported and are recorded on a non-discounted basis. ***The lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment***. The adequacy of the reserve is monitored quarterly and is subject to adjustment in the future based upon changes in claims experience, including the number of incidents for which the Company is ultimately responsible and changes in the cost per claim, or changes to the Company's policy as to what amounts of the deductible or claim will be paid by the Company.

While certain liability insurance claims may take several years to completely settle, the Company's liability exposure limit is generally met in the near term. ***Due to our limited operational history, the Company makes certain assumptions based on both currently available information to estimate the insurance reserves as well as third party claims adjuster data provided on existing claims***. A number of factors can affect the actual cost of a claim, including the length of time the claim remains open, economic and healthcare cost trends and the results of related litigation. Furthermore, claims may emerge in future periods for events that occurred in a prior period that differs from expectations. Accordingly, actual losses may vary significantly from the estimated amounts reported in the consolidated financial statements. Reserves are reviewed quarterly and adjusted as necessary as experience develops or new information becomes known. However, ultimate results may differ from the Company's estimates, which could result in losses over the Company's reserved amounts. Such adjustments are recorded in costs of revenues.

181.   The statements in ¶180 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) the Company failed to disclose that insurance reserves were

being suppressed by Defendants' refusal or failure to pay valid claims and that as a result of such suppression, the Company would (and eventually did) true up such under reserved amounts through a true-up which would materially depress earnings per share; (2) in listing discrete factors that impact insurance reserves without disclosing that insurance reserves could also be impacted by management's purposeful refusal to pay valid claims was misleading; and (3) in stating that the Company was making assumptions about its insurance reserve levels based on purported "third party claims adjuster data" was both (i) objectively false because ABI and thus Genoteq were conflicted parties, not third parties; (ii) subjectively misleading because the purported third-party was a mere three or four person operation owned by a related party and installed by the Company to underreport claims; (iii) even without any purposefully underreporting, the failure to disclose the conflict of interest in relying on a related party for claims adjustment data was misleading.

182.   Also within the Significant Accounting policies within the 2020 10-K, the Company stated:

*Other Concentrations*

The Company has historically relied on a single insurance broker and one underwriter to provide all automobile insurance on vehicles in service over the last few years. There are multiple brokers and carriers who issue this type of insurance coverage, and the Company is regularly making reviewing leading insurers in the transportation and mobility sectors as this is an important part of our operations. ***The company does not believe the loss of our current broker or underwriter would have a material effect on our operations***.

183.   The statements in ¶182 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) the Company failed to disclose the existence of its concentration in just one claims administrator (Genoteq), and that such a claims

administrator was a conflicted party; and (2) the Company failed to disclose not just the existence of its highly concentrated reliance on Genoteq, but also Genoteq's role in HyreCar's delayed claim payouts..

184.   The 2020 10-K also stated the following with respect to related party transactions:

*Insurance*

> The president of the Company's primary insurance broker through June 2020 is also a minority stockholder and holder of warrants. As of December 31, 2020 and December 31, 2019, the Company had outstanding balances to the insurer totaling $0 and $101,167, included in accounts payable or accrued liabilities, respectively. During the year ended December 31, 2020 and 2019, the Company paid the insurer approximately $2,514,743 and $5,008,000, respectively. On June 15, 2020, the Company completed moving its primary and excess automobile insurance liability programs over to a new insurance provider and is no longer using the related party broker.

185.   The statements in ¶184 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) the statements above misleadingly refer to the Company's primary insurance broker (ABI) while omitting that the owner of ABI also owns and controls Genoteq, which was the Company's purported third-party adjuster and sole claims administrator; and (2) fail to disclose that the completion of moving its primary and excess automobile insurance liability programs to a new insurance provider would have the effect of materially increasing the Company's insurance reserves because, *inter alia*, such claims had been artificially suppressed by the Company's reckless reliance on Genoteq as its claims administrator.

186.   The 2020 10-K also reported 2020 annual revenue of 25,231,741, and $23,522,980 of annual operating expenses. The 2020 10-K also reported a loss from operations of $15,252,689.

187.   The statements in ¶186 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because they understated insurance expenses by between $700,000 to $1.25 million, and thus also understated loss from operations. The statement was also misleading because it was not prepared in accordance with GAAP nor with the Company's critical accounting policy and also provided materially misleading information about the Company's operating trends.

**5.     Statements from the Company's Q1 2021 Press release**

188.   On May 13, 2021, HyreCar issued a press release which stated that the Company had achieved "Record First Quarter 2021 Financial Results" for the quarter ended March 31, 2021 ("Q1 2021"). The release stated that HyreCar's ***insurance deposits had more than doubled during the quarter to $1.7 million, while the amount of the Company's insurance reserve (which indicates the amount of claims incurred but not yet paid) had declined more than 17% since year end to $1.7 million***.

189.   Also at that time, HyreCar held an earnings call, led by Defendants Furnari and Brogi, with analysts and investors to discuss the Company's Q1 2021 results. During the Q1 2021 earnings call, Defendants stated:

> After holding steady on pricing for several years, we tested and then enacted some pricing enhancements early in the second quarter ***to both our driver and insurance fees to better reflect the new competitive environment and align reimbursement rates with new driver risk scoring data***. The combination of these two pricing elements should drive significant net revenue and ***gross margin improvements*** through 2021 and increase our daily average net revenue from the $24 to $25 a day we've seen historically to the $27 to $28 a day range.
>
> \* \* \*
>
> Cost of sales increased for the quarter ended March 31, 2021 to $4.7 million from $3.6 million the prior year as insurance expenses continue to account for the majority of cost of goods

sold **primarily due to some seasonal shifts in insurance costs** to support higher levels of car supply through the winter quarter

\* \* \*

Q - Casey Hambrick. Thank you very much for taking the question. So when you guys are talking about these price increases, historically you've always kind of led investors to think about every 1,000 cars is roughly $9 million annualized. What's the new rate? Should we start thinking like 10,000? Every 1,000 cars is $10 million annualized? How should we think about that?

A - Scott Brogi Yes. Hey Casey, it's Scott. I think that's probably a good basic way to think about it. We're - - the part that we're - - that has some additional upside to it is kind of the risk adjustment piece, right. There's a driver fee component and a risk or insurance component and **it's dependent on the mix of drivers within some different risk pool**s. But I think it's pretty safe to assume that it's going to be at least a 10% increase to that sort of per day contribution. a So yes, going from $9 million to $10 million per 1,000 cars. That's a good basic way to think about it and hopefully we can do a little bit better than that.

190. The emphasized statements in ¶¶188-89 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) increased insurance costs were not due to seasonal shifts, but rather, reflected the spillover of prior periods' claims which had been suppressed and carried over; and (2) the forecasted gross margin improvement was not possible because Defendants had not yet incurred the looming insurance expense true up and once it did, such a true up would materially compress gross margins (make them worse), not better.

191. The statements in ¶¶188-89 above were also materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because they understated insurance expenses by between $700,000 to $1.25 million, and thus also understated loss from operations. The

statement was also misleading because it was not prepared in accordance with GAAP nor with the Company's critical accounting policy and also provided materially misleading information about the Company's operating trends.

### 6.   Statements From the Company's Q1 2021 10-Q

192.   On the same day, the Company filed its 10-Q with the SEC for the period ending March 31, 2021. In it, the Company stated:

> The Company records a loss reserve for physical damage and other liability coverage caused to owner vehicles up to the Company's insurance deductibles or relevant limits. ***This reserve represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported and are recorded on a non-discounted basis***. The ***lag time in reported claims is*** minimal and as such represents ***a low risk of unreported claims being excluded from the loss reserve assessment***. The adequacy of the reserve is monitored quarterly and is subject to adjustment in the future based upon changes in claims experience, including the number of incidents for which the Company is ultimately responsible and changes in the cost per claim, or changes to the Company's insurance policy which dictates what amounts of a claim will be paid by the Company. Effective March 1, 2021 the Company entered into a two-year claim adjusting agreement with Sedgwick which included an escrow account requirement of $1,750,000 to be held by Sedgwick for claim payments. This escrow account is replenished by the Company on a quarterly basis dependent on the actual claims paid during that quarter. As of March 31, 2021 and December 31, 2020, $1,747,134 and $2,113,039 was included in the accompanying consolidated balance sheets, respectively, related to the loss reserve, where the expense is included in costs of revenues.

193.   The statements in ¶192 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) because of Defendants' then existing backlog of previously incurred but then excluded insurance claims from the Company's loss reserve assessment was not low; (2) because of the Company's history of materially delayed

claims and growing backlog of the same, the "lag time" of the Company's reported claims was not low.

194.   The Q1 2021 10-Q also reported revenue of $7,448,400, operating expenses of 9,938,362, and operating loss of ($7,206,112).

195.   The statements in ¶194 were false when made and/or omitted to state material facts necessary to make the statement not misleading because they understated insurance expenses, and thus also understated loss from operations. The statement was also misleading because it was not prepared in accordance with GAAP nor with the Company's critical accounting policy and also provided materially misleading information about the Company's operating trends.

**7.     Statements Related To The Company's June 2021 Investor Presentation**

196.   In June 2021, the Company posted an investor presentation to its website. In it, the Company stated:

> Opportunities for Margin Enhancement
> - Expansion of dealer subscriptions from HyreCar for Business enhancements
> - Addition of lead remarketing referrals with automobile marketing partners
> - Improvements in insurance program with new partners AON and Apollo reduces costs moving forward

197.   The statements in ¶196 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because: (1) they misleadingly failed to disclose that its new marketing partners would not in fact reduce costs, but would increase them because the new marketing partners would prompt the Company to true up its then recklessly under-reserved insurance payouts, which would thus increase costs and pressure margins; and, in the alternative (2) to the extent that costs would be reduced, they would be reduced only when compared to the Company's actual costs (not its purposefully

suppressed costs), which had been concealed to investors until the Company's August 2021 reserve true up, thus rending the above misleading.

198.   The June 2021 Investor Presentation also stated that it had "over 4,000" daily rentals, which was misleading because that figure included rentals from drivers that Defendants knew were high risk of creating insurance liability but had been "unlocked" by Defendant Furnari's brother specifically to increase that metric.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

199.   As alleged herein, the Individual Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and/or misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding HyreCar, and their control over and/or receipt and/or modification of HyreCar's materially false and/or misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

200.   Defendants knew and/or recklessly disregarded the false and/or misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

201.   The Individual Defendants, because of their positions with HyreCar, controlled the contents of HyreCar's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.

Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and/or misleading.

202.   Indeed, the Individual Defendants held themselves out to investors as the persons most knowledgeable to discuss the Company's insurance products, reserves and claims severity and incidence, and continuously kept themselves apprised of these aspects of HyreCar's business, operations and financial results as part of their primary job responsibilities. Insurance revenues and claims incidents are major components of the Company's cash flows and financial results and management was particularly focused on these trends during the Class Period as evidenced by the May 13, 2021 statement that the Company "tested and then enacted some pricing enhancements early in the second quarter to both our driver *and insurance fees* to better reflect the new competitive environment and ***align reimbursement rates with new driver risk scoring data,*** thereby establishing that management knew driver risk was not being properly managed or scored, but even with said knowledge still omitted reference to the underlying risk that Genoteq and ABI's involvement would, and indeed did, have on HyreCar's reported financial statements. Furthermore, because the fraud alleged herein relates to the core operations of HyreCar, which is a relatively small company with 86 full-time employees as of December 31, 2020, knowledge of the facts underlying the fraud may be imputed to the Individual Defendants based on their positions with the Company. As a result, each of the Defendants is responsible for the accuracy of HyreCar's corporate statements and is, therefore, responsible and liable for the representations contained therein.

203.   Additional scienter is shown by Defendants' reckless reliance on a related party to process claims and provide data for insurance reserve determination purpose, particularly when the nature of that relationship was misrepresented to one of arm's length (*i.e.*, as a third-party relationship).

204.   Defendants' scienter is also corroborated by the suspicious sales of Company stock by Company insiders. The sales are suspicious in that they were unusual in their size, unusual in comparison to the insider's prior trading history, and unusually timed to maximize profits at artificially inflated prices. Following Defendants' materially false and misleading statements on the first day of the Class Period, the price of HyreCar stock rocketed upwards 45% on May 14, 2021. This preceded an unprecedented spate of insider selling at the Company, totaling more than $13 million in gross proceeds.

205.   For example, Defendant CEO Furnari sold 300,000 shares of Company stock on July 21, 2021 through July 23, 2021, reaping gross proceeds of more than $5.2 million. Prior thereto, Furnari sold no Company shares since the Company's IPO in June 2018.

206.   Michael Furnari, the Company's Chief Business Development Officer since October 2017 and the brother of defendant CEO Furnari, also engaged in suspicious insider selling. Michael Furnari sold 299,900 shares of Company stock on July 21, 2021 through July 23, 2021, reaping gross proceeds of nearly $5.2 million. Prior thereto, Michael Furnari sold no Company shares since the Company's IPO in June 2018.

207.   Defendant CFO Brogi likewise engaged in suspicious insider selling. Brogi sold 72,329 shares of Company stock on May 20, 2021 and May 24, 2021, reaping gross proceeds of over $1.2 million. Prior thereto, Brogi sold no Company shares since joining the Company in September 2018.

208.   Grace Mellis, Chair of the Company's Board of Directors during the Class Period, engaged in suspicious insider trading as well. Mellis sold 50,000 Company shares on May 24, 2021 and June 3, 2021, reaping gross proceeds of nearly $875,000. Prior thereto, Mellis sold no Company shares since the Company's IPO.

209.   Henry Park, the Company's Chief Operating Officer during the Class Period, engaged in suspicious insider trading too. Park sold 35,000 Company shares

on May 19, 2021 and May 20, 2021, reaping gross proceeds of over $578,000. Prior thereto, Park sold no Company shares since joining the Company in October 2018.

210. Additionally, on June 23, 2021, the Company announced the unexpected "retirement" of defendant CFO Brogi, at only age 56. Brogi was replaced as CFO on July 5, 2021. Brogi's unexpected departure from the Company under the circumstances described herein further evidences defendants' scienter particularly given its proximity to ABI and Genoteq's replacement.

211. Indeed, the Individual Defendants held themselves out to investors as the persons most knowledgeable to discuss the Company's insurance products, reserves and claims severity and incidence, and continuously kept themselves apprised of these aspects of HyreCar's business, operations and financial results as part of their primary job responsibilities. Insurance revenues and claims incidents are major components of the Company's cash flows and financial results and management was particularly focused on these trends during the Class Period. Furthermore, because the fraud alleged herein relates to the core operations of HyreCar, which is a relatively small company with a total of 86 full-time employees as of December 31, 2020, knowledge of the facts underlying the fraud may be imputed to the Individual Defendants based on their positions with the Company.

## VII. LOSS CAUSATION

212. During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of HyreCar securities and operated as a fraud or deceit on Class Period purchasers of HyreCar securities by misrepresenting the value of the Company's business and prospects including by concealing negative aspects of the Company's insurance products and claims incidence.

213. As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's securities fell precipitously as the prior artificial inflation came out of the stock's price. Indeed, following the

Company's corrective disclosure on August 10, 2021, the price of HyreCar stock fell ***nearly 50%*** in a single day to close at $9.85 per share on August 11, 2021, on abnormally high volume of over 5.8 million shares traded, thereby damaging investors.

214.   HyreCar shares continued to fall for several trading days on this news including by $0.03 per share on August 12, 2021, $0.03 per share on August 13, 2021, $0.21 per share on August 16, 2021, and $0.38 per share on August 17, 2021, thereby damaging investors.

215.   By the close of trading on August 17, 2021, HyreCar shares closed at $9.20 per share, or 52% lower than its close of $19.12 on August 10, 2021, thereby damaging investors.

216.   As a result of their purchases of HyreCar securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VIII.   CLASS ACTION ALLEGATIONS

217.   Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired HyreCar securities between February 3, 2021 through August 17, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

218.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HyreCar's securities actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed

Class. Millions of HyreCar's securities were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by HyreCar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions.

219.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

220.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

221.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

222.   (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

223.   (b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of HyreCar;

224.   (c)     whether Defendants engaged in a scheme to defraud shareholders of HyreCar; and

225.   (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

226.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX.   UNDISCLOSED ADVERSE FACTS

227.   The market for HyreCar's securities was open, well-developed and efficient.  As a result of these materially false and/or misleading statements, and/or failures to disclose, HyreCar's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired HyreCar's securities relying upon the integrity of the market price of the Company's securities and market information relating to HyreCar and have been damaged thereby.

228.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of HyreCar's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about HyreCar's business, operations, and prospects as alleged herein.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE

229.   The market for HyreCar's securities was open, well-developed and efficient. As a result of the materially false and/or misleading statements and/or failures to disclose, HyreCar's securities traded at artificially inflated prices during the Class Period. On June 23, 2021 the Company's share price closed at a Class Period high of $22.95 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of HyreCar's securities and market information relating to HyreCar and have been damaged thereby.

230. During the Class Period, the artificial inflation of HyreCar's securities was caused by the material misrepresentations and/or omissions and/or scheme particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants engaged in a scheme and made or caused to be made a series of materially false and/or misleading statements about HyreCar's business, prospects, and operations. These material misstatements and/or omissions and/or scheme created an unrealistically positive assessment of HyreCar and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company securities. Defendants' materially false and/or misleading statements during the Class Period caused Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

231. At all relevant times, the market for HyreCar's securities was an efficient market for the following reasons, among others:

232. (a) HyreCar shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

233. (b) As a regulated issuer, HyreCar filed periodic public reports with the SEC and/or the NASDAQ;

234. (c) HyreCar regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

235. (d) HyreCar was followed by securities analysts who wrote reports and/or issued public statements about the Company, and these reports and statements were publicly available and entered the public marketplace.

236.   As a result of the foregoing, the market for HyreCar's securities promptly digested current information regarding HyreCar from all publicly available sources and reflected such information in HyreCar's share price. Under these circumstances, all purchasers of HyreCar's securities during the Class Period suffered similar injury through their purchase of HyreCar's securities at artificially inflated prices and a presumption of reliance applies.

## XI.   NO SAFE HARBOR

237.   HyreCar's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

238.   Defendants are also liable for any false or misleading FLS pleaded because, when each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of HyreCar who knew that the FLS was false. None of the historical or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historical or present tense statements when made.

AMENDED COMPLAINT

# XII.   COUNT ONE

## Violation of Section 10(b) of The Exchange Act and  SEC Rule 10b-5 Promulgated Thereunder

239.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

240.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase HyreCar's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

241.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for HyreCar's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a)—(c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

242.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about HyreCar's financial well-being and prospects, as specified herein.

243.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of HyreCar's value and performance and continued substantial growth, which included the making

of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about HyreCar and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

244.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate recklessness. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing HyreCar's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

245.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of HyreCar's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or absent material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired

HyreCar's securities during the Class Period at artificially high prices and were damaged thereby.

246.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth about the problems that HyreCar was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their HyreCar securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

247.   By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(a)—(c) promulgated thereunder.

248.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

249.   During the Class Period, Defendants also carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the market price of the Company's securities; and (iii) cause Plaintiff and other Class members to purchase the Company's securities at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, and as alleged more fully herein, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of the Company's securities in violation of §10(b) of the Exchange Act and Rule 10b- 5(a) and (c) promulgated thereunder.

250.   Plaintiff and the Class reasonably relied upon the integrity of the market in which the Company's securities traded. During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased the Company's securities, or if they had, would not have done so at the artificially inflated prices they paid.

251.   As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

252.   By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of the Company's securities during the Class Period.

## XIII.  COUNT TWO

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

253.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

254.   The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

255.   The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.   Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

256.   The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

257.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other relief as the Court may deem just and proper.

## XV.  JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED:  December 3, 2021

**GLANCY PRONGAY & MURRAY LLP**

By:   _s/ Robert V. Prongay_

Robert V. Prongay
Ex Kano S. Sams II
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

_Counsel for Lead Plaintiff Turton Inc._

DocuSign Envelope ID: 3DA0F4C0-1997-4EFC-AB9F-F7DF12727342

# SWORN CERTIFICATION OF PLAINTIFF

## HYRECAR INC. SECURITIES LITIGATION

I, Michael Criden, on behalf Turton Inc., certify that:

1.  I and Todd Katz have assigned to Turton Inc. all rights, title, ownership, and interest in claims, demands, and causes of action of any kind whatsoever that we have or may have arising from violations of the federal securities laws of the United States of America in connection with out purchases or acquisitions of HyreCar Inc. securities.

2.  I have reviewed the Complaint and authorize its filing and/or the filing of lead plaintiff motion on behalf of Turton Inc.

3.  I am duly authorized to institute legal action on Turton Inc.'s behalf, including legal action against HyreCar Inc., and other defendants.

4.  Turton Inc. did not purchase the HyreCar Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

5.  Turton Inc. and I are willing to serve as representative parties on behalf of a class and are willing to provide testimony at deposition and trial, if necessary.

6.  Turton Inc.'s transactions in HyreCar Inc. securities, including transactions related to claims assigned to Turton Inc. are as follows:

    (See attached transactions)

7.  Turton Inc. has not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

    *Turton, Inc. vs Slack Technologies, Inc.*, 19-CIV-05411
    (California State Court, filed September 13, 2019)

8.  Turton Inc. will not accept any payment for serving as a representative party, except to receive its pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

12/3/2021

_____
Date

*Michael Criden*

_____
Michael Criden, President and Director
Turton, Inc.

**Turton Inc.'s Transactions in HyreCar Inc. (HYRE)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 4/9/2021 | Bought | 5,000 | $11.8499 |
| 4/9/2021 | Bought | 3,510 | $12.0800 |
| 4/9/2021 | Bought | 1,490 | $12.0799 |
| 4/16/2021 | Sold | -1,000 | $10.9612 |
| 4/16/2021 | Sold | -4,000 | $10.9601 |
| 4/16/2021 | Sold | -400 | $11.2400 |
| 4/16/2021 | Sold | -4,000 | $11.2001 |
| 4/16/2021 | Sold | -600 | $10.9700 |
| 4/19/2021 | Bought* | 20,000 | $10.0000 |
| 5/14/2021 | Sold | -69 | $12.2700 |
| 5/14/2021 | Sold | -293 | $12.2600 |
| 5/14/2021 | Sold | -466 | $12.2508 |
| 5/14/2021 | Sold | -4,172 | $12.2500 |
| 5/14/2021 | Sold | -5,000 | $12.6300 |
| 5/20/2021 | Sold | -2,500 | $16.9000 |
| 5/20/2021 | Sold | -2,353 | $16.9900 |
| 5/20/2021 | Sold | -5,000 | $17.1200 |
| 5/20/2021 | Sold | -147 | $16.9300 |
| 5/24/2021 | Bought* | 10,000 | $12.5000 |
| 5/24/2021 | Sold | -1 | $17.3750 |
| 5/24/2021 | Sold | -4,999 | $17.3606 |
| 5/25/2021 | Sold | -209 | $16.9901 |
| 5/25/2021 | Sold | -4,791 | $16.9900 |
| 5/26/2021 | Bought | 1 | $14.6550 |
| 6/3/2021 | Sold | -1 | $16.5450 |
| 7/9/2021 | Bought | 2,500 | $19.6199 |
| 7/9/2021 | Bought | 334 | $19.6799 |
| 7/9/2021 | Bought | 1,766 | $19.6784 |
| 7/9/2021 | Bought | 200 | $19.6720 |
| 7/9/2021 | Sold | -100 | $20.5450 |
| 7/9/2021 | Bought | 200 | $19.6690 |
| 7/9/2021 | Sold | -400 | $20.5170 |
| 7/9/2021 | Bought | 3,500 | $19.9700 |
| 7/9/2021 | Sold | -2,000 | $20.5114 |
| 7/9/2021 | Bought | 1,500 | $20.0399 |
| 7/12/2021 | Bought | 2,500 | $20.4399 |
| 7/12/2021 | Bought | 5,000 | $20.4399 |
| 7/12/2021 | Bought | 2,529 | $20.5100 |
| 7/12/2021 | Bought | 500 | $20.5099 |
| 7/12/2021 | Bought | 1,971 | $20.5080 |
| 7/14/2021 | Bought | 10,000 | $18.6199 |
| 8/11/2021 | Bought | 5,000 | $9.9199 |
| 8/12/2021 | Bought | 2,500 | $10.1500 |
| 8/12/2021 | Bought | 2,417 | $10.1100 |
| 8/12/2021 | Bought | 83 | $10.0900 |

*Option exercise.

**Turton Inc.'s Transactions in HyreCar Inc. Options**

| Date | Transaction Type | Contract Type | Exp / Strike | Quantity | Unit Price |
|------|------------------|---------------|--------------|----------|------------|
| 4/9/2021 | Bought to Open | Call | Apr 16, 2021 / $10 | 100 | $2.2000 |
| 4/12/2021 | Bought to Open | Call | Apr 16, 2021 / $10 | 56 | $2.2500 |
| 4/12/2021 | Bought to Open | Call | Apr 16, 2021 / $10 | 44 | $2.2000 |
| 4/16/2021 | Exercised | Call | Apr 16, 2021 / $10 | -200 | $0.0000 |
| 4/16/2021 | Bought to Open | Call | May 21, 2021 / $12.50 | 66 | $1.3500 |
| 4/16/2021 | Bought to Open | Call | May 21, 2021 / $12.50 | 18 | $1.3400 |
| 4/16/2021 | Bought to Open | Call | May 21, 2021 / $12.50 | 16 | $1.3300 |
| 4/16/2021 | Bought to Open | Call | May 21, 2021 / $12.50 | 100 | $1.3300 |
| 4/19/2021 | Bought to Open | Call | May 21, 2021 / $12.50 | 100 | $1.2500 |
| 5/7/2021 | Sold to Close | Call | May 21, 2021 / $12.50 | -100 | $1.6500 |
| 5/7/2021 | Sold to Close | Call | May 21, 2021 / $12.50 | -100 | $1.6500 |
| 5/21/2021 | Exercised | Call | May 21, 2021 / $12.50 | -100 | $0.0000 |

**Michael Criden's Transactions in HyreCar Inc. (HYRE)**

**Account 1**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 3/9/2021 | Sold | -700 | $8.8210 |
| 3/9/2021 | Sold | -300 | $8.8200 |
| 3/30/2021 | Sold | -2,000 | $8.6801 |
| 4/5/2021 | Sold | -2,000 | $10.1301 |
| 4/20/2021 | Bought | 1,000 | $10.8500 |
| 4/20/2021 | Bought | 1,000 | $10.8400 |
| 5/14/2021 | Sold | -500 | $12.6200 |
| 5/14/2021 | Sold | -500 | $12.6101 |
| 6/3/2021 | Sold | -1,000 | $17.3901 |
| 6/11/2021 | Sold | -1,000 | $18.9400 |
| 7/14/2021 | Bought | 1,000 | $18.4800 |
| 8/11/2021 | Bought | 166 | $14.0000 |
| 8/11/2021 | Bought | 175 | $13.9900 |
| 8/11/2021 | Bought | 200 | $13.9500 |
| 8/11/2021 | Bought | 400 | $13.9300 |
| 8/11/2021 | Bought | 59 | $13.9100 |
| 8/11/2021 | Bought | 1,000 | $11.8699 |
| 8/11/2021 | Bought | 100 | $11.8499 |

**Account 2**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 4/9/2021 | Bought | 5,000 | $11.7346 |
| 5/14/2021 | Sold | -5,000 | $11.4141 |
| 5/20/2021 | Bought* | 10,000 | $12.5000 |
| 5/20/2021 | Sold | -10,000 | $17.2500 |
| 5/20/2021 | Bought* | 10,000 | $12.5000 |
| 5/28/2021 | Sold | -6,050 | $16.5731 |
| 6/1/2021 | Sold | -3,950 | $17.0006 |
| 7/9/2021 | Bought | 5,000 | $20.8706 |
| 7/12/2021 | Bought | 5,000 | $20.9065 |
| 8/5/2021 | Sold | -5,000 | $17.1240 |

*Option exercise.

**Michael Criden's Transactions in HyreCar Inc. Options**

| Date | Transaction Type | Contract Type | Exp / Strike | Quantity | Unit Price |
|------|------------------|---------------|--------------|----------|------------|
| 4/20/2021 | Bought to Open | Call | May 21, 2021 / $12.50 | 100 | $1.1000 |
| 4/20/2021 | Bought to Open | Call | May 21, 2021 / $12.50 | 100 | $1.1000 |
| 5/21/2021 | Exercised | Call | May 21, 2021 / $12.50 | -200 | $0.0000 |

**Todd Katz' Transactions in HyreCar Inc. (HYRE)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 4/19/2021 | Bought | 4,500 | $11.4699 |
| 4/19/2021 | Bought | 400 | $11.4690 |
| 4/20/2021 | Bought | 5,100 | $10.7499 |
| 5/14/2021 | Sold | -5,000 | $11.4301 |
| 5/14/2021 | Sold | -4,950 | $11.4100 |
| 5/14/2021 | Sold | -50 | $11.3908 |
| 5/14/2021 | Bought | 10,000 | $12.6400 |
| 5/17/2021 | Sold | -2,085 | $13.7608 |
| 5/17/2021 | Sold | -1,217 | $13.7600 |
| 5/17/2021 | Sold | -670 | $13.7350 |
| 5/17/2021 | Sold | -4 | $13.7200 |
| 5/17/2021 | Sold | -1,024 | $13.7100 |
| 5/19/2021 | Sold | -5,000 | $16.0000 |
| 5/21/2021 | Bought | 3,000 | $17.0899 |
| 5/21/2021 | Bought | 2,000 | $17.1000 |
| 5/21/2021 | Bought | 2,500 | $17.0799 |
| 5/21/2021 | Bought | 3,176 | $16.9950 |
| 5/21/2021 | Bought | 2,900 | $17.1200 |
| 5/21/2021 | Bought | 1,424 | $17.1200 |
| 5/24/2021 | Sold | -4,786 | $17.0601 |
| 5/24/2021 | Sold | -214 | $17.2106 |
| 5/25/2021 | Sold | -5,000 | $16.9901 |
| 5/25/2021 | Sold | -1,006 | $16.3501 |
| 5/25/2021 | Sold | -3,994 | $16.3500 |
| 7/13/2021 | Bought | 2,500 | $21.0999 |
| 7/13/2021 | Bought | 2,500 | $21.0988 |
| 7/13/2021 | Bought | 2,300 | $21.1486 |
| 7/13/2021 | Bought | 200 | $21.1470 |
| 7/13/2021 | Bought | 3,100 | $21.1999 |
| 7/13/2021 | Bought | 200 | $21.1960 |
| 7/13/2021 | Bought | 200 | $21.1900 |
| 7/13/2021 | Bought | 4,000 | $21.3000 |
| 7/14/2021 | Bought | 5,000 | $20.1490 |
| 7/14/2021 | Bought | 8,200 | $18.6199 |
| 7/14/2021 | Bought | 1,699 | $18.6190 |
| 7/14/2021 | Bought | 1 | $18.5800 |
| 7/14/2021 | Bought | 100 | $18.5750 |
| 8/11/2021 | Bought | 5,000 | $9.9399 |
| 8/11/2021 | Bought | 5,000 | $9.9199 |

**Todd Katz' Transactions in HyreCar Inc. Options**

| Date | Transaction Type | Contract Type | Exp / Strike | Quantity | Unit Price |
|---|---|---|---|---|---|
| 4/26/2021 | Bought to Open | Call | May 21, 2021 / $12.50 | 150 | $2.5000 |
| 5/21/2021 | Sold to Close | Call | May 21, 2021 / $12.50 | -150 | $4.6000 |

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.  On December 3, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 3, 2021, at Los Angeles, California.

_s/ Robert V. Prongay_
Robert V. Prongay