Robert V. Prongay (SBN 270796)
Ex Kano S. Sams II (SBN 192936)
Raymond D. Sulentic (SBN 316913)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: esams@glancylaw.com
Email: rsulentic@glancylaw.com

*Counsel for Lead Plaintiff Turton Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN BARON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> HYRECAR INC., JOSEPH FURNARI and ROBERT SCOTT BROGI, <br><br> Defendants. | Case No. 2:21-cv-06918-PA-JC <br><br> **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT BY DEFENDANTS HYRECAR INC., JOSEPH FURNARI AND ROBERT SCOTT BROGI** <br><br> Hearing Date: January 31, 2022 <br> Time: 1:30 p.m. <br> Ctrm: 9A <br> Judge: Hon. Percy Anderson |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

I. INTRODUCTION ...........................................................................................1

II. STATEMENT OF FACTS ............................................................................3

    A. Background ..........................................................................................3

    B. Defendants' Insurance Expense Suppression and Earnings Management ..........................................................................................4

    C. HyreCar's Delay in Payments Was Based Upon Budgetary Considerations and Other Criteria Irrelevant to the Underlying Claims ..................................................................................................5

    D. To Minimize the Effect of Surging Claims, Defendants Closed Accounts...............................................................................................6

    E. HyreCar's Delay in Payments Created a Surge of Backlogged Claims and a Looming True Up Event.................................................7

    F. Reams of Complaints to the BBB Corroborate the CWs' Accounts......7

    G. HyreCar Also Withheld Payments Owed to Owners Who Had Renters Incur Tolls or Tickets.............................................................................8

    H. HyreCar Also Recklessly Permitted High-Risk Drivers to Rent Vehicles to Show Near-Term Revenue Growth ..................................................8

    I. The Truth Begins to Emerge................................................................9

III. STANDARD OF REVIEW ...........................................................................9

IV. PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT .....................................................................................10

    A. Plaintiff Adequately Alleges That Defendants Made Materially False and Misleading Statements ...............................................................10

        1. Defendants Made False and Misleading Statements Regarding HyreCar's Insurance Expenses and Earnings.............................11

        2. Defendants Made False and Misleading Statements About HyreCar's Insurance, Gross Margins, Scalability, and Risk Pricing...........................................................................................11

        3. Defendants' Falsity Arguments Fail..........................................13

i

B.    Plaintiff Adequately Alleges that Defendants Acted With Scienter.....17

    1.    The Confidential Witnesses Support a Strong Inference of Scienter ...............................................................................18

    2.    Defendants' Stock Sales Support a Strong Inference of Scienter ...............................................................................19

    3.    CFO Brogi's Departure Adds to the Strong Inference of Scienter Alleged...........................................................22

    4.    Because the Facts Alleged Relate to the Company's Core Operations, They Support a Strong Inference of Scienter..........23

    5.    The Small Size of the Company Further Supports a Strong Inference of Scienter................................................23

C.    Plaintiff Adequately Alleges Control Person Liability........................25

V.    CONCLUSION ...........................................................................25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................9

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ...............................................................24

*Batwin v. Occam Networks, Inc.*,
   No. CV 07-2750 CAS (SHx), 2008 WL 2676364 (C.D. Cal. July 1, 2008)...20, 24

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................9

*Berson v. Applied Signal Tech.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................................16

*Bielousov v. GoPro, Inc.*,
   No. 16-cv-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) ..................22

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) ................................................................................15

*Curry v. Hansen Medical, Inc.*,
   No. 4:09-cv-05094-CW, 2012 WL 3242447 (N.D. Cal. Aug. 10, 2012)..............24

*Cutler v. Kirchner*,
   No. 15-56897, 2017 WL 3530893 (9th Cir. Aug. 17, 2017)...........................16, 19

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) ................................................................................18

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ..............................................................................25

*Flynn v. Sientra, Inc.*,
   No. CV1507548SJORAOX, 2016 WL 3360676 (C.D. Cal. June 9, 2016) .........23

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Allied Nevada Gold Corp. Sec. Litig.*,
   743 F. App'x 887 (9th Cir. 2018)...........................................................................15

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) .........................................................................*passim*

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
   324 F. Supp. 2d 474 (S.D.N.Y. 2004) ...................................................................14

*In re Banc of California Sec. Litig.*,
   No. SACV1700118AGDFMX, 2017 WL 3972456 (C.D. Cal. Sept. 6, 2017).....23

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   654 F. Supp. 2d 1037 (N.D. Cal. 2009)..................................................................17

*In re Countrywide Fin. Corp. Derivative Litig.*,
   554 F. Supp. 2d 1044 (C.D. Cal. 2008)..................................................................19

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008)..................................................................14

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ........................................................................10, 18

*In re Diamond Foods, Inc., Sec. Litig.*,
   No. C 11-05386 WHA, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) ...............24

*In re Faro Techs. Sec. Litig.*,
   534 F. Supp. 2d 1248 (M.D. Fla. 2007) .................................................................14

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014).....................................................................22

*In Re Intuitive Surgical Sec. Litig.*,
   No. 5:13-CV-01920-EJD, 2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ...........20

*In re JDS Uniphase Corp. Sec. Litig.*,
   No. C 02-1486 CW, 2007 WL 2429593 (N.D. Cal. Aug. 24, 2007) ....................21

*In re Lantronix, Inc.*,
   No. CV02-03899PA(JTLX), 2003 WL 23198818 (C.D. Cal. Dec. 31, 2003)......24

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Levi Strauss & Co. Sec. Litig.*,
  527 F. Supp. 2d 965 (N.D. Cal. 2007)......................................................................24

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008)...................................................................24

*In re Omnivision Techs., Inc.*,
  No. C-04-2297 SC, 2005 WL 1867717 (N.D. Cal. July 29, 2005)......................20

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) .....................................................................*passim*

*In re Secure Computing Corp. Sec. Litig.*,
  184 F. Supp. 2d 980 (N.D. Cal. 2001)....................................................................21

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
  266 F. Supp. 2d 1150 (C.D. Cal. 2003)............................................................20, 21

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999) ...................................................................................22

*In re Silver Wheaton Corp. Sec. Litig.*,
  No. CV15-5146-CAS(JEMX), 2016 WL 3226004 (C.D. Cal. June 6, 2016) ......25

*In re STEC Inc. Sec. Litig.*,
  No. CV09-08536-JVS MLGX, 2011 WL 2669217 (C.D. Cal. June 17, 2011)....16

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006) ....................................................................................20

*In re TUT Sys., Inc. Sec. Litig.*,
  No. C 01-02659 CW, 2002 WL 35462358 (N.D. Cal. Aug. 15, 2002) ................22

*In re VeriFone Holdings, Inc. Sec. Litig.*,
  704 F.3d 694 (9th Cir. 2012) ...................................................................................18

*Junge v. Geron Corp.*,
  No. C 20-00547 WHA, 2021 WL 1375960 (N.D. Cal. Apr. 12, 2021)................21

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................................................16

v

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Luna v. Marvell Tech. Grp.*,
  No. C 15-05447 WHA, 2017 WL 2171273 (N.D. Cal. May 17, 2017)...............23

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) .....................................................................15

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
  540 F.3d 1049 (9th Cir. 2008) ..............................................................................22

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ................................................................22

*Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*,
  50 F. Supp. 3d 1328 (C.D. Cal. 2014) ..................................................................24

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
  780 F. App'x 480 (9th Cir. 2019) ...................................................13, 14, 16, 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................................15

*Robb v. Fitbit Inc.*,
  216 F. Supp. 3d 1017 (N.D. Cal. 2016)................................................................14

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ........................................................................18, 23

*Schlagal v. Learning Tree Int'l*,
  No. CV 98-6384 ABC (EX), 1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) .......21

*SEC v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ..............................................................................25

*Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*,
  No. 20-CV-04737-RS, 2021 WL 4864421 (N.D. Cal. Oct. 19, 2021)..................13

*Suez Equity Investors, L.P., v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) ....................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)......................................................................10, 17, 18, 24

vi

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) .................................................................................23

STATUTES

15 U.S.C. §78j(b) ...................................................................................................10

15 U.S.C. §78t(a) ...................................................................................................25

15 U.S.C. §78u-4(b)(1)(B) .....................................................................................10

15 U.S.C. §78u-4(b)(2) ...........................................................................................17

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.   INTRODUCTION

This case is a securities class action on behalf of all purchasers of the securities of HyreCar, Inc. between February 3, 2021 and August 17, 2021, inclusive ("Class Period").[1]  Defendants raised money from shareholders and used a conflicted party to help manage earnings through expense concealment and suppression.  This scheme enabled HyreCar to delay reporting insurance losses just long enough for Company insiders to reap millions through significant insider sales.  Once Defendants revealed the truth, the Company's stock cratered by over 50%, causing significant losses for investors.

HyreCar operates a peer-to-peer platform where owners of vehicles can rent their cars directly to consumers.  Like a traditional car rental agency, HyreCar required drivers to maintain insurance to protect the car owner's property.  The Company also required drivers to use HyreCar's own insurance plan, which was partially self-funded.  HyreCar charged drivers an additional fee for this service that was intended to provide protection for drivers.  When HyreCar charged the fee, it boosted the Company's revenue.  Conversely, when HyreCar paid an insurance claim, that payout created an expense.  Accordingly, there was tension between acquiring more renters – which boosted revenue – and paying insurance claims expenses, which offset that revenue.  Estimates of future payouts also created an insurance reserve.

Unlike a traditional car rental dealer, however, HyreCar did not consistently pay its insurance claims for vehicles that were damaged or stolen.  Indeed, the Company delayed so many claims that it had hundreds of complaints and negative reviews with the Better Business Bureau ("BBB").  As HyreCar fell further behind on its claims owed to customers, around the middle of 2019, HyreCar's then existing

---

[1]   Defendants are HyreCar, Inc. ("HyreCar" or the "Company"), Chief Executive Officer ("CEO") Joseph Furnari ("Furnari"), and Chief Financial Officer ("CFO") Robert Scott Brogi ("Brogi").  Unless otherwise stated, all emphasis is added and all internal citations and quotations are omitted.

1

claims administrator ended its relationship with HyreCar.  At that point, Defendants engaged a newly formed conflicted party, Genoteq, to manage its claims.

Defendants, however, concealed that Genoteq was a tiny entity that had just recently been formed by David Haley ("Haley"), who also: (1) sat on HyreCar's Strategic Advisory Board; (2) held a minority position in HyreCar; (3) entered into a joint venture with the Hyrecar; and (4) owned a company called ABI, which was HyreCar's sole insurance broker.  HyreCar paid ABI millions per year for insurance brokerage services and paid $50 per claim to Genoteq to purportedly process claims.

Moreover, Genoteq – a newly-created entity with few employees and no experience in claims adjustment – was ill suited to handle the volume of claims that HyreCar faced.  Thus, once Genoteq was in place, HyreCar could continue making insurance payments based not on a claim's validity, but on considerations such as the Company's budget.  According to hundreds of consumer complaints, HyreCar ignored consumers whose vehicles were damaged.  This dynamic negatively impacted HyreCar's financial statements by creating a significant backlog of insurance liability.  Defendants, however, misrepresented the purported "strength" of the Company's insurance platform and claimed that "the lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment."  Defendants also fundamentally misrepresented Genoteq's involvement.  Rather than disclose the true nature of the conflicted relationship between Genoteq and HyreCar, Defendants represented that the Company's insurance reserves were based on "both currently available information to estimate the insurance reserves as well as ***third party claims adjuster data*** provided on existing claims," which was patently false because Genoteq was not a truly independent third-party.

This claims-suppression dynamic became unsustainable and eventually the Company replaced ABI with AON, a well-known and reputable broker and risk manager. Soon afterward, HyreCar replaced Genoteq, suggesting AON was uncomfortable with the conflicted party arrangement.  Then, CFO Brogi resigned.  On

2

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

August 11, 2021, Defendants reported deeply disappointing results for the Company's quarterly period ended June 30, 2021 ("Q2 2021"), including net losses of $9.3 million. Defendants further disclosed that HyreCar had incurred skyrocketing costs during the quarter mainly due to significantly higher insurance claims incidence – including claims before March 31, 2021 "in excess of the reserves." Defendants also revealed that "[t]he remainder of the cost increase was primarily driven up by additional insurance claims of $2.8 million of which approximately $1.2 million was attributed to one-off new developments on claims and incidental payments incurred prior to March 31, 2021 in excess of the reserves and accruals." Once Defendants were forced to recognize HyreCar's massive backlog of unpaid claims as expenses, the Company's stock plummeted ***nearly 50%*** in a single day to close at $9.85 per share on August 11, 2021, thereby causing substantial losses to investors.

Contrary to Defendants' Motion to Dismiss Amended Complaint by Defendants HyreCar Inc., Joseph Furnari and Robert Scott Brogi ("Motion"), Plaintiff has adequately stated claims pursuant to the Securities Exchange Act of 1934 ("Exchange Act"). Accordingly, the Court should deny Defendants' Motion.

## II.   STATEMENT OF FACTS

### A.   Background

HyreCar operates a web-based marketplace that allows car and fleet owners to rent their cars to Uber, Lyft and other gig economy service drivers. ¶28.[2] HyreCar operates a platform that connects gig drivers with automobiles while also providing insurance and tactical support. *Id*. HyreCar also provides a way for an owner of a vehicle to generate passive income from his or her car by renting it directly to interested renters for a fee. ¶29. HyreCar generates revenue by taking a fee out of each rental processed on HyreCar's platform. ¶30. HyreCar uses self-insurance for a portion of its claims. ¶31. When a vehicle on its platform gets into an accident,

---

[2]   Unless otherwise stated, all paragraph ("¶") references refer to Plaintiff's Amended Complaint for Violations of the Federal Securities Laws ("Complaint").

3

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

HyreCar uses a claims adjuster and administrator to both review the claim and process it. *Id.* To process that payment, HyreCar, as the self-insuring entity (with supplemental insurance from a reinsurance provider), would put funds into an account and then the TPA would distribute those funds to the claimant. *Id.*

Furnari became HyreCar's CEO in January 2017. ¶32. Shortly after becoming CEO, Furnari's brother, Michael Furnari, was elevated from Director of Sales (a position he held since May 2016), to Chief Business Development Officer in October 2017. *Id.* In April and May 2017, just over a year before the Company's June 2018 IPO, Furnari and Haley invested $100,000 and $200,000, respectively, into Notes ("the 2017 Notes") with embedded warrants that converted into HyreCar shares at $2.10 per share. ¶33.

**B.    Defendants' Insurance Expense Suppression and Earnings Management**

Following the joint investment in the 2017 Notes, Haley and HyreCar entered into a joint venture. ¶34. Haley was both a minority shareholder in HyreCar and a member of the Company's Strategic Advisory Board. *Id.* Additionally, Haley also owned ABI, HyreCar's sole insurance broker, and Genoteq, HyreCar's purported third-party claims adjuster and claims administrator ("TPA").

HyreCar also turned to conflicted party Genoteq after its prior TPA ceased doing business with HyreCar. At some point during 2019, HyreCar's prior TPA ceased doing business with HyreCar. ¶41. According to CW9 (a Genoteq Claims Assistant and Manager's Assistant who worked at Genoteq from July 2020 through October 2021), the prior TPA was purchased by another company around the time when the new owner of HyreCar's former TPA took over, and the new owner dropped HyreCar because HyreCar was not paying its claims. ¶¶36, 41. Then, according to CW9, Haley formed Genoteq to operate as HyreCar's conflicted TPA. ¶42.[3]

---

[3]    Defendants correctly identify a scrivener's error in the Complaint. Motion at 13-14, n.5 (citing footnote four of the Complaint). Footnote four of the Complaint

4

Before the October 2018 Joint Venture with Haley ("the 2018 JV"), Genoteq did not have an operating history and consisted of just a handful of employees. ¶¶44-45. The combination of Genoteq's small size and Haley's ownership made Genoteq: (1) ill-equipped to handle the high volume of HyreCar's claims; and (2), well-suited for HyreCar and Haley to manage and suppress claim payouts based on budgetary or earnings considerations. ¶46. After Genoteq was installed, the insurance claim payment delays worsened considerably, and Defendants gained more control over the timing of the payouts. ¶¶47-48. These delays were made possible in part by HyreCar's use of self-insurance for a portion of its claims. ¶49.

### C. HyreCar's Delay in Payments Was Based Upon Budgetary Considerations and Other Criteria Irrelevant to the Underlying Claims

Defendants based their decisions on claims payments on budgetary considerations unrelated to the underlying claims. For instance, according to CW5, a Customer Support Specialist who worked at HyreCar between August 2019 and November 2020, Genoteq would first decide whether "we're going to cover them [or not and if so,] we'll give them this amount." ¶50. Then, after Genoteq would provide its initial feedback, HyreCar Head of Dealer Development, Jordan Neidig ("Neidig") ran an initial pass at "whether the claim gets paid out." *Id.* According to CW9, Neidig and Genoteq Manager Stacy Ashton ("Ashton") "had a meeting every Friday to discuss claims and paying them." ¶51. The purpose "*was to delay processing claims as much as possible,*" according to CW4, an Operational Risk Manager from July 2017 through September 2018. ¶52. CW4 also stated that HyreCar would just pay claims out of the budget given by the CEO. *Id.* Similarly, CW10, the Manager of Genoteq, stated "HyreCar reviewed every claim, and they had to approve them before

---

should have read "CW9 was intimately familiar with and reviewed correspondence of Genoteq Manager Stacy Ashton between the fall of 2020 and spring of 2021," not between the fall of 2019 and spring of 2020. Plaintiff apologizes for the scrivener's error and for any confusion to the parties or the Court.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

they were paid." ¶53. When asked who at HyreCar issued approvals, CW10 responded, "**The CFO was involved**, I'm sure." *Id*. CW7 likewise stated that CFO Brogi would "pretty much give us the green light in terms of paying claims . . . **[which] was based on our budget – like if we could afford it that month**." ¶54.

Additionally, CW5 also stated that "[t]here were times when [managers] would say there were no funds for refunds or rebates. **We were told to not disclose that**, you know, if people called asking about their refund or rebate." ¶¶55-56. CW4 stated that "[c]laims issues were well known to operations. It was not a secret." ¶57. Additionally, CW1 stated that "HyreCar didn't want to pay – didn't have enough money to pay – and wanted to keep it in its account to gain interest or whatever." ¶58.

CW8, a Genoteq Associate who worked at Genoteq from March 2020 through June 2020, stated that "people would call in and complain and complain and complain and complain, because their claims weren't getting handled in a timely manner." ¶59. CW8 estimated that roughly half of HyreCar's claims rolled over every month. *Id*. CW9 added that the Company had claims over seven or eight months old because HyreCar chose not to pay them. ¶¶60-61. At the time of the March 1, 2021 transition to Sedgwick, CW9 estimated that Genoteq's runoff HyreCar claims totaled "anywhere from $700,000 to a million." ¶62.

**D.    To Minimize the Effect of Surging Claims, Defendants Closed Accounts**

Defendants also closed accounts to reduce the effect of surging claims. According to CW9, who saw emails between Neidig of HyreCar and Ashton of Genoteq, HyreCar worked with Genoteq to mark outstanding claims as "closed" to minimize the appearance of outstanding claims "so that HyreCar could report that there were no runoff claims." ¶¶63-65. When asked who issued the instruction to close claims, CW9 responded, "I believe it was Jordan [Neidig] - the claims manager – and the CEO and CFO of HyreCar." ¶¶66-67. CW9 stated further that CFO Brogi decided on the amount to fund the claims account. ¶¶68-70.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**E.    HyreCar's Delay in Payments Created a Surge of Backlogged Claims and a Looming True Up Event**

One result of Defendants' delay in paying claims was that it snowballed.  ¶71. CW2, a Genoteq representative from early 2019 through October 2020 who communicated with Neidig and Megan Behrens at HyreCar, stated that "we would continue getting complaints about claims not being paid" and estimated that Genoteq rolled over "nothing less than 300 claims per month."  ¶72.  Similarly, CW11, a Genoteq adjuster assistant from September 2020 through May 2021, stated that HyreCar "would take forever to make payments. We'd have a million dollars sitting in claims, needing to be paid, and they hadn't been paid in months."  ¶73.

CW6 (a HyreCar employee who held various roles from August 2019 through August 2021), stated that CW6's accounts would tell CW6 that the vehicle "owners were supposed to be paid out in mid-2019" but still had not been.  ¶74.  CW9 stated that the largest backlog of claims that CW9 observed at HyreCar "was probably $1.2 to 1.3 million."  ¶75.   CW9 reported that HyreCar had an average of $500,000 in claims per month.  ¶76. However, CW9 continued, "[i]f you go months without paying, that's how you get to the $1.3 million that you owe."  *Id*.  CW11 estimated the unpaid backlog in March 2021 "in the millions."  ¶77.  In fact, the surging claims at Genoteq led to multiple CWs who worked there to receive death threats from angry consumers over delays.  ¶78.  Multiple CWs also expressed concern over the legality over numerous facets of Genoteq and HyreCar's operations, such as employees improperly conducting work without a license.  ¶¶79-81.

**F.    Reams of Complaints to the BBB Corroborate the CWs' Accounts**

Additionally, dozens upon dozens of consumer complaints and reviews submitted to the BBB corroborate the CWs' accounts and similarly describe Genoteq's inability or unwillingness to properly process claims as well as the resulting obfuscation on HyreCar's part that Genoteq enabled.  ¶¶83-92.

7

**G.      HyreCar Also Withheld Payments Owed to Owners Who Had Renters Incur Tolls or Tickets**

In addition to denying or delaying insurance claim payments to vehicle owners for damaged vehicles, HyreCar also refused to refund owners whose renters incurred various tolls or tickets, contrary to HyreCar's stated policy.  ¶¶93-95.

**H.      HyreCar Also Recklessly Permitted High-Risk Drivers to Rent Vehicles to Show Near-Term Revenue Growth**

At Furnari's direction, HyreCar also knowingly permitted drivers who would otherwise be unqualified to rent from HyreCar to boost revenue.  ¶96.  For instance, CW4 stated that Mike Funari would unlock accounts of drivers who had gotten into accidents "***just to hit rental numbers***."  *Id*.  When asked if this activity had caused more insurance claims, CW4 responded: "[a]bsolutely.  They had one or two claims for accidents in other cars and then they put them in another car.  It was all about active rentals."  *Id*.  CW4 further stated that CW4 raised this concern with CEO Furnari in weekly meetings and in his office, but that CW4 was told "sales were more important than anything."  ¶97.  CW1 was told to even promise owners of damaged vehicles that their outstanding claims would be more likely to be processed if they uploaded more vehicles onto HyreCar's platform to rent out.  ¶98.  Reviews and complaints on the BBB – as well as CW accounts – further establish that HyreCar was either deliberately reckless in conducting driver background checks or knowingly permitting drivers with criminal backgrounds to rent cars to boost revenue.  ¶¶99-107.

Defendants' practices also distorted HyreCar's reported financials.  ¶108.  For instance, by delaying payouts and denying valid claims, HyreCar initially reported lower costs than would have (and should have) been the case had it not withheld valid claims owed to its users.  *Id*. That lower expense early on, in turn, led investors to believe that HyreCar was a company with higher profit margins than it really had – and more specifically, higher gross profits (which is calculated as sales minus cost of sales).  *Id*.  Moreover, by permitting otherwise unqualified drivers onto the platform, HyreCar initially showed a bump in revenue that was both: (1) artificial because many

8

drivers never should have qualified had they not been "unlocked" by Defendants; and (2) likely to lead to future insurance claims because persons convicted of felonies are more likely to steal cars than those that have not been. ¶109.

Defendants' ability to continue their scheme, however, began to hit resistance in May 2021, when the Company announced that it "completed its integration" with Sedgwick, a claim processing partner that replaced Genoteq. ¶¶110-11. CW9 stated that after the transition from Genoteq to Sedgwick "[w]e were in contact with Sedgwick quite often, because of confusion about who the adjuster was during the transition – and we got a lot of info from them too. They'd say, 'Oh, they're not really paying these claims.'" ¶112. Roughly a month later, on June 15, 2020, HyreCar engaged AON to replace ABI as its insurance broker. ¶113. AON also served as HyreCar's risk partner. *Id*. Less than two weeks later, CFO Brogi resigned. ¶114.

## I. The Truth Begins to Emerge

On August 10, 2021, HyreCar announced deeply disappointing results for the quarterly period ended June 30, 2021 ("Q2 2021"). ¶146. HyreCar also disclosed that it had incurred skyrocketing costs of revenue during the quarter mainly due to significantly higher insurance claims incidence – including claims before March 31, 2021 "in excess of the reserves." ¶147. These revelations effectively served as a true-up for prior periods insurance reserves and expenses that had been purposefully under-reserved or suppressed through Defendants' scheme to delay payouts to valid claimants. ¶148. HyreCar further revealed that it was forced to revamp its claims procedures and improve risk price adjustments, which would severely compress margins. ¶¶151-55. On this news, the price of HyreCar stock fell ***nearly 50%***. ¶156.

## III. STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

9

(2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). Courts must also construe the facts alleged "in the light most favorable to plaintiffs." *In re Daou Sys., Inc*., 411 F.3d 1006, 1013 (9th Cir. 2005); *In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1140 (9th Cir. 2017).

## IV. PLAINTIFF ADEQUATELY ALLEGES VIOLATIONS OF THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §78j(b). To state a claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Quality Sys.*, 865 F.3d at 1140.

### A. Plaintiff Adequately Alleges That Defendants Made Materially False and Misleading Statements

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B). Statements are misleading if they "affirmatively create a plausibly misleading impression of a state of affairs that differed in a material way from the one that actually existed." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021); *Quality Sys.*, 865 F.3d at 1144.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**1.  Defendants Made False and Misleading Statements Regarding HyreCar's Insurance Expenses and Earnings**

Defendants made numerous false and misleading statements regarding HyreCar's insurance expenses and earnings.  ¶¶35-40, 117-118, 162, 164, 166-67, 170, 172, 175-78, 180, 186, 188-89, 192, 194.  For instance, HyreCar represented that it would rely on a purported TPA to estimate its insurance reserves.  ¶¶35-40, 166-67, 175-76.  These representations were false because the purported TPA, Genoteq, was not a truly independent third-party.  *Id.*  Haley was both a minority shareholder in HyreCar and a member of the Company's Strategic Advisory Board.  *Id.*  Additionally, Haley also owned ABI, HyreCar's sole insurance broker, and Genoteq, HyreCar's purported third-party claims adjuster and claims administrator ("TPA").  *Id.*  Moreover, according to CW9, Furnari and Haley were good friends and Genoteq received $50 for every claim which it processed for HyreCar.  *Id.*  Throughout the Class Period, therefore, Defendants misrepresented the nature of HyreCar's relationship with ABI and Genoteq, including by touting its relationship with ABI as "a strength" and by misrepresenting that HyreCar relied on a "third-party" for information to estimate its insurance reserves when Genoteq was not a third-party but a conflicted party.  ¶¶117-118.  According to HyreCar's Form 10-K for the year ended December 31, 2019 ("the 2019 10-K"), HyreCar paid ABI $5.0 and $4.3 million, or 31.6% and 44.0% of revenue, respectively, during 2019 and 2018, respectively.  *Id.*

**2.  Defendants Made False and Misleading Statements About HyreCar's Insurance, Gross Margins, Scalability, and Risk Pricing**

Defendants also made false and misleading statements about HyreCar's insurance, gross margins, scalability, and risk pricing. ¶¶119, 120-22, 127-28, 135, 141, 145, 176-77, 189-90, 196.  For example, Defendants suggested that insurance costs should decline going forward as claims has been brought "completely current," (¶¶119, 175), when, in fact, claims were not brought current but were still being suppressed.  ¶¶120, 176.  Defendants also sought to lay blame for growing insurance

11

expenses on exogenous factors, which, according to Defendants, was "***primarily due to some seasonal shifts in insurance costs*** to support higher levels of car supply through the winter quarter." ¶¶121, 127, 135, 177, 189.[4]  These statements were also false and misleading because of: (a) a swelling backlog of claims due to Defendants' reckless reliance on conflicted-party Genoteq; (b) the natural correlations between insurance costs and high-risk drivers; and (c) the foreseeable result of recklessly permitting high-risk drivers, including those with criminal records, onto HyreCar's platform.  ¶¶122, 128, 177, 190.

Defendants' misrepresentations continued.  Defendants claimed that "[t]he lag time in reported claims is minimal and as such ***represents a low risk of unreported claims being excluded from the loss reserve assessment***."  ¶123.  Defendants also represented that in estimating the Company's reserves, HyreCar "makes certain assumptions based on both currently available information to estimate the insurance reserves as well ***as <u>third party claims adjuster data</u>*** provided on existing claims."  *Id*. These statements were patently false and misleading because the purported "third party claims adjuster" was not a third party, but the exact opposite: it was a conflicted party controlled by Haley, with whom the Company had a joint venture that appears to have been formed for the purpose of suppressing claims.  ¶124.

Defendants' misrepresentations about HyreCar's insurance liability continued when Defendants described the Company's "unique insurance program" as being a "Key Company Metric."  ¶129.  As demonstrated both by customer complaints and multiple CW accounts, however, HyreCar was recklessly permitting high risk drivers on its platform merely to show higher sales growth.  ¶130.  Defendants also

---

[4]    Defendants used identical language in blaming these purported "seasonal shifts" for two consecutive quarters.  ¶¶121 (blaming Q4 2020 insurance expenses on so-called "seasonal shifts"), 127-128 (blaming Q1 2021 insurance expense increases again to "seasonal shifts).  In other words, the purported "seasonal shift" that Defendants claim was the reason for increasing insurance costs lasted at least six months long, which is of course longer than any particular season.

12

misrepresented the risk that the Company's driver selection criteria had on the Company's insurance claims and thus HyreCar's earnings. ¶¶130-35.

As a result, Defendants' scheme distorted HyreCar's ability to reach economies of scale as it grew (also referred to as "scalability") in large part by understating, and indeed suppressing, the true cost of insurance in HyreCar's platform which was aided by Defendants' reckless reliance on conflicted-party Genoteq to process claims. ¶¶136-45. Indeed, the suppressed insurance costs that reflected Genoteq and HyreCar's denial and delay in paying claims made HyreCar appear to have more operating leverage than was really the case. *Id*. Thus, Defendants' representations created "a plausibly misleading impression of a state of affairs that differed in a material way from the one that actually existed." *Alphabet*, 1 F.4th at 700.

### 3. Defendants' Falsity Arguments Fail

Defendants' falsity argument are meritless. First, Defendants suggest that Plaintiff's allegations merely constitute mismanagement. Motion at 11. Defendants are wrong. "Rather than a *post hoc* critique of management decisions, plaintiffs contend that they were deceived by [defendants' misrepresentations] into purchasing a financial instrument that they would have otherwise avoided." *Suez Equity Investors, L.P., v. Toronto-Dominion Bank*, 250 F.3d 87, 99 (2d Cir. 2001). Indeed, defendants are liable where, as here, they "mismanage their company and lie to investors about that mismanagement." *Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc*., 780 F. App'x 480, 484 n.4 (9th Cir. 2019). Because Plaintiff alleges that Defendants intentionally misled investors rather than simply made bad business decisions, Plaintiff has pled more than mere mismanagement. *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, No. 20-CV-04737-RS, 2021 WL 4864421, at *3 (N.D. Cal. Oct. 19, 2021).

Second, Defendants claim that Plaintiff has not adequately alleged that HyreCar's expenses or insurance reserves were understated. Motion at 11-15. Defendants' Motion, however, concedes that Plaintiff alleges that Defendants

13

understated the Company's insurance expenses by between $700,000 and $1.25 million.  Motion at 11-12; ¶¶171, 187, 191, 195.  Defendants' suggestion that more specificity is required is incorrect.  "Neither the PSLRA nor Rule 9(b) requires a plaintiff to reconstruct a company's financial affairs in greater detail than the corporation's own auditors were able to achieve."  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 487 (S.D.N.Y. 2004); *see also In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008) ("failing to precisely specify each fact and date is not fatal"); *In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1260 (M.D. Fla. 2007) (rejecting defendants' argument that plaintiff inadequately alleged the amount by which expenses were understated and not requiring that plaintiff to "quantify the falsity to the penny").  Moreover, although Defendants attempt to challenge the account of CW9 (Motion at 13-15), Plaintiff adequately alleges the basis for CW9's statements.  ¶36; *see Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (holding that plaintiffs adequately alleged the CWs' positions thereby "establishing their reliability and personal knowledge of the alleged inaccuracies").  Defendants also attempt to rely upon the Company's risk disclosures to evade liability.  Motion at 6, 13 n.4, 14-17, 19.  However, warnings that "actual losses ***may*** exceed our insurance reserves" (Motion at 6) or that "new information regarding claims ***may*** require adjustment to reserves" (Motion at 13 n.4) are insufficient where, as here, the risk has already materialized.  *See, e.g.*, *Alphabet*, 1 F.4th at 703 ("Risk disclosures that speak[ ] entirely of as-yet-unrealized risks and contingencies and do not alert[ ] the reader that some of these risks may already have come to fruition can mislead reasonable investors."); *LifeLock*, 780 F. App'x at 484 (the company's "risk disclosures only discussed the ***possibility*** of future problems").[5]

---

[5]     With no authority, Defendants contend that HyreCar's audit opinion insulates them from liability.  Motion at 12.  However, the "fact that [a company's] independent

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Third, Defendants claim that the Company's insurance reserve estimates constitute inactionable statements of opinion.  Motion at 15, 16 n.6, 18.  In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), however, the Supreme Court affirmed that statements of opinion are actionable if either "the speaker did not hold the belief she professed" or if "the supporting fact she supplied were untrue." *Id*. at 185-86.  Importantly, the Court in *Omnicare* held further that opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor.   *Id*. at 194.   Thus, even if the Company's insurance reserve estimates were deemed statements of opinion, they are actionably false here because Plaintiff has identified "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 887 (9th Cir. 2018); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 615-16 (9th Cir. 2017).

Indeed, Plaintiff alleges that Defendants directed Genoteq to close customer accounts.  ¶¶63-70.  Defendants contend that "claims that have not yet been paid are accounted for by estimating future payouts and recording them in 'insurance reserves.'"  Motion at 5-6.  And that amount purportedly includes "claims incurred but not yet paid and claims incurred but not yet reported, based on estimates of the number and severity of claims, as well as related judgment or settlement amounts." *Id*. at 6.  But even Defendants' description of the so-called estimates does not include ***closed accounts*** of the sort alleged here, thus rendering the "supporting fact" of any estimate, or opinion, untrue.  Nor did Defendants' statements about insurance reserves

---

auditor may have approved the accounting methods will not shield [the company] from liability for deception such methods may have caused." *Marksman Partners, L.P. v. Chantal Pharm. Corp*., 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

ever disclose how HyreCar's practice of purposefully permitting high-risk drivers onto the platform would impact reserves.  ¶¶96-109, 151.

Fourth, Defendants assert that Plaintiff does not adequately allege that Defendants' misrepresentations regarding insurance reserves were misleading and that Defendants' omissions do not render their statements misleading.  Motion at 15-17.  As set forth above, however, Plaintiff has adequately alleged that Defendants' statements affirmatively created "a plausibly misleading impression of a state of affairs that differed in a material way from the one that actually existed."  *Alphabet*, 1 F.4th at 700; *Quality Sys.*, 865 F.3d at 1144.

Fifth, Defendants argue that they had no duty to disclose the conflicted relationship between Genoteq and HyreCar.  Motion at 17-18.  Here, however, Defendants repeatedly spoke about the Company's insurance reserves and its "third party claims adjuster."  *See, e.g.*, ¶¶12, 35, 117-19, 123, 125-26, 164-69, 173-76 180-85.  "[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information."  *LifeLock*, 780 F. App'x at 483; *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019); *Berson v. Applied Signal Tech.*, 527 F.3d 982, 987 (9th Cir. 2008).

Finally, Defendants claim that certain statements are protected by the PSLRA's safe harbor provision.  Motion at 18-19.  "Defendants bear the burden of demonstrating that their statements are protected by the safe harbor."  *In re STEC Inc. Sec. Litig.*, No. CV09-08536-JVS MLGX, 2011 WL 2669217, at *9 (C.D. Cal. June 17, 2011).  Defendants' argument fails because the safe harbor provision does not protect defendants "when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement."  *Quality Sys.*, 865 F.3d at 1142; *Cutler v. Kirchner*, No. 15-56897, 2017 WL 3530893, at *4 (9th Cir. Aug. 17, 2017).  Because the statements Defendants highlight contain

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

statements of current or past facts that Plaintiff alleges are misleading (¶¶178-79, 189-90) and because Defendants did not admit that such non-forward-looking statements were materially false and misleading (¶¶196-97), Defendants' argument fails. *See Quality Sys.*, 865 F.3d at 1146-47 ("If the non-forward-looking statement is materially false or misleading, it is likely that no cautionary language – short of an outright admission of the false or misleading nature of the non-forward-looking statement – would be sufficiently meaningful to qualify the statement for the safe harbor.").[6]

### B.   Plaintiff Adequately Alleges that Defendants Acted With Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Quality Sys.*, 865 F.3d at 1144.[7] Importantly, "courts must consider the complaint in its entirety . . . . The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S.

---

[6]   Defendants also challenge Plaintiff's allegation that HyreCar's representation that it had over 4,000 daily rentals was misleading because CW4 was purportedly not employed at the Company when the Company made the statement. Motion at 19 n.9. However, CWs who were "not at [the company] during the Class Period" can nevertheless support a claim where, as here, they "had personal knowledge of executive-level management's real-time access" to company information that demonstrates falsity. *Quality Sys.*, 865 F.3d at 1145.

[7]   Defendants misstate the standard for scienter by claiming that knowledge or intent is required. Motion at 1, 21. On the contrary, deliberate recklessness also satisfies the standard. *LifeLock*, 780 F. App'x at 484; *Quality Sys.*, 865 F.3d at 1144. Defendants also mischaracterize the holding in *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037 (N.D. Cal. 2009) (Motion at 21), which held that plaintiffs must allege "that Defendants were actually aware that (*or reckless with respect to whether*) the accounting was incorrect." *Cadence*, 654 F. Supp. 2d at 1046.

17

at 322-23 (italics in original).  "Thus, *Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  Moreover, "[t]he Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement . . . ."  *Id.* "Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter." *Id.*  Accordingly, in assessing scienter allegations, often "the sum is greater than the parts."  *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 698 (9th Cir. 2012).

A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324-26.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences" – the inference need only be equally plausible to any non-culpable inference.  *Id.* at 324.  "[A] tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

### 1. The Confidential Witnesses Support a Strong Inference of Scienter

Plaintiffs can establish a strong inference of scienter through CW accounts by satisfying two pleading requirements.  "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge.  Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Quality Sys.*, 865 F.3d at 1144-45; *Daou*, 411 F.3d at 1015-22.

18

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs have satisfied this standard. First, the Complaint "describes the confidential witnesses on whose statements Plaintiffs rely with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Quality Sys.*, 865 F.3d at 1145; ¶¶36, 45-46, 48, 50, 52-53, 59, 72-74, 102. These allegations support the probability that the individuals in these positions would possess the information alleged. Second, the statements attributed to the CWs are indicative of scienter. ¶¶42, 53-54, 64, 66-70, 92, 96-97. For instance, when asked who at HyreCar issued claims approvals, CW10 responded, "***The CFO was involved***, I'm sure." ¶53. Similarly, when asked who issued the instruction to close HyreCar claims to reduce the effect of surging claims, CW9 responded, "I believe it was Jordan [Neidig] - the claims manager – and the CEO and CFO of HyreCar." ¶¶66-67. When asked who at HyreCar decided by how much to fund the claims account, CW9 responded, "Scott – the CFO." ¶¶68-70. CW7 likewise stated that after Genoteq's initial review CFO Brogi would "pretty much give us the green light in terms of paying claims . . . ***[which] was based on our budget – like if we could afford it that month***." ¶54. Additionally, CW4 reported that HyreCar would unlock accounts of drivers who had gotten into accidents, "***just to hit rental numbers***" and that CW4 raised this concern with CEO Furnari but that CW4 was told "sales were more important than anything." ¶¶96-97. Additionally, "[c]orroboration from multiple sources also supports an inference of scienter." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008). Here, the corroborating accounts of the 11 CWs describe "specific allegation[s] about management's exposure to factual information needed for a strong inference of scienter." *Cutler*, 2017 WL 3530893, at *5.

### 2. Defendants' Stock Sales Support a Strong Inference of Scienter

Defendants' stock sales add to the strong inference of scienter alleged. "Unusual or suspicious stock sales by corporate insiders may constitute circumstantial

19

evidence of scienter" considering: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Quality Sys.*, 865 F.3d at 1146. Here, all three factors demonstrate scienter.

First, the amount and percentage of Defendants' stock sales strongly support an inference of scienter. Defendants' sales totaled more than $13 million in gross proceeds. ¶204. Specifically, CEO Furnari sold 300,000 shares of stock between July 21, 2021 and July 23, 2021, for proceeds of more than $5.2 million. ¶205. Similarly, CFO Brogi sold 72,329 shares of stock between May 20, 2021 and May 24, 2021, reaping over $1.2 million. ¶207. Defendants concede that these sales constituted 43% of Furnari's holdings and 36% of Brogi's holdings, respectively. Motion at 24. Courts have held that sales of lesser percentages of holdings support a strong inference of fraud. *See, e.g.*, *In Re Intuitive Surgical Sec. Litig.*, No. 5:13-CV-01920-EJD, 2017 WL 4355072, at *4 (N.D. Cal. Sept. 29, 2017) (sales of 40% and 30% of holdings supported a strong inference of scienter); *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 WL 2676364, at *14-15 (C.D. Cal. July 1, 2008) (sales constituting 7% of holdings were suspicious); *In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 WL 1867717, at *4 (N.D. Cal. July 29, 2005) (sales amounting to 18% of holdings supported a finding of scienter); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (sales constituting 7.6% of holdings added to a strong inference of scienter).

Moreover, the magnitude of the sales relative to Defendants' salaries support scienter. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (scienter supported where sales netted defendant more than four times his salary and occurred just before the executive's resignation). Here, CEO Furnari's sales of $5.2 million constituted approximately 52 times his $100,000 salary (¶205, Motion at 24, n.15) and CFO Brogi's proceeds of $1.2 million represented six times his 2020 salary and 6.8 times his 2018-2019 salary. ¶207, Motion at 24, n.15.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Additionally, other insiders also reaped millions from stock sales, which adds to the strong inference of scienter alleged. *See, e.g.*, *Junge v. Geron Corp.*, No. C 20-00547 WHA, 2021 WL 1375960, at *7 (N.D. Cal. Apr. 12, 2021) (holding that sales by non-defendant executives supported an inference of scienter); *In re JDS Uniphase Corp. Sec. Litig.*, No. C 02-1486 CW, 2007 WL 2429593, at *17 (N.D. Cal. Aug. 24, 2007) (holding that the stock sales of non-defendant insiders contributed to a strong inference of scienter). Michael Furnari, the Company's Chief Business Development Officer (and the brother of CEO Furnari) sold 299,900 shares of stock, reaping nearly $5.2 million. ¶206. Grace Mellis, Chair of the Company's Board of Directors, sold 50,000 shares for proceeds of nearly $875,000. ¶208. Henry Park, the Company's Chief Operating Officer, sold 35,000 shares for proceeds of over $578,000. ¶209.

Second, the timing of Defendants' stock sales also supports a strong inference of scienter. "The Ninth Circuit has repeatedly held that where stock sales occurred on the heels of optimistic statements, this constitutes circumstantial evidence that statements were fraudulent when made." *Schlagal v. Learning Tree Int'l*, No. CV 98-6384 ABC (EX), 1998 WL 1144581, at *10 (C.D. Cal. Dec. 23, 1998); *see also Quality Sys.*, 865 F.3d at 1146 (holding that the sale of stock "made near the apogee of [the company's] stock price during the Class Period, [] shortly before the stock went into a steep decline" and shortly after defendants made positive company statements "is, to say the least, suspicious"); *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 989 (N.D. Cal. 2001) (holding that the timing of stock sales, which occurred shortly after management made optimistic statements to the market, "makes them suspicious"). Here, following Defendants' misrepresentations at the start of the Class Period, the price of HyreCar stock rocketed upwards 45%. ¶204. This increase preceded an unprecedented spate of insider selling totaling more than $13 million in gross proceeds. *Id*. Allegations that defendants sold substantial portions of their holdings "in a very short period of time" while "stock was trading at

21

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

all-time highs, give rise to a strong inference of scienter." *In re TUT Sys., Inc. Sec. Litig.*, No. C 01-02659 CW, 2002 WL 35462358, at *12 (N.D. Cal. Aug. 15, 2002).

Third, the inconsistent nature of Defendants' stock sales strongly supports an inference of scienter. *See, e.g.*, *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 838-39 (N.D. Cal. 2014) (finding a strong inference of scienter was alleged where defendants' "trading practices were inconsistent with past history"). Prior to their sales, CEO Furnari, CFO Brogi, Michael Furnari, Grace Mellis, and Henry Park sold no Company shares since the Company's IPO. ¶¶205-209. Thus, Defendants' stock sales support a strong inference of scienter.[8]

### 3. CFO Brogi's Departure Adds to the Strong Inference of Scienter Alleged

Coupled with the other allegations of scienter, CFO Brogi's departure also bolsters the strong inference of scienter alleged. *See Bielousov v. GoPro, Inc.*, No. 16-cv-06654-CW, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (holding that resignation of the company's president bolstered the strong inference of scienter alleged); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187-1188 (C.D. Cal. 2007) (holding that because defendant's resignation was "highly suspicious," it leaned "heavily towards a finding of scienter"). Here, the Company announced the unexpected "retirement" of CFO Brogi on June 23, 2021, at only age 56. ¶210. CFO Brogi's "retirement" came ***less than two weeks*** after HyreCar replaced ABI as its insurance broker and shortly after HyreCar replaced Genoteq. ¶¶13, 113-14. Thus, Brogi's departure adds "one more piece to the scienter puzzle."

---

[8] Defendants' cases are distinguishable. In *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999), the court held that although an officer's sales appeared "somewhat suspicious," the sales amounted "to just five percent" of the "allegedly suspicious sales." *Id*. at 987. In *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008), the bulk of an insider's sales was made pursuant to a 10b5-1 trading plan. *Id*. at 1067 n.11. Defendants make no such claim here.

22

*In re Banc of California Sec. Litig.*, No. SACV1700118AGDFMX, 2017 WL 3972456, at *8 (C.D. Cal. Sept. 6, 2017).[9]

### 4. Because the Facts Alleged Relate to the Company's Core Operations, They Support a Strong Inference of Scienter

The facts alleged also support a strong inference of scienter because they relate to the core operations of the Company.  There are three ways in which allegations regarding management's role in company can support a strong inference of scienter.  "First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations." *S. Ferry*, 542 F.3d at 785.  "Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . ." *Id*. at 786.  "Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."  *Id*.; *Alphabet*, 1 F.4th at 706.  The first two standards apply here because the alleged fraud relates to the core operations of the Company.  ¶¶201-02, 211; *see also Flynn v. Sientra, Inc*., No. CV1507548SJORAOX, 2016 WL 3360676, at *15-16 (C.D. Cal. June 9, 2016) (holding that the core operations doctrine supported a strong inference of scienter).

### 5. The Small Size of the Company Further Supports a Strong Inference of Scienter

The Company's small size also bolsters the strong inference of scienter alleged.  Because company executives are often closer to alleged problems in a smaller

---

[9]    Defendants' cases support Plaintiff's position.  In *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981 (9th Cir. 2009), the court held that "uncharacteristic" resignations that do not occur near "retirement age" can be indicative of scienter.  *Id.* at 1002.  Such is the case here.  In *Luna v. Marvell Tech. Grp.*, No. C 15-05447 WHA, 2017 WL 2171273 (N.D. Cal. May 17, 2017), the court held that a CEO's departure supported a strong inference of scienter.  *Id.* at *5.

23

company as opposed to a larger company, a company's small size can support a strong inference of scienter. *See, e.g.*, *Curry v. Hansen Medical, Inc.*, No. 4:09-cv-05094-CW, 2012 WL 3242447, at \*11-\*12 (N.D. Cal. Aug. 10, 2012) (the fact that the company was "small" with "less than 200 employees" contributed to a strong inference of scienter); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1173, 1186 (S.D. Cal. 2009) (the company's small size of 300 employees supported a strong inference of scienter). Here, HyreCar had only 86 full-time employees as of December 31, 2020. ¶¶202, 211. "Given [the company's] relatively small size . . . plaintiff's allegations of scienter are persuasive." *Batwin*, 2008 WL 2676364, at \*12.

When considering these facts collectively – as the Court is required to do under *Tellabs* (551 U.S. at 323) – Plaintiff has adequately alleged scienter. *In re Lantronix*, Inc., No. CV02-03899PA(JTLX), 2003 WL 23198818, at \*7 (C.D. Cal. Dec. 31, 2003) (Anderson, J.).[10]

---

[10] Courts have repeatedly rejected Defendants' claim that any inference of scienter is undermined by HyreCar's unqualified auditor opinions. Motion at 20; *see, e.g.*, *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1365 n.183 (C.D. Cal. 2014) (an "audit opinion does not, standing alone, negate any otherwise compelling inference of scienter plaintiffs' pleading raises"); *In re New Century*, 588 F. Supp. 2d 1206, 1231-32 (C.D. Cal. 2008) ("The Court therefore does not consider the audit opinion to undermine the particularity with which Plaintiffs have alleged scienter."). Although Defendants cite cases to argue the contrary (Motion at 20), the weight of authority holds that an auditor's "unqualified audit opinion does not negate an inference of scienter." *In re Diamond Foods, Inc., Sec. Litig.*, No. C 11-05386 WHA, 2012 WL 6000923, at \*8 (N.D. Cal. Nov. 30, 2012); *see also In re Levi Strauss & Co. Sec. Litig.*, 527 F. Supp. 2d 965, 987 (N.D. Cal. 2007) ("an unqualified independent auditor's opinion does not absolve or shield a defendant from liability"). Defendants' purported reliance on an auditor defense is even less applicable here given Plaintiff's allegations about account closures and CW accounts of HyreCar employees being both instructed to conceal certain facts from customers and noting an apparent savviness on the part of Brogi to avoid creating paper trails. *See*, *e.g.*, ¶¶ 63-68 (employees told to close customer accounts), ¶69 ("I guess [Brogi] didn't want to put it in writing"). An auditor would presumably face difficulty verifying a liability associated with an account of which the auditor was

24

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## C.     Plaintiff Adequately Alleges Control Person Liability

Contrary to Defendants' assertion (Motion at 25) – and as demonstrated above – Plaintiff has adequately pled a primary violation and has also sufficiently alleged the Individual Defendants' control over the Company.  ¶¶26-27, 253-57.  Thus, Plaintiff has adequately alleged a control person claim under the Exchange Act.  15 U.S.C. §78t(a); *SEC v. Todd*, 642 F.3d 1207, 1222-24 (9th Cir. 2011).

## V.     CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion. Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend.  *See Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").

DATED:  January 10, 2022          **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Ex Kano S. Sams II*
Robert V. Prongay
Ex Kano S. Sams II
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: esams@glancylaw.com
Email: rsulentic@glancylaw.com

*Counsel for Lead Plaintiff Turton Inc.*

unaware (because that account had been closed).  Thus, there is a reasonable inference that HyreCar's auditor was unaware of Defendants' conduct in managing earnings. *Cf.*, *In re Silver Wheaton Corp. Sec. Litig.*, No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *11-12 (C.D. Cal. June 6, 2016) (many courts have sustained securities claims "even when the defendants obtained 'clean' audit opinions from their independent auditors and [] never restated their financial statements") (collecting cases).

25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.  On January 10, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 10, 2022, at Los Angeles, California.

s/ Ex Kano S. Sams II
Ex Kano S. Sams II