Robert V. Prongay (SBN 270796)
Ex Kano S. Sams II (SBN 192936)
Raymond D. Sulentic (SBN 316913)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel for Lead Plaintiff Turton Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN BARON, Individually and on Behalf of All Others Similarly Situated, | Case No. 2:21-cv-06918-PA-JC |
| Plaintiff, | **CLASS ACTION** |
| v. | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| HYRECAR INC., JOSEPH FURNARI and ROBERT SCOTT BROGI, | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

SECOND AMENDED COMPLAINT

1

## **<u>TABLE OF CONTENTS</u>**

I.      NATURE OF THE ACTION AND OVERVIEW ........................................... 1

II.     JURISDICTION AND VENUE .................................................................... 5

III.    PARTIES ..................................................................................................... 5

IV.     RELEVANT NONPARTIES ....................................................................... 6

V.      SUBSTANTIVE ALLEGATIONS .............................................................. 7

      A.      Background .......................................................................................... 7

      B.      HyreCar Introduces A Tiered Program Structure Taking On More Risk For Physical Damages Claims ................................................................ 9

      C.      HyreCar's Insurance Reserves Are Mostly For Physical Damages And Incidental Claims To Owner Vehicles Under The Company's Plan Program ............................................................................................... 11

      D.      By Their Inherent Nature, Physical Damages Claims And Incidental Claims Under HyreCar's Program Should Present Minimal Risk of Being Unreported Or Under-Reserved ................................................ 12

      E.      Defendants' Use Of A Conflicted TPA To Handle Physical Damage Claims ................................................................................................. 14

            1.      Defendants Conceal The True Nature Of HyreCar's Purported Third Party Administrator ........................................................ 14

            2.      HyreCar Had Access To Genoteq's Physical Damage Claims Information .............................................................................. 16

            3.      HyreCar Concealed The True Nature Of Its Conflicted Relationship With Genoteq ...................................................... 17

      F.      Former Genoteq And HyreCar Employees Detail HyreCar's Delay And Suppression of Claims ....................................................................... 18

1.   The Accounts Of Former Genoteq And HyreCar Employees Are Corroborated By HyreCar's End Of Class Period And Post Class Period Admissions That The Company Had Under-reserved At Least $1 Million In Genoteq Claims Incurred Prior To January 1, 2021 ........................................................................................ 19

2.   Reams Of Additional Consumer Complaints To The Better Business Bureau Corroborate The Accounts Of Former Genoteq And HyreCar Employees .......................................................... 20

G.   HyreCar's Transition From Genoteq To Sedgwick In March 2021 ..... 23

H.   Prior To Disclosing The Massive Backlog of Under-reserved Claims, Defendants Unloaded Massive Quantities Of Their HyreCar Stock At Inflated Prices .................................................................................... 24

1.   HyreCar Falsely Represented Its Insurance Reserves And Cost of Revenue During Its Q1 2021 Financials .................................... 25

2.   Defendants False Statements Artificially Inflated HyreCar's Stock, And Defendants Cashed In Through Insider Sales ......... 26

I.   The Truth Begins To Be Revealed ...................................................... 27

VI.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ............................................................................................... 34

A.   Statements from the Company's Q1 2021 Press Release ..................... 34

B.   Statements From the Company's Q1 2021 Earnings Call .................... 35

C.   Statements From the Company's Q1 2021 10-Q ................................. 36

VII.   ADDITIONAL SCIENTER ALLEGATIONS ............................................ 39

VIII.   LOSS CAUSATION ..................................................................................... 43

IX.   CLASS ACTION ALLEGATIONS .............................................................. 43

X.   UNDISCLOSED ADVERSE FACTS ........................................................... 45

XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE ............................ 45

SECOND AMENDED COMPLAINT

XII.   NO SAFE HARBOR ........................................................................47

XIII.  COUNT ONE.................................................................................48

XIV.  COUNT TWO.................................................................................51

XV.   PRAYER FOR RELIEF ..................................................................52

XVI.  JURY TRIAL DEMANDED ...........................................................52

SECOND AMENDED COMPLAINT

Lead Plaintiff Turton Inc. ("Plaintiff"), individually and on behalf of all others similarly situated, by and through its attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by HyreCar Inc. ("HyreCar" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued and disseminated by HyreCar; (c) interviews of former Company employees; and (d) review of other publicly available information concerning HyreCar.

# I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of all purchasers of HyreCar securities between May 13, 2021 and August 10, 2021, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against HyreCar and certain of the Company's current and former senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.    This is a paradigmatic securities fraud case where a tightly-controlled public company, led by the Individual Defendants,[1] raised money from shareholders and used a conflicted "third party" adjuster ("TPA") to help manage earnings through expense concealment and under-accrual of a liability for its insurance reserves. This arrangement enabled the Company to under-reserve its insurance reserves on its Balance Sheet and lower its cost of sales on its Income Statement, the latter of which also directly — and artificially — inflated earnings. Defendants did so for just long enough for insiders to cash out through perfectly-timed sales of their shares.

---

[1] Defendant Joseph Furnari ("Furnari") and Defendant Robert Scott Brogi ("Brogi") are referred to as the "Individual Defendants."

SECOND AMENDED COMPLAINT

Defendants also made multiple misrepresentations about the same issues throughout the Class Period. Once the truth surfaced, the stock cratered by over 50% in a few days, thereby damaging investors.

3.      The fraud here involves public company, HyreCar. HyreCar operates a peer-to-peer (PTP) platform where owners of vehicles can rent their cars directly to consumers who want to rent them. The general idea is that a car owner can collect passive income on a vehicle that might otherwise sit idle, while the renter of that vehicle sidesteps the middleperson and can rent a car at a lower price than they could ordinarily through a traditional car rental agency.

4.      As part of its service offering, HyreCar provided vehicle owners insurance coverage to protect owners from physical damage to their cars. When HyreCar collected fees for insurance related costs, it boosted the Company's revenue. By contrast, when HyreCar paid an insurance claim for a damaged vehicle, that payout created an expense on HyreCar's Income Statement. So, there was natural tension between more renters – which boosted revenue – and insurance claims expenses, which offset that revenue. It also means that more activity on HyreCar's platform drives up both revenue and expenses, and specifically from insurance. Estimates of future payouts for damaged vehicles creates an insurance reserve liability on HyreCar's Balance Sheet and a corresponding expense on HyreCar's Income Statement.

5.      HyreCar was known by both consumers and confidential witnesses to have delayed payments on its insurance claims to vehicles that were damaged or stolen.

6.      HyreCar's delayed payment scheme appears to have been structured in such a way to avoid auditor scrutiny: because as more claims are paid, the harder it becomes for a company to keep insurance reserves at the same level.

7.      An auditor that sees increasing claims payouts would likely demand a company to record a higher insurance reserve because increasing cash payouts

compared to a relatively constant insurance reserve suggests an under-accrual. If, however, those claims never appear before the auditor—because they not accepted from the customer or not paid – then the scheme is harder for an auditor to detect.

8.     But consumers will keep calling and demanding payment, and eventually the claims must be paid. And when that happens, the corresponding expense and liability must be recognized (if it had not been properly recognized already).

9.     Effective March 1, 2021, HyreCar transitioned from using its former/conflicted TPA to a well-known, established, and reputable TPA. However, there was a massive backlog/runoff of unpaid claims in excess of HyreCar's reserves. For example, HyreCar's financial statements for the quarter ending March 31, 2021, reported an insurance reserve of approximately $1.74 million, even though HyreCar belatedly admitted that there was an additional $1.1 million *in excess of the reserves* for claims that predated January 1, 2021.

10.    HyreCar failed to adequately reserve for these claims even though it had access to the prior TPA's system/database and had clear visibility into all the claims data. Moreover, HyreCar management was well-versed in the underlying claims data and payments because HyreCar management would speak with the manager of the prior TPA on a weekly basis, and receive weekly reports from the TPA.

11.    HyreCar's massive backlog of under-accrued claims eventually needed to be recognized as an expense on its Income Statement, and as an increased liability on its Balance Sheet (within the insurance reserve liability). In other words, there was a growing insurance expense and liability true up that loomed because of HyreCar's constant under-accrual of claims. And when that true up happened (which was all at once), HyreCar's stock got decimated.

12.    On August 10, 2021, HyreCar reported quarterly results, wherein it announced deeply disappointing results for the quarterly period ended June 30, 2021 ("Q2 2021"), including net losses of $9.3 million compared to losses of $3.8 million

in the same period the prior year. Along with the release, HyreCar filed with the SEC a Form 10-Q that disclosed that the Company had incurred skyrocketing costs of revenue during the quarter, mainly due to significantly higher insurance claims incidence – including claims before March 31, 2021 "in excess of the reserves." The 10-Q also disclosed that "***The remainder of the cost increase was primarily driven up by additional insurance claims of $2.8 million of which approximately $1.2 million was attributed to one-off new developments on claims and incidental payments incurred prior to March 31, 2021 in excess of the reserves and accruals***."[2,3]

13.     On all this news, HyreCar's stock fell ***nearly 50%*** in a single day to close at $9.85 per share on August 11, 2021, on abnormally high volume of over 5.8 million shares traded, thereby damaging investors.

14.     Before the above sell-off decimated HyreCar's stock, HyreCar's COO, CEO, the CEO's brother, and HyreCar's Board chair all made perfectly-timed stock sales, reaping millions in profit, and avoided millions in losses. They sold their shares after the expenses had been incurred, but before those expenses had been reflected on the Company's financials.

15.     As a result of Defendants' scheme and false statements and omissions, and the significant decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages. Accordingly, Plaintiff brings securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

---

[2] HyreCar's subsequent annual report filed on March 15, 2020 further discloses that as much as $1.0 million of the true up was "related to settling claims ***incurred prior to January 1, 2021***" under our previous insurance claims processing partner.

[3] Unless otherwise noted, all emphasis is added.

## II.   JURISDICTION AND VENUE

16.   Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under, and pursuant to, Sections 10(b), and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b), and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

17.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

18.   Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District. In addition, the Company's principal executive offices are in this District.

19.   In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange in this District.

## III.   PARTIES

20.   Plaintiff Turton Inc., as set forth in its previously filed Certification, which is incorporated by reference, purchased HyreCar securities at artificially inflated prices during the Class Period and suffered damages as a result of Defendants' misconduct as alleged below.

21.   Defendant HyreCar is a Delaware corporation with its headquarters in Los Angeles, California. The Company's common stock is listed on the NasdaqGS ("NASDAQ") under the ticker symbol HYRE. HyreCar conducted its initial public offering ("IPO") and began trading on the NASDAQ in June 2018

22.   Defendant Joseph Furnari ("Furnari") served as HyreCar's Chief Executive Officer ("CEO") and one of its directors during the Class Period. Furnari

has served as CEO of HyreCar since January 2017. From May 2016 until his appointment as CEO, Furnari served as the Company's Chief Financial Officer ("CFO").

23.     Defendant Robert Scott Brogi ("Brogi") served as CFO of HyreCar from September 2018 to July 2021, when he unexpectedly "retired" at age 56. The Individual Defendants and the Company are referred to as "Defendants."

## IV.   RELEVANT NONPARTIES

24.     The nonparties identified below are either former HyreCar employees, or current or former Genoteq employees. [4]

25.     "CW1." CW1 was an Account Manager at HyreCar from July 2019 through March 2020.

26.     "CW3." CW3 was a Sales Representative who worked at HyreCar between August 2019 and August 2021. CW3 reported to Nil Yenice, HyreCar's current Vice President of Strategic Growth.

27.     "CW5." CW5 was a Customer Support Specialist who worked at HyreCar between August 2019 and November 2020. While CW5's title was that of a Customer Support Specialist, CW5 noted that during CW5's tenure at HyreCar, CW5 participated in a variety of functions including working with the operations team, handling claims, and some customer service. Much of CW5's day was spent fielding calls from vehicle owners.

28.     "CW7." CW7 was a Billing and Claims Specialist who worked at HyreCar from September 2018 through May 2020.

29.     "CW9." CW9 was a Genoteq Claims Assistant, and Manager's Assistant, who worked at Genoteq from July 2020 through October 2021. CW9 was

---

[4] To avoid confusion, the Confidential Witnesses cited here track those cited within Plaintiff's First Amended Complaint.

intimately familiar with and reviewed the correspondence of Genoteq Manager, Stacy Ashton, between the fall of 2020 and spring of 2021.

30.    "CW10." CW10 was the Manager of Genoteq between 2019 and at least late 2021. CW10 managed Genoteq and handled HyreCar's claims from 2018 through March 1, 2021.

31.    "CW11." CW11 was a Genoteq Adjuster Assistant from September 2020 through May 2021. At Genoteq, CW11 reported doing "a bit of everything". CW11 reported to Candace Keenum.

32.    "CW12." CW12 was a Genoteq Claims Adjuster who worked at Genoteq from February 2020 through March 2021. CW12 reported to Stacy Ashton.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

33.    Defendant HyreCar operates a web-based marketplace that allows car and fleet owners to rent their cars to Uber, Lyft and other gig economy service drivers. HyreCar operates a platform that connects gig drivers with automobiles while also providing insurance and tactical support.

34.    HyreCar also provides a way for an owner of a vehicle to generate passive income from his or her car by renting it directly to interested renters for a fee—much like one rents a car from a rental car provider, except HyreCar eliminates the middleperson so it is a peer-to-peer relationship.

35.    HyreCar generates revenue by taking a fee out of each rental processed on HyreCar's platform. Each rental transaction represents a driver renting a car from a car owner. Drivers pay a daily rental rate set by the car owner, plus a 10% HyreCar Driver Fee as well as direct daily insurance costs. Owners receive their daily rental rate minus a 15%-25% HyreCar Owner Fee. As of December 31, 2020, the average daily rental rate of a HyreCar vehicle nationally was about $36, plus a 10% HyreCar Driver Fee ($3.60), and a daily direct insurance fee of $13, totaling $52.60 in total daily gross billings paid by the driver. On average, about 80% of the daily rental, or

$28.80, is transferred to the owner via the Company's merchant processing partner. HyreCar earns revenues from the two revenue share fees (one from the driver and one from the owner) as well as fees for driver insurance, which, in the above example would total around $24.16 per day (using the 21% average for owner fees), with the insurance fee representing a large (if not majority) percentage of the revenue generated by each transaction.

36.   As part of its insurance offering to its customers, HyreCar has different tiers of coverage. The various tiers have varying deductibles and coverage limits, but generally, all tiers cover physical damage to a vehicle, liability for passenger injuries, and incidentals, such as gas and cleaning costs (up to a certain point).

37.   Because a substantial number of HyreCar drivers operate their rented vehicles for services such as Uber or Lyft, an overlap of insurance coverage exists with these Transportation Network Companies ("TNCs") (discussed further below).

38.   HyreCar's 2020 10-K explains the overlap in coverage with the various TNCs as follows:

> Our insurance purposes a vehicle rental is broken into four distinct driving periods. Period 0 is when the Driver has picked a vehicle up from the Owner and is driving with the Uber or Lyft app turned-off. Period 1 is when the Driver has the Uber or Lyft app turned-on but has not yet accepted a fare. Period 2 is when the Driver has accepted a fare and is on the way to pick-up a passenger. Period 3 is when a passenger is in the vehicle. The HyreCar policy is specifically written to cover periods in which the Drivers are operating HyreCar vehicles OFF the Uber or Lyft platform (period 0). During the periods when Drivers are operating ON the Uber or Lyft platform (periods 1, 2 and 3), the HyreCar liability insurance subordinates to state mandated insurance provided by Uber and Lyft. This enables us to keep insurance costs and ***liability low by leveraging state mandated insurance policies provided by the TNCs***.

39.   In other words, HyreCar is not the sole insurance provider for many of its users, and the overlapping coverage with the TNC carriers means that during

periods of time when liability for personal injury is most likely to be in play – like when an Uber driver picks up a passenger – coverage is provided first by the state mandated TNC insurance. Thus, HyreCar has a lower probability of incurring liability claims for personal injuries than it does for physical damage.

**B.    HyreCar Introduces A Tiered Program Structure Taking On More Risk For Physical Damages Claims**

40.    From its IPO through early 2019, HyreCar provided coverage to owners for physical damages claims in a manner that capped HyreCar's potential liability at approximately $7,500 per claim. According to CW10, for physical damages, every owner had a $2,500 deductible but HyreCar had a $10,000 deductible with the insurance policy, which meant that HyreCar basically had to pay the difference (*i.e.*, the amount from $2,500 to $10,000).

41.    In late 2018 and early 2019, HyreCar explored several options to allow it to offer tiered products in hopes of reducing its insurance costs. HyreCar explored alternative insurance options that, most notably, included a look into the potential of utilizing a captive insurance model. Captive insurance programs are effectively "in-house" insurance companies with the company risking its own capital to avoid entering contracts with commercial insurance agencies.

42.    On April 9, 2019, HyreCar announced that it renewed its insurance partnership with Y-Risk, LLC and that the new contract allowed for lower costs on the basic insurance plan and the creation of two new plan offerings. HyreCar began offering a choice between a "Basic", "Standard", or "Premium" insurance plan. With the "Standard" and "Premium" plans, owners received increasingly better coverage and, in return, HyreCar was able to retain a greater percentage of the Daily Rental Rate—15%, 20% and 25%, respectively. Importantly, each plan had a different deductible, meaning that HyreCar would take on more risk if it was taking a higher percentage of the of the Daily Rental Rate.

43.     Although HyreCar did not disclose the precise terms of its renewed insurance agreement, CW10 described the post-March 2019 coverage as effectively a captive policy, which is basically a self-insured program.[5] According to CW10, for physical damages claims, HyreCar was responsible for funding an account at the direction of Genoteq (HyreCar's TPA) and Genoteq would mail checks directly to the owners.

44.     With the changes to the tiered model in 2019, HyreCar took on substantially more risk, and thus became more exposed to physical damage claims that arose among its users. While HyreCar does not publicly disclose what its precise coverage levels are (with its own insurance provider that is), in a worst-case scenario HyreCar's maximum exposure for a single physical damage claim would be the upper bound of its plan limits, which is (and was at all relevant times) $25,000. For example, below is an overview of the terms of HyreCar's program (in or around 2020) that reflect varying deductibles of $500, $2500, and $3000:

| | Basic Plan | Standard Plan | Premium Plan |
|---|---|---|---|
| **Liability** | State Minimums | $1,000,000 | $1,000,000 |
| **Physical Damage** | Up to $25,000 | Up to $25,000 | Up to $25,000 |
| **Physical Damage Deductible** | $3000 | $2500 | $500 |
| **Tickets*** | Up to 100%* | Up to 100%* | Up to 100%* |
| **Toll fees/violations*** | Up to 100%* | Up to 100%* | Up to 100%* |
| **Cleaning** | Up to $30 | Up to $50 | Up to $50 |
| **Gas** | Up to 65% | Up to 85% | 100% |
| **Mileage Overages** | Up to 65% | Up to 85% | 100% |
| **Impound Fees** | | Up to 85% | 100% |
| **Lost/Stolen Keys** | | | 100% |
| **Portion of rental price kept by owner** | 85% | 80% | 75% |

**\*Tickets and toll violations are only covered up to 100% under HyreCar Protection in cities where liability is non-transferrable.**

[5] Checks were issued by an opaque insurance entity named "Iron Reassurance Company" but also stated, "Claims handled by Genoteq Claims." According to the Alabama Department of Insurance's website, Iron Reassurance Company, LLC is a "Protected Cell Captive Insurance Company."

1

### C. HyreCar's Insurance Reserves Are Mostly For Physical Damages And Incidental Claims To Owner Vehicles Under The Company's Plan Program

2

3    45.    According to the Company's Q1 2021 10-Q, HyreCar records a loss

4  reserve for physical damage and other liability coverage caused to owner vehicles "up

5  to the Company's insurance deductibles or relevant limits." The insurance reserve

6  represents "an estimate for both reported accidents claims not yet paid, and claims

7  incurred but not yet reported."

8    46.    Under Generally Accepted Accounting Principles ("GAAP"), HyreCar

9  must accrue for an insurance claim on its Balance Sheet whenever a claim incurred is

10  probable[6] and can be reasonably estimated.[7] ASC 450-20-25-2.

11    47.    As explained in HyreCar's SEC filings, most of its insurance reserve,

12  if not all, is for physical damage claims. Indeed, as noted above, HyreCar "records a

13  loss reserve ***for physical damage*** and other liability coverage ***caused to owner***

14  ***vehicles*** up to the Company's insurance deductibles or relevant limits." In other

15  words, the Company's description of its insurance reserve is focused on damage *to*

16  *cars*, as opposed to personal injury to a passenger.

17    48.    Similarly, in the Company's 10-K for the period ending December 31,

18  2021 ("the 2021 10-K"), the Company stated that "The lag time in reported claims

19  ***for physical damage*** is minimal and as such represents a low risk of unreported claims

20  being excluded from the loss reserve assessment."

21    49.    And while HyreCar does bear some risk for incidentals, those costs—

22  such as for cleaning or gas — are, by their very nature, always going to be a fraction

23  of the cost of physical damage to a vehicle. And, under all its plans, some incidentals

24  (such as cleaning) are capped, and others, like fines and parking tickets, are not even

25

26  ─────────────────

[6] "Probable" is defined as "likely to occur." ASC 450-20-20.

27  [7] The "reasonably estimate" requirement means that "If some amount within a range

28  of loss appears at the time to be a better estimate of loss than any other amount within the range," the entity is to accrue that amount. ASC 450-20-30-1.

HyreCar's responsibility.[8] However, HyreCar is responsible for paying the incidental claims under the Company's plan programs.

50.     The risk-sharing tiers between HyreCar and its customers (described above) also create a dynamic which leads to most of HyreCar's insurance reserve being comprised of physical damage to vehicles because HyreCar shares the risk on physical damage claims, but appears to be only exposed up to its deductible on the liability side. For example, in its filings with the SEC, HyreCar routinely notes that "While certain liability claims *may* take several years to completely settle, the Company's liability exposure limit is generally met in the near term."

51.     Other types of liability claims, such as personal injury, are also less of an issue for HyreCar because, as noted above, most of the time that another passenger is likely to be in a HyreCar user's vehicle (like when an Uber driver picks up a passenger), the TNCs' coverage kicks in.

### D.     By Their Inherent Nature, Physical Damages Claims And Incidental Claims Under HyreCar's Program Should Present Minimal Risk of Being Unreported Or Under-Reserved

52.     Incidental claims that an owner may make, such as receiving a car that requires cleaning, are both small in magnitude; and also easily payable and reportable: no trip to a body shop is needed, and no claims adjuster need be involved.

53.     But even for physical damage claims, the turnaround should be expeditious because HyreCar requires owners of its vehicles to submit a claim for physical damage within 24 hours after a vehicle has been returned by the renter. Indeed, HyreCar's policy states that "[n]o claims will be accepted after 24 hours, excluding holidays and weekends." HyreCar's own website states that "damages

---

[8] If a renter of a vehicle runs a red-light camera or incurs a parking ticket, HyreCar does not cover the cost of such a fine, but merely "facilitates the management of parking tickets and camera violations through its partnership with Voi Logistics ("VOi")." But "Administration of toll fees and toll fee payments under all HyreCar Protection Plans are the responsibility of the driver and ***it is up to the owner to recover these charges***."

claim cases on average take 2 to 8 weeks to process and receive a settlement."

54.    Accordingly, given the rapid expected turnaround for both incidentals and physical damage claims, HyreCar represents in its SEC filings — including in its 10-Q for the period ending March 31, 2021 ("the Q1 2021 10-Q") issued during the Class Period — that "[t]he lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment."

55.    A quick turnaround also makes intuitive sense because the process for reporting a claim is straightforward. Indeed, HyreCar even provides renters with an app for users to report damage so that HyreCar can monitor such claims on a real time basis.

56.    Once submitted, the owner takes pictures of the damage and sends pictures through the app which can be monitored by HyreCar's purported third-party claims adjuster and administrator ("TPA") in real time.[9] The owner then obtains an estimate from a body shop and provides the estimate to the TPA for approval. Once approved, the claim is processed, and a check is issued.

57.    When HyreCar incurs such an insurance claim, it impacts its financials in two places: on its Balance Sheet as a liability, categorized as "insurance reserve" and on its Income Statement as an expense, embedded within the cost of revenue[10] line.[11]

_____

[9] When a vehicle on its platform gets into an accident, HyreCar uses a claims adjuster and administrator to both review the claim and process it. To process that payment HyreCar, will put funds into an account, and then the TPA will distribute those funds to the claimant.

[10] "Cost of revenue" and "cost of sales" are used interchangeably and mean the same thing. On HyreCar's reported financials, the item appears as "cost of sales", however in earnings calls, HyreCar management most commonly refers to "cost of sales", which is the same thing. The terms "revenue" and "sales" are equally interchangeable.
[11] Most of HyreCar's cost of revenue is, in fact, comprised of insurance costs. According to the Company, as of the Second Quarter of 2021, "insurance, both

58.     To ensure that HyreCar's Balance Sheet balances, when it incurs an insurance expense it makes two entries – it debits an expense from owner's equity, and credits a liability (the liability is its insurance reserve).

59.     On the Income Statement, HyreCar must record the expense for its insurance claim at the same time that it records its liability (otherwise the Balance Sheet would not balance). In other words, insurance claims from vehicle owners on HyreCar's platform make liabilities go up, and earnings go down.

60.     Thus, an under-accrual of insurance reserves will necessarily lead to overstated earnings (because the understated insurance expense makes earnings go up).

61.     Given HyreCar's real time information monitoring and the policy that claims must be submitted within 24 hours, the speed with which HyreCar becomes aware of the existence of a probable claim is in nearly real time. And the ability to reasonably estimate such a claim is a modest undertaking. Accordingly, HyreCar should not face substantial delays between the time damage to a vehicle is incurred and when it ultimately records the corresponding expense on its financial statements (under insurance reserve on the Balance Sheet, and under cost of revenue on the Income Statement).

### E.     Defendants' Use Of A Conflicted TPA To Handle Physical Damage Claims

#### 1.     Defendants Conceal The True Nature Of HyreCar's Purported Third Party Administrator

62.     In April and May 2017, just over a year before the Company's June 2018 IPO, Furnari and David Haley ("Haley") invested $100,000 and $200,000, respectively, into Notes ("the 2017 Notes") with embedded warrants[12] that converted

_____

premium and claims, account[ed] for the vast majority" of the Cost of Revenue expense.

[12] A warrant is essentially a call option, which gives the holder the right but not the obligation to buy shares of HyreCar at a predetermined price.

into HyreCar shares at $2.10 per share.

63.     Following the joint investment in the 2017 Notes, Haley and HyreCar entered into a joint venture, which was announced on October 3, 2018. In that press release, the Company stated that:

> [The] strategic joint venture with Dave Haley, CEO of American Business Insurance Services (ABI), and Peter Foley, CEO of LILCHA Holdings. An extension of an ongoing partnership, this venture will focus on creating an insurance captive designed specifically for carsharing in the ridesharing space.

> "Peter and Dave have been with HyreCar from the beginning, and this announcement cements our relationship with two of the most well-respected industry veterans in the commercial auto insurance business," says Joe Furnari, CEO of HyreCar. "This collaboration confirms HyreCar's continued commitment to the ridesharing industry and providing scalable InsurTech solutons for users on the platform."

> This joint venture allows the company flexibility to reduce insurance risk, increase profit margins and provide tailored insurance solutions to the on-demand economy.

> "I am thrilled to be working with Joe and Dave in this new and exciting sector," says Foley. "After more than 35 years in the insurance industry, I am excited to be a part of some new and exciting opportunities that will drive innovation for HyreCar and ridesharing."

64.     ABI and/or Haley own another entity, Genoteq, which also works with HyreCar. The general purposes for Genoteq's involvement with HyreCar was to process insurance claims for physical damage. To process such claims, Genoteq handled adjusting and processing and then HyreCar funded an account for the claims to be paid to owners. Genoteq only dealt with physical damage claims while HyreCar was responsible for paying owners directly for incidentals.

65.     According to its website, Genoteq purports to be a "Third-Party Claims Administration (Claims TPA) specializing in the handling and adjusting of insurance claims for risks within the transportation industry."

66.     Before the October 2018 Joint Venture with Haley ("the 2018 JV"), Genoteq did not have an operating history, and consisted of just a handful of

employees. Indeed, according to Genoteq's license on file with the Louisiana Department of Insurance, Genoteq's License Issuance Date was May 14, 2019, meaning it was formed just months after the 2018 JV.

67.     Genoteq was at all relevant times a tiny entity with just a few employees. CW7, a Billing and Claims Specialist who worked at HyreCar from September 2018 through May 2020, stated that "There were a handful of people [at Genoteq who] we'd work closely with." According to multiple former Genoteq employees, at all relevant times, Stacy Ashton was Genoteq's only licensed adjuster and the other Genoteq adjusters worked under Stacy Ashton's license.

68.     The combination of Genoteq's small size along with Haley's close relationship with HyreCar and its executives, made it easy for HyreCar to delay funding and suppress the ultimate physical damage payouts to vehicle owners. In other words, the close relationship made it possible for HyreCar to manage and suppress claim payouts based on earnings management considerations.

### 2.     HyreCar Had Access To Genoteq's Physical Damage Claims Information

69.     HyreCar was in near constant contact with Genoteq, including meetings every Friday between HyreCar Head of Dealer Development Neidig and Genoteq Manger Stacy Ashton, according to CW9.

70.     According to CW10, CW10 was in touch with HyreCar "upper management." According to CW10, "HyreCar reviewed every claim, and they had to approve them before they were paid." When asked who at HyreCar issued approvals, CW10 responded, "[I]t would be the operations director or vice president – and accounting, most definitely. ***The CFO was involved***, I'm sure."

71.     CW10 also indicated that HyreCar had access to Genoteq's system and could see what claims were ready to be approved.

72.     CW9 also confirmed that HyreCar had access to Genoteq's database and could see what claims were pending at Genoteq including the amount of the claims.

"They could see everything" CW9 stated. According to CW9, Genoteq's system was built for HyreCar and HyreCar custom-picked what they wanted filled out for every claim and that HyreCar executives could see everything. CW9 also stated that HyreCar received a report every week with the claims that were pending. CW9 also confirmed that Ashton met with HyreCar every week and Ashton frequently argued with them over unpaid amounts "every week."

### 3. HyreCar Concealed The True Nature Of Its Conflicted Relationship With Genoteq

73. HyreCar SEC filings, including those issued during the Class Period,[13] stated that HyreCar would rely on a purported "third-party" claims adjuster ("TPA") to estimate its insurance reserves. This representation was false however, because the purported TPA, Genoteq, was not a truly independent third-party. It was not a truly an independent third party because HyreCar and Genoteq maintained a conflicted relationship. The relationship was conflicted because Haley was, according to Company filings, both a minority shareholder in HyreCar and a member of the Company's Strategic Advisory Board. On top of those dual roles with HyreCar, Haley also owns ABI, HyreCar's sole insurance broker, and Genoteq, HyreCar's purported third-party claims adjuster and claims administrator.

74. Moreover, according to CW9, HyreCar was supposed to fund the account for claims payments every two weeks but ABI and Genoteq always let HyreCar work around it and do whatever it wanted. According to CW9, Furnari and Haley were good friends. CW9 stated, Haley and Furnari did barbeques together with their families, golfed together, went on trips together. CW9 continued, "They were friends, just as much as they were in business." According to CW9, Genoteq received $50 for every claim which it processed for HyreCar.

---

[13] Such as in the Q1 2021 10-Q.

75.    According to HyreCar's Form 10-K for the year ended December 31, 2019 ("the 2019 10-K"), HyreCar paid ABI $5.0 and $4.3 million, or 31.6% and 44.0% of revenue, respectively, during the years ended 2019 and 2018, respectively.

76.    Indeed, the conflicted relationship between HyreCar and Genoteq was so blurred that CW3 remarked, "I'm pretty sure Genoteq was our company" because "we'd have Genoteq members in our meetings."

### F.    Former Genoteq And HyreCar Employees Detail HyreCar's Delay And Suppression of Claims

77.    HyreCar was intimately aware of Genoteq's operations, and often dictated Genoteq's payment schedule.

78.    For instance, CW7 stated that after Genoteq's initial review, Brogi would "pretty much give us the green light in terms of paying claims . . . When CW7 was asked how CW7 knew that Brogi set the budget, CW7 stated that CW7's manager, Anthony Rodriquez, would bring it to Brogi's attention and that once HyreCar's limit "tapped out", "they wouldn't pay any claims."

79.    CW5 similarly observed, "[t]here were times when [managers] would say there were no funds for refunds or rebates. ***We were told to not disclose that***, you know, if people called asking about their refund or rebate." When CW5 was asked who told CW5 this, CW5 responded Anthony Rodriquez, who was the senior most manager on the operations team, and assistant director James Avery, who both remain at HyreCar.

80.    CW9 explained that HyreCar was responsible for funding claims – and they never did – and, when they did, HyreCar would pick and choose who to pay. CW9 recalled claims over seven or eight months old, because HyreCar chose not to pay them.

81.    When asked who at HyreCar decided by how much to fund the claims account, CW9 responded, "Scott – the CFO" and that he "was the one in charge of all the money at HyreCar" and "determined how much we got and when we got it."

82.    CW9 knew this because CW9 was Genoteq Manager Stacy Ashton's assistant for a short period. CW9 explained, that CW9 would be in Ashton's office and see emails on the screen. Also, CW9 also indicated that Ashton would share this information with CW9.

### 1. The Accounts Of Former Genoteq And HyreCar Employees Are Corroborated By HyreCar's End Of Class Period And Post Class Period Admissions That The Company Had Under-reserved At Least $1 Million In Genoteq Claims Incurred Prior To January 1, 2021

83.    The delays in payments observed by former HyreCar and current former Genoteq employees are corroborated by post Class Period admissions made by HyreCar. For example, on March 15, 2022, HyreCar issued its form 10-K for the year ended December 31, 2021 ("the 2021 10-K"). In the 2021 10-K, the Company admitted that at least $1.0 million, or the vast majority of its under-accrual announced on August 10, 2021, related to "settling claims incurred *prior to January 1, 2021* under our previous insurance claims processing partner in the second quarter of 2021 as we liquidated their claims portfolio."[14]

84.    This $1.0 million in under-accrued claims closely approximates the "runoff" observed by Genoteq employees.

85.    For example, CW11 similarly estimated that HyreCar's unpaid backlog in March 2021 was "millions." Similarly, CW11 estimated that there were about 400 claims that were open and needed to be paid as well as more claims that were closed and needed to be paid. CW11 recalled that one day there was about $2 million that needed to be paid out. CW11 recalled that Ashton would hound HyreCar but the Company would just pay it when they felt like it, and not pay the full thing.

---

[14] The Company made a similar admission in its 3Q 2021 10-Q issued on November 9, 2021 wherein it stated that "$1.1 million in one-off items related to prior periods (prior to January 1, 2021) and technical issues related to the transition between insurance claims processing partners" weighed on gross profit.

86.     CW12, a former Genoteq employee, said that at the time CW12 was let go in March 2021, CW12 was one of two Genoteq adjusters. CW12 reported that both CW12 and the other adjuster had over 300 claims each, of which CW12 had 80 total loss claims that CW12 described as "big payments."

87.     CW9 similarly estimated that Genoteq's runoff of claims as of the March 1, 2021 transition totaled anywhere from $700,000 to $1 million.

**2.      Reams Of Additional Consumer Complaints To The Better Business Bureau Corroborate The Accounts Of Former Genoteq And HyreCar Employees**

88.     Independent complaints filed at the Better Business Bureau ("BBB") also support the notion that HyreCar was not paying valid claims. For instance, in a September 2, 2020 complaint that appears on the BBB website, a HyreCar vehicle owner noted weeks of being ignored by HyreCar:

> Hello, I rented out my car through Hyrecar and Driver (Renter) abandoned my car at random place, so I had to drive a hour to recover the vehicle and of course car was full of trash and the key was missing. But I wasn't worried much since I have an Insurance with Hyrecar. But ***when I submit my claims, Hyrecar completely ignoring my claims***, never answers back to emails, when I call their automatic robot keep saying "representatives will call you back" which never happened. It's been over 2 weeks without any response from Hyrecar. ***I feel like this company scammed me by forced to buy insurance policy that doesn't even exists***.

89.     In a response to the above that came almost a month-and-a-half later on October 15, 2020, HyreCar admitted the validity of the complainant's claim: "[w]e apologize for the delay in processing of this claim. We have experienced a large influx of open requests in the recent months and are currently working to expedite these services. Payment has been made at this time and the customer should receive the amount within 3-5 business days."

90.     Dozens upon dozens of additional consumer complaints and reviews submitted to the BBB corroborate the CWs' accounts above and similarly describe

Genoteq's inability or unwillingness to properly process claims as well as the resulting obfuscation on HyreCar's part that Genoteq enabled.

91.    For instance, an August 26, 2020 BBB complaint echoes that above:

> I rented out my car via their platform and chose the premium coverage that covers things like smoking, gas, tolls etc but have failed to honor that. . . I had my first rental and so far, it's going to be last because . . . HyreCar has not lived up to their promise. . . . I have yet to receive any penny from HyreCar regards the extra costs. Only thing I received was the daily rental. At this point it has cost me more to rent the car out than I have made*. **It's been almost two months** when I submitted my claim . . .ever since then I have been following up and getting some bogus excuses why my claim has not been handled . . . And mind you, I paid for the premium plan that is suppose[d] to cover all that. Last I heard from them was July 16, 2020 after I had tried to reach them in multiple times. I called and called and called, all the numbers I had and texted them, like they have texted me and no answers. So I called from blocked number, guess what, they responded immediately. ***And that's the last time I heard from them, telling me that they can't give me a timeline**. That is not professional at all. I have lost my job and now I'm not even getting the costs that occurred during HyreCar platform rental, **basically** they are keeping my money interest free. Huge corporation sledding on poor people backs.

92.    The above customer followed his August 26, 2020 complaint with another complaint on September 10, 2020 saying, "I have not heard from HyreCar to resolve this claim either." Finally, on October 1, 2020*, **96 days after the above customer first contacted HyreCar about a denied claim,** HyreCar responded and approved the payout and blamed the pandemic (when fewer people were driving) for the delay:

> At this time the reimbursement request has been approved for the Covered Items, and submitted to the financial department for issuance and should be available to you by Oct 6. We apologize for the delay in processing your request, and we appreciate your patience as we work to resolve the growing number of requests we received due to the pandemic.

93.   HyreCar's claims denial was persistent and continued up to just before the start of the Class Period, as evidenced by the following BBB complaint filed on March 9, 2021:

> I am a car owner with a dozen cars and purchased a new 2018 Sonata to rent on the HyreCar platform. The car was totaled in Feb of 2019, and HyreCar has yet to settle the claim. They presently owe me $[redacted] on this claim and I've spoken to 20 different people about this and nobody takes responsibility to resolve the issue. . . . ***The Loss occurred in February of 2019, and the car was deemed a total loss***. . . so HyreCar should have paid me [] but never did. It is my understanding that [redacted] never sent the payout request, so HyreCar never paid it.

94.   After HyreCar responded 10 days later that the above claim had been "escalated to the finance department", the consumer further responded on April 7, 2021, saying "***Its been in manager review for over 2 years now. I'm still waiting for the check.***"

95.   Additional customer complaints about not receiving timely claim payouts (or not getting payouts altogether) include:

- Anton B, who on March 3, 2020, reported to the BBB that HyreCar "just dropped my claim, so I haven't even the damage repair fixed. My overall loss is more than 5,000k, plus the car I cant sell now!" Anton B warned other consumers that "They are scammers."

- Ted M, who on January 22, 2020 reported to the BB that "My car was rented through Hyrecar. it got into an accident on July 2019. The car was totaled and as of today January 2020, I haven't received any-payment. Despite the fact that the car had insurance, they are ignoring me and they don't even return my phone calls or my emails. I lost my car by renting it through Hyrecar. ***This company is a fraud and it shouldn't be in business***."

- Benjamin P, who on July 15, 2019 complained that "I have called HyreCar multiple times to try and get my claim resolved. It is impossible to get through. My car is still in the shop after a month and I cannot get in contact with HyreCar. Doesn't get any worse than this. HyreCar should be shut down."

- Matt K, who on March 8, 2019 stated that "I have called them for over 3 weeks trying to get a receipt to submit to my insurance company for the rental amount and ***they can't produce a normal receipt*** with the price broke down."

96.    The smattering of complaints above represent a small fraction of the total complaints about HyreCar's failure to make claim payments that appear on the BBB website. Between December 12, 2018 and October 29, 2021, the BBB shows 203 total complaints about HyreCar, roughly 87% of which generally deal with nonreceipt of funds, delayed funds, or other issues with reimbursement from HyreCar for an expense the claimant feels is owed.

97.    CW1 recounted that "I remember [in the summer of 2019] we went from an F to a D on our BBB rating, and we had a party…. We were celebrating failure, essentially." In other words, the inference from the CWs statements suggests that the BBB review excerpts above – which were themselves just a sampling of HyreCar's 287 BBB reviews – represent just a fraction of the overall claims which HyreCar denied because not every consumer whose claim is denied elects to file a BBB complaint.

**G.     HyreCar's Transition From Genoteq To Sedgwick In March 2021**

98.    Effective on or around March 1, 2021, HyreCar entered into a two-year claim adjusting agreement with Sedgwick, which had previously handled HyreCar's liability claims.

99.    The Company formally announced the transition to Sedgwick on May 21, 2021 as part of a broader announcement that it had renewed its policy with Lloyds.

In that press release, Furnari reiterated that "Insurance is a key component of our model." Framed as somewhat of an aside, the Company also mentioned in passing that "HyreCar has also completed integration with Sedgwick, a leading insurance claim processing partner for many top companies in rideshare transportation and food delivery."

100.   The above press release announcing the transition away from Sedgwick did not disclose that there was still a substantial runoff of claims that remained at Genoteq, which had not been paid.

101.   At the time of the March 1, 2021 transition to Sedgwick, CW9 estimated that Genoteq's runoff HyreCar claims totaled "anywhere from $700,000 to a million."

102.   CW12, a former Genoteq employee, said that at the time CW12 was let go in March 2021, CW12 was one of two Genoteq adjusters. CW12 reported that both CW12 and the other adjuster had over 300 claims each, of which CW12 had 80 total loss claims that CW12 described as "big payments."

103.   Despite the sizeable remaining liabilities from the runoff of the Genoteq claims portfolio at the time of the March 2021 transition to Sedgwick, HyreCar's financial statements for the quarter ending March 31, 2021 reflected an insurance reserve of approximately $1.74 million.

**H.    Prior To Disclosing The Massive Backlog of Under-reserved Claims, Defendants Unloaded Massive Quantities Of Their HyreCar Stock At Inflated Prices**

104.   Defendants broadly misrepresented five aspects of HyreCar's business—all of which were impacted in one way or another by their contemporaneous scheme: HyreCar's insurance expenses, including (1) HyreCar's reported cost of revenue; (2) HyreCar's reported insurance reserve liability on its Balance Sheet; (3) how insurance reserves were estimated (not from a reliable third party, but a conflicted party); (4) the nature of the relationship between HyreCar and Genoteq; and (5) how Defendants' reckless reliance on a nondisclosed conflicted party to estimate reserves impacted the reliability of such reserves.

24

SECOND AMENDED COMPLAINT

1. **HyreCar Falsely Represented Its Insurance Reserves And Cost of Revenue During Its Q1 2021 Financials**

105. On May 13, 2021, HyreCar issued a press release which stated that the Company had achieved "Record First Quarter 2021 Financial Results" for the quarter ended March 31, 2021 ("Q1 2021"). The Q1 2021 release stated that HyreCar's insurance deposits had more than doubled during the quarter to $1.7 million, while the amount of the Company's insurance reserve (which indicates the number of claims incurred but not yet paid) *had declined more than 17%* since year end to $1.7 million.

106. This was false, and as later revealed, when the above statement was made, HyreCar's insurance reserve, had it been properly recorded should have *increased by 39%*, to just under $3.0 million. The Q1 2021 results also omitted the existence of the runoff claims or the amount of such liability and misrepresented the Company's cost of revenue.

107. Also at that time, HyreCar held an earnings call, led by CEO Furnari and CFO Brogi, with analysts and investors to discuss the Company's Q1 2021 results. During the Q1 2021 earnings call, Brogi stated:

> Cost of sales increased for the quarter ended March 31, 2021 to $4.7 million from $3.6 million the prior year as insurance expenses continue to account for the majority of cost of goods sold *primarily due to some seasonal shifts in insurance costs to support higher levels of car supply through the winter quarter*. Accordingly, gross profit for the three months ended March 31, 2021 was $2.7 million increasing 26% from $2.1 million in the year-ago period ended March 31, 2020. This is an improvement from last year's gross profit margin of 33% for the 12 months ending December 31, 2020 and flat sequentially from 37% in the first quarter of 2020. Due to the second quarter pricing changes, *we expect our progress toward the gross profit margin near-term goal of 45% to 50% we have discussed previously to accelerate*.

108. A portion of the statements above are identical to what CFO Brogi said the prior quarter when he *again* blamed the growing insurance costs from claims that

had been suppressed from prior periods on "some seasonal shifts in insurance costs to support higher levels of car supply through the winter quarter."

109.   But Brogi's statements were untrue. At the time Brogi made the above statement, HyreCar was under-reserved and had under-expensed its cost of revenues, and thus its gross profit.

110.   Under GAAP, Defendants Q1 2021 financials were false. As would later be revealed, Q1 2021's figures should have been reported as:

|  | 3/31/2021 |
|---|---|
| **Insurance Reserve** (Balance Sheet) |  |
| Reported | 1,747,134 |
| Amount under-reserved | 1,200,000 |
| True Reserve | 2,947,134 |
|  |  |
| **Cost of Revenue** (Income Statement) |  |
| Reported | 4,716,150 |
| Amount underexpensed | 1,200,000 |
| True expense | 5,916,150 |

**2.   Defendants False Statements Artificially Inflated HyreCar's Stock, And Defendants Cashed In Through Insider Sales**

111.   After reporting its Q1 2021 results, HyreCar's stock increased dramatically: from its May 13, 2021 closing price of $8.93, to as high as $24.21 on June 23, 2021.

112.   Capitalizing on these artificially-inflated prices, Defendants cashed out.

113.   For instance, Defendant CEO Furnari sold 300,000 shares of Company stock on July 21, 2021 through July 23, 2021, reaping gross proceeds of more than $5.2 million. Prior thereto, Furnari sold no Company shares since the Company's IPO in June 2018.

114.   And Defendant CFO Brogi likewise engaged in suspicious insider selling. Brogi sold 72,329 shares of Company stock on May 20, 2021 and May 24,

2021, reaping gross proceeds of over $1.2 million. Prior thereto, Brogi sold no Company shares since joining the Company in September 2018.

## I.     The Truth Begins To Be Revealed

115.   On August 10, 2021, after the market had closed, HyreCar issued a press release announcing deeply disappointing results for the quarterly period ended June 30, 2021 ("Q2 2021"), including net losses of $9.3 million compared to losses of $3.8 million in the same period the prior year. Furthermore, the Company's adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") loss for Q2 2021 was $7.1 million (four times higher than the $1.7 million adjusted EBITDA loss experienced in the second quarter of 2020) and its gross profit for Q2 2021 was just $0.8 million (less than one third the Company's gross profit in the second quarter of 2020), with a gross profit margin of just 24%.

116.   Along with the release, HyreCar filed with the SEC a Form 10-Q that disclosed that the Company had incurred skyrocketing costs of revenue during the quarter mainly due to significantly higher insurance claims incidence – ***including claims before March 31, 2021 "in excess of the reserves*.**" The Form 10-Q stated as follows:

> Cost of revenue totaled $8.3 million for the three months ended June 30, 2021, an increase of $5.2 million or 170.6% from $3.1 million recognized during the three months ended June 30, 2020. About $2.4 million are due to the attributable increase in insurance premiums and claims from expanded rental day volume, and normalization for the quarter ended June 30, 2020 volatility. The remainder of the cost increase was primarily driven up by additional insurance claims of $2.8 million of ***which approximately $1.2 million was attributed*** to one-off new developments on ***claims and incidental payments incurred prior to March 31, 2021 in excess of the reserves and accruals***. Some of those one-offs resulted ***from settling claims incurred prior to March 1, 2021 under our previous insurance claims processing partner***. Another $0.2 million of one-off expenses were related to technical transitional difficulties to the new claims processing partners platform which have been resolved.

117.   In the above disclosure, Defendants admitted that the prior periods' insurance reserves had been under-accrued and expenses had been understated. Thus, Q1 2021's insurance reserve was under-reserved by $1.2 million, and because that under-accrual requires a corresponding impact on HyreCar's Income Statement, it also means that HyreCar's Q1 2021 pretax earnings had also been overstated by *at least* $1.2 million.

118.   HyreCar later admitted that at least $1 million of the $2.8 million increase related to the liquidation of the Genoteq claims portfolio in Q2 2021 relating to the settlement of claims incurred *prior to January 1, 2021*.

119.   A careful analysis of the above disclosure in the Company's Q2 2021 Form 10-Q appears to suggest that there was an additional $1.4 million of abnormal "additional claims" that the Company has not described and was not attributable normal claims activity in Q2 2021. For example, HyreCar stated that of the $5.2 million year-over-year increase in cost of revenue, $2.4 million related to the associated increased insurance premiums and claims associated with the increased revenue/rentals in Q2 2021. The Company explained that there was separately $2.8 million of abnormal "additional claims" but only explained $1.2 million (under-reserved claims) and $0.2 million (from transitional challenges), leaving another $1.4 million of additional claims that were not explained. Accordingly, the mystery $1.4 million of additional claims would need to relate to claims from prior to March 31, 2021. These claims would either have to be incurred claims that were unreserved or unknown claims (which HyreCar says is unlikely to occur given the minimal lag time for reporting of claims).

120.   Also at that time, HyreCar held an earnings call, led by CEO Furnari and CFO Brogi, with analysts and investors to discuss the Company's Q2 2021 results. During the earnings call, in prepared remarks, Defendants noted:

> Now on to the cost side. Cost of revenue increased in Q2 to $8.3 million from $3.1 million year-over-year, with insurance was

> premium and claims, accounting for the vast majority of the cost. While the insurance premium increased relatively proportionally to the increase in rental days, *claims expenses have exceeded that*, mostly because we centralized our claim portfolio with *a new single processing partner* with the goal to improve customer experience. We settle lot of claims, migrated platforms, and performed a deep dive into insurance reserves to date. We add $1.4 million in one-time expenses related to transition *and to claims development incurred from prior* periods. At the same time, *we observed a sharp decrease in customer complaints related to the claims process.* We are assessing the ROI of various portion of the process and aim to find the right balance between customer retention and direct costs.

121. The above statements further revealed that insurance expenses had been understated on HyreCar's Income Statement in prior periods and the insurance reserve liability had also been understated.

122. During the second quarter 2021 earnings call, HyreCar executives also revealed that the Company had been forced to revamp its claims processes and procedures and improve its risk price adjustments for policies issued by the Company and that such revamping would have the effect of severely compressing margins. Serge De Bock, HyreCar's new CFO following defendant Brogi's abrupt July 2021 retirement, stated as follows:

> Accordingly, gross profit for the current quarter was $0.8 million, representing a gross margin of 8.9%. Adjusted for one-off expenses related to the claims portfolio transition, our gross margin was 24.3%. We optimized our new process and pricing and *have already identified several tangible opportunities to improve claims profitability*, either by process improvements, geographical and risk price adjustment, or adequate pricing for our premium coverage offerings. One of these opportunities relates to *reassessing our deductibles on physical damage claim and providing incentives for drivers with low claims experienc*e. We want to strike the right balance between customer experience and cost. *We believe we can aim for low 30s gross profit margin in Q3*, in line with fiscal year 2020, and an improved profit margin of mid-30s in Q4 through pursuing

and affecting these initiatives without impacting our growth or driver and owner retention.

*We are also collaborating with our insurance partners to leverage data and improve our driver and car screening processes to both reduce claims outcomes and claims premium through risk control* and to continue our path towards 40% plus gross margin in the later half of 2022 and beyond. *Specifically, during our discussions with our insurance partners, we estimated that we could reduce insurance premium over time by up to 20% by identifying and filtering more effectively high-risk drivers*.

123. Later, in response to another an analyst question, De Bock elaborated on the extensive efforts that HyreCar had been engaged in to reform its claims processes, stating as follows:

Mike Grondahl**:** Got it. And then just secondly, it sounds like there was some insurance transition claims of $1.4 million. And if you subtracted that, you got a gross margin of like 24%, but that still seemed down from where you were running. I guess, help reconcile that a little bit more.

Serge De Bock: Absolutely. So the $1.4 million represents a truly one-off items *that impacted us from prior periods* or just purely transition items, like, for instance, we had about 200k that came from an API that broke between our -- in our transition between claims insurance processing partners. So those are purely one-off items. So the bridging to last year gross margin that was at 33% for the whole year comes from us changing our processes. We want to improve customer satisfaction, customer retention. So we made it a little bit easier for folks to kind of go through the claims process.

* * *

Now we're trying to find the right balance between direct costs and being able to have customers being happy and have a good retention impact. And as we get through, this is just a few **-- first few months with our new insurance processing partners**. We're already hammering out. We're doing a deep dive, hammering out the details on the claims process. We already identified a few

areas that we can fix or just improve. We're doing a good trade out there, and we believe we can get back the margin above 30% directly in Q3 through those efforts. But it's going to take a little time for us to kind of get back as we transition between partners and we understand the claims better.

And then another angle is read data. We collect a lot of data in our claims process, and *we were trying to understand better what makes a good driver as we mature*, and we're able to do that. We'll be able to pick drivers more effectively, and then in turn, that's going to turn into less claims and lower insurance premiums. So we're trying to get a favorable wheel going in terms of getting data, adjust, and then reduce our expenses. But as we get through the transition, the new processes took a little bit of toll in -- on our direct profitability.

124.    Later, in response to another an analyst question, De Bock elaborated on the extensive efforts that HyreCar had been engaged in to reform its claims processes, stating as follows:

So the bridging to last year gross margin that was at 33% for the whole year, comes from us changing our processes. We want to improve customer satisfaction, customer retention. So we made it a little bit easier for folks to kind of go through the claims process. Now we try to find the right balance between direct costs and being able to have customers being happy and have a good retention impact. And as we get through, this is just a first few months with our new insurance processing partners.

We're already hammering out. We're doing a deep dive, hammering out the details on the claims process. We already identified a few areas that we can fix or just improve. We're doing a good trade out there. And we believe we can get back the margin above 30% directly in Q3 through those efforts. But *it's going to take a little time for us to kind of get back as we transition between partners* and we *understand the claims better.* And then another angle is read data. We collect a lot of data in our claims process, and we were trying to understand better what makes a good driver as we mature, and we're able to do that, we'll be able to pick drivers more effectively. And then in turn, that's going to turn into less claims and lower insurance

31

premiums. So we're trying to get a favorable wheel going in terms of getting data adjust and then reduce our expenses. *But as we get through the transition, the new processes took a little bit of toll on a direct profitability*.

125.   Another analyst asked De Bock to explain how HyreCar's claims could "have risen so dramatically in the last couple of quarters." De Bock responded that the Company was responding to some "alarming trends" in claims incidents, stating as follows:

Yes, absolutely. I think this quarter, we had $1.4 million in one-off expenses from the transition, but also we're changing our process and implementing faster payment process that work more customer-friendly, led to faster payouts, and sometimes *payout is a little higher than what we've seen in the past*. We identified a few things we need to do to be able to curtail that. We're going to focus on deductible as one portion to be able to have a good handle *on the amount and volume of claims coming in*. . .

We also looked at different trends for different states. *We identified a couple of states where we saw more alarming trends* and also a different profile of drivers, and *we immediately action to curtail that in Q3*. And that's going to show up partially in Q3 and then in Q4. And I think that's – with more data, and I think that's going to be a trend you're going to see. We have more data, more dashboards, we're able to discern and analyze the data more quickly and react very quickly to trends. And I think that's going to help us be more efficient, effective and generate more profit in the future.

126.   When asked whether HyreCar was on track to achieve 45% to 50% gross margins in the near term as represented, De Bock essentially withdrew this goal, calling it a "shoot for the sky" aim and stating that "shooting for margin upwards of 40%" was more realistic. Gross margin is a direct function of increased cost of sales – which is driven by insurance claims – because gross margin is equivalent to sales minus cost of sales. Thus, De Bock's concession that gross margins would not be able

to hit 45% to 50%, was, by inference, also a concession that insurance expenses would remain elevated – because if gross margins expand, it necessarily means insurance costs (relative to sales), decline. And De Bock was conceding that gross margin would not expand, which by inference means cost of revenue (which is comprised most of insurance), would remain high.

127.  On all this news, the price of HyreCar stock fell ***nearly 50%*** in a single day to close at $9.85 per share on August 11, 2021, on abnormally high volume of over 5.8 million shares traded.

128.  Within the Company's third quarter form 10-Q ("the Q3 2021 10-Q"), filed on November 9, 2021, the Company disclosed:

> Gross profit totaled $6.5 million for the nine months ended September 30, 2021, a decrease of $1.1 million or 14.5% over the $7.6 million gross profit recognized during the nine months ended September 30, 2020. Gross Profit Margin decreased to 24.8% for the nine months ended September 30, 2021 from 41.8% for the nine months ended September 30, 2020. Gross Profit Margin would have been 29.0% for the nine months ended September 30, 2021 ***not including $1.1 million in one-off items related to prior periods*** (prior to January 1, 2021) and technical issues related to the transition between insurance claims processing partners.

129.  Similarly, in the Company's annual report filed on March 15, 2022, ("the 2021 10-K"), the Company disclosed that:

> Cost of Sales totaled $25,942,684 for the year ended December 31, 2021, an increase of $8,981,234 or 52.9% over $16,961,450 recognized during the year ended December 31, 2020. The increase was attributable to a combination of three factors. First the expanded rental day volume drove increase in related premiums and claims. Second, our transition to a new claims processing partner in March of 2021 led to an increase in claims payouts that we rightsized since then and some transition costs. Third, ***we recorded about $1.0 million in new one-off developments related to settling claims incurred prior to January 1, 2021 under our previous insurance claims***

*processing partner in the second quarter of 2021* as we liquidated their claims portfolio.

## VI.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS

### A.   Statements from the Company's Q1 2021 Press Release

130.   On May 13, 2021, HyreCar issued a press release which stated that the Company had achieved "Record First Quarter 2021 Financial Results" for the quarter ended March 31, 2021 ("the Q1 2021 Press Release"). The Q1 2021 Press Release stated that the Company's insurance reserve *had declined more than 17% since year end to $1.7 million*.

131.   The Q1 2021 Press Release also stated that *Cost of revenues was $4.7 million* and *gross profit for the first quarter of 2021 was $2.7 million*.

132.   The emphasized statements in ¶¶130-31 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because: HyreCar's insurance reserve did not *decline 17%* to $1.7 million, but *increased 39%,* to $2.9 million, when accounting for the $1.2 million of under-accrued expenses related to claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals." For similar reasons, cost of revenue was not $4.7 million when including the accompanying expense related to claims that were incurred prior to March 31, 2021 in excess of the reserves and accruals, but was instead $5.9 million.

133.   Also within the Q1 2021 Press Release, Defendants stated that HyreCar reported a net loss of $7.2 million, which was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because HyreCar's reported net loss was understated by at least $1.2 million, or at least 14.3%, stemming from the under-accrued expenses related to claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals." Similarly, the Q1 2021 Press Release was also materially false and/or

misleading when made and/or omitted to state material facts necessary to make the statements not misleading because gross profit was likewise overstated by $1.2 million, of which at least $1.0 million should have been reported prior to December 31, 2021. As a result, gross profit was overstated by 78%.

134. The Q1 2021 Press Release also stated that HyreCar's pre-tax loss from operations was $7.2 million.

135. The statements in ¶134 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because Defendants understated HyreCar's cost of revenues by $1.2 million, and thus also understated the Company's pre-tax loss from operations by $1.2 million, or 14.3%.

**B.   Statements From the Company's Q1 2021 Earnings Call**

136. On the same day that HyreCar issued its Q1 2021 press release, it also held an earnings call, led by Defendants Furnari and Brogi, with analysts and investors to discuss the Company's Q1 2021 results. During the Q1 2021 earnings call, Defendants stated:

> ***Cost of sales increased for the quarter ended March 31, 2021 to $4.7 million from $3.6 million the prior year as insurance expenses continue to account for the majority of cost of goods sold primarily due to some seasonal shifts in insurance costs*** to support higher levels of car supply through the winter quarter

137. The emphasized statements in ¶136 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because cost of revenue was not $4.7 million when accounting for the accompanying expense related to claims that were incurred prior to March 31, 2021 in excess of the reserves and accruals.

138. Also in the Q1 2021 earnings call, Furnari stated, "Dynamic pricing combined with increasing gross profit from normalized claims and increased affiliate revenue puts us on to reach EBITDA neutral in the second half of 2021."

139.   The statement in ¶138 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because at the time that Furnari made the above statement, claims had not normalized but were still surging, and the Company had failed to expense $1.2 million in claims related insurance expenses that were incurred prior to March 31, 2021.

**C.**   **Statements From the Company's Q1 2021 10-Q**

140.   On the same day, the Company filed its 10-Q with the SEC for the period ending March 31, 2021. In it, the Company stated:

> The Company records a loss reserve for physical damage and other liability coverage caused to owner vehicles up to the Company's insurance deductibles or relevant limits. ***This reserve represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported and are recorded on a non-discounted basis***. The ***lag time in reported claims is minimal*** and as such represents ***a low risk of unreported claims being excluded from the loss reserve assessment***. The adequacy of the reserve is monitored quarterly and is subject to adjustment in the future based upon changes in claims experience, including the number of incidents for which the Company is ultimately responsible and changes in the cost per claim, or changes to the Company's insurance policy which dictates what amounts of a claim will be paid by the Company. Effective March 1, 2021 the Company entered into a two-year claim adjusting agreement with Sedgwick which included an escrow account requirement of $1,750,000 to be held by Sedgwick for claim payments. This escrow account is replenished by the Company on a quarterly basis dependent on the actual claims paid during that quarter. As of March 31, 2021 and December 31, 2020, $1,747,134 and $2,113,039 was included in the accompanying consolidated balance sheets, respectively, related to the loss reserve, where the expense is included in costs of revenues.

141.   The statements in ¶140  above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because: (1) because the "lag time" of the Company's reported claims

was not low as shown by, among other places, its disclosure on August 10, 2021 that $1.2 million of claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals" had still not been taken at the time the above statement was made. Moreover, the Company's subsequent admission in its 2021 10-K that $1.0 million of the $1.2 million in claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals" were actually incurred even **before January 1, 2021,** establishes that the lag time is not minimal.

142.    The 2021 10-Q also stated that *Cost of revenues was $4.7 million*, *gross profit for the first quarter of 2021 was $2.7 million*, operating loss for the quarter was $7.2 million, net loss for the period was $7.2 million, and insurance reserve for the period was $1.75 million.

143.    The statements immediately above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because: HyreCar's insurance reserve was not $1.75 million, but increased to $2.9 million when including the $1.2 million of under-accrued expenses related to claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals." For similar reasons, cost of revenue was not $4.7 million when accounting for the accompanying expense related to claims that were incurred prior to March 31, 2021 in excess of the reserves and accruals, but was instead $5.9 million. Likewise, the Company's pre-tax loss from operations was also understated by $1.2 million, or 14.3% due to the same under-accrual of insurance claims. And the Company's Q1 2021 net loss was understated by $1.2 million, or 14.3%, also stemming from the under-accrued expenses related to claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals."

144.    The Q1 2021 10-Q also stated that "The consolidated financial statements of HyreCar Inc. are prepared in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP").

145.   The statement above was false because the Q1 2021 financials were not compliant with GAAP because under GAAP, the Company should have increased its insurance reserve by $1.2 million and increased its cost of sales by the same amount due to claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals", a fact Defendants knew or were deliberately reckless in not knowing that because Defendants had real time access to Genoteq's claims data, which showed a substantial backlog of claims that should have been accounted for within the reserves as of March 31, 2021.

146.   The Q1 2021 10-Q stated that "there have been no material changes to our Risk Factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2020." And in the 2020 10-K, the Company stated:

> We establish insurance reserves for claims incurred but not yet paid and claims incurred but not yet reported and any related estimable expenses, and we periodically evaluate and, as necessary, adjust our insurance reserves as our experience **develops or new information is learned**. We employ various predictive modeling actuarial techniques and make numerous assumptions based on limited historical experience and industry statistics to estimate our insurance reserves. Estimating the frequency and severity of claims, as well as related judgment or settlement amounts, is inherently difficult, subjective, and speculative. A number of external factors can affect the actual losses incurred for any given claim, including the length of time the claim remains open, fluctuations in healthcare costs, legislative and regulatory developments, jurisdiction and judicial developments. Additionally, we may encounter in the future, instances of insurance fraud, which could increase our actual insurance-related costs. For any of the foregoing reasons, our actual losses for claims and related expenses may deviate, individually or in the aggregate, from the insurance reserves reflected in our consolidated financial statements. If we determine that our estimated insurance reserves are inadequate, **we may** be required to increase such reserves at the time of the determination, which could result in an increase to our net loss in the period in which the deficiency is determined and

negatively impact our financial condition and results of operations.

147.   The statements in ¶146 were false when made and/or omitted to state material facts necessary to make the statements not misleading because it omitted that claims that were incurred prior to January 1, 2021 under HyreCar's previous insurance claims processing partner had already been incurred and thus necessitated HyreCar to increase its reserve at the time that both the 2020 10-K and Q1 2021 10-Q were issued. In other words, the above statement warned of a risk in the abstract that had already come to fruition and the Q1 2021 10-Q ratified it by stating that "there have been no material changes to our Risk Factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2020."

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

148.   As alleged herein, the Individual Defendants knew, or recklessly and deliberately disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and/or misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding HyreCar, and their control over and/or receipt and/or modification of HyreCar's materially false and/or misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

149.   Defendants knew and/or recklessly and deliberately disregarded the false and/or misleading nature of the information they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the deliberate reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.

150.   The Individual Defendants, because of their positions with HyreCar, controlled the contents of HyreCar's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly and deliberately disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and/or misleading.

151.   Indeed, the Individual Defendants held themselves out to investors as the persons most knowledgeable to discuss the Company's insurance products, reserves and claims severity and incidence, and continuously kept themselves apprised of these aspects of HyreCar's business, operations and financial results as part of their primary job responsibilities. Insurance revenues and claims incidents are major components of the Company's cash flows and financial results and management was particularly focused on these trends during the Class Period as evidenced by the May 13, 2021 statement that the Company "tested and then enacted some pricing enhancements early in the second quarter to both our driver *and insurance fees* to better reflect the new competitive environment and ***align reimbursement rates with new driver risk scoring data*,"** thereby establishing that management knew driver risk was not being properly managed or scored, but even with said knowledge still omitted reference to the underlying risk that Genoteq and ABI's involvement would, and indeed did, have on HyreCar's reported financial statements. Furthermore, because the fraud alleged herein relates to the core operations of HyreCar, which is a relatively small company with 86 full-time employees as of December 31, 2020, knowledge of the facts underlying the fraud may be imputed to the Individual Defendants based on their positions with the Company. As a result, each of the Defendants is responsible for the

accuracy of HyreCar's corporate statements and is, therefore, responsible and liable for the representations contained therein.

152.   Defendants' scienter is further shown because on March 1, 2021, the Company entered into a two-year claim adjusting agreement with Sedgwick ("the Sedgwick Advance") which included an escrow account requirement of $1,750,000 to be held by Sedgwick for claim payments. This escrow account is replenished by the Company on a quarterly basis dependent on the actual claims paid during that quarter. The Sedgewick Advance establishes that when the Company began transferring claims from Genoteq to Sedgwick it had, or was deliberately reckless in not having, internal reviews over what the appropriate level of quarterly reserves should be. Indeed, the Sedgwick Advance was even greater than the insurance reserve that HyreCar booked on its own Balance Sheet as of the end of Q1 2021.

153.   Additional scienter is shown by Defendants' reckless reliance on a related party to process claims and provide data for insurance reserve determination purpose, particularly when the nature of that relationship was misrepresented to one of arm's length (*i.e.*, as a third-party relationship).

154.   Defendants' scienter is also corroborated by the suspicious sales of Company stock by Company insiders. The sales are suspicious in that they were unusual in their size, unusual in comparison to the insider's prior trading history, and unusually timed to maximize profits at artificially inflated prices. Following Defendants' materially false and misleading statements on the first day of the Class Period, the price of HyreCar stock rocketed upwards 45% on May 14, 2021. This preceded an unprecedented spate of insider selling at the Company, totaling more than $13 million in gross proceeds.

155.   For example, Defendant CEO Furnari sold 300,000 shares of Company stock on July 21, 2021 through July 23, 2021, reaping gross proceeds of more than $5.2 million. Prior thereto, Furnari sold no Company shares since the Company's IPO in June 2018.

156.   Michael Furnari, the Company's Chief Business Development Officer since October 2017 and the brother of defendant CEO Furnari, also engaged in suspicious insider selling. Michael Furnari sold 299,900 shares of Company stock on July 21, 2021 through July 23, 2021, reaping gross proceeds of nearly $5.2 million. Prior thereto, Michael Furnari sold no Company shares since the Company's IPO in June 2018.

157.   Defendant CFO Brogi likewise engaged in suspicious insider selling. Brogi sold 72,329 shares of Company stock on May 20, 2021 and May 24, 2021, reaping gross proceeds of over $1.2 million. Prior thereto, Brogi sold no Company shares since joining the Company in September 2018.

158.   Grace Mellis, Chair of the Company's Board of Directors during the Class Period, engaged in suspicious insider trading as well. Mellis sold 50,000 Company shares on May 24, 2021 and June 3, 2021, reaping gross proceeds of nearly $875,000. Prior thereto, Mellis sold no Company shares since the Company's IPO.

159.   Henry Park, the Company's Chief Operating Officer during the Class Period, engaged in suspicious insider trading too. Park sold 35,000 Company shares on May 19, 2021 and May 20, 2021, reaping gross proceeds of over $578,000. Prior thereto, Park sold no Company shares since joining the Company in October 2018.

160.   Additionally, on June 23, 2021, the Company announced the unexpected "retirement" of defendant CFO Brogi, at only age 56. Brogi was replaced as CFO on July 5, 2021. Brogi's unexpected departure from the Company under the circumstances described herein further evidences Defendants' scienter particularly given its proximity to ABI and Genoteq's replacement.

161.   Indeed, the Individual Defendants held themselves out to investors as the persons most knowledgeable to discuss the Company's insurance products, reserves and claims severity and incidence, and continuously kept themselves apprised of these aspects of HyreCar's business, operations and financial results as part of their primary job responsibilities. Insurance revenues and claims incidents are major components

of the Company's cash flows and financial results and management was particularly focused on these trends during the Class Period. Furthermore, because the fraud alleged herein relates to the core operations of HyreCar, which is a relatively small company with a total of 86 full-time employees as of December 31, 2020, knowledge of the facts underlying the fraud may be imputed to the Individual Defendants based on their positions with the Company.

## VIII.  LOSS CAUSATION

162.   During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of HyreCar securities and operated as a fraud or deceit on Class Period purchasers of HyreCar securities by misrepresenting the value of the Company's business and prospects including by concealing negative aspects of the Company's insurance products and claims incidence.

163.   As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of the Company's securities fell precipitously as the prior artificial inflation came out of the stock's price. Indeed, following the Company's corrective disclosure on August 10, 2021, the price of HyreCar stock fell ***nearly 50%*** in a single day to close at $9.85 per share on August 11, 2021, on abnormally high volume of over 5.8 million shares traded, thereby damaging investors.

## IX.   CLASS ACTION ALLEGATIONS

164.   Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired HyreCar securities between May 13, 2021 through August 10, 2021, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

165.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, HyreCar's securities actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of HyreCar's securities were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by HyreCar or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions.

166.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

167.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

168.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of HyreCar;

(c)   whether Defendants engaged in a scheme to defraud shareholders of HyreCar; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

169.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.     UNDISCLOSED ADVERSE FACTS

170.   The market for HyreCar's securities was open, well-developed and efficient.  As a result of these materially false and/or misleading statements, and/or failures to disclose, HyreCar's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired HyreCar's securities relying upon the integrity of the market price of the Company's securities and market information relating to HyreCar and have been damaged thereby.

171.   During the Class Period, Defendants materially misled the investing public, thereby inflating the price of HyreCar's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about HyreCar's business, operations, and prospects as alleged herein.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE

172.   The market for HyreCar's securities was open, well-developed and efficient. As a result of the materially false and/or misleading statements and/or failures to disclose, HyreCar's securities traded at artificially inflated prices during

the Class Period. On June 23, 2021 the Company's share price closed at a Class Period high of $22.95 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of HyreCar's securities and market information relating to HyreCar and have been damaged thereby.

173.   During the Class Period, the artificial inflation of HyreCar's securities was caused by the material misrepresentations and/or omissions and/or scheme particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants engaged in a scheme and made or caused to be made a series of materially false and/or misleading statements about HyreCar's business, prospects, and operations. These material misstatements and/or omissions and/or scheme created an unrealistically positive assessment of HyreCar and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company securities. Defendants' materially false and/or misleading statements during the Class Period caused Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

174.   At all relevant times, the market for HyreCar's securities was an efficient market for the following reasons, among others:

175.   (a)   HyreCar shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

176.   (b)   As a regulated issuer, HyreCar filed periodic public reports with the SEC and/or the NASDAQ;

177.   (c)   HyreCar regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services

SECOND AMENDED COMPLAINT

and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

178. (d)    HyreCar was followed by securities analysts who wrote reports and/or issued public statements about the Company, and these reports and statements were publicly available and entered the public marketplace.

179.   As a result of the foregoing, the market for HyreCar's securities promptly digested current information regarding HyreCar from all publicly available sources and reflected such information in HyreCar's share price. Under these circumstances, all purchasers of HyreCar's securities during the Class Period suffered similar injury through their purchase of HyreCar's securities at artificially inflated prices and a presumption of reliance applies.

## XII.   NO SAFE HARBOR

180.   HyreCar's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

181.   Defendants are also liable for any false or misleading FLS pleaded because, when each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of HyreCar who knew that the FLS was false. None of the historical or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by

defendants expressly related to or stated to be dependent on those historical or present tense statements when made.

## XIII. COUNT ONE

### Violation of Section 10(b) of The Exchange Act and SEC Rule 10b-5 Promulgated Thereunder

182.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

183.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase HyreCar's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

184.   Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for HyreCar's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a)—(c). All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

185.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about HyreCar's financial well-being and prospects, as specified herein.

186.   Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices,

and a course of conduct as alleged herein in an effort to assure investors of HyreCar's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about HyreCar and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

187. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with deliberate recklessness. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing HyreCar's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were deliberately reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

188. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of HyreCar's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or absent material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants

during the Class Period, Plaintiff and the other members of the Class acquired HyreCar's securities during the Class Period at artificially high prices and were damaged thereby.

189. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth about the problems that HyreCar was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their HyreCar securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

190. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) promulgated thereunder.

191. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

192. During the Class Period, Defendants also carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiff and the Class; (ii) artificially inflate the market price of the Company's securities; and (iii) cause Plaintiff and other Class members to purchase the Company's securities at artificially inflated prices. In furtherance of this unlawful plan, scheme, and course of conduct, and as alleged more fully herein, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of the Company's securities in violation of §10(b) of the Exchange Act and Rule 10b- 5(a) and (c) promulgated thereunder.

193.   Plaintiff and the Class reasonably relied upon the integrity of the market in which the Company's securities traded. During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased the Company's securities, or if they had, would not have done so at the artificially inflated prices they paid.

194.   As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

195.   By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of the Company's securities during the Class Period.

## XIV.  COUNT TWO

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

196.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

197.   The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

198.   The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected.  Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

199.   The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

200.   By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment:

(a)   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)   Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)   Such other relief as the Court may deem just and proper.

## XVI.  JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED:  March 21, 2022

**GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Robert V. Prongay*
Robert V. Prongay
Ex Kano S. Sams II
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel for Lead Plaintiff Turton Inc.*

SECOND AMENDED COMPLAINT

1

**PROOF OF SERVICE BY ELECTRONIC POSTING**

2

I, the undersigned say:

3

I am not a party to the above case and am over eighteen years old.  On March

4

21, 2022, I served true and correct copies of the foregoing document, by posting the

5

document electronically to the ECF website of the United States District Court for the

6

Central District of California, for receipt electronically by the parties listed on the

7

Court's Service List.

8

I affirm under penalty of perjury under the laws of the United States of America

9

that the foregoing is true and correct.  Executed on March 21, 2022, at Los Angeles,

10

California.

11

12

*s/ Robert V. Prongay*

Robert V. Prongay

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28