LATHAM & WATKINS LLP
  Joshua G. Hamilton, Esq. (199610)
    *Joshua.Hamilton@lw.com*
  Regina Wang, Esq. (326262)
    *Regina.Wang@lw.com*
10250 Constellation Blvd., Suite 1100
Los Angeles, CA 90067
Telephone: 424.653.5500
Facsimile: 424.653.5501

  Meryn C. N. Grant, Esq. (291315)
    *Meryn.Grant@lw.com*
355 S Grand Ave., Suite 100
Los Angeles, CA 90071
Telephone: 213.485.1234
Facsimile: 213.891.8763

*Attorneys for Defendants HyreCar Inc.,*
*Joseph Furnari and Robert Scott Brogi*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN BARON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HYRECAR INC., JOSEPH FURNARI and ROBERT SCOTT BROGI,<br><br>Defendants. | Case No. 2:21-cv-06918-PA-JC<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS SECOND AMENDED COMPLAINT BY DEFENDANTS HYRECAR INC., JOSEPH FURNARI AND ROBERT SCOTT BROGI**<br><br>Hearing Date:  May 9, 2022<br>Time:          1:30 p.m.<br>Ctrm:          9A<br>Judge:         Hon. Percy Anderson<br><br>[Request for Judicial Notice; Declaration of Regina Wang; and [Proposed] Order filed and served concurrently herewith] |

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on May 9, 2022 at 1:30 p.m., or at such later date and time as the Court may order, in the Courtroom of the Honorable Percy Anderson, located at First Street Courthouse, 350 W. 1st Street, Courtroom 9A, 9th Floor, Los Angeles, California 90012, Defendants HyreCar Inc. ("HyreCar"), Joseph Furnari, and Robert Scott Brogi (collectively, "Defendants") will and hereby do move for an Order dismissing with prejudice Lead Plaintiff Turton Inc.'s ("Plaintiff") Second Amended Complaint for Violations of the Federal Securities Laws ("SAC"). This Motion is made pursuant to Rule 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 ("Reform Act").

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place beginning on March 2, 2022. This Motion is made on the following grounds:

1) Plaintiff's SAC fails to state a claim under Section 10b of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 (17 C.F.R. § 240.10b-5) and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, because the SAC fails to plead a material false statement or omission with particularity, as required under the Reform Act and Federal Rule of Civil Procedure 9(b).

2) Plaintiff's SAC fails to state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder because the SAC fails to plead a strong inference of scienter, as required under the Reform Act.

3) Plaintiff's SAC fails to state a claim for secondary liability under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)) because Plaintiff fails to plead a primary violation of the Exchange Act.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, Defendants' Request for

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

2

Judicial Notice and Documents Incorporated by Reference, the Declaration of Regina Wang, the SAC, the Court's record on this matter, the arguments of counsel, and other materials and arguments that may be presented prior to the Court's decision on this Motion.

Dated:  April 4, 2022

LATHAM & WATKINS LLP
Joshua G. Hamilton

By:  _/s/ Joshua G. Hamilton_
Joshua G. Hamilton
Attorneys for Defendants HyreCar Inc.,
Joseph Furnari and Robert Scott Brogi

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

3

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................... 1

II. RELEVANT FACTUAL BACKGROUND ............................................. 3

  A. Overview of HyreCar's Business ................................................... 3

  B. HyreCar's Evolution as an Emerging Growth Company .............. 4

    1. HyreCar's Recent Growth ................................................... 4

    2. HyreCar's Insurance Model ................................................. 4

  C. HyreCar's Accounting for Insurance Claims Expenses ................ 6

  D. HyreCar Incurred an Unexpected Expense Increase After It Switched Insurance Adjusters ......................................................... 8

III. LEGAL STANDARD ............................................................................ 10

IV. ARGUMENT .......................................................................................... 11

  A. Plaintiff Fails to Sufficiently Plead Any Materially False Or Misleading Statement or Omission ............................................... 11

    1. Plaintiff Cannot Adequately Plead That Reserves Were Understated ........................................................................ 12

    2. Statements Regarding GAAP Compliance Were Accurate ..... 15

    3. Statements of Insurances Reserves Are Inactionable Opinions .............................................................................. 15

    4. Defendants' Statements Regarding Setting Of Reserves Were Not False ................................................................... 16

    5. Statements Regarding Anticipated Results Are Inactionable Forward-Looking Statements ............................ 18

  B. Plaintiff Fails To Plead A Strong Inference Of Scienter ............... 18

    1. HyreCar's Clean Audit Opinion Undermines An Inference of Scienter .......................................................... 19

    2. Plaintiffs Has Not Alleged that Defendants Had Knowledge of Facts that Would Render Their Statements False ..................................................................................... 20

    3. The Sedgwick Escrow Account Does Not Support an Inference of Scienter ........................................................ 23

V. CONCLUSION ...................................................................................... 25

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

i

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re 3M Co. Sec. Litig.*,
2021 WL 4482987 (D. Minn. Sept. 30, 2021) .............................................. 12, 22

*Alaska Elec. Pension Fund v. Adecco S.A.*,
371 F. Supp. 2d 1203 (S.D. Cal. 2005) .......................................................... 23

*In re Alphabet Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ............................................................................ 11

*In re Apple Computer, Inc., Securities Litigation, Sec. Litig.*,
243 F. Supp. 2d 1012 (N.D. Cal. 2002) .......................................................... 18

*In re Bausch & Lomb, Inc. Sec. Litig.*,
592 F. Supp. 2d 323 (W.D.N.Y. 2008) ............................................................ 20

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ..................................................................... 11, 16

*In re Cadence Design Sys., Inc. Sec. Litig.*,
654 F. Supp. 2d 1037 (N.D. Cal. 2009) .......................................................... 20

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ........................................................................ 11

*Cho v. UCBH Holdings, Inc.*,
2011 WL 3809903 (N.D. Cal. May 17, 2011) .................................................. 22

*In re CIT Grp. Inc. Sec. Litig.*,
349 F. Supp. 2d 685 (S.D.N.Y. 2004) ............................................................. 13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F. 3d 605 (9th Cir. 2017) ......................................................................... 15

*Curry v. Yelp Inc.*,
2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017) .............................................................................................................. 22

*Davoli v. Costco Wholesale Corp.*,
854 F. App'x 116 (9th Cir. 2021) .................................................................... 21

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ....................................................................................... 10

*Feola v. Cameron*,
2015 WL 12644566 (C.D. Cal. Nov. 24, 2015) ............................................... 19

*In re Foxhollow Techs. Sec. Litig.*,
359 F. App'x 802 (9th Cir. 2009) .................................................................... 16

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

ii

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

*Gammel v. Hewlett-Packard Co.*,
  905 F. Supp. 2d 1052 (C.D. Cal. 2012)......................................................................10

*In re Hansen Nat. Corp. Sec. Litig.*,
  527 F. Supp. 2d 1142 (C.D. Cal. 2007)......................................................................19

*In re ICN Pharms., Inc., Sec. Litig.*,
  299 F. Supp. 2d 1055 (C.D. Cal. 2004)......................................................................12

*In re Inmpac Mortgage Holdings, Inc. Sec. Litig.*,
  554 F. Supp. 2d 1083 (C.D Cal. 2008)......................................................................16

*Iron Workers Loc. No. 25 Pension Fund v. Oshkosh Corp.*,
  2010 WL 1287058 (E.D. Wis. Mar. 30, 2010)..........................................................24

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009)...................................................................................10

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018), *cert. denied sub nom.*
  *Hagan v. Khoja*, 139 S. Ct. 2615 (2019)..................................................................11

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002)..............................................................................22, 25

*Lloyd v. CVB Fin. Corp.*,
  2012 WL 12883522 (C.D. Cal. Jan. 12, 2012)...........................................................12

*Luna v. Marvell Tech. Grp. Ltd.*,
  2016 WL 5930655 (C. D. Cal. Oct. 12, 2016) ......................................................15, 25

*In re Metawave Commc'ns Corp. Sec. Litig.*,
  298 F. Supp. 2d 1056 (W.D. Wash. 2003).................................................................21

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008).........................................................................10, 19, 24

*NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*,
  2012 WL 3191860 (S.D.N.Y. Feb. 9, 2012) ..............................................................13

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003)......................................................................................24

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014)....................................................................................21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ...................................................................................................15

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014)......................................................................................19

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d 1051 (9th Cir. 2014)...............................................................................18, 22

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
CENTURY CITY

iii

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

*In re Read-Rite Corp. Sec. Litig.*,
  335 F.3d 843 (9th Cir. 2003) ............................................................... 11

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) .......................................................... 23, 24

*Rubke v. Capitol Bancorp, Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) ............................................................. 11

*Santa Fe Industries, Inc. v. Green*,
  430 U.S. 462 (1977) ............................................................................. 16

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970 (9th Cir. 1999), *as amended* (Aug. 4, 1999) ................. 24

*In re Skechers U.S.A., Inc. Sec. Litig.*,
  2005 WL 8168047 (C.D. Cal. Mar. 21, 2005) (Anderson, J.), *aff'd*, 273 F.
  App'x 626 (9th Cir. 2008) .................................................................... 24

*In re Taleo Corp. Sec. Litig.*,
  2010 WL 597987 (N.D. Cal. Feb. 17, 2010) ....................................... 22

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................. 19

*Waterford Twp. Police v. Mattel, Inc.*,
  321 F. Supp. 3d 1133 (C.D. Cal. 2018) ............................................... 18

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................... 23

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
  2022 WL 853252 (9th Cir. Mar. 23, 2022) ............................ 2, 10, 11, 13

*In re Wet Seal, Inc. Sec. Litig.*,
  518 F. Supp. 2d 1148 (C.D. Cal. 2007) ............................................... 19

*Wochos v. Tesla, Inc.*,
  2019 WL 1332395 (N.D. Cal. Mar. 25, 2019) *aff'd*,
  985 F.3d 1180 (9th Cir. 2021) ............................................................. 18

*Woolgar v. Kingstone Companies, Inc.*,
  477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............................................. 13, 15

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..................................................... 21, 22, 25

**STATUTES**

15 U.S.C.
  § 78j(b) ................................................................................................... 2
  § 78t(a) ................................................................................................ 2, 2
  § 78u-4(b) ............................................................................................... 2
  § 78u-4(b)(1) ......................................................................................... 10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

iv

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

§ 78u-4(b)(2)..................................................................................................10, 18

§ 78u-5(c) ............................................................................................................18

Private Securities Litigation Reform Act of 1995..............................................*passim*

Securities and Exchange Act of 1934.............................................................2, 2, 12

**RULES**

Fed. R. Civ. P.

9(b)..................................................................................................................2, 10

12(b)(6) ...............................................................................................................2

L.R. 7-3 ....................................................................................................................2

**REGULATIONS**

17 C.F.R. § 240.10b-5 .........................................................................................2, 10

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

v

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

## I.   INTRODUCTION

Plaintiff's SAC, like its dismissed First Amended Complaint ("FAC"), attempts to allege securities law violations by misconstruing and mischaracterizing HyreCar's natural growing pains it experienced as an emerging growth company offering a unique business model to the "gig economy."  The SAC, like the FAC, should be dismissed.  In the Court's detailed order granting Defendants' motion to dismiss the FAC (Dkt. 74 "Order"), the Court found that Plaintiff failed to plead any materially false or misleading statement with the specificity required under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4.  The Court recognized Plaintiff' s flawed theory that HyreCar "understated insurance expenses or concealed a material risk that its insurance reserves (reflecting an estimate of liability for unpaid claims) were understated."  Order at 6.  The Court found that Plaintiff failed to plead falsity, and determined that the FAC "appears to conflate the pace at which claims were paid with the accuracy of the insurance reserves periodically set and disclosed by HyreCar.  But the speed with which the claims were paid is not the same as setting reserves for submitted claims and anticipating the number and value of future claims.  Nothing alleged in the 1st AC adequately links these two distinct concepts or otherwise attempts to quantify the magnitude by which HyreCar and its executes might have knowingly misstated the insurance reserves or the risks posed by some unknown portion of pool drivers." *Id.* at 7. The Court also found that "HyreCar repeatedly disclosed both the difficulty it faced in setting its insurance reserves and, as ultimately happened, the risk that actual claims might exceed the insurance reserves." *Id*.

The SAC contains the same fundamental flaws as the FAC and should be dismissed.  Again, Plaintiff persists in the illogical and unsupported assumption that all insurance claims made were entitled to immediate payment in full.  That ignores HyreCar's business model and the common sense notion that not all insurance claims are valid or entitled to full payment.  Rather, each claim requires

Latham & Watkins LLP
Attorneys At Law
Century City

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

1

investigation into whether and how much coverage applies. That takes time and, as HyreCar repeatedly disclosed, meant that HyreCar's actual losses may exceed insurance reserves because estimating those losses "is inherently difficult, subjective, and speculative." Ex. 1 (2020 Form 10-K) at 15. Again, none of the "confidential witnesses" or "CWs" Plaintiff relies on address whether claims pending at HyreCar's third party adjuster and administrator were properly accounted for in HyreCar's insurance reserves. Also again, Plaintiff attempts to use HyreCar's August 2021 announcement that it incurred a $1.2 million cost attributed to claims and incidental payments incurred prior to March 31, 2021 to argue its reserves were understated. But the Court already found these same hindsight allegations insufficient to plead falsity, and as the Ninth Circuit recently recognized, "it is simply not enough to assume or implausibly infer that the defendants must have known about these issues . . . based on later facts or developments. Yet Plaintiffs repeatedly rely on future statements to leap to that conclusion." *Weston Fam. P'ship LLLP v. Twitter, Inc.*, 2022 WL 853252, at *7 (9th Cir. March 23, 2022). This impermissible "leap" is exactly what Plaintiff has done again here. Plaintiff still fails to plead any specific facts that HyreCar materially understated its reserves, much less to suggest Defendants knew its reserve estimates were false when made. Indeed, HyreCar has received only unqualified audit opinions from its independent auditor, and the reported financial figures have never been restated.

Plaintiff also fails to plead the requisite "strong inference" of scienter where it relies on (1) statements from confidential witnesses with no personal knowledge of HyreCar's financial statements, (2) executive stock sales that are not suspicious, and (3) the unremarkable retirement of HyreCar's former CFO at age 56. As Plaintiff fails to plead a primary violation of the Exchange Act, its Section 20(a) claim must also fail.

Because there is no cure for these defects, the Court should grant this

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

2

Motion with prejudice.

## II.     RELEVANT FACTUAL BACKGROUND

### A.     Overview of HyreCar's Business

The Court's Order provides a detailed factual background of the allegations and judicially noticed facts, and the SAC cannot change the fundamental allegations concerning HyreCar's business model upon which the Court relied. Order at 2-3.  As explained in HyreCar's prior motion to dismiss (Dkt. 67 at 3-4), HyreCar provides a platform for individuals, and more recently commercial car fleet owners, to directly rent their cars to Uber, Lyft, and other "gig economy" service platforms.  SAC ¶ 33.  HyreCar's revenue model is simple: HyreCar earns revenue from rental fees collected from both the driver and the car owner, and an additional insurance fee from the driver.  Ex. 1 at 6.  For each rental, the cost to the driver at the relevant times was a daily rental rate, a 10% HyreCar fee, and direct daily insurance costs.  The owner received a daily rental rate minus a 15 to 25 percent owner fee that went to HyreCar.  *Id.*; Ex. 3 (Q2 2021 Form 10-Q) at 13. HyreCar then provides insurance coverage to both the renter and owner of the car. Ex. 4 (HyreCar Policy, Insurance).  HyreCar's insurance policies vary based on whether they insure the renter or the owner and type of protection ("Basic," "Standard," or "Premium"), but generally cover physical damage to a vehicle, liability to third parties, personal injury and uninsured motorist protection, and incidental costs like gas, tickets and cleaning.  SAC ¶¶ 35-36, 42; Ex. 12 (HyreCar Protection Plans for Owners).

HyreCar repeatedly disclosed to investors in detail the specific risks of its business attributable to its unique and growing business.  Ex. 1 at 8-9, 14-15. These risks included, as particularly relevant to this Motion, the risks that HyreCar's "results of operations vary and are unpredictable from period-to-period," and would continue to vary as the result of numerous factors; HyreCar's "limited operating history makes it difficult to evaluate our current business and

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

3

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

prospects and plan for and model our future growth," and risks related to setting reserves discussed in detail below. *Id.*

During the relevant period, HyreCar was led by Defendants Joseph Furnari ("Furnari") and Robert Scott Brogi. Joseph Furnari joined HyreCar in its infancy in 2016 and has served as HyreCar's CEO since January 2017. SAC ¶ 22; Ex. 2 (April 30, 2021 Form DEF 14A) at 21. Defendant Robert Scott Brogi served as HyreCar's CFO from September 2018 until his retirement in July 2021 at the age of 56. SAC ¶ 23; Ex. 2 at 22.

**B.      HyreCar's Evolution as an Emerging Growth Company**

**1.      HyreCar's Recent Growth**

There are three main inputs to HyreCar's business: drivers, car owners, and insurance. In recent years, all three aspects have experienced enormous growth. In 2019 and 2020, HyreCar added approximately 11,000 and 14,000 new drivers, respectively. Ex. 1 at 2. When the COVID-19 pandemic hit, although initially impacted by the downturn, HyreCar pivoted and expanded its "marketing to drivers who provide delivery services with companies like Instacart and Postmates." Ex. 1 at 2; Ex. 5 (June 2021 Investor Presentation) at 4-5. As a result, total "rental days" grew more than 60% year-over-year from 2019 to 2020, with the majority of the growth in the second half of 2020. Ex. 1 at 23.

**2.      HyreCar's Insurance Model**

HyreCar's insurance encompasses two general categories: liability coverage and coverage for physical damage to a vehicle. SAC ¶ 36; Ex. 3 at 7. HyreCar must pay for liability claims—including injuries to third parties or the driver—up to the deductible on its own insurance policy; in contrast, HyreCar self-insures up to $25,000 of physical damage claims minus the deductible paid by the owner, which could range from $500 to $3000. Ex. 1 at 32; Ex. 12; SAC ¶¶ 44. HyreCar uses insurance brokers to handle back-end insurance generation and processing, and a managing general underwriter affiliated with a liability insurance provider.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

4

Ex. 3 at 5.

HyreCar's insurance policy is limited, covering only one of the four "distinct driving periods" that apply to a vehicle rental. SAC ¶ 38; Ex. 1 at 4. Therefore, for every claim, it needs to be determined whether HyreCar's coverage applies. HyreCar's insurance policy only covers a certain driving period—"Period 0"— when "[d]rivers are operating HyreCar vehicles OFF" of a rideshare or delivery platform . . . . During the periods when Drivers are operating ON the [rideshare or delivery] platform (periods 1-3) . . . the HyreCar liability insurance subordinates to state mandated insurance provided by [these platforms]." SAC ¶ 38; Ex. 1 at 5.

As HyreCar has experienced tremendous growth, it has continually upgraded its insurance partners to meet with the demands of a growing company. Until June 2020, HyreCar used American Business Insurance Services ("ABI") as its insurance broker. *Id.* at 5. HyreCar disclosed its relationship with David Haley, ABI's CEO, including that he was an industry veteran, that he sat on HyreCar's strategic advisory board (not the Board of Directors) and was a minority shareholder. *See id.*; SAC ¶ 73. On December 7, 2020, HyreCar announced it would use a new insurance broker (to replace ABI) that was "a leader in the digital economy space, with a specialized team dedicated to Transportation as a Service," as HyreCar "expand[ed] its carsharing services." Ex. 7 (Dec. 7, 2020 Press Release). HyreCar also has worked to upgrade the parties it relies on to adjust and process insurance claims—*i.e.* to investigate and determine whether the claim is covered by HyreCar's limited policy—as opposed to TNCs' insurance policies, and the amount of coverage. SAC ¶ 64. Until March 2021, for its physical damage claims, HyreCar relied on Genoteq as its adjuster. Ex. 6 at 7; Ex. 9 (Q4 2020 Earnings Call). By Plaintiff's own allegations, Genoteq was formed by Haley, and was not affiliated with HyreCar.[1] SAC ¶¶ 64-65.

---

[1] On October 3, 2018, HyreCar announced a joint venture with Haley and Peter Foley, CEO of LILCHA Holdings, to "creat[e] an insurance captive designed specifically for

LATHAM&WATKINSLLP
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

5

## C.    HyreCar's Accounting for Insurance Claims Expenses

HyreCar accounts for insurance claims in cost of revenue, which are expenses. Ex. 1 at 7. Claims that have been paid are accounted for directly as expenses. SAC ¶ 4. Claims that have not yet been paid are accounted for by estimating future payouts and recording them in "insurance reserves." Ex. 1 at 15. Reserve estimates are evaluated on a quarterly basis, and net changes in insurance reserves are included each quarter as adjustments to costs of revenue. *Id*. at 32. In accordance with GAAP, HyreCar only needs to record a loss reserve for claims that are "probable and can be reasonably estimated." SAC ¶ 46; s*ee also* Ex. 21 (ASC 450-20-25-2); Ex. 11 (Q1 2021 Form 10-Q) at 7. These claims include physical damage, liability, and other incidental costs. SAC ¶¶ 36, 49.

In HyreCar's detailed risk disclosures, insurance reserves were identified as one of "the Company's most significant estimates." Ex. 1 at 30. HyreCar "records a loss reserve for physical damage and other liability coverage caused to owner vehicles up to the Company's insurance deductibles." *Id*. at F-9. That amount includes "claims incurred but not yet paid and claims incurred but not yet reported, based on estimates of the number and severity of claims, as well as related judgment or settlement amounts." *Id*. at 15. Owners had up to 24 hours after the return of the vehicle to file a claim for physical damage to the vehicle. SAC ¶ 53; Ex. 4. For physical damage, once reported, the owner is responsible for obtaining an estimate from a body shop (SAC ¶ 56) and the adjuster was responsible for investigating and determining whether the claim was covered by HyreCar's policy and whether it was subject to any exclusions. Ex. 12. With the growth of the company and influx of claims in the winter, Genoteq adjusters struggled to keep up and claimants experienced long processing times. SAC ¶¶ 86, 107, 136.

HyreCar repeatedly disclosed risks inherent in estimating insurance reserves:

carsharing in the ridesharing space." SAC ¶ 63; Ex. 10 (October 3, 2018 Press Release). Plaintiff's insinuation, however, that *Genoteq* was the product of this joint venture is complete speculation not supported by any facts. SAC ¶ 66.

LATHAM&WATKINSᴸᴸᴾ
ATTORNEYS AT LAW
CENTURY CITY

6

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

- HyreCar reviewed the reserve quarterly, and made adjustments based upon changes in claims experience, including "the number of incidents for which the Company is ultimately responsible and changes in the cost per claim, or changes to the Company's policy as to what amounts of the deductible or claim will be paid by the Company." Ex. 1 at 32.

- The reserve was estimated based on its "limited operating history," various "assumptions" and "third party claims adjuster data provided on existing claims;" and the estimation process was "inherently difficult, subjective, and speculative." *Id*. at 8, 15, 32.

- HyreCar may need to "adjust our insurance reserves as our experience develops or new information is learned," or "increase such reserves" if "our estimated insurance reserves are inadequate." *Id*. at 10, 15.

- Because "claims may emerge in future periods for events that occurred in a prior period that differed from expectations," "***actual losses may exceed our insurance reserves.***" *Id*. at 15, 32.

The insurance reserves were reviewed as part of HyreCar's independent auditor's review of the financial statements, as one "[t]he Company's most significant estimates and judgments." *Id*. at F-1, F-6; Ex 13 (2021 Form 10-K) at F-1, F-6.  The independent auditor opined that "the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and 2019, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America." Ex. 1 at F-1.

HyreCar's insurance reserves are considered "accounting estimates" because their valuation was "uncertain, pending the outcome of future events." Ex. 14 (Auditing Standards of Public Company Accounting Oversight Board) at 278.  In reviewing such estimates, audit standards require the auditor to design and

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

7

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

implement procedures to address risks of material misstatement, including (1) testing the company's process used to develop the insurance reserve, (2) developing its own "independent estimate," (3) evaluating audit evidence from events or transactions after the measurement date related to the accounting estimate, or a combination of these three approaches. *Id.* at 263-64. Among other things, the auditing standards direct auditors to evaluate the methods used by the company in the reserve estimate; the accuracy, completeness, relevance, and reliability of data used in the reserve estimate; and the reasonableness of significant assumptions. *Id.* at 264-67. HyreCar disclosed that it had no disagreements with accountants on its financial disclosures. Ex. 1 at 33. HyreCar's financial statements have never been restated. *See* Ex. 13 at 32. And, in 2021, HyreCar's independent auditor again found that its financial statements complied with GAAP and fairly presented HyreCar's financial results. *Id*. at F-1.

### D. HyreCar Incurred an Unexpected Expense Increase After It Switched Insurance Adjusters

In 2019 and 2020, HyreCar used Genoteq as its physical damage claims adjuster and administrator, but as HyreCar grew, Genoteq struggled to keep up with the attendant growth, which resulted in increased claims processing times. *See generally* SAC ¶¶ 56, 85, 86, 89; Ex. 9.

By the end of the fourth quarter of 2020, HyreCar's rental days had increased 63% since the prior year—meaning it had more drivers than ever and, naturally, more insurance claims—and HyreCar's cost of revenues had increased even further in Q4 2020 "primarily due to some seasonable shifts in insurance costs to support higher levels of car supply." Ex. 9. In Q1 2021, HyreCar announced "Record First Quarter 2021 Financial Results," based on its continued growth. Ex. 15 (May 13, 2021 Press Release); SAC ¶ 105. HyreCar also reported that its "insurance reserve had declined more than 17% since year end to $1.7 million." *Id.*

On a March 30, 2021 earnings call, Brogi announced the selection process

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

8

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

for a new third-party administrator to "bring both the [physical damage] claims and the liability claims together, so that you are having a really efficient determination of responsibility . . . [and] dealing with those claims quickly so that you can get those cars back on the platform." Ex. 9. Essentially, HyreCar was elevating its administrators to keep up with its growth.

HyreCar reported in its Q1 2021 Form 10-Q that, effective March 1, 2021, it had entered into a two-year claim adjusting agreement with Sedgwick—a large and sophisticated claims administrator—which required an escrow account to be set up with "$1,750,000 to be held by Sedgwick for claim payments." Ex. 11 at 7. As claims were paid, HyreCar would replenish that account "on a quarterly basis." *Id*.; SAC ¶ 140; *see also* Ex. 16 (Q1 2021 Earnings Call). HyreCar further announced in May 2021 that it renewed its Automobile Liability Insurance Program with Apollo until 2023 and completed its integration with Sedgwick. Ex. 17 (May 20, 2021 Press Release).

In Q2 2021, HyreCar again reported record revenues, increasing 62% from the same quarter the previous year, "primarily driven by rental days increasing 44%." Ex. 18 (Q2 2021 Press Release). But, it also reported increased operating expenses, which were "primarily due to investments . . . to continue scaling HyreCar for accelerated growth in 2021 and beyond." *Id*. As a result of increased expenses, HyreCar suffered increased net losses, and missed its guidance on earnings per share. SAC ¶ 115.

With respect to insurance expenses, HyreCar disclosed that cost of revenues had increased to $8.3 million from $3.1 million year-over-year. Ex. 19 (Q2 2021 Earnings Call). The "vast majority" of that increase was attributed to insurance "premium and claims"—"[w]hile the insurance premium increased relatively proportionally to the increase in rental days, claims expenses have exceeded that, mostly because [HyreCar] centralized [its] claim portfolio with a new single processing partner with the goal to improve customer experience." *Id*. HyreCar

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

9

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

further explained that $2.8 million of this $5.2 million increase was attributable to additional insurance claims, of which $1.2 million was "one-off new developments on claims and incidental payments incurred prior to March 31, 2021 in excess of the reserves and accruals." Ex. 3 at 15; Ex. 19; SAC ¶ 116. HyreCar disclosed that only "**some** of those one-offs resulted from settling claims prior to March 1, 2021, under our previous insurance claims processing partner. SAC ¶ 116.

On August 10, 2021, HyreCar's stock price closed at $19.12. Ex. 20 (HyreCar Historic Stock Prices). After the market closed, HyreCar reported its Q2 financial results, and the Company conducted an earnings call that same day. HyreCar's stock price began to fall on August 11, 2021, closing at $9.85. *Id*. Like nearly every public company that suffers a decline in stock price following an earnings release, a reflexive lawsuit followed just two weeks later. The SAC, alleging a shortened class period of May 13, 2021 to August 13, 2021, is now the operative complaint.

## III.  LEGAL STANDARD

In its Order, the Court described the Legal Standard and heightened pleading standard for Plaintiff's claims under Section 10(b) and Rule 10b-5 of the Securities Act of 1934 ("Exchange Act") and the Reform Act alleged in this litigation. Order at 3-6 and cases cited therein. Here, Defendants challenge Plaintiff's failure to plead a material misrepresentation or omission, and scienter, with the requisite particularity to survive a motion to dismiss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); Order at 4-7.

Under the Reform Act, and Rule 9(b), Plaintiff must specify with particularity "'each statement alleged to have been misleading'" and "'the reason or reasons why the statement is misleading. . . .'" Order at 4 (quoting 15 U.S.C. § 78u-4(b)(1)); *see also Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1071 (C.D. Cal. 2012). In addition, Plaintiff is required to plead specific facts that "raise a 'strong inference' of scienter—i.e., a strong inference that the defendant

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

10

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

acted with an intent to deceive, manipulate, or defraud." Order at 4; *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)). "[U]nder the [Reform Act's] particularity requirements and Federal Rule of Civil Procedure 9(b), allegations of 'fraud must be accompanied by the who, what, when, where, and how of the misconduct charged.'" *Twitter, Inc.*, 2022 WL 853252, at *5 (citing *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009); 15 U.S.C. § 78u-4(b)(1)); *see also* Order at 4-5, 8-9.

As the Court has already recognized, when resolving a motion to dismiss for failure to state a claim, the Court may consider documents referenced and relied on in the complaint and matters that are properly the subject of judicial notice. Order at 3; *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1002-08 (9th Cir. 2018), *cert. denied sub nom. Hagan v. Khoja*, 139 S. Ct. 2615 (2019).

## IV. ARGUMENT

### A. Plaintiff Fails to Sufficiently Plead Any Materially False Or Misleading Statement or Omission

For a statement to be false or misleading, it must "directly contradict what the defendant knew at the time" or "omit[] material information." *Twitter, Inc.*, 2022 WL 853252, at *5. Further, in order to plead falsity as required by the Reform Act, Plaintiff must allege, with particularity, "contemporaneous statements or conditions" that are "inconsistent" with the challenged statements—so as to demonstrate that they were false when made. *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (citations omitted). That is, a statement is misleading only if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002); *see also* Order at 6 (citing *In re Alphabet Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021)) (an omission is material if it would "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available'"). "[I]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

11

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

earlier, cheerier statement a falsehood." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003). Plaintiff cannot meet this burden.

Plaintiff has still not pled facts that make its scheme "theory more likely than [any] innocent explanations." Order at 7 (citing *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013)). As the Court recognized, "HyreCar may have been slow to pay insurance claims . . . while simultaneously estimating its insurance reserves as accurately as possible." *Id.* Plaintiff remains unable to adequately plead facts that support any scheme to materially delay or suppress payments, much less suggest any pending claims were not properly accounted for, based on available information, in HyreCar's expenses or reserves.

### 1. Plaintiff Cannot Adequately Plead That Reserves Were Understated

Plaintiff's entire theory of falsity now turns on the claimed understatement of reserves, but Plaintiff again fails to allege any specific facts that HyreCar's insurance reserves in its Q1 statements were understated, relying instead solely on improper hindsight. In order for allegations concerning reserves to be actionable as false statements under the Exchange Act, Plaintiff must include ***detailed*** allegations on the amount reserves were understated. *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *21 (C.D. Cal. Jan. 12, 2012) (complaint must "include details about when and to what level the accounts receivable should have been written down, . . . why the allowance made by the corporation was unreasonable . . . and how many accounts ultimately were uncollectible"); *In re ICN Pharms., Inc., Sec. Litig.*, 299 F. Supp. 2d 1055, 1067 (C.D. Cal. 2004) (finding alleged GAAP violation insufficiently pled where Plaintiffs "do not state the requisite specifics"); *In re 3M Co. Sec. Litig.*, 2021 WL 4482987, at *10 (D. Minn. Sept. 30, 2021).

Like the FAC, the SAC "conflates the pace at which claims were paid with the accuracy of the insurance reserve periodically set and disclosed by HyreCar." Order at 7. As the Court already held "the speed with which claims were paid is not the same as setting reserves for submitted claims and anticipating the number

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

12

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

and value of future claims." *Id.*  Yet again, Plaintiff misses the point and utterly fails to "link[] these two distinct concepts," and here also indiscriminately conflates claims "accrued" with claims "incurred." *Id.*; *see also* SAC ¶ 11. Plaintiff has not (and cannot plead) that the investigation into any "runoff claims"—which it again tellingly fails to define—was complete and a determination had been made as to whether those claims must have been recognized as expenses.  More importantly, Plaintiff never alleges that estimates for every claim made were not included in reserves.

Moreover, as the Court previously recognized "HyreCar repeatedly disclosed both the difficulty it faces in setting its reserves and, as ultimately happened, the risk that actual claims might exceed the reserves."  Order at 7; *see also* Ex. 1 at 15.  Without specific factual allegations "support[ing] an inference that Defendants thought the reserves were inadequate" or that HyreCar was "aware of the need to make those increases to the reserves before [it] actually took the charges and made those increases," the Court should reject Plaintiff's conjecture that "because the Company increased its loss reserves . . . its prior reserve estimates must have been fraudulent when originally made." *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 226 (S.D.N.Y. 2020); *see also Twitter, Inc.*, 2022 WL 853252, at *5.

Plaintiff offers its own self-serving calculations purporting to quantify the amount that HyreCar's reserves were understated (and the corresponding understatement of cost of goods and overstatement of earnings).  *See*, *e.g.*, SAC ¶¶ 110, 130-146.  But the figures Plaintiff offers simply take the later increase in reserves announced by HyreCar in August 2021 and add it to the figures reported by HyreCar in Q1 2021, and those allegations are based entirely on impermissible hindsight, have no grounding in sound accounting principles, and contradict the opinions of the independent auditor.  "[I]t is simply not enough to assume or implausibly infer that the defendants must have known about these issues in [early

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

13

2021] based on later facts or developments.  Yet Plaintiff[] repeatedly rel[ies] on future statements to leap to that conclusion." *Twitter, Inc.*, 2022 WL 853252, at *7; *see also NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012) (the fact that "predicted loss reserves turned out to be insufficient sometime after they were made does not render those figures false at the time that they were publicly filed with the SEC."); *see also In re CIT Grp. Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690-91 (S.D.N.Y. 2004) (similar).

Plaintiff also postulates that the $1.0 million in allegedly under-accrued claims closely approximates the "runoff" observed by Genoteq employees.  SAC ¶ 84.  But, no particularized facts or competent CW statements support that assertion.  Plaintiff never alleged facts of what constitutes "runoff" and does not actually allege that those claims were not included in reserves.  None of the CWs it relies on have any knowledge of how reserves were set or even competently address the amount of claims HyreCar was actually liable for as of March 31, 2021.  *Cf. id.* ¶¶ 85-87.[2]  In fact, by Plaintiff's own allegations, HyreCar's reported reserve at that time could have included that "runoff":  As of March 31, 2021, HyreCar's reserve, which Plaintiff claims was majority physical damage claims, was $1,747,134.  SAC ¶ 110.

Plaintiff's reliance on later-disclosed increase in reserves is more problematic because it assumes (incorrectly) that the $1.2 million increase in reserves recorded in Q2 2021 was solely attributable to physical damage claims processed by Genoteq.  Plaintiff offers the conclusory assertion that "HyreCar has a lower probability of liability claims for personal injuries than it does for physical

[2] Not one of the CWs competently addressed the amount of claims HyreCar was actually liable for as of March 1, 2021, when HyreCar transitioned to Sedgwick.  Only CW9 claims that "runoff" claims totaled "anywhere from $700,000 to $1 million" as of that date.  SAC ¶ 87.  But, CW9 never identifies the basis for her estimate.  Plaintiff also fails to provide a date or basis for the estimate of $2 million from CW11.  *Id.* ¶¶ 31, 85.  CW12, "one of two Genoteq adjusters," merely reported the two adjusters having over 300 pending claims each and 80 "total loss claims"—which itself suggests that a coverage determination had not been made on the other "pending" claims.  *Id.* ¶ 86.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

14

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

damage" (SAC ¶ 39) and reasons that "most of its insurance reserve, if not all, is for physical damage claims." SAC ¶¶ 47, 50. That's not right. The fact that HyreCar's coverage is limited to Period 0 does not eliminate the possibility for liability claims for injuries to the driver or third parties. No factual allegations address what portion of the increase in Q2 expenses was for liability claims versus physical damage claims. Nor do any allegations address what portion of the increase was for claims processed by Genoteq prior to March 1, 2021 versus those processed by Sedgwick between March 1 and March 31, 2021. *See* Ex. 3 at 15.

**2.      Statements Regarding GAAP Compliance Were Accurate**

Because Plaintiff cannot plead that reserves were understated in Q1 2021, it also cannot claim that statements that HyreCar's financials were prepared in accordance with GAAP were false. SAC ¶¶ 144-45. HyreCar's Q1 2021 financial figures have never been corrected or restated. And, HyreCar has and continues to receive unqualified audit opinions on all of its prior audited financial statements, most recently in 2021, after this lawsuit was filed. Ex. 13 at F-1. Plaintiff's unsupported, conclusory allegations regarding GAAP violations are insufficient. *See Luna v. Marvell Tech. Grp. Ltd.*, 2016 WL 5930655, at *7 (C. D. Cal. Oct. 12, 2016) ("decisions to accrue a loss reserve requires more detailed analysis . . . therefore, more detailed allegations are required to explain [a GAAP violation]").

**3.      Statements Regarding Insurance Reserve Estimates Are Inactionable Opinions**

Plaintiff's allegations about reserve estimates also fail because HyreCar's insurance reserve estimates, adjustments to which are included in cost of revenues (and rolled up into expenses and earnings), are inactionable statements of opinion. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015); *see also Woolgar*, 477 F. Supp. 3d at 222 ("loss reserves are statements of opinion"). Plaintiff has not, as it must, alleged "particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

15

statement fairly and in context." *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.,* 856 F. 3d 605, 615 (9th Cir. 2017).  Plaintiff's inability to plead that insurance reserves were subjectively false is fatal to any challenge to reserves or expenses, and its theory that "the Q1 2021 results also omitted the existence of the runoff claims or the amount of such liability." *See, e.g.*, SAC ¶¶ 106, 137.

As Plaintiff recognizes, HyreCar must accrue for an insurance claim on its Balance Sheet "whenever a claim incurred is probable and can be reasonably estimated."  SAC ¶ 46 (citing ASC 450-20-25-2); Ex. 21.  Plaintiff has not alleged any facts regarding the setting of reserves at all, much less those that render Defendants' opinions as to the whether it was "probable" that such claims were covered or that they could be "reasonably estimated."  Plaintiff concedes the fact that even for physical damage claims made to Genoteq, HyreCar was only responsible for those claims in Period 0 and its policy requires an "estimate from a body shop" to determine the amount of coverage.  SAC ¶ 56.  Moreover, HyreCar specifically warned in its risk disclosures about the difficulty and uncertainty in setting reserves.  Ex. 1 at 8, 15 and 32.  It follows that determining whether liability on a claim is probable and reasonably estimated is not automatic, it requires investigation and time, and is an opinion as a matter of law.

**4.     Statements Regarding Setting Of Reserves Were Not False**

Plaintiff challenges the statements in HyreCar's Q1 2021 10-Q describing how reserves are set.  SAC ¶¶ 140, 146.  HyreCar's statements regarding how its insurance reserves were are not actionable because they do not "affirmatively create an impression . . . that differs in a material way from the one that actually exists." *Brody*, 280 F.3d at 1006; *In re Foxhollow Techs. Sec. Litig.*, 359 F. App'x 802, 805 (9th Cir. 2009).  Investors would understand this basic insurance dynamic—that claims must be investigated before payment, and HyreCar's loss reserves were their best estimate based on available information.  Specifically,

LATHAM&WATKINS^{LLP}
ATTORNEYS AT LAW
CENTURY CITY

16

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

Plaintiff challenges statements that the reserve "represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported," that the "lag time in reported claims is minimal and as such represents a low risk of unreported claimed being excluded from the loss reserve assessment" (SAC ¶ 140) and that insurance reserves were adjusted "as [HyreCar's] experience develops or new information is learned." SAC ¶ 146. Plaintiff's theory is that because the Company later recorded an increase in reserves for $1.2 million of claims incurred prior to March 31, 2021, "lag time was not minimal" and insurance reserves were not adjusted as new information was learned. *Id.* ¶¶ 141-42, 147. That theory ignores the context in which the statements were made.[3]

As is clear from the surrounding context, "lag time" refers to the time for the driver to report a claim, not for the additional time needed to investigate the validity of a claim. Under HyreCar's policy, physical damage claims must be reported within 24 hours of the vehicle's return. SAC ¶ 53. Therefore, as HyreCar disclosed, there is a "low risk of unreported claims being excluded" altogether from the reserve estimate. Ex. 1 at 32. But, "lag time" says nothing about whether the information initially reported was sufficient to accurately determine coverage or estimate potential liability. *See id.* Further, Plaintiff has not adequately alleged that any claims—reported or unreported—were excluded from HyreCar's Q1 2021 loss reserve estimate. Even if physical damage claims are reported immediately, that does not mean that Genoteq (or HyreCar) has all the information necessary to determine coverage and the amount of liability, or did in fact make such a determination. The fact that reserves were later increased based on claims incurred

---

[3] Stripped of hindsight allegations, Plaintiff's complaint simply lists a series of customer complaints and critiques relating to Genoteq's (and by extension HyreCar's) delays in processing claims or decisions not to pay certain claims. While HyreCar again disagrees with Plaintiff's characterizations, under any circumstances, as this Court recognized, any customer service issues cannot establish that the reserves were understated. Order at 7. And, critiques of HyreCar's management of its claims process do not give rise to a claim for securities fraud. *See, e.g.*, *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–78 (1977); *In re Inmpac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1094-95 (C.D Cal. 2008).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

17

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

prior to March 1, 2021 simply means that HyreCar reached a different determination on losses that were "probable" and "reasonably estimated" on certain claims based on new information received when it switched to a more sophisticated third-party administrator. That is exactly what HyreCar told investors could happen. Ex. 1 at 32; Order at 7.

### 5. Statements Regarding Anticipated Results Are Inactionable Forward-Looking Statements

Plaintiff also challenges statements about the Company's expectations regarding EBITDA as a result of "dynamic pricing combined with increasing gross profit from normalized claims and increasing affiliate revenue." SAC ¶ 138.

Plaintiff does not adequately claim that any embedded facts were false. *See* SAC ¶ 139. Plaintiff offers the conclusory assertion that "claims had not normalized but were still surging," (*id.*) but says absolutely nothing about the actual rate of claims at any time. No particularized allegations contradict the Company's statement that "seasonal shifts in insurance costs" in the "winter quarter" resulted in increased cost of goods in Q1 2021, or its expectation that claims rates would normalize in future quarters. Ex. 16. And, Plaintiff says nothing about the pricing enhancements or increases in affiliate revenue. *Id.*

"Federal securities laws do not punish companies for failing to achieve their targets." *Wochos v. Tesla, Inc.*, 2019 WL 1332395, at *7 (N.D. Cal. Mar. 25, 2019) *aff'd*, 985 F.3d 1180 (9th Cir. 2021); *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1150 (C.D. Cal. 2018) (statements concerning "48.5% target" for gross margin were forward-looking); *see also Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). HyreCar's prediction about future EBITDA is therefore inactionable as a protected forward-looking statement. 15 U.S.C. § 78u-5(c). HyreCar made the requisite "meaningful cautionary statements" identifying "factors" that could cause a material difference in results, *supra* at Section II.C; Ex. 1 at 11-15, 32.

### B. Plaintiff Fails To Plead A Strong Inference Of Scienter

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

18

The Court may dismiss this case with prejudice for Plaintiff's failure to plead falsity. As an independent basis for dismissal, Plaintiff has failed to meet its burden to state particular facts giving rise to a strong inference that Defendants acted with scienter. *See* 15 U.S.C. §78u-4(b)(2). To sufficiently plead scienter against HyreCar, Plaintiff must show that the "individual corporate officer making the statement has the requisite level of scienter . . . ." *In re Apple Computer, Inc., Securities Litigation*, *Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002). Moreover, "[w]here, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with respect to each of the individual defendants." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014). "To qualify as 'strong' within the intendment of [the Reform Act], . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Metzler*, 540 F.3d at 1066 (quoting *Tellabs*, 551 U.S. at 314).

Here, Plaintiff's allegations fail, both individually and collectively, to give rise to a "strong inference of scienter." *Id.* Plaintiff cannot credibly overcome the unqualified clean audit opinions that HyreCar has received, without any restatement, nor has it sufficiently alleged that the Furnari and Brogi ("Individual Defendants") knew specific, contemporaneous facts that rendered their statements materially false when made. Plaintiff's remaining theories about the Sedgwick escrow account, stock sales, Brogi's retirement, and core operations similarly do not pass muster.

**1.    HyreCar's Clean Audit Opinion Undermines Any Inference of Scienter**

Collectively, any inference of scienter is undermined by the fact that an independent auditor reviewed HyreCar's financial statements, including its reserve estimates, in 2018, 2019, 2020 and 2021 and offered an unqualified auditor opinion for each, without ever issuing a restatement. Ex 6 at F-1; Ex. 13 at F-1. That fact

LATHAM&WATKINS^LLP
ATTORNEYS AT LAW
CENTURY CITY

19

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

alone is "'highly probative' of an absence of scienter" for purposes of a motion to dismiss securities fraud claims. *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (dismissing claims); *see also Feola v. Cameron*, 2015 WL 12644566, at *8 (C.D. Cal. Nov. 24, 2015) (holding "independent auditors['] unqualified opinions . . . weighs against an inference of scienter"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1166 (C.D. Cal. 2007) (similar).

In a desperate and grossly improper attempt to overcome these audit opinions, Plaintiff alleges that "HyreCar's delayed payment scheme appears to have been structured in such a way to avoid auditor scrutiny." SAC ¶¶ 6-7. This is utterly baseless and reckless speculation, reflecting a fundamental misunderstanding of both the reserve calculation and the audit process. There is no allegation that the auditors failed to follow audit standards; each audit letter stated the exact opposite—*i.e.*, that the auditor followed PCAOB standards and employed "procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements" and specifically HyreCar's insurance reserves. Ex. 6 at F-1; Ex. 13 at F-1. According to audit standards, those test procedures include, among other things, evaluating the methods used by the company to estimate the reserve estimate; the accuracy, completeness, relevance, and reliability of data used in the reserve estimate; and the reasonableness of significant assumptions. No pled facts even suggest that the auditor's "review was inadequate, that [defendants'] management kept any information from [the auditor], or that [the auditor] had any incentive to give a false audit report." *See In re Bausch & Lomb, Inc. Sec. Litig.,* 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008). Even after this lawsuit was filed, HyreCar's independent auditor again certified that its financial statements 2020 and 2021 complied with GAAP.

### 2. Plaintiffs Has Not Alleged That Defendants Had Knowledge of Facts That Would Render Their Statements False

Plaintiff has failed to allege sufficient facts to plead a cogent and compelling

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

20

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

inference of scienter for any alleged under-statement of reserves.  In order to plead scienter with respect to accounting determinations, Plaintiff must show "defendants knew specific facts at the time that rendered their accounting determinations fraudulent."  *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037, 1046 (N.D. Cal. 2009) (citation omitted).  Plaintiff relies entirely on incompetent CWs who provide no concrete facts regarding the setting of reserves, much less any allegations of nefarious conduct that should be the hallmark of an accounting fraud case.  To satisfy the Reform Act's pleading requirements: (1) "confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge" and (2) "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (citations omitted).  "The Court must be able to tell whether a confidential witness is speaking from personal knowledge, or merely regurgitating gossip and innuendo."  *In re Metawave Commc'ns Corp. Sec. Litig.*, 298 F. Supp. 2d 1056, 1068 (W.D. Wash. 2003) (quotations omitted) (granting motion to dismiss); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1061 (9th Cir. 2014) (affirming dismissal where CWs accounts were "unspecific and speculative").

Not one of the CWs employed at the time the challenged statements were made purports to have had any direct contact with Furnari or Brogi, or any other senior executive.[4]  Plaintiff's CWs do not and cannot claim either Furnari or Brogi had knowledge of particularized facts that contradicted the reported reserve, or that any other "senior controlling officer" had knowledge such that it could be

---

[4] *See* SAC ¶¶ 70 (CW10's knowledge was based on being in touch with unspecified "upper management"); 78 (CW7's manager communicated with Brogi); 79 (CW5's knowledge was based on what other people told him); 82 (CW9's knowledge was based on "be[ing] in Ashton's office and see[ing] emails on the screen").

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

21

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

attributed to HyreCar. *See Davoli v. Costco Wholesale Corp.*, 854 F. App'x 116, 117 (9th Cir. 2021). The absence of any particularized facts supporting Plaintiff's conspiracy theory that HyreCar or its executives knowingly underreported HyreCar's reserves is glaring in light of Plaintiff's contact with no less than 12 CWs.[5] Plaintiff relies on CWs from Genoteq to claim that the Individual Defendants were involved in setting the budget for claims or approving claims for payment (CW9, 10) and had access to claims data (CW 9, 11, 12), all of which are normal business practices. SAC ¶¶ 70-72, 74, 80-81. There is simply nothing "necessarily nefarious" about HyreCar approving claims for payment based on its limited insurance policy, or, as the Court previously recognized, even delaying payment of those claims. *See Zucco*, 552 F.3d at 998; *see also* Order at 7. No reasonable investor would believe that Genoteq, any other adjustor, or HyreCar would pay all submitted claims without investigating whether they were valid and entitled to full coverage. *See Curry v. Yelp Inc.*, 2015 WL 7454137, at *6 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017) (dismissing claims based in part on "common-sense understanding" that reasonable investors would know not "all Yelp reviews were authentic.").

Broad statements that HyreCar had access to Genoteq's system, including those that were "ready to be approved," SAC ¶¶ 10, 70-72, are also insufficient to establish knowledge of fraud. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035–36 (9th Cir. 2002) (allegations of access to data insufficient). Merely referencing access to pending claims, without any allegations whatsoever about whether they were included in reserves, is insufficient. *See In re 3M Co.*, 2021 WL 4482987, at *10 (dismissing claims that failed to allege "Defendants knew of a

---

[5] Conspicuously, several CWs included in the FAC were not even included in the SAC. *See* SAC ¶¶ 25-32 (not mentioning CWs 2, 4, 6, or 8 from FAC). Moreover, none of the remaining CWs can address the period of time after Sedgwick became the adjuster on March 1, 2021, which, as HyreCar disclosed, accounted for part of the $1.2 million "claims and incidental payments . . . in excess of the reserves and accruals." SAC ¶ 116; *see also* Ex. 3 at 15.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

22

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

reasonably estimable amount that [they] should have accrued").[6]

### 3. The Sedgwick Escrow Account Does Not Support an Inference of Scienter

Plaintiff also attempts to allege scienter based on the fact that HyreCar was required to establish an escrow account with its new adjuster, which HyreCar was required to replenish on a quarterly basis depending on actual claims paid. SAC ¶ 152; Ex. 8 at 7. But, as HyreCar explained, its insurance claims adjuster used the escrow account to pay out claims in a timely fashion. *Id.* The more compelling inference is the non-culpable one: a sophisticated claims processor who, as HyreCar predicted, would improve the speed of claims processing, required an escrow account to facilitate the timely payment of claims. *See* Ex. 9. No well pled facts suggest that this escrow account was unusual or anything other than a standard contractual requirement.

### 4. Executive Trading Does Not Support a Strong Inference of Scienter

Plaintiff also attempts to plead scienter based on non-suspicious stock sales by HyreCar executives between May and July of 2021. SAC ¶¶ 154-59. However, in order to support a strong inference of scienter, allegations of stock sales must be "unusual" or "suspicious." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). "[S]tock sales alone cannot create a strong inference of scienter." *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1251 (N.D. Cal. 1998).

The trades Plaintiff deems "suspicious" represent a small portion of each executives' total holdings and therefore do not support an inference of scienter. *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F. Supp. 2d 1203, 1221 (S.D. Cal. 2005). Even after the sales, Defendants continued to remain heavily invested in the future success of HyreCar through ownership in stock. The following chart

[6] Plaintiff's effort to invoke the "core operations" doctrine, SAC ¶¶ 150-51, 161, which does not contain "specific admissions by the individual defendants" or statements from witnesses with "direct access to the executives," must fail. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014); *In re Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *11 (N.D. Cal. Feb. 17, 2010); *Cho v. UCBH Holdings, Inc.*, 2011 WL 3809903, at *15 (N.D. Cal. May 17, 2011).

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
CENTURY CITY

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

23

reflects the allegedly suspicious stock sales by the individuals (SAC ¶¶ 155-59):

| Individual | Alleged Stock Sales (No. of shares) | Remaining Stock[7] Holdings Immediately After Alleged Sales |
|---|---|---|
| Joe Furnari | July 21-23, 2021 sold 300,000 | 393,207 |
| Michael Furnari | July 21-23, 2021 sold 299,900 | 369,907 |
| Scott Brogi | May 20-24, 2021 sold 72,329 | 130,400 |
| Grace Mellis | May 24-June 3, 2021 sold 50,000 | 236,000 |
| Henry Park | May 19-20, 2021 sold 35,000 | 167,365 |

Exs. 22-27.  Furnari and Brogi, the only individuals alleged to have control over HyreCar's public statements during the Class Period, sold only 34.8% and 36% respectively, of their total holdings.  These amounts are well within the range of amounts other courts have found to be insufficient to support an inference of scienter.  *Compare Metzler*, 540 F.3d at 1067 (37% insufficient); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 987 (9th Cir. 1999), *as amended* (Aug. 4, 1999) (43.6% insufficient), *and In re Skechers U.S.A., Inc. Sec. Litig.*, 2005 WL 8168047, at *8-9 (C.D. Cal. Mar. 21, 2005) (Anderson, J.), *aff'd*, 273 F. App'x 626 (9th Cir. 2008) (7%, 17% and 42% insufficient) *with No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939-40 (9th Cir. 2003) (between 88% and 100% sufficient).  Again, the more plausible inference is the non-culpable one:  Each executive sold a minority of their total holdings in order to recognize a portion of their compensation and, following the sales, remained heavily invested in HyreCar.[8]  *See Ronconi*, 253 F.3d at 435; *Iron Workers Loc. No. 25 Pension Fund v. Oshkosh Corp.*, 2010 WL 1287058, at *20

---

[7] Values do not include outstanding options or restricted stock units held after the trades. Considering total equity holdings, Joseph Furnari sold only 34.8% of his total holdings. Ex. 2.

[8] The majority of HyreCar's executives compensation was in HyreCar stock since prior to its IPO.  Ex. 2 at 26-27.  Joseph Furnari's salary was $100,000 from October 2016 to August 2018, $185,000 from September 2018 to December 2019, and $215,000 starting January 2020, and Brogi's was $175,000 from October 2018 to December 2019, $200,000 starting January 2020.  *Id.*  Selling a small portion to recognize compensation cannot support an inference of fraud.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

24

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT

(E.D. Wis. Mar. 30, 2010) (more reasonable inference is "that his stock sales during the class period were simply in the normal, responsible course undertaken by any executive who receives stock as part of their compensation packages.").

### 5. Plaintiff's Additional Allegations Do Not Support a Strong Inference of Scienter

Plaintiff's conclusory reference to Brogi's retirement at age 56, which Plaintiff alone deems "unexpected," is insufficient to support a strong inference of scienter. *See Zucco*, 552 F.3d at 1002; *Luna*, 2017 WL 2171273, at *6. Plaintiff has no idea whether Brogi's retirement was unexpected, and cites no confidential witness or other facts to support its statement. Plaintiff also does not (and cannot) allege that Brogi's retirement was inconsistent with his work history and tenure at other public companies. Nor are conclusory allegations of HyreCar's alleged reliance on Genoteq as a "related party" indicative of scienter, as Plaintiff has not adequately pled any "scheme" to delay payment, much less connected the dots between any alleged delay and the reported reserves to support an inference that statements were intentionally or recklessly false. SAC ¶ 153. To the contrary, because Plaintiff alleges that Genoteq was paid a fee for every claim processed, its motive was to process claims as fast as possible, not to suppress them. SAC ¶ 74. *See Lipton*, 284 F.3d at 1038.[9]

## V.   CONCLUSION

For the foregoing reasons, the SAC should be dismissed in its entirety. Because Plaintiff has already had an opportunity to cure the defects by amendment, the dismissal should be with prejudice.

Dated: April 4, 2022

LATHAM & WATKINS LLP
Joshua G. Hamilton

By: */s/ Joshua G. Hamilton*
Joshua G. Hamilton
Attorneys for Defendants

---

[9] Because the SAC fails to state a claim for a primary violation under Section 10(b), Plaintiff's claims for secondary liability under Section 20(a) of the Exchange Act must be dismissed. *Zucco*, 552 F.3d at 1008; Order at 9.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
CENTURY CITY

25

CASE NO. 2:21-cv-06918-PA-JC
DEFENDANTS' MOTION TO DISMISS
SECOND AMENDED COMPLAINT