Robert V. Prongay (SBN 270796)
Ex Kano S. Sams II (SBN 192936)
Raymond D. Sulentic (SBN 316913)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: esams@glancylaw.com
Email: rsulentic@glancylaw.com

*Counsel for Lead Plaintiff Turton Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVAN BARON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HYRECAR INC., JOSEPH FURNARI and ROBERT SCOTT BROGI,<br><br>Defendants. | Case No. 2:21-cv-06918-PA-JC<br><br>**PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS SECOND AMENDED COMPLAINT BY DEFENDANTS HYRECAR INC., JOSEPH FURNARI AND ROBERT SCOTT BROGI**<br><br>Hearing Date: May 9, 2022<br>Time:              1:30 p.m.<br>Ctrm:            9A<br>Judge:           Hon. Percy Anderson |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## **TABLE OF CONTENTS**

I.     INTRODUCTION & PROCEDURAL HISTORY .........................................1

II.    STATEMENT OF FACTS...........................................................................2

       A.    Background ............................................................................2

       B.    HyreCar Introduces a Tiered Program Structure Taking On More Risk for Physical Damages Claims ................................................3

       C.    HyreCar's Insurance Reserves Are Mostly for Physical Damages ........3

       D.    By Their Inherent Nature, Physical Damages Claims and Incidental Claims Under HyreCar's Program Should Present Minimal Risk of Being Unreported or Under-Reserved ......................................................4

       E.    Defendants' Use a Conflicted TPA For Physical Damage Claims.........5

       F.    Former Genoteq and HyreCar Employee Detail HyreCar's Scheme .....6

       G.    HyreCar's Transition From Genoteq to Sedgwick in March 2021.........6

       H.    The Truth Begins To Be Revealed........................................................7

III.   STANDARD OF REVIEW .........................................................................7

IV.    PLAINTIFF ADEQUATELY ALLEGES SECURITIES VIOLATIONS.......8

       A.    Plaintiff Adequately Alleges That Defendants Made Materially False and Misleading Statements ................................................................8

             1.    Defendants' Statements About HyreCar's Level Of Reserves Were False And the Company's Subsequent Admission Concedes As Much..................................................................................8

             2.    Defendants' Statements About How HyreCar Sets Reserves Were False and Misleading ................................................................14

             3.    Because HyreCar's Reserves Were False, So Too Were The Company's Cost of Sales, Net Income And Earnings................17

             4.    The Company's Representation That It Complied With GAAP Was False And Misleading........................................................18

i

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

5.   The Company's Risk Factors Were False And Misleading ....... 19

6.   Even if Viewed As Opinions, HyreCar's Insurance Reserves Were Misleading And Not Within the PSLRA's Safe Harbor ............ 20

B.   Plaintiff Adequately Alleges that Defendants Acted With Scienter ..... 20

V.   CONCLUSION ............................................................................................. 25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# **TABLE OF AUTHORITIES**

<u>CASES</u>

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)................................................................................25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...........................................................................................7

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009) .............................................................24

*Batwin v. Occam Networks, Inc.*,
No. CV 07-2750 CAS (SHx), 2008 WL 2676364 (C.D. Cal. July 1, 2008).........23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................7, 14

*Bielousov v. GoPro, Inc.*,
No. 16-cv-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) .................24

*City of Roseville Employees' Ret. Sys. v. Orloff Fam. Tr. UAD 12/31/01*,
484 F. App'x 138 (9th Cir. 2012).......................................................................2

*Curry v. Hansen Medical, Inc.*,
No. 4:09-cv-05094-CW, 2012 WL 3242447 (N.D. Cal. Aug. 10, 2012)..............24

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017)............................................................19, 20, 22

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .............................................................................21

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ...........................................................................25

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ...........................................................................20, 24

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Banc of California Sec. Litig.*,
No. SACV1700118AGDFMX, 2017 WL 3972456 (C.D. Cal. Sept. 6, 2017)..... 24

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997) ................................................................................ 13

*In re Cadence Design Sys., Inc. Sec. Litig.*,
654 F. Supp. 2d 1037 (N.D. Cal. 2009)................................................................ 21

*In re Citigroup Inc. Bond Litig.*,
723 F. Supp. 2d 568 (S.D.N.Y. 2010) .................................................................. 18

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................... 22

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) .......................................................................... 7, 10

*In re Diamond Foods, Inc. Sec. Litig.*,
No. C 11-05386 WHA, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012) .............. 22

*In re Genworth Fin. Inc. Sec. Litig.*,
103 F. Supp. 3d 759 (E.D. Va. 2015) ............................................................. 10, 12

*In re Global Crossing, Ltd. Sec. Litig.*,
322 F. Supp. 2d 319 (S.D.N.Y. 2004) .................................................................. 13

*In re GoHealth Sec. Litig.*,
No. 20-CV-5593, 2022 WL 1016389 (N.D. Ill. Apr. 5, 2022) ............................ 14

*In re LDK Solar Sec. Litig.*,
584 F. Supp. 2d 1230 (N.D. Cal. 2008)........................................................... 12, 25

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................... 16, 25

*In re Omnivision Techs., Inc.*,
No. C-04-2297 SC, 2005 WL 1867717 (N.D. Cal. July 29, 2005)...................... 23

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .....................................................................*passim*

iv

*In re Read-Rite Corp. Sec. Litig.*,
   335 F.3d 843 (9th Cir. 2003) ...................................................................................21

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ..................................................................23

*In re Silicon Graphics Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...................................................................................23

*In re Silver Wheaton Corp. Sec. Litig.*,
   No. CV15-5146-CAS(JEMX), 2016 WL 3226004 (C.D. Cal. June 6, 2016) ......25

*In re Skechers U.S.A., Inc. Sec. Litig.*,
   No. CV 03-02094 PA (EX), 2005 WL 8168047 (C.D. Cal. Mar. 21, 2005) ..23, 24

*In re TUT Sys., Inc. Sec. Litig.*,
   No. C 01-02659 CW, 2002 WL 35462358 (N.D. Cal. Aug. 15, 2002) ................23

*Iron Workers Loc. No. 25 Pension Fund v. Oshkosh Corp.*,
   No. 08-C-797, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010) ............................24

*Junge v. Geron Corp.*,
   No. C 20-00547 WHA, 2021 WL 1375960 (N.D. Cal. Apr. 12, 2021) ...............23

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...............................................................................9, 14

*Luna v. Marvell Tech. Grp.*,
   No. C 15-05447 WHA, 2017 WL 2171273 (N.D. Cal. May 17, 2017)...............24

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
   927 F. Supp. 1297 (C.D. Cal. 1996) ......................................................................12

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ................................................................................23

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007)..................................................................24

*Nguyen v. Radient Pharm. Corp.*,
   2011 WL 5041959 (C.D. Cal. 2011) .......................................................................15

v

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...................................................................22

*Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*,
50 F. Supp. 3d 1328 (C.D. Cal. 2014) .....................................................25

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)...................................................................................20

*S. Ferry LP, #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ...................................................................24

*Schlagal v. Learning Tree Int'l*,
No. CV 98-6384 ABC (EX), 1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) .......23

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) ...................................................................21

*SEC v. Cotton*,
2006 WL 6382128 (C.D. Cal. Dec. 21, 2006).........................................13

*SEC v. Goldfield Deep Mines Co. of Nevada*,
758 F.2d 459 (9th Cir. 1985) ...................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................7, 20, 21, 25

*Yanek v. Staar Surgical Co.*,
388 F. Supp. 2d 1110 (C.D. Cal. 2005) ...............................................10, 11

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ...................................................................24

vi

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

STATUTES

15 U.S.C. §78j(b) ...................................................................................................... 8

15 U.S.C. §78t(a) .................................................................................................... 25

15 U.S.C. §78u-4(b)(1)(B) ........................................................................................ 8

15 U.S.C. §78u-4(b)(2) .......................................................................................... 20

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Lead Plaintiff submits this opposition to Defendants'[1] Motion to Dismiss ("Motion" or "Mot.") Plaintiff's Second Amended Complaint ("Complaint").

## I.    INTRODUCTION & PROCEDURAL HISTORY

This is a securities class action on behalf of all purchasers of HyreCar securities between May 13, 2021 and August 10, 2021, inclusive ("Class Period"). In short, Defendants' fraud stems from understating the Company's insurance reserve expense and liability, which was enabled by close coordination between Defendants and a conflicted third party. Following Defendants' false statements, HyreCar's stock took off: rising from $8.93 per share when the Class Period began, to as high as $24.21. During this short window when the stock was artificially inflated, Defendants cashed out through perfectly-timed sales of stock—like CEO Furnari, who sold $5.2 million in shares at an average price of $17.33 per share (¶155) on July 21, 2021. When the truth was finally revealed, just 20 days after Furnari's sale, the Company's stock cratered by over 50% in a day, to close at $9.85 per share on August 11, 2021. It has never recovered. At the time of this filing, HyreCar trades at just $1.59 per share, *more than 93% below* its Class Period high.

In the Court's February 16, 2022 Order ("the Order"), it found Plaintiff's allegations inadequately alleged because it failed to quantify the magnitude by which HyreCar misstated its reserves, and failed to quantify the magnitude of claims handled by Genoteq. Order at 7-8. Through added allegations to Plaintiff's Complaint, including by incorporating certain Company admissions disclosed only after the Order, such as those within HyreCar's March 15, 2022 annual report,[2] Plaintiff has cured its earlier pleading defects and now states a claim for securities fraud.

---

[1] Defendants are HyreCar, Inc. ("HyreCar" or the "Company"), Chief Executive Officer ("CEO") Joseph Furnari ("Furnari"), and Chief Financial Officer ("CFO") Robert Scott Brogi ("Brogi"). Defendants Furnari and Brogi are the "Individual Defendants." Unless otherwise stated, all emphasis is added and all internal citations and quotations are omitted.

[2] *E.g.*, ¶110 (quantifying amount by which HyreCar understated reserves); ¶83 (HyreCar admitted that at least $1.0 million of its increased costs related to "settling claims" from Genoteq which were incurred before January 1, 2021).

1

Perhaps recognizing this fact, Defendants advance a myriad of factual arguments supported by a proffer of a whopping 27 exhibits to improperly craft an alternative narrative at the pleading stage. Their heavy-handed approach comes in response to a Complaint that alleges just one quarter of fraudulent financial statements, comprised of two documents and one earnings call transcript. Regardless, on top of being littered with factual arguments and improper extraneous documents, Defendants' logic and reasoning is deeply flawed. For instance, they rely on the Company's annual audit opinions for annual periods outside the Class Period to argue they somehow evince the propriety of **unaudited** quarterly financial results. Defendants' Motion[3] lacks merit: the Court should entirely deny it.

## II. STATEMENT OF FACTS

### A. Background

HyreCar operates a web-based marketplace that allows car and fleet owners to rent their cars to Uber, Lyft and other gig economy service drivers. ¶33.[4] It also gives owners a way to generate passive income by renting out their vehicles. ¶34.

As part of its insurance offering to its customers, HyreCar has different tiers of coverage. ¶36. The various tiers have varying deductibles and coverage limits, but generally, all tiers cover physical damage to a vehicle, liability for passenger injuries, and incidentals, such as gas and cleaning costs (up to a certain point). *Id*. Because most HyreCar drivers operate their rented vehicles for services such as Uber or Lyft, an overlap of insurance coverage exists with these Transportation Network Companies ("TNCs"). ¶¶37-38. Thus, HyreCar is not the sole insurance provider for many users, and the overlapping coverage with the TNC carriers means that during periods when liability for personal injury is most likely to be in play, coverage is

---

[3] The Motion challenges just falsity and scienter, so Defendants waived their chance to challenge any other element. *City of Roseville Employees' Ret. Sys. v. Orloff Fam. Tr. UAD 12/31/01*, 484 F. App'x 138, 141, n.2 (9th Cir. 2012) (party who made no argument in opening brief, waived issue).

[4] All paragraph ("¶") references refer to Plaintiff's Second Amended Complaint ("Complaint").

2

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

provided first by TNC insurance. ¶39. Accordingly, HyreCar has a lower probability of incurring liability claims than it does for physical damage. *Id*.

**B.    HyreCar Introduces a Tiered Program Structure Taking On More Risk for Physical Damages Claims**

From its IPO through early 2019, HyreCar provided coverage to owners for physical damages claims in a manner that capped HyreCar's potential liability at approximately $7,500 per claim. ¶40. According to CW10, for physical damages, every owner had a $2,500 deductible but HyreCar had a $10,000 deductible with the insurance policy, which meant that HyreCar basically had to pay the difference (*i.e.*, the amount from $2,500 to $10,000). *Id*. In late 2018 and early 2019, HyreCar explored several tiered products in hopes of reducing its insurance costs. ¶41. Importantly, each such tiered plan had a different deductible: HyreCar would take more risk if it took a higher percentage of the of the Daily Rental Rate. ¶42. Although HyreCar did not disclose the precise terms of its renewed insurance agreement, CW10 described the post-March 2019 coverage as effectively a captive policy, which is basically a self-insured program. ¶43. With the changes to the tiered model in 2019, HyreCar took on substantially more risk, and thus became more exposed to physical damage claims that arose among its users. ¶44. HyreCar's maximum exposure for a single physical damage claim would be the upper bound of its plan limits, which is (and was at all relevant times) $24,500. *Id*.

**C.    HyreCar's Insurance Reserves Are Mostly for Physical Damages**

According to the Company's Q1 2021 10-Q, HyreCar's insurance reserve represents "an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported." *Id*. Under Generally Accepted Accounting Principles ("GAAP"), HyreCar must accrue for an insurance claim on its Balance Sheet whenever a claim incurred is probable and can be reasonably estimated. ¶46.

Most of HyreCar's insurance reserve, if not all, is for physical damage claims. ¶47. Indeed, HyreCar "records a loss reserve ***for physical damage*** and other liability

3

coverage *caused to owner vehicles* up to the Company's insurance deductibles or relevant limits." *Id*. Similarly, in its 2021 10-K, the Company stated that "The lag time in reported claims *for physical damage* is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment." ¶48.

### D. By Their Inherent Nature, Physical Damages Claims and Incidental Claims Under HyreCar's Program Should Present Minimal Risk of Being Unreported or Under-Reserved

Physical damage claims do not require a lengthy turnaround and should be expeditious because HyreCar requires owners of its vehicles to submit a claim within 24 hours after a vehicle has been returned. ¶53. Indeed, HyreCar's policy states that "[n]o claims will be accepted after 24 hours, excluding holidays and weekends." *Id*. Additionally, HyreCar's own website states that "damages claim cases on average take 2 to 8 weeks to process and receive a settlement." *Id*. Accordingly, given the rapid expected turnaround for both incidentals and physical damage claims, HyreCar represented in its SEC filings — including its Q1 2021 10-Q — that "[t]he lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment." ¶54.

When HyreCar incurs such an insurance claim, it impacts its financials in two places: on its Balance Sheet as a liability, categorized as "insurance reserve" and on its Income Statement as an expense, embedded within the cost of revenue line. ¶57. To ensure that HyreCar's Balance Sheet balances, when it incurs an insurance expense it makes two entries – it debits an expense from owner's equity and credits a liability (the liability is its insurance reserve). ¶58. HyreCar must record the expense for its insurance claim at the same time that it records its liability. ¶59. Thus, an under-accrual of insurance reserves will necessarily lead to overstated earnings because the understated insurance expense makes earnings increase. ¶60. Given HyreCar's real-time information monitoring and the policy that claims must be submitted within 24 hours, the speed with which HyreCar becomes aware of the existence of a probable claim is in nearly real time. ¶61. And the ability to reasonably estimate such a claim

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

is a modest undertaking. *Id*. Accordingly, HyreCar should not face substantial delays between the time damage to a vehicle is incurred and when it ultimately records the corresponding expense on its financial statements. *Id*.

**E.    Defendants' Use a Conflicted TPA For Physical Damage Claims**

Defendants concealed the true nature of HyreCar's purported TPA, Genoteq. Genoteq processed HyreCar's insurance claims for physical damage (and only physical damage) until March 2021. ¶64. Before its October 2018 Joint Venture with Haley ("the 2018 JV"), Genoteq did not have an operating history and it consisted of just a handful of employees. ¶¶66-67. According to multiple former Genoteq employees, at all relevant times, Stacy Ashton was Genoteq's only licensed adjuster and the other Genoteq adjusters worked under Stacy Ashton's license. ¶67. The combination of Genoteq's small size along with Haley's close relationship with HyreCar and its executives made it easy for HyreCar to suppress the ultimate physical damage payouts to vehicle owners. ¶68.

HyreCar had real-time access to Genoteq's physical damage claims information. ¶72. According to CW9, HyreCar was also in near-constant contact with Genoteq, including meetings every Friday between HyreCar Head of Dealer Development Neidig and Genoteq Manger Stacy Ashton. ¶69. Additionally, CW10 (who was in touch with HyreCar upper management) stated "HyreCar reviewed every claim, and they had to approve them before they were paid." ¶70. With respect to approvals, CW10 stated that "[I]t would be the operations director or vice president – and accounting, most definitely. ***The CFO was involved***, I'm sure." *Id*. According to CW9, Genoteq's system was built for HyreCar, HyreCar custom-picked what they wanted filled out for every claim, and HyreCar executives could see everything. *Id*. HyreCar received a report every week with the claims that were pending. *Id*.

HyreCar also concealed the true nature of its conflicted relationship with Genoteq. HyreCar's SEC filings stated that HyreCar would rely on a purported TPA to estimate its insurance reserves. ¶73. This representation was false, however,

5

because the purported TPA, Genoteq, was not a truly independent third-party. *Id.* Moreover, according to CW9, HyreCar was supposed to fund the account for claims payments every two weeks, ***but ABI and Genoteq always let HyreCar work around it and do whatever it wanted***. ¶74.[5] According to CW9, Furnari and Haley were good friends and Genoteq received $50 for every claim which it processed for HyreCar. *Id.* Additionally, HyreCar paid ABI $5.0 and $4.3 million, or 31.6% and 44.0% of revenue, respectively, during the years ended 2019 and 2018, respectively. ¶¶75-76.

**F.      Former Genoteq and HyreCar Employee Detail HyreCar's Scheme**

HyreCar often dictated Genoteq's payment schedule. ¶77. For instance, CW7 stated that after Genoteq's initial review, CFO Brogi would "pretty much give us the green light in terms of paying claims . . ." ¶78. CW9 stated that "Scott – the CFO" was "the one in charge of all the money at HyreCar" and "determined how much we got and when we got it." ¶¶81-82. This level of control enabled HyreCar to keep its insurance expense low and avoid auditor scrutiny. ¶¶6-8. Indeed, on March 15, 2022, HyreCar admitted that at least $1.0 million, or the vast majority of its under-accrual announced on August 10, 2021, related to "settling claims incurred ***prior to January 1, 2021*** under our previous insurance claims processing partner in the second quarter of 2021 as we liquidated their claims portfolio." *Id.*[6]

**G.      HyreCar's Transition From Genoteq to Sedgwick in March 2021**

On March 1, 2021, HyreCar ceased doing business with Genoteq and engaged Sedgwick instead. ¶98. The Company formally announced this transition on May 21, 2021. ¶99. In that press release, the Company mentioned in passing that "HyreCar has also completed integration with Sedgwick, a leading insurance claim processing

---

[5] Unlike the last complaint, Plaintiff now alleges that HyreCar was not supposed to have discretion to delay payment of claims because it was Genoteq, as the TPA, that was supposed to determine when HyreCar paid. ¶74. This fact is further supported by Sedgwick's subsequent demand for an escrow agreement requiring claims to be paid in advance and replenished. ¶152; *Cf.* Order at 7.

[6] And on November 9, 2021, the Company also admitted that "$1.1 million in one-off items related to prior periods (prior to January 1, 2021) and technical issues related to the transition between insurance claims processing partners" weighed on gross profit. *Id.*

6

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

partner for many top companies in rideshare transportation and food delivery." *Id.* This announcement, however, did not disclose that there was still a substantial runoff of claims that remained at Genoteq that had not been paid. ¶100. At the time of the March 1, 2021 transition to Sedgwick, CW9 estimated that Genoteq's runoff HyreCar claims totaled "anywhere from $700,000 to a million." ¶101.

### H.   The Truth Begins To Be Revealed

On August 10, 2021, HyreCar announced deeply disappointing results for the quarter, including net losses of $9.3 million compared to losses of $3.8 million in the same period the prior year. ¶115. Those results were marred by skyrocketing costs of revenue during the quarter mainly due to significantly higher insurance claims incidence – ***including claims before March 31, 2021 "in excess of the reserves*.**" ¶116. Defendants admitted that the prior periods' reserves had been under-accrued and expenses had been understated. ¶117. Indeed, Q1 2021's insurance reserve was under-reserved by $1.2 million, and that under-accrual requires a corresponding impact on HyreCar's Income Statement, so HyreCar's Q1 2021 pretax earnings had also been overstated by ***at least*** $1.2 million. *Id*. HyreCar later admitted that at least $1 million of the $2.8 million increase related to the liquidation of the Genoteq claims portfolio in Q2 2021 relating to the settlement of claims incurred ***prior to January 1, 2021***. ¶118. On all this news, HyreCar's stock fell ***nearly 50%***in a single day.

### III.   STANDARD OF REVIEW

A plaintiff's allegations need only be "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must "accept all factual allegations in the complaint as true" and "must consider the complaint in its entirety . . . ." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322 (2007). Courts must also construe the facts "in the light most favorable to plaintiffs." *In re Daou Sys., Inc*., 411 F.3d 1006, 1013 (9th Cir. 2005).

# IV. PLAINTIFF ADEQUATELY ALLEGES SECURITIES VIOLATIONS

Section 10(b) makes it unlawful "to use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. §78j(b). To state a claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1140 (9th Cir. 2017).

### A. Plaintiff Adequately Alleges That Defendants Made Materially False and Misleading Statements

Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff adequately pleads falsity by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1)(B).

#### 1. Defendants' Statements About HyreCar's Level Of Reserves Were False And the Company's Subsequent Admission Concedes As Much

On May 13, 2021, HyreCar announced that the Company had achieved "Record First Quarter 2021 Financial Results" for the quarter ended March 31, 2021 ("the Q1 2021 Press Release"). ¶¶105, 130. The Q1 2021 Press Release stated that the Company's insurance reserve had declined more than 17% since year end to $1.7 million. *Id*.[7] These statements were materially false and misleading because HyreCar's insurance reserve did not ***decline 17%*** to $1.7 million, but ***increased 39%,*** to $2.9 million, when accounting for $1.2 million of under-accrued expenses related to claims that were "incurred prior to March 31, 2021 in excess of the reserves and

---

[7] Defendants made similar statements about its reserves in its earnings call and 10-Q on the same day, (¶¶142-143), which are also alleged to be false and misleading for substantially similar reasons.

8

accruals." ¶¶106, 132.[8] Defendants later admitted the falsity of the above statement on August 10, 2021, when the Company revealed that prior periods' insurance reserves had been under-accrued and expenses had been understated. ¶¶116-117. Months later, on March 15, 2022, the Company provided more specifics about just how stale the claims were that caused the May 13, 2021 under-accrual: at least $1 million of its under-accrual related to the liquidation of Genoteq claims for settlement of claims incurred ***prior to January 1, 2021***. ¶¶ 83, 118.

Indeed, perhaps recognizing that the falsity of HyreCar's Q1 2021 reserves has already been admitted, Defendants try to steamroll their own facts into the Complaint by proffering 27 exhibits to craft a different narrative and advance a myriad of factual arguments—like Plaintiff's calculations are wrong (Mot. at 13); or Plaintiff's allegations about HyreCar's *unaudited* financial statements conflict with HyreCar's auditor's (*id*.). But Defendants' falsity arguments are wholly improper, illogical, and unsupported by their 27 proffered exhibits.[9] At its core, Defendants' defense ignores the well-settled principle that courts must "take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party." *Quality Sys*., 865 F.3d at 1140. But even if the Court declines to treat HyreCar's subsequent admissions and adjustment as plausibly alleging falsity, each of Defendants' five factual arguments related to HyreCar's reserves statements fails in any event.

***First***, Defendants argue Plaintiff "fails to allege any specific facts that HyreCar's reserves in its Q1 statements were understated" or "the amount the reserves were understated." Mot. at 12. Wrong. Based on Defendants' own admissions, Plaintiff provides the very amounts, *to the dollar*, that HyreCar's reserves were understated. ¶110. Plaintiff provides the levels to which the reserve should have been

---

[8] Similarly, cost of revenue was not $4.7 million when including claims incurred before March 31, 2021 in excess of the reserves and accruals, but was instead $5.9 million. ¶¶131-132.

[9] The Court should largely disregard these exhibits. *See Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 998 (9th Cir. 2018) (cautioning against the "overuse and improper application of judicial notice and the incorporation-by-reference doctrine").

9

recorded. *Id*. Plaintiff explains why the reserve should have been adjusted (¶¶117-118), and even traces which financial statements the under-reserve impacts and in which direction. ¶121 (Income Statement and Balance Sheet); ¶143 (cost of revenue understated, pre-tax loss from operations understated, net loss understated).[10] Finally, Plaintiff alleges why it was unreasonable for Defendants to fail to recognize the under-reserved liability and expense for as long as they did.[11] "These allegations set forth in very clear and specific terms the information available to Defendant and why, given its possession of this information, Defendant's statements about the adequacy of its reserves were misleading." *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 777 (E.D. Va. 2015). "In short, Plaintiffs have not asserted fraud by hindsight." *Id.*

Because Defendants disregard Plaintiff's detailed allegations, the resulting legal conclusions they draw are deeply flawed. Plaintiff has pled more than enough to allege falsity. *See, e.g.*, *Daou*, 411 F.3d at 1016 (a plaintiff should allege details such as the approximate amount of overstatement, the products or services involved, the dates of the transactions, and the identities of the customers involved, but a plaintiff "need not allege each of these particular details"); *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1121 (C.D. Cal. 2005) (falsity alleged when plaintiffs "adequately identify which statements they allege to be misleading, and provide the reasons why they are misleading").

---

[10] Plaintiff even details the very journal entries the Company must enter when a reserve is first recorded, and why a failure to properly record reserves could throw the Company's entire balance sheet out of balance. ¶58 (debit expense from equity, credit insurance reserve liability); ¶59 (failure to so debit/credit would cause Balance Sheet not to balance).

[11] *E.g.*, ¶83 (subsequent Company admission that vast majority of its under-accrual announced in May 2021 related to settling claims incurred before January 1, 2021); ¶118 (Company admission that $1.0 million of under-accrual related to the liquidation of the Genoteq claims portfolio). Moreover, as Plaintiff alleges, the Company stated that "[t]he lag time in reported claims for physical damage is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment" (¶48) and that HyreCar's own website states that "damages claim cases on average take 2 to 8 weeks to process and receive a settlement." ¶53. Thus, it is illogical that Defendants could not discern their claims liability between January 1, 2021 and May 13, 2021.

10

***Second***, Defendants argue Plaintiff conflates "incurred" claims with "accrued" claims. Mot. at 13. Defendants are again wrong. According to Defendants, the reasons that an incurred claim (*e.g*., an owner's vehicle is damaged) would not be recorded as an accrued claim (*i.e*., a claim HyreCar must pay), would be if either the claim were covered by another insurer (Mot. at 16), the claim were invalid (*id*.), or the value of the claim was less than the owner's deductible (¶44). But here, HyreCar adjusted reserves *ex post facto* to reflect claims incurred from earlier periods, thus ***admitting that the earlier claims were valid***. ¶¶83, 117-118. So, with respect to the under-reserve, "incurred" and "accrued" should have been the same thing here because the Company admitted that over $1 million of the under-reserve stemmed from incurred claims at Genoteq before *January 1, 2021*, so they should have been accrued well before the May 13, 2021 false statements. ¶118.[12] They also should have been timely paid. *See* supra, n.5; ¶¶6, 74, 152.

***Third***, contrary to Defendants' Motion, Plaintiff does allege that Defendants knew, or were deliberately reckless in not knowing, that the claims were valid because: (1) they had real time access to Genoteq's system (¶¶61, 71-72, 81, 145); (2) were personally involved (¶70 "the CFO was involved I'm sure; ¶78 Brogi would give the "green light" in terms of paying claims—and the Company would not pay an invalid claim); and (3) contemporaneous customer complaints establish the Company did belatedly agree the customer claims were valid. *E.g*., ¶89 (admitting delayed payment to a valid claim); ¶92 (similar).  And, as discussed below, this delayed recognition of valid claims occurred on a systemic basis.

***Fourth***, Defendants' improper factual argument challenging how Plaintiff calculated the amount of the Company's under-accrual (Mot. at 13) is not something

---

[12] Defendants wrongly contend that Plaintiff's allegations do not demonstrate that the $1.0 million in under-accrued claims approximates the runoff observed by Genoteq employees.  Mot. at 14. Plaintiff's particularized allegations, however, prove otherwise.  ¶¶9, 84-87, 100-01, 103, 106. For instance, at the time of the March 1, 2021 transition to Sedgwick, CW9 estimated that Genoteq's runoff of HyreCar claims totaled "anywhere from $700,000 to a million" (¶101), which approximates the amount by which the Company later admitted it had under-reserved. ¶118.

11

that can be resolved on a motion to dismiss, and certainly not in Defendants' favor. *Genworth*, 103 F. Supp. 3d 759 at 776 ("the Court cannot engage in a factual dispute at this stage of litigation regarding how Genworth calculated its reserves."). Moreover, Defendants' attempt to invoke a reliance on auditor defense (Mot. at 13)—for financial statements that were ***unaudited***—is as surprising as it is irrelevant because unlike Plaintiff's prior complaint, the Class Period here constitutes just one quarter of the Company's financial results, and those results ***were unaudited***. Indeed, the Company stated within its 10-Q filed on May 13, 2021 that "[t]he financial data and the other information disclosed in these notes to the interim consolidated financial statements related to the three-month periods ***are unaudited***." Doc. 76-13 at 5 (Exhibit 11 at 291).[13] Finally, "[i]f a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negate the existence of the requisite intent or establish good faith reliance." *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 467 (9th Cir. 1985); *see also In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1246 (N.D. Cal. 2008) ("the [auditor's] unqualified opinion did not necessarily exonerate [the company] because "[i]t did not specifically discuss the time periods at issue; it discussed year-end results"); *Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1314 n.13 (C.D. Cal. 1996) ("The fact that Chantal's independent auditor may have approved

---

[13] Not only does HyreCar's purported auditor defense raise an improper factual issue, but that issue provides Defendants little support because HyreCar's auditor, DBB McKennon, is hardly a Big Four accounting firm and there are facts which suggest that DBB McKennon may not have conducted all its audits in accordance with Public Company Accounting Oversight Board ("PCAOB") standards. For example, the latest publicly-available PCAOB inspection report on DBB McKennon reflects that HyreCar's auditor had a mere seven issuer clients, with which only three had audit partners involved in the audits. *See* Pls.' Ex. A at 3. Moreover, as part of the PCAOB's inspection of DBB McKennon, it sampled two audits, and, in both, identified "deficiencies" existed in how the audits were conducted. Defendants suggestion that the Court should rely on DBB McKennon's audit opinions of HyreCar at the pleading stage would require the Court to presuppose factual findings about the sufficiency of DBB McKennon's work that is not in the record, nor appropriate at the motion to dismiss stage. *Khoja*, 899 F.3d at 999.

12

the accounting methods will not shield Chantal from liability for deception such methods may have caused."). Indeed, every public company issues audited financials, and even so, securities fraud still exists.

For similar reasons, Defendants' argument—also unsupported by any of its 27 exhibits—that Plaintiff's reserve calculations purportedly "have no grounding in sound accounting principles" (Mot. at 13), should likewise be given no credit at the pleading stage. *See, e.g.*, *SEC v. Cotton*, 2006 WL 6382128, at *8 (C.D. Cal. Dec. 21, 2006) ("Whether [defendants'] accounting practices . . . were consistent with GAAP is a question of fact, best resolved by expert testimony.").[14]

*Fifth*, Defendants incorrectly contend that "Plaintiff's reliance on later-disclosed increase in reserves is more problematic because it assumes (*incorrectly*) that the $1.2 million increase in reserves recorded in Q2 2021 was solely attributable to physical damage claims processed by Genoteq." Mot. at 14. Yet once again, Defendants are wrong. Plaintiff *assumed nothing*. Defendants *admitted* that nearly all the $1.2 million increase in reserves originated from Genoteq.[15] Plaintiff separately alleges that Genoteq only handled physical damage claims. ¶64. Thus, by Defendants' own admissions, between $1.0 and $1.1 million (Defendants offer conflicting figures at different times), of the under-reserve was *due to physical damage claims from Genoteq* that were validly incurred before January 1, 2021 but not expensed until over *eight months later* on August 10, 2021. And because Defendants admitted that $1.0 million of physical damage claims were incurred before January 1, 2021, Defendants' alternative factual argument that some portion of the $1.0 million under-accrual may

---

[14] *See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir. 1997) ("it is a factual question whether [defendant's] accounting practices were consistent with GAAP"); *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 339 (S.D.N.Y. 2004) ("Although the question of whether GAAP has been violated might appear to be a legal determination, the element of what is 'generally accepted' makes this difficult to decide as a matter of law.").

[15] ¶83 (admitting $1.0 million of Q2 2021 under-accrual came from "previous insurance claims processing partner" – which is indisputably Genoteq – for claims "incurred prior to January 1, 2021"); Complaint n.14 (Company separately reports $1.1 million, not $1.0 million of the under-accrual came before January 1, 2021); ¶¶116-117 (showing breakdown of under-accrual).

13

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

have come from Sedgewick between March 1 and March 31, 2021 (Mot. at 15), also fails. Defendants are clearly trying to extend the Court's prior Order to newly alleged facts, but in doing so, they completely misrepresent what those new facts are, hoping to draw a similar conclusion from the Court as that set forth in the Order.[16]

But their numerous attempts to challenge the veracity of Plaintiff's factual allegations violates "the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage." *Khoja.*, 899 F.3d at 1014. "At this stage, the Court need not determine that the statements were in fact misleading—plausibly alleging as much suffices." *In re GoHealth Sec. Litig.*, No. 20-CV-5593, 2022 WL 1016389, at *5 (N.D. Ill. Apr. 5, 2022). Moreover, "Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *Twombly*, 550 U.S. at 556.

### 2. Defendants' Statements About How HyreCar Sets Reserves Were False and Misleading

On the same day as its Q1 2021 press release, the Company also filed its Q1 2021 10-Q. ¶140. In it, the Company stated that "[t]he Company records a loss reserve for physical damage and other liability coverage caused to owner vehicles up to the Company's insurance deductibles or relevant limits" and that "[t]his reserve represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported and are recorded on a non-discounted basis." *Id.* Defendants further represented that "[t]he lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment." *Id.*

---

[16] Defendants also dispute Plaintiff's allegations that HyreCar has a lower probability of liability claims for personal injuries than it does for physical damage and that most of its insurance reserve, if not all, is for physical damage claims (¶¶39, 47, 50) by arguing "[t]hat's not right" and, again with no citation to any of their 27 exhibits, Defendants point to a hypothetical of potential liability claims. Motion at 15. But, as discussed above, Plaintiff alleges that both: (a) Genoteq only handles physical damage claims; and (b) by what amount Genoteq contributed to the under-reserve (¶¶64, 83), so by inference, those allegations plausibly establish what proportion of the under-accrual was for liability versus physical damage claims: it was nearly all, if not all, physical damage.

14

These statements were false and misleading because: (1) the "lag time" of the Company's reported claims was not low as shown by, among other places, its disclosure on August 10, 2021 that $1.2 million of claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals" had still not been taken at the time the above statement was made; and (2) the Company's subsequent admission in its 2021 10-K that $1.0 million of the $1.2 million in claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals" were actually incurred even **before January 1, 2021,** which establishes that the lag time is not minimal. ¶141.

In response, Defendants interpret "lag time" differently than how it is alleged, arguing "lag time" simply refers to the time in between when an accident happens and when that accident is reported to HyreCar. Mot. at 17. But Defendants' factual interpretation—again unsupported by citation to the Complaint or any of their voluminous exhibits—fails because "[a]ny conflicting interpretation of the false or misleading statements . . . will likely lead to consideration of facts that are inappropriate at the 12(b)(6) stage of the litigation." *Nguyen v. Radient Pharm. Corp*., 2011 WL 5041959, at *7 (C.D. Cal. 2011). Even so, in essence, Defendants make the unsurprising point that it takes time for HyreCar to determine whether a claim is valid. Mot. at 16. What is surprising is that it seems Defendants are now saying that those claims awaiting validation are apparently excluded from HyreCar's reserve, and "[t]he fact that reserves were later increased based on claims incurred prior to March 1, 2021 simply means that HyreCar reached a different determination on losses that were probable and reasonably estimated on certain claims based on new information received when it switched to a more sophisticated third-party administrator." Mot. at 17-18. As before, Defendants' fact-intensive argument suffers many flaws. First, by Defendants' own definition of reserves, whether or not there is "additional time needed to investigate" a claim, the insurance reserve "represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported" (¶45) – *i.e.*, that is *all* claims. So, if what Defendants are saying now is that there were a

15

bunch of claims that they knowingly excluded from their reserve estimate while they took time to investigate them (between January 1, 2021 and August 10, 2021), that itself is a material omission because HyreCar's insurance reserve definition purports to capture all claims and thus already considers that some claims may not be valid. *See* ¶140. And the reserve definition also makes no distinction between valid or invalid claims and references no additional time needed to determine whether a claim is valid before it is included in the reserve. *See id.* If what Defendants are now arguing is true, it constitutes securities fraud because they had a massive bucket of claims that they were still investigating but knowingly excluded from their insurance reserves simply based on the mere hope that they may not have to pay them or that the claims were perhaps invalid—none of which was disclosed. *See In re New Century*, 588 F. Supp. 2d 1206, 1230–31 (C.D. Cal. 2008) (management knowledge of growing backlog supported scienter for statements related to adequacy of reserve).

Even if there were some necessary delay between when a customer reported a claim and when HyreCar booked that claim as an insurance reserve, and even if that were disclosed, such intermittent delays would not be as widespread and systemic as they are alleged to be here. Again, HyreCar had at least $1.0 million of claims that predated January 1, 2021. ¶141. HyreCar's own website states that customers who submit insurance claims can expect to be *paid* in two-to-eight weeks. ¶53. That eight-week timeline represents when a customer *gets paid* (*id.*), which, in turn, necessarily bakes in a cushion to process the claim, cut the check, and mail the check to the customer. By inference, before any of those things can happen, HyreCar must have already determined whether the claim is valid (or why else would the Company pay it). Thus, it is simply illogical that Defendants could not discern their claims liability by May 13, 2021 for over $1.0 million worth of claims incurred before January 1, 2021—potentially well before January 1, 2021.[17]

---

[17] This point is particularly true because even if a claim had not yet been processed, Defendants still had real-time access to information on all claims in their pipeline. ¶¶69-72, 145.

16

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

And the Complaint alleges a systemic scale of insurance-reserve avoidance because HyreCar's maximum liability is $24,500 per claim (¶44), so its under-reserve of $1.2 million (¶110) represents hundreds of claims. For instance, supposing the average claim size is $5,000, that would equate to 240 discrete claims. At $2,500 per claim, the $1.2 million under-reserve represents at least 480 discrete claims. These hypothetical figures are consistent with CW11, who estimated that HyerCar's unpaid backlog in March 2021 was in the "millions" (on a dollar basis) and that there were about 400 claims open and needing to be paid. ¶85. In any event, this is not a scenario where HyreCar simply ended up paying out higher amounts than it had previously reserved for. Rather, the under-reserving took place on a systemic scale, across likely hundreds of individual claims, and could only have been executed in close coordination with the CEO's good friend[18] (¶74), and transpired just as Defendants unloaded massive amounts of stock just before the truth about the under-reserve of previously undisclosed claims would decimate the Company's stock price. ¶¶154-158. Those facts describe fraud, not "opinions."

**3.   Because HyreCar's Reserves Were False, So Too Were The Company's Cost of Sales, Net Income And Earnings**

The reason HyreCar's insurance reserve was so critical to the Company's reported financials, and indeed an integral part of Defendants' overall scheme, is that by manipulating its insurance reserve, Defendants were also able to broadly impact all of HyreCar's reported financials – such as its cost of sales, which was understated, and thus materially overstated its operating income. ¶2, 57; Mot. at 9, 13. More specifically, within the Q1 2021 Press Release, Defendants stated that HyreCar reported a net loss of $7.2 million. ¶133. This statement was materially false and misleading because HyreCar's reported net loss was understated by at least $1.2 million, or at least 14.3%, stemming from the under-accrued expenses related to

---

[18] For instance, according to CW9, HyreCar was supposed to fund the account for claims payments every two weeks, but ABI and Genoteq always let HyreCar work around it and do whatever it wanted. ¶¶74, 80.

17

claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals." *Id*. Similarly, Q1 2021 gross profit was likewise overstated by $1.2 million, of which at least $1.0 million should have been reported prior to December 31, 2021. *Id*. As a result, gross profit was overstated by 78%. *Id*.[19]

Also in the Q1 2021 earnings call, CEO Furnari stated, "[d]ynamic pricing combined with increasing gross profit from normalized claims and increased affiliate revenue puts us on to reach EBITDA neutral in the second half of 2021." ¶138. This statement was false and misleading because at the time, claims had not normalized but were still surging, and the Company had failed to expense $1.2 million in valid claims. Even if the Company legitimately believed its reserves were adequate, claims had not normalized – but were on a steady uptrend. ¶¶85-87. There is no business judgment in representing that claims had normalized when they had not.

### 4. The Company's Representation That It Complied With GAAP Was False And Misleading

The Q1 2021 10-Q also stated that "The consolidated financial statements of HyreCar Inc. are prepared in accordance with [GAAP]." ¶144. This statement was false and misleading because the Q1 2021 financials were not compliant with GAAP. ¶145. Under GAAP, the Company should have increased its insurance reserve by $1.2 million and increased its cost of sales by the same amount due to claims that were "incurred prior to March 31, 2021 in excess of the reserves and accruals," a fact Defendants knew or were deliberately reckless in not knowing that because Defendants had real-time access to Genoteq's claims data, which showed a substantial backlog of claims that should have been accounted for within the reserves as of March 31, 2021. ¶¶69-72, 145. Thus, falsity is adequately alleged as to Defendants' GAAP compliance. *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010) (GAAP violation alleged by identifying the relevant GAAP provisions and how

---

[19] The Company reported similar figures in its 2021 10-Q (¶¶142-143) and are false for substantially similar reasons.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

those provisions were violated); ¶46 (identifying GAAP provision); ¶110 (quantifying violation); ¶¶144-45 (explaining why Defendants violated GAAP).

### 5. The Company's Risk Factors Were False And Misleading

Defendants claim that the Company repeatedly disclosed the difficulty it faced in setting reserves and the risk that actual claims might exceed the reserves. Mot. at 13, 16 Yet, the Q1 2021 10-Q stated that "there have been no material changes to our Risk Factors previously disclosed in our Annual Report on Form 10-K for the year ended December 31, 2020." ¶146. And in the 2020 10-K, the Company stated that "[w]e establish insurance reserves for claims incurred but not yet paid and claims incurred but not yet reported and any related estimable expenses, and we periodically evaluate and, as necessary, adjust our insurance reserves as our experience *develops or new information is learned*." *Id*. The 2020 10-K also stated that "[i]f we determine that our estimated insurance reserves are inadequate, *we may* be required to increase such reserves at the time of the determination, which could result in an increase to our net loss in the period in which the deficiency is determined and negatively impact our financial condition and results of operations." *Id*.

These statements were false and misleading because they omitted that claims that were incurred prior to January 1, 2021 under HyreCar's previous insurance claims processing partner had already been incurred and thus necessitated HyreCar to increase its reserve at the time that both the 2020 10-K and Q1 2021 10-Q were issued.[20] ¶147; *see also Cutler v. Kirchner*, 696 F. App'x 809, 813 (9th Cir. 2017) (statements are misleading when "they disclosed a risk in the abstract but omitted the fact that it had already come to fruition"). Thus, Defendants' representations created "a plausibly misleading impression of a state of affairs that differed in a material way

---

[20] Defendants again argue that they warned of the purported difficulty in estimating future reserves (Mot. at 13), but expensing known claims is not difficult. Regardless, "difficulty" has no bearing on whether a statement is false. And the language Defendants rely on does not support them. *See* Mot. at 7. Warning that "claims may emerge in future periods for events that occurred in a prior period that differed from expectations" does not warn that the Company may take more than five months to investigate hundreds of *known reported claims* – those claims have already "emerged".

19

from the one that actually existed." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021). Warnings are insufficient where, as here, the risk has already materialized. *Id.* at 703 ("Risk disclosures that speak[ ] entirely of as-yet-unrealized risks . . . and do not alert[ ] the reader that some of these risks may already have come to fruition can mislead reasonable investors."). *Contra* Mot. at 6, 16.

### 6.    Even if Viewed As Opinions, HyreCar's Insurance Reserves Were Misleading And Not Within the PSLRA's Safe Harbor

Defendants argue that the Company's insurance reserve estimates constitute inactionable statements of opinion. Mot. at 15-16. In *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015), however, the Supreme Court held that opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor. *Id.* at 194. As alleged, such is the case here because Defendants omitted the known backlog of valid claims swelling at Genoteq, which, in turn, understated the Company's reserves. ¶145.

Defendants' statement that "[d]ynamic pricing combined with increasing gross profit from normalized claims and increased affiliate revenue puts us on to reach EBITDA neutral in the second half of 2021" (¶138) is not subject to the PSLRA's safe harbor provision because Defendants were representing the present state of *normalized claims*. *Contra* Mot. at 18. "[W]here defendants make mixed statements . . . the non-forward-looking statements are not protected by the safe harbor." *Cutler*, 2017 WL 3530893, at *4; *Quality Sys.*, 865 F.3d at 1142. Thus, Plaintiff has adequately alleged falsity.

### B.    Plaintiff Adequately Alleges that Defendants Acted With Scienter

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs*, 551 U.S. at 314. "[T]he required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate

20

recklessness." *Quality Sys.*, 865 F.3d at 1144. "The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (italics in original). A strong inference of scienter arises if, "[w]hen the allegations are accepted as true and taken collectively," a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. A tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).[21] Plaintiff alleges scienter for at least five reasons.

*First*, Defendants' admissions support a strong inference of scienter. A "later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003). For example, the Company ***admitted*** that at least $1.0 million, or the vast majority of its under-accrual announced on August 10, 2021, related to "settling claims incurred ***prior to January 1, 2021*** under our previous insurance claims processing partner in the second quarter of 2021 as we liquidated their claims portfolio." ¶83. The Company also admitted that "$1.1 million in one-off items related to prior periods (prior to January 1, 2021) and technical issues related to the transition between insurance claims processing partners" weighed on gross profit. *Id*. Thus, Defendants admit that the Company's claims liability was understated when they made their statements. Accordingly, "Defendants' own response to the issue contributes to an inference of scienter here." *Schueneman v. Arena Pharm., Inc.*, 840

---

[21] Defendants mischaracterize the holding in *In re Cadence Design Sys., Inc. Sec. Litig.*, 654 F. Supp. 2d 1037 (N.D. Cal. 2009) (Motion at 21), which held that plaintiffs must allege "that Defendants were actually aware that (***or reckless with respect to whether***) the accounting was incorrect." *Cadence*, 654 F. Supp. 2d at 1046.

21

F.3d 698, 708 (9th Cir. 2016); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232-33 (9th Cir. 2004).

***Second***, the CW allegations support a strong inference of scienter because they are "described with sufficient particularity to establish their reliability and personal knowledge" and are "indicative of scienter." *Quality Sys.*, 865 F.3d at 1144-45; ¶¶25-32, 40, 43, 67, 69-72, 74, 76, 78-82, 85-87, 97, 101-102.[22] Furthermore, "[c]orroboration from multiple sources also supports an inference of scienter." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058 (C.D. Cal. 2008). Thus, the corroborating accounts of the eight CWs describe "specific allegation[s] about management's exposure to factual information needed for a strong inference of scienter." *Cutler*, 2017 WL 3530893, at \*5.

***Third***, Defendants' stock sales bolster the strong inference of scienter alleged considering: "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Quality Sys.*, 865 F.3d at 1146. Defendants' sales totaled more than $13 million in gross proceeds. ¶154. Specifically, CEO Furnari sold 300,000 shares for proceeds of more than $5.2 million. ¶155. Similarly, CFO Brogi sold 72,329 shares, reaping over $1.2 million. ¶157. Defendants concede that these sales constituted 35% of Furnari's holdings and 36% of Brogi's holdings, respectively. Mot. at 24. Sales of lesser percentages support a strong

---

[22] For instance, CW10 (who interacted with HyreCar's upper management) stated that "HyreCar reviewed every claim" and that "[t]he CFO was involved, I'm sure." ¶70. Additionally, both CW9 and CW10 stated that HyreCar executives had access to Genoteq's system, could see what claims were ready to be approved, and that HyreCar received a report every week with the claims that were pending. ¶¶71, 72; *see In re Diamond Foods, Inc. Sec. Litig.*, No. C 11-05386 WHA, 2012 WL 6000923, at \*9 (N.D. Cal. Nov. 30, 2012) (allegations that "include details about defendants' access to information within the company can be sufficient to create a strong inference of scienter"). Moreover, according to CW9, HyreCar was supposed to fund claims payments every two weeks but ABI and Genoteq always let HyreCar work around it and do whatever it wanted. ¶¶74, 80. Similarly, CW9 stated that CFO Brogi decided by how much to fund the claims account and that Genoteq's runoff of claims as of the March 1, 2021 transition totaled from $700,000 to $1 million. ¶¶81, 82, 87, 101. Additionally, CW11 estimated that HyerCar's unpaid backlog in March 2021 was in the "millions" and that there were about 400 claims open and needing to be paid. ¶85.

22

inference of fraud. *See, e.g.*, *Batwin v. Occam Networks, Inc.*, No. CV 07-2750 CAS (SHx), 2008 WL 2676364, at *14-15 (C.D. Cal. July 1, 2008) (sales of 7% of holdings were suspicious).[23] Other insiders also reaped millions from stock sales. *See, e.g.*, *Junge v. Geron Corp.*, No. C 20-00547 WHA, 2021 WL 1375960, at *7 (N.D. Cal. Apr. 12, 2021) (sales by non-defendant executives supported an inference of scienter). Michael Furnari, the Company's Chief Business Development Officer (and the brother of CEO Furnari) sold 299,900 shares, reaping nearly $5.2 million. ¶156. Grace Mellis, Chair of the Company's Board of Directors, sold 50,000 shares for proceeds of nearly $875,000. ¶158. Henry Park, the Company's Chief Operating Officer, sold 35,000 shares for proceeds of over $578,000. ¶159.  And Defendants' stock sales "occurred on the heels of optimistic statements" which "constitutes circumstantial evidence that [the] statements were fraudulent when made." *Schlagal v. Learning Tree Int'l*, No. CV 98-6384 ABC (EX), 1998 WL 1144581, at *10 (C.D. Cal. Dec. 23, 1998). Following Defendants' misrepresentations at the start of the Class Period, the price of HyreCar stock rocketed upwards 45%. ¶154. This increase preceded insider selling totaling more than $13 million in proceeds. *Id*. Allegations that defendants sold "in a very short period of time" while "stock was trading at all-time highs, give rise to a strong inference of scienter." *In re TUT Sys., Inc. Sec. Litig.*, No. C 01-02659 CW, 2002 WL 35462358, at *12 (N.D. Cal. Aug. 15, 2002). Moreover, CEO Furnari, CFO Brogi, Michael Furnari, Grace Mellis, and Henry Park sold no Company shares since the Company's IPO. ¶¶155-59. Thus, Defendants' stock sales support a strong inference of scienter.[24]

---

[23] *See In re Omnivision Techs., Inc.*, No. C-04-2297 SC, 2005 WL 1867717, at *4 (N.D. Cal. July 29, 2005) (sales of 18% of holdings supported scienter); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (sales of 7.6% of holdings supported scienter).

[24] Defendants' cases are distinguishable.  In *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999), although sales appeared "somewhat suspicious," the sales amounted "to just five percent" of the "allegedly suspicious sales."  *Id*. at 987.  In *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049 (9th Cir. 2008), the bulk of sales was made under a 10b5-1 trading plan.  *Id*. at 1067 n.11.  Defendants make no such claim here.  In *In re Skechers U.S.A., Inc. Sec.*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Fourth*, CFO Brogi's departure also adds to the strong inference of scienter alleged. *See Bielousov v. GoPro, Inc.*, No. 16-cv-06654-CW, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (resignation of the company's president bolstered the strong inference of scienter alleged); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187-1188 (C.D. Cal. 2007) (same). HyreCar announced Brogi's unexpected "retirement" on June 23, 2021, at only age 56. ¶¶23, 160. CFO Brogi's "retirement" came *less than two weeks* after HyreCar replaced ABI as its insurance broker and shortly after HyreCar replaced Genoteq. ¶¶98, 160. Brogi's departure adds "one more piece to the scienter puzzle." *In re Banc of California Sec. Litig.*, No. SACV1700118AGDFMX, 2017 WL 3972456, at *8 (C.D. Cal. Sept. 6, 2017).[25]

*Fifth*, the Company's small size and the core operations inference bolster the strong inference of scienter alleged. *See, e.g.*, *Curry v. Hansen Medical, Inc.*, No. 4:09-cv-05094-CW, 2012 WL 3242447, at *11-*12 (N.D. Cal. Aug. 10, 2012) (the fact that the company was "small" with "less than 200 employees" supported scienter); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1173, 1186 (S.D. Cal. 2009) (300 employees supported scienter). Here, HyreCar had only 86 full-time employees as of December 31, 2020. ¶¶151, 161. Also, the fact that the fraud alleged relates to the core operations of HyreCar (¶¶150-51, 161) further supports a strong inference of scienter. *S. Ferry*, 542 F.3d at 785-76; *Alphabet*, 1 F.4th at 706.

Finally, courts have soundly rejected Defendants' scienter arguments. Mot. at 20-25. For instance, an "audit opinion does not, standing alone, negate any otherwise

---

*Litig.*, No. CV 03-02094 PA (EX), 2005 WL 8168047 (C.D. Cal. Mar. 21, 2005), defendants made similar sales before the relevant period. *Id*. at *8. Such is not the case here. ¶¶155-59. In *Iron Workers Loc. No. 25 Pension Fund v. Oshkosh Corp.*, No. 08-C-797, 2010 WL 1287058 (E.D. Wis. Mar. 30, 2010), the court held that the long class period of more than four years undermined finding scienter based upon stock sales. *Id*. at *20. The Class Period here is only three months.

[25] Defendants' cases support Plaintiff's position. In *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), the court held that "uncharacteristic" resignations that do not occur near "retirement age" can be indicative of scienter. *Id*. at 1002. Such is the case here. In *Luna v. Marvell Tech. Grp.*, No. C 15-05447 WHA, 2017 WL 2171273 (N.D. Cal. May 17, 2017), the court held that a CEO's departure supported a strong inference of scienter. *Id*. at *5.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

compelling inference of scienter plaintiffs' pleading raises." *Oklahoma Firefighters Pension & Ret. Sys. v. IXIA*, 50 F. Supp. 3d 1328, 1365 n.183 (C.D. Cal. 2014); *see also New Century*, 588 F. Supp. 2d 1206 at 1231-32 ("The Court . . . does not consider the audit opinion to undermine the particularity with which Plaintiffs have alleged scienter."). Thus, there is a reasonable inference that HyreCar's auditor was unaware of Defendants' conduct in managing earnings. *See In re Silver Wheaton Corp. Sec. Litig.*, No. CV15-5146-CAS(JEMX), 2016 WL 3226004, at *11-12 (C.D. Cal. June 6, 2016) (courts have sustained securities claims "even when the defendants obtained 'clean' audit opinions from their independent auditors and [] never restated their financial statements").[26] Importantly, moreover, Defendants claim that "[t]here is no allegation that the auditors failed to follow audit standards" (Mot. at 20) but, as noted above, fail to recognize that HyreCar's audit opinion is irrelevant. Unlike Plaintiff's prior complaint, the Class Period here only relates to ***unaudited*** financials. When considering these facts collectively as required under *Tellabs* (551 U.S. at 323), Plaintiff has adequately alleged scienter.[27]

## V. CONCLUSION

For the above reasons, the Court should deny the Motion; but if it grants any part of it, Plaintiff requests leave to amend. *See Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").

---

[26] Contrary to Defendants' contentions, the absence of a restatement does not weigh against an inference of scienter. *See, e.g.*, *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) ("To hold otherwise would shift to accountants the responsibility that belongs to the courts. It would also allow officers . . . to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements."); *LDK*, 584 F. Supp. 2d at 1245 ("the lack of a restatement did not mean that [the company] only engaged in legitimate conduct").

[27] Plaintiff has adequately pled a primary violation and has also sufficiently alleged the Individual Defendants' control over HyreCar. ¶¶22-23, 197-200; 15 U.S.C. §78t(a). *Contra* Motion at 25 n.9.

25

DATED: April 18, 2022            **GLANCY PRONGAY & MURRAY LLP**

By:   *s/ Ex Kano S. Sams II*

Robert V. Prongay
Ex Kano S. Sams II
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
Email: esams@glancylaw.com
Email: rsulentic@glancylaw.com

*Counsel for Lead Plaintiff Turton Inc.*

26

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On April 18, 2022, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 18, 2022, at Los Angeles, California.

s/ Ex Kano S. Sams II
Ex Kano S. Sams II