**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

IVAN BARON, individually and on behalf of all others similarly situated,

Plaintiff,

v.

HYRECAR INC., JOSEPH FURNARI and ROBERT SCOTT BROGI,

Defendants.

Case No. 2:21-cv-06918-FWS-JC

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS [76]**

Before the court is Defendants HyreCar, Inc. ("HyreCar"), Robert Scott Brogi ("Brogi"), and Joseph Furnari's ("Furnari") (collectively, "Defendants") Motion to Dismiss Lead Plaintiff Turton Inc.'s ("Plaintiff") Second Amended Complaint. (Dkt. 76 ("Motion" or "Mot.).) Plaintiff filed an Opposition, (Dkt. 77 ("Opposition" or "Opp.")), and Defendants filed a Reply, (Dkt. 81 ("Reply")). Based on the state of the record, as applied to the applicable law, the court **DENIES** the Motion.

## I. Relevant Background

This case is a putative securities fraud class action concerning alleged misrepresentations in corporate financial statements. The SAC alleges[1] that HyreCar, a "tightly-controlled company led by" Brogi and Furnari, used a conflicted third-party insurance adjuster, Genoteq, to manipulate HyreCar's earnings by concealing certain expenses and under-accruing liability for its insurance reserves, resulting in inaccurate financial statements. (Dkt. 75 ("SAC") ¶ 2.) Plaintiff alleges an early investor in HyreCar, either individually or through a company in which he served as CEO, owned Genoteq from October 2018 until approximately March 2021. (*Id.* ¶¶ 62-68, 98.) Plaintiff alleges that, based on statements of "confidential witnesses" identified as employees of Genoteq and HyreCar, Genoteq's employees were in frequent contact with HyreCar's and that HyreCar's management had access to Genoteq's insurance claims database. (*Id.* ¶¶ 10, 69-72.) Plaintiff alleges that HyreCar's representations in SEC filings that it relied on Genoteq to estimate its reserves were thus misleading, in part, because they did not disclose the full extent of the parties' relationship. (*Id.* ¶¶ 73-76.)

HyreCar is a public company that operates a peer-to-peer platform by which car owners can rent their automobiles directly to another individual. (*Id.* ¶¶ 3, 33-34.)

---

[1] For the purposes of the Motion, the court accepts all allegations of material fact as true and construes the pleadings in the light most favorable to Plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Car owners set a daily rate to rent their vehicles. (*Id.* ¶ 35.) The renter pays the posted rate, "direct daily insurance costs," and a 10% fee to HyreCar; the owner then receives that posted rate after HyreCar deducts a 15-25% fee. (*Id.*) HyreCar provided car owners with insurance coverage of various "tiers," but all protect the car owners from physical damage to their vehicles caused by a renter. (*Id.* ¶¶ 4, 36.) When HyreCar owners are operating their vehicles on Uber or Lyft platforms, HyreCar's insurance coverage "subordinates to state mandated insurance provided by Uber and Lyft" to "keep insurance costs and liability low." (*Id.* ¶ 38.)

HyreCar kept insurance reserves representing "an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported." (*Id.* ¶ 45.) Plaintiff alleges Generally Accepted Accounting Principles ("GAAP"), specifically the Financial Accounting Standards Board ("FASB") Accounting Standard 450-20-25 ("ASC 450-20-25"), require HyreCar to accrue an insurance claim as a liability on its Balance Sheet once the cost is reasonably probable to incur and it can be reasonably estimated. (*Id.* ¶ 46.) Plaintiff claims that under-accruing the insurance reserves affects HyreCar's debiting and crediting on its Balance Sheet and impacts earnings reported on its Income Statement. (*Id.* ¶¶ 57-60.) The SAC alleges HyreCar's SEC filings reflect that HyreCar records a loss reserve for physical damage rather than personal injury to a passenger and that, specifically, HyreCar's 10-K for 2021 stated that the "lag time in reported claims for physical damage is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment." (*Id.* ¶¶ 47-48.) Plaintiff further alleges HyreCar's website states "[n]o [insurance] claims will be accepted after 24 hours, excluding holidays and weekends" and that "damages claim cases on average take 2 to 8 weeks to process and receive a settlement." (*Id.* ¶ 53.)

According to the SAC, car owners who rented their vehicles through HyreCar's platform and "confidential witnesses" identified as HyreCar's and Genoteq's employees, were aware that HyreCar would delay payments on insurance claims due

to damaged or stolen cars. (*Id.* ¶¶ 5, 77-97.) The SAC alleges this delay effectively permitted HyreCar's level of insurance reserves to remain below the amount that would be necessary to pay the amount of claims it received, by preventing delayed claims from appearing as liabilities on the balance sheet. (*Id.* ¶¶ 6-8; *see, e.g.*, *id.* ¶ 110.) These individuals allegedly identified other insurance practices of HyreCar, namely that (1) the company's deductible to insurers exceeding that of car owners using the platform by $7,500 until "early 2019," (*id.* ¶ 40); and (2) HyreCar began offering three tiers of coverage on April 9, 2019, in which owners received better insurance coverage in exchange for remitting a great percent of their daily rental rate to HyreCar, (*id.* ¶ 42).

The SAC asserts HyreCar switched from Genoteq to a "well-known, established, and reputable" third-party adjuster effective March 1, 2021. (*Id.* ¶¶ 9, 98-102.) The SAC further alleges that HyreCar had a backlog of unpaid claims in excess of its $1.74 million in reserves at the end of Q1 2021 on March 31, 2021, and later stated there was an additional $1.1 million in claims in excess of its reserves for claims that predated January 1, 2021. (*Id.* ¶¶ 9, 103.) The SAC also alleges that HyreCar's Q1 2021 results improperly stated insurance reserves were $1.7 million and should instead have been $3.0 million under GAAP, thus inflating its stock price. (*Id.* ¶¶ 105-11.)

According to the SAC, when HyreCar reported its quarterly results for Q2 2021 on August 10, 2021, HyreCar reported net losses of $9.3 million, as compared to losses of $3.8 million in Q2 2020. (*Id.* ¶¶ 12, 115.) The SAC alleges HyreCar concurrently disclosed in its Form 10-Q for Q2 2021 that it incurred much higher costs of revenue during the quarter, primarily on account of higher insurance claims than previously expected. (*Id.* ¶¶ 12, 116.) Specifically, the SAC alleges the Form 10-Q disclosed that "[t]he remainder of the cost increase was primarily driven up by additional insurance claims of $2.8 million of which approximately $1.2 million was attributed to one-off new developments on claims and incidental payments incurred

prior to March 31, 2021 in excess of the reserves and accruals." (*Id.* ¶¶ 12, 116-19.) The SAC also alleges HyreCar's 2021 10-K report stated that "as much as $1.0 million of the true up was 'related to settling claims incurred prior to January 1, 2021' under our previous insurance claims processing partner." (*Id.* ¶¶ 12 n.2, 83-84.) The SAC also claims that, during an earnings call, Brogi or Furnari commented that cost of revenue increased from $3.1 million to $8.3 million "year-over-year" with insurance "premium and claims, accounting for the vast majority of the cost" due to the switch to a "new single [claims] processing partner" and an additional "$1.4 million in one-time expenses related to transition and to claims development incurred from prior periods" with a concomitant "sharp decrease in customer complaints related to the claims process." (*Id.* ¶ 120.)

The SAC alleges that HyreCar's CEO (Furnari) sold 300,000 shares of common stock in HyreCar in July 2021 and CFO (Brogi) sold 72,329 shares of the same in May 2021. (*Id.* ¶¶ 14, 111-14.) After Brogi retired in July 2021, the SAC alleges the new CFO made various statements to the market regarding HyreCar's efforts to reform its claims process. (*Id.* ¶¶ 122-26.) Shortly thereafter, the SAC asserts that HyreCar's stock fell almost 50%, closing at $9.85 on August 11, 2021, on a volume of 5.8 million shares traded. (*Id.* ¶¶ 13, 127-29.) The SAC also alleges several other stock sales: (1) HyreCar's Chief Business Development Officer, who was also Furnari's brother, sold 299,900 HyreCar shares in July 2021; (2) the Chair of HyreCar's Board of Directors sold 50,000 HyreCar shares in May and June 2021; and (3) HyreCar's COO sold 35,000 HyreCar shares in May 2021, all of which resulted in the subject individuals avoiding significant losses. (*Id.* ¶¶ 14, 156, 158-59.) The SAC alleges these individuals had not previously sold shares in HyreCar prior to its IPO in July 2018, or, in the case of HyreCar's COO and Brogi, since they joined the company in September 2018. (*Id.* ¶¶ 14, 111-14, 156, 158-59.)

Based on these allegations, the SAC asserts claims against Defendants for violations of Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange

Act"), 15 U.S.C. § 78j, and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as claims for secondary liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against Brogi and Furnari as controlling persons of HyreCar. (SAC ¶¶ 1, 15, 182-200.) Plaintiff seeks to bring this action on behalf of purchasers of HyreCar securities from May 13, 2021, to August 10, 2021. (*Id.* ¶ 1.)

On August 27, 2021, the initial Complaint was filed in this action, asserting Section 10(b), Rule 10b-5, and Section 20(a) claims against Defendants. (Dkt. 1) After the court appointed Plaintiff as lead plaintiff pursuant to the Private Securities Litigation Reform Act, 15 USCA §§ 78u-4, *et seq.* ("PSLRA"), Plaintiff filed the First Amended Complaint on December 3, 2021, asserting the same claims against the same Defendants as the SAC. (Dkts. 62, 66 ("FAC").) In its Order on Defendants' Motion to Dismiss the FAC, the court found the FAC did not adequately plead scienter or a materially false statement or omission, and dismissed the FAC without prejudice and with leave to amend. (*See generally* Dkt. 74.) Plaintiff then filed the SAC, which Defendants now move to dismiss, asserting the SAC's allegations concerning scienter and asserted materially false statements and/or omissions are still inadequate to sustain Plaintiff's claims. (SAC; *See generally* Mot.)

## II. Legal Standard

### A. Motion to Dismiss Pursuant to Rule 12(b)(6)

Rule 12(b)(6) permits a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). To withstand a motion to dismiss brought under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While "a complaint attacked by a Rule

12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions" and "a formulaic recitation of the elements of a cause of action" such that the factual allegations "raise a right to relief above the speculative level." *Id.* at 555 (citations and internal quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (reiterating that "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"). "A Rule 12(b)(6) dismissal 'can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.'" *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).

"Establishing the plausibility of a complaint's allegations is a two-step process that is 'context-specific' and 'requires the reviewing court to draw on its judicial experience and common sense.'" *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995-96 (9th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 679). "First, to be entitled to the presumption of truth, allegations in a complaint . . . must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Id.* at 996 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). "Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quoting *Starr*, 652 F.3d at 1216); *see also Iqbal*, 556 U.S. at 681.

Plausibility "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. 544, 556 (2007)). On one hand, "[g]enerally, when a plaintiff alleges facts consistent with both the plaintiff's and the defendant's explanation, and both explanations are plausible, the plaintiff survives a motion to dismiss under Rule 12(b)(6)." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 47 (9th Cir. 2022) (citing *Starr*, 652

F.3d at 1216). But, on the other, "'[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.'" *Eclectic Props. E., LLC*, 751 F.3d at 996 (quoting *Iqbal*, 556 at U.S. 678). Ultimately, a claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 at 556); *accord Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

In *Sprewell v. Golden State Warriors*, the Ninth Circuit described legal standards for motions to dismiss made pursuant to Rule 12(b)(6):

> Review is limited to the contents of the complaint. *See Enesco Corp. v. Price/Costco, Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998). All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *See id.* The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. *See Mullis v. United States Bankr. Ct.*, 828 F.2d 1385, 1388 (9th Cir.1987). Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

266 F.3d 979, 988 (9th Cir. 2001).

**B. Standard to Plead Fraud Under Rule 9(b)**

"Securities fraud class actions must meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)." *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9(b) requires "that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct so that they can defend against the

charge and not just deny that they have done anything wrong." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (cleaned up). The allegations of fraud "must be accompanied by 'the who, what, when, where, and how' of the misconduct alleged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation omitted); *see also Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (stating claims subject to Rule 9(b) must allege the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations") (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir.2004)). The plaintiff must also "set forth what is false or misleading about a statement, and why it is false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547 (9th Cir. 1994) (en banc), *superseded by statute on other grounds as recognized by Ronconi v. Larkin*, 253 F.3d 423, 429 n.6 (9th Cir. 2001). Rule 9(b) "does not allow a complaint to lump multiple defendants together but requires plaintiffs to differentiate their allegations when suing more than one defendant." *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011) (cleaned up); *see also Swartz*, 476 F.3d at 764-65 (holding that, under Rule 9(b), plaintiffs must "inform each defendant separately of the allegations surrounding [their] alleged participation in the fraud") (citation and internal quotation marks omitted). However, Rule 9(b)'s heightened standard does not apply to allegations related to a defendant's state of mind, instead permitting "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." Fed. R. Civ. P. 9(b).

## III. DISCUSSION

### A. Requests for Judicial Notice

Defendants seek judicial notice of and/or to incorporate by reference a total of 28 Exhibits submitted in connection with the Motion. (Dkts. 76-1 ("Defendants' RJN"); 81-2, Exh. 28.) In a footnote, Plaintiff submits the court "should largely disregard these exhibits," arguing the Ninth Circuit "caution[s] against the 'overuse and improper application of judicial notice and the incorporation-by-reference

doctrine.'" (Opp. at 9 n.9 (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018)).) Defendants argue Plaintiff's argument is too conclusory to be credited. (Dkt. 81-1 at 8-9.)

Defendants argue Exhibits 1, 3, 11, 13, 15-16, 19, and 21-27 are incorporated by reference, or, in the alternative, judicially noticeable. (Defendants' RJN at 10-13, 18, 19.) Defendants relatedly argue Exhibit 14 is judicially noticeable. (*Id.* at 10, 19.) Exhibits 1, 3, 11, 13, and 22-27 are SEC filings made by HyreCar. (*See id.* at 12.) Exhibits 16 and 19 are HyreCar's Earnings Call Transcripts from Q1 and Q2 2021, respectively. (*See id.* at 13.) Exhibit 15 is a press release of HyreCar's Q1 2021 Financial Results. (*See id.*) Exhibit 21 is FASB ASC 450-20-25, (*see id.*), and Exhibit 14 is an excerpt of the official Auditing Standards of the Public Company Accounting Oversight Board ("PCAOB"), (*see id.* at 19).

The court **GRANTS** Defendants' request with respect to Exhibits 1, 3, 11, 13, 15-16, and 21-27, and incorporates this material by reference. Each of these Exhibits is described or quoted in the SAC, and each relates to the basis of the SAC's pleaded violations of the federal securities laws. Specifically, Plaintiff alleges Exhibits 1, 11, 15, and 16 contain materially false or misleading statements, while 3, 13, and 19 are subsequent disclosures that Plaintiff alleges demonstrate those earlier statements were materially false or misleading. Exhibits 22-27 are disclosures of stock sales on which Plaintiff relies to establish scienter, and 21 is FASB ASC 450-20, which forms the basis of Plaintiff's assertions regarding GAAP violations. Accordingly, the court incorporates these documents by reference. *See Khoja*, 899 F.3d at 1002 (9th Cir. 2018) (noting a document may be incorporated by reference into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim") (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

The court **DENIES** Defendants' request with respect to Exhibit 14. It is true that courts take judicial notice of official accounting standards to establish the terms

of GAAP themselves, as the court does with respect to ASC 450-20-25. *See, e.g.*, *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 561 n.18 (N.D. Cal. 2009) (sua sponte taking judicial notice of FASB Accounting Standard where compliant alleged related GAAP violation). However, the arguments Defendants raise in the Motion concerning Exhibit 14 dispute whether GAAP was violated as a factual matter, (*see* Mot. at 7-8), and Defendants do not argue that the court should consider Exhibit 14 for a more limited purpose, (*see generally* Defendants' RJN). "Whether accounting practices are consistent with GAAP is a question of fact and the [c]ourt may not make such a factual determination at the pleadings stage." *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *14 (C.D. Cal. Jan. 12, 2012) (cleaned up); *accord S.E.C. v. Cotton*, 2006 WL 6382128, at *6 (C.D. Cal. Dec. 21, 2006) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997)). Accordingly, the court finds taking judicial notice of Exhibit 14 to resolve disputed factual issues of GAAP compliance would be improper.

Defendants assert Exhibits 4 and 12 are judicially noticeable as web pages that Plaintiff references in the SAC. (Defendants' RJN at 13-15.) Specifically, Exhibit 4 is an article from HyreCar's website detailing HyreCar's Insurance Policy, and Exhibit 12 is an article from HyreCar's website discussing HyreCar's Protection Plan for Owners. (*See id.* at 13-14.)

The court **DENIES** Defendants' request with respect to Exhibits 4 and 12. These Exhibits concern HyreCar's explanation of its insurance policies, which is not a matter beyond reasonable dispute such that judicial notice is proper. *See, e.g.*, *Stamas v. Cnty. of Madera*, 2010 WL 2556560, at *3 (E.D. Cal. June 21, 2010) (noting courts "may not take judicial notice of the interpretation of the facts contained in [judicially noticeable] records"). To the extent Defendants seek to incorporate this material by reference, the court acknowledges the SAC briefly quotes HyreCar's statement on its website regarding the expected timing of the claims process under its insurance policy. (*See* SAC ¶ 53.) However, the SAC does not necessarily depend on the

particular tiers or exact expected processing times of HyreCar's insurance policy; the SAC alleges more broadly that an intentional delay in payment of claims impacted HyreCar's financial reporting rather than its exact timing. Thus, the court declines to incorporate these exhibits by reference. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) ("[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document.") (citation omitted). Accordingly, the court will not consider them.

Defendants contend Exhibits 2, 5-10, and 17-18 are subject to judicial notice under Federal Rule of Evidence 201 because they are SEC filings, earnings call transcripts, and news releases. (Defendants' RJN at 16-18.) Exhibit 2 is HyreCar's Form 14A Proxy Statement, filed with the SEC on April 30, 2021, and includes the work history and compensation of Furnari and Brogi. (*See id.* at 16.) Exhibit 6 is HyreCar's 2019 10-K, which reflects criteria under HyreCare utilizes to deny insurance claims and the opinion of its independent auditor, while Exhibit 8 is HyreCar's Q3 2021 10-Q that disclosed HyreCar's use of an escrow account in connection with payment of insurance claims. (*See id.*) Defendant also seeks judicial notice of Exhibit 9, HyreCar's Q4 2020 earnings call transcript for the fact that HyreCar announced to investors that it "had begun a selection process for a new third party adjuster to deal with both physical damage and liability claims efficiently, and disclosed an increase in both rental days and cost of revenue." (*See id.* at 16-17.) Finally, Defendants assert judicial notice of Exhibits 5, 7, 10, 17 and 18 because they are press releases or investor presentations, for the fact the market was aware of the information contained in these articles. (*See id.* at 17-18.)

The court **DENIES** Defendants' request with respect to Exhibits 2 and 6. While SEC filings may be judicially noticed for the fact that their contents were disclosed to the market, *see, e.g.*, *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 874 n.1 (N.D. Cal. Dec. 10, 2020) (noting 10-Ks, 10-Qs, and similar SEC filings are proper subjects for judicial notice), *aff'd sub nom. Weston Fam. P'ship LLLP v.*

*Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022), these documents are not necessary for the court's analysis of that fact. Specifically, the facts that the market knew Furnari and Brogi's work history and compensation per Exhibit 2 and the opinion of HyreCar's independent auditor regarding its method of paying insurance claims per Exhibit 6 do not materially bear on Plaintiff's theories that HyreCar violated securities laws based on the improper reporting of insurance claims due to its delay in payment of those claims. Accordingly, the court declines to take judicial notice of these documents. *See, e.g.*, *Garrett v. Governing Bd. of Oakland Unified Sch. Dist.*, 583 F. Supp. 3d 1267, 1271 n.2 (N.D. Cal. 2022) (finding "documents unnecessary for the purposes of resolving the questions of law the pending motions to dismiss raise and accordingly declin[ing] to take judicial notice of them") (citations omitted).

The court **GRANTS** Defendants' request as to Exhibits 8 and 9, for the proffered purposes that HyreCar *disclosed* to the market that HyreCar used an escrow account to pay insurance claims per Exhibit 8 and that it had begun a selection for a new third-party adjuster per Exhibit 9, but not for the *truth* of factual assertions contained in these Exhibits. As noted above, 10-Qs filed with the SEC like Exhibit 8 are proper subjects for judicial notice. *In re Twitter*, 506 F.Supp.3d at 874 n.1. Relatedly, Exhibit 9, an investor call transcript is a document courts may "notice[] in a securities fraud action as documents reflecting publicly available information about the company." *Id.* But that "does not [necessarily] mean that every assertion of fact within th[ese] document[s] is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999. Accordingly, the court does not consider these statements or any attendant implications for their truth.

The court **DENIES** Defendants' request with respect to Exhibits 5, 7, and 10, 17, and 18. Exhibit 5, an investor presentation regarding "HyreCar's expansion into different services like Instacart and Postmates," (Defendants' RJN at 17), does not bear on Plaintiff's claims, and thus the court declines to take notice of it. *See Garrett* 583 F. Supp. 3d at 1271 n.2. Each of the remaining exhibits relates to disclosures

HyreCar made to investors regarding its partnerships with insurance companies or HyreCar's reported results for Q2 2021; however, to the extent the facts that any of these disclosures were made to the market is relevant to the court's analysis, they are duplicative of the related SEC filings discussed above or already alleged in the SAC, and so the court declines to take notice of these Exhibits as well. *See id.* Additionally, the relevance of Exhibit 17's announcement that HyreCar "renewed its liability insurance with Apollo," (Defendants' RJN at 18), is tenuous considering neither the SAC nor the Motion mention an initial contract with Apollo, (*see generally* SAC; Mot.).

Defendants further seek judicial notice of Exhibit 20, a historical compendium of HyreCar stock prices obtained from Yahoo! Finance, arguing courts often take notice of historical stock prices of publicly traded companies. (*See* Defendants' RJN at 18-19.) HyreCar's stock price is not a material issue in the Motion. Thus, the court **DENIES** Defendant's request with respect to Exhibit 20. *See Garrett* 583 F. Supp. 3d at 1271 n.2.

Finally, in connection with the Reply, Defendants seek judicial notice of or to incorporate by reference Exhibit 28, a printout of HyreCar's Damage Claim Policy, to note that a statement referenced in the Opposition and reflected in Exhibit 28 was made on January 4, 2022. (Dkt. 81-1 at 4-5.) The FAC alleges "HyreCar's own website states that 'damages claim cases on average take 2 to 8 weeks to process and receive a settlement,'" but does not state when this statement was first made, (SAC ¶ 53); Defendant seeks judicial notice of the Exhibit 28 to date this statement. "Courts may take judicial notice of publications introduced to indicate what was in the public realm at the time, [but] not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (citations and internal quotation marks omitted). Accordingly, the court **GRANTS** Defendants' request.

Plaintiff seeks judicial notice of Exhibit A, "the latest publicly available PCAOB Inspection Report of HyreCar's auditor, DBB McKennon," either to provide context to Defendants' Exhibit 14, or, alternatively, as "rebuttal evidence" because Defendants put the PCAOB's auditing standards "at issue." (*See* Dkt. 79 ("Plaintiffs' RJN") at 1-4.) Defendants argue Exhibit A is irrelevant, not referenced or relied on in the SAC, improperly seeks judicial notice of its contents as evidence, and Defendant did not "open[] the door" to a dispute regarding the qualifications of Defendant's auditor. (Reply at 5-8.)

Plaintiff insufficiently demonstrates that facts included in Exhibit A are "not subject to reasonable dispute." *See* Fed. R. Evid. 201(b). The court similarly finds Plaintiff's the purpose for which Plaintiff seeks to admit Exhibit A, a PCAOB Inspection Report of HyreCar's auditor—to 'provide context' to Defendant's auditor's opinions—concerns factual assertions that are not beyond a reasonable dispute. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (courts may not take judicial notice of disputed facts, even if contained in matters properly subject to judicial notice). For clarity and as discussed above, the court is not considering Defendant's auditors' statements for their truth at this stage.[2] Accordingly, the court **DENIES** Plaintiff's Request as to Exhibit A.

As set forth above, the court takes judicial notice of the stated facts in Exhibits 8-9, and 28; incorporates by reference Exhibits 1, 3, 11, 13, 15-16, 21-27, and 22; and declines to consider Exhibits 2, 4-7, 10, 12, 14, 17-18, 20, and A.[3]

---

[2] Additionally, Plaintiff's position that "rebuttal evidence" aimed at undermining Defendant's auditor's qualifications is improper at this stage considering the court is not converting the instant Rule "12(b)(6) motion [] into a motion for summary judgment under Rule 56." *See Khoja*, 899 F.3d at 998 (citation omitted).

[3] Defendants also assert that, prior to the reassignment of this case, the court took judicial notice of Exhibits 2, 7, 17, and 20, and additionally considered Exhibits 1, 3, 5-6, 9, 11, 15-16, 18-19, and 22-27. (Defendants' RJN at 9-10; Dkt. 81-1 at 8.)

**B. Plaintiff's Securities Fraud Claims**

1. Section 10(b) of the Exchange Act and Rule 10b-5

To state a claim under Section 10(b) or Rule 10b-5, a plaintiff "must adequately plead six elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)), *cert. denied sub nom. BofI Holding, Inc. v. Houston Mun. Emps. Pension Sys.*, 142 S. Ct. 71 (2021). Claims brought under Rule 10b-5 and Section 10(b) must satisfy the heightened pleading requirements of Rule 9(b). *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 605 ("Rule 9(b) applies to all elements of a securities fraud action" brought under Section 10(b) or Rule 10b-5); *see also* Fed. R. Civ. P. 9(b). Because Defendants only challenge the sufficiency of the SAC's pleading of scienter and a material misrepresentation or omission, the court considers only those two elements in its analysis.

*i. Confidential Witness Allegations*

Under the PSLRA, a complaint pleading securities fraud may rely on accounts of confidential witnesses "so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (citation and internal quotation marks omitted). "[A] complaint relying on statements from confidential witnesses" to establish scienter "must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d

---

Regardless, the court independently analyzes whether these exhibits are proper subjects for consideration at this stage. *See Dreith v. Nu Image, Inc.*, 648 F.3d 779, 787-88 (9th Cir. 2011); *Dietz v. Bouldin*, 579 U.S. 40, 46-47 (2016).

981, 995 (9th Cir. 2009). "First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* (citing *Daou*, 411 F.3d at 1015-16). "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* (citing *Daou*, 411 F.3d at 1022).

The SAC references statements made by several confidential witnesses who were employed at HyreCar or Genoteq, each numbered as "CWs." "CW1" was "an Account Manager at HyreCar from July 2019 through March 2020." (SAC ¶ 25.) "CW3" was "a Sales Representative who worked at HyreCar between August 2019 and August 2021" and "reported to" HyreCar's "current Vice President of Strategic Growth." (*Id.* ¶ 26.) "CW5" was "a Customer Support Specialist who worked at HyreCar between August 2019 and November 2020," who "participated in a variety of functions including working with the operations team, handling claims, and some customer service" and "field[ed] calls from vehicle owners." (*Id.* ¶ 27.) "CW7" was "a Billing and Claims Specialist who worked at HyreCar from September 2018 through May 2020." (*Id.* ¶ 28.) "CW9" was a "Claims Assistant, and Manager's Assistant," at Gentoeq "from July 2020 through October 2021" who "reviewed the correspondence of" Genoteq's manager, Stacy Ashton "between the fall of 2020 and spring of 2021." (*Id.* ¶ 29.) "CW10" was Genoteq's manager "between 2019 and at least late 2021" who "managed Genoteq and handled HyreCar's claims from 2018 through March 1, 2021." (*Id.* ¶ 30.) "CW11" was an "Adjuster Assistant from September 2020 through May 2021" at Genoteq, and is described as "doing 'a bit of everything'" and reporting to an individual not named elsewhere in the SAC. (*Id.* ¶ 31.) Finally, "CW12" was a "Claims Adjuster" who worked at Genoteq "from February 2020 through March 2021" and reported to the same manager of Genoteq as CW9. (*Id.*¶ 32.)

As a general matter, the court finds the SAC adequately pleads CW3, CW5, CW10, and CW12's job titles, descriptions of duties, responsibilities, and period of employment to sufficiently meet the PSLRA's requirements for confidential witnesses. *See Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*, 2020 WL 2559939, at *4 (N.D. Cal. May 20, 2020) (finding complaint "met the PSLRA's requirements for confidential witnesses" where complaint sufficiently alleged "each witness's job title, description, and responsibilities"). Because the court is unable to determine from the SAC's allegations the job responsibilities and duties of CW1, CW7, CW9, and CW11 with sufficient specificity to gauge their reliability, the court finds the SAC inadequately specifies these requirements with respect to these CWs. *Cf. id.*

*ii. Materially False Statement or Omission*

Defendants argue that Plaintiff has not adequately pleaded a materially false or misleading statement or omission, whether based on the SAC's allegations pertaining to (1) the understatement of HyreCare's insurance reserves; (2) HyreCar's representations that its financials were prepared in accordance with GAAP; (3) HyreCar's insurance reserve estimates; (4) statements regarding how HyreCar's insurance reserves were set; or (5) statements pertaining to HyreCar's anticipated results. (Mot. at 11-18.) Plaintiff counters that (1) Defendants falsely understated HyreCar's insurance reserves, which HyreCar subsequently admitted; (2) Plaintiff adequately alleges Defendants did not comply with GAAP, which is a factual issue that should not be resolved on a motion to dismiss; (3) HyreCar's insurance reserve estimates did not take into account claims incurred prior to March 31, 2021, in excess of its reserves and accruals; and (4) HyreCar's reported financials did not incorporate the alleged understatement of insurance reserves or related risk factors, and thus were false. (Opp. at 8-20.)

The PSLRA requires private securities fraud complaints to "specify each statement alleged to have been misleading [and] the reason or reasons why the

statement is misleading." *Tellabs*, 551 U.S. at 321 (alteration in original) (quoting 15 U.S.C. § 78u–4(b)(1)). Courts "apply the objective standard of a 'reasonable investor' to determine whether a statement is misleading." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 212 L. Ed. 2d 233 (Mar. 7, 2022). A misrepresentation or omission is material where there is "'a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available' for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (alteration in original) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). For instance, "[a] statement can constitute a material misrepresentation giving rise to Section 10(b) or Rule 10b-5 liability if there is no reasonable basis for the speaker's belief in the statement's accuracy or if the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010).

When predicated on an opinion statement—"a belief, a view, or a sentiment which the mind forms of persons or things"—there are three standards for pleading falsity. *Omnicare, Inc. v. Laborers Dist. Council Const. Ind. Pension Fund*, 575 U.S. 175, 183 (2015) (alterations and citations omitted); *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 615-617 (9th Cir. 2017) (applying *Omnicare*'s standards to Section 10(b) and Rule 10b-5 claims). These standards depend on the plaintiff's underlying theory of falsity:

> First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege both that the speaker did not hold the belief she professed and that the belief is objectively untrue. Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that the supporting fact the speaker supplied is untrue. Third, when a plaintiff relies on a theory of omission, the plaintiff must allege facts going to the

> basis for the issuer's opinion whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

*Dearborn Heights*, 856 F.3d at 615-16 (cleaned up).

a. *HyreCar's GAAP Compliance and Financial Statements*

Plaintiff alleges HyreCar's statement that its financial statements were compliant with GAAP, and HyreCar's costs figures in certain of those statements themselves, were misleading on the basis that HyreCar's recording of insurance expenses contravened ASC 450-20-25. ASC 450-20-25 provides that an "estimated loss from a loss contingency shall be accrued by a charge to income" if (1) "it is probable that an asset had been impaired or a liability had been incurred"; and (2) "[t]he amount of loss can be reasonably estimated." (Exh. 14.) If sufficiently pleaded, GAAP violations may constitute a material misrepresentation or omission, so long as the violations are "significant" and not merely "minor or technical in nature." *See Daou*, 411 F.3d at 1016-17 (noting overstatement of revenues may state a claim for securities fraud based on its contravention of GAAP). "To properly state a claim for accounting fraud, plaintiffs must plead facts sufficient to support a conclusion that defendant prepared the fraudulent financial statements and that the alleged financial fraud was material." *Id.* (cleaned up).

The application of GAAP principles, at least in some circumstances, requires a company to exercise its judgment, such that the resulting figures may constitute opinion statements under *Omnicare*. *See Dearborn Heights*, 856 F.3d at 616-19 (evaluating statements regarding goodwill impairment under *Omnicare*'s framework for opinion statements). "As other courts have explained, ASC 450 [] asks companies to provide 'an educated approximation of future claims, i.e., an opinion.'" *See Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *5 (N.D. Cal. Sept. 29, 2021) (citing *Kanefsky v. Honeywell Int'l Inc.*, 2020 WL 2520669, at *5 (D.N.J. May 18, 2020)); *but see Sec. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 27 (D.D.C. 2017)

(questioning whether loss contingencies under ASC 450 should be characterized as "opinion" statements).

Plaintiff points to allegations in the SAC that HyreCar "reviewed every claim, and [] had to approve them before they were paid," based on CW10's contact with HyerCar's "upper management." (SAC ¶ 70.) Additionally, the SAC alleges, based on CW10's statement, that HyreCar had "access to Genoteq's system and could see what claims were ready to be approved." (*Id.* ¶ 71.) Plaintiffs allege, based on this access, that Defendants violated GAAP by failing to increase HyreCar's insurance reserves by $1.2 million and its cost of sales on account of claims "incurred prior to March 31, 2021" pursuant to ASC 450-20-25, that were omitted from HyreCar's Q1 2021 10-Q. (*See id.* ¶¶ 117-18, 121, 140-45.) The SAC states these adjustments mathematically. (*Id.* ¶ 110.)

The court concludes the SAC's allegations are sufficiently detailed to survive the motion to dismiss stage. While Defendants raise several arguments regarding their interpretation of ASC 450-20-25 and an auditor's opinion, the court finds these arguments prematurely seek to resolve the factual dispute of whether Defendants actually violated GAAP. *See Crafton v. Powerwave Techs., Inc.*, 2008 WL 11338622, at *6 (C.D. Cal. Apr. 17, 2008) (finding, on a motion to dismiss, that it was "premature to credit one party's GAAP interpretation over the other party's interpretation" where plaintiffs alleged GAAP violations with specificity). Ultimately, Plaintiff has plausibly alleged that HyreCar had access to Genoteq's claims database and that its management, including Brogi and Furnari, had similar access, permitting the plausible inference that its management was involved in the approval process for claims. Here, Plaintiffs have alleged the amount by which HyreCar's insurances reserves were understated, the relevant time periods in which the understatements affected HyreCar's GAAP-related disclosures to the market, the pool of insurance claims affected by the understatements, and testimony from confidential witnesses tying the understatements to HyreCar and its management. *See*

*Daou*, 411 F.3d at 1016 ("When pleading irregularities in revenue recognition, plaintiffs should allege (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or company employees involved in the transactions.") (cleaned up); *In re Silver Wheaton*, 2016 WL 3226004 at *9 (C.D. Cal. 2016) (finding ASC 450 violation adequately alleged where the likelihood of liability was "more than remote"); *In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) (same). Overall, applying "the *Omnicare* ruling," the court finds the SAC "passes the objective test" because the "facts alleged in the [SAC] about what was known to [Defendants] but omitted from the filings would render the statements misleading to a reasonable reader" and the SAC "supports a plausible inference that [Defendants'] statements about contingencies did not rest on meaningful inquiry, and did not fairly align with the facts known at the time." *See RPM Int'l*, 282 F. Supp. 3d at 27; *id.* at 22 (finding SEC adequately "alleged that defendants violated ASC 450 by failing to disclose and accrue for a loss contingency in RPM's three October 2012 filings").

b. *Statements Related to HyreCar's Insurance Reserves and Forward Looking Statements*

As noted above, the crux of Plaintiff's allegations is that HyreCar inadequately set its insurance reserves based on inaccurate recording of expenses related to pending claims processed by HyreCar's former insurance adjuster, which Plaintiff contends were improperly delayed by HyreCar.

The statements related to, and the adequacy of the amount of, HyreCar's insurance reserves are "opinion statements because they 'are inherently subjective and involve management's opinion regarding fair value.'" *See Dearborn Heights*, 856 F.3d at 613; *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (holding "statements regarding the adequacy of loan loss reserves" are opinion statements).

The SAC relevantly alleges Defendants made several statements in SEC filings and to the market related to HyreCar's insurance reserves. In particular, the SAC alleges that HyreCar understated its reserves in its Q1 2021 financial results disclosure based on later HyreCar's later disclosure of $1.2 million in insurance expenses incurred prior to March 31, 2021, in excess of its reserves, and that $1 million of those expenses were later disclosed to have been incurred prior to January 1, 2021. The SAC alleges this, in turn, rendered HyreCar's reported financial statements, and similar statements made by HyreCar, Brogi, and Furnari, false and misleading because they did not accurately reflect the company's insurance costs. The court finds these allegations essentially derivative of the SAC's allegations that this understatement in reserves was caused by violations of GAAP and incorporates by reference the analysis above.

The SAC also alleges that a particular disclosure in HyreCar's Q1 2021 10-Q, stating that "[t]he Company records a loss reserve for physical damage and other liability coverage caused to owner vehicles up to the Company's insurance deductibles or relevant limit" which "represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported and are recorded on a non-discounted basis," (Exh. 11 at 6), was false and misleading because it omitted the $1.2 million in claims incurred prior to March 31, 2021. Plaintiffs argue that the related representation that "[t]he lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment," was also false and misleading for the same reason.

Defendants argue that "lag time" refers to the time between when an accident is reported to HyreCar by a driver and not the time necessary to assess the validity of the claim, but simultaneously point to allegations in the SAC that HyreCar's policy requires physical damage to be reported within 24 hours. (*See* Mot. at 17 (citing SAC ¶ 53).) Defendants argue the later increase in insurance reserves "simply means that HyreCar reached a different determination on losses that were 'probable' and

'reasonably estimated' on certain claims based on new information received when it switched to a more sophisticated third-party administrator." (*See* Mot. at 18.) But neither the SAC nor judicially noticeable exhibits in this action adequately demonstrate specific and relevant "new information" came to light during the switch, and the court agrees with Plaintiff that this statement is in tension with HyreCar's statement that its insurance reserve "represents an estimate for both reported accidents claims not yet paid, and claims incurred but not yet reported." (*See* Opp. at 15 (citing SAC ¶45).) Taken together, the court finds that Plaintiff has plausibly pleaded that these statements could be materially misleading to a reasonable investor, considering HyreCar stated its insurance reserve includes "claims incurred but not yet reported," but also that the "lag time in reported claims is minimal and as such represents a low risk of unreported claims being excluded from the loss reserve assessment," which, without more, permits the plausible inference that the $1.2 million in claims allegedly omitted should have been accounted for in periods prior to its disclosure. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.") (citation and internal quotation marks omitted).

The SAC also alleges HyreCar's risk factors disclosed in HyreCar's 2020 10-K and 2021 10-Q filings were misleading because they were not updated in response to risks that had already materialized; namely, insurance claims that were incurred prior to January 1, 2021. (SAC ¶ 146.) In its 2020 10-K, language HyreCar adopted in its 2021 10-Q, Hyrecar stated "'[w]e establish insurance reserves for claims incurred but not yet paid and claims incurred but not yet reported and any related estimable expenses, and we periodically evaluate and, as necessary, adjust our insurance reserves as our experience develops or new information is learned'" and "[i]f we determine that our estimated insurance reserves are inadequate, we may be required to increase such reserves at the time of the determination, which could result in an

increase to our net loss in the period in which the deficiency is determined and negatively impact our financial condition and results of operations." (*Id.*) On similar facts, the Ninth Circuit has previously held that several SEC filings disclosing the state of the market "as a 'risk factor' that 'could' affect the ability of loan customers to repay 'in the future'" were not misleading solely because "that risk had already come to fruition.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016). The Ninth Circuit noted "there is nothing misleading about these statements, which were accompanied by information about [] credit losses and charge-offs and a warning that '[w]e may be required to make additional provisions for loan losses and charge off additional loans in the future.'" *Id.* Given the allegations at issue are materially similar to those in *Lloyd*, the court finds HyreCar's risk factors, as alleged in the SAC, do not constitute a materially misleading misstatement or omission.

Finally, Plaintiff argues that Furnari's statement during HyreCar's Q1 2021 results regarding "[d]ynamic pricing combined with increasing gross profit from normalized claims and increased affiliate revenue puts us on to reach EBITDA neutral in the second half of 2021," (Opp. at 20 (citing SAC ¶ 138)) is not subject to the PSLRA's safe harbor for forward looking statements, 15 U.S.C. § 78u-5(c), because it represented the present state of normalized claims. However, the court agrees with Defendants that the SAC inadequately sets forth facts demonstrating that the cited earnings call transcript, in which Furnari also stated the increase in costs of sales was "primarily due to some seasonal shifts in insurance," was a forward-looking statement falling within the ambit of 15 U.S.C. § 78u-5(c) in that it contains "a projection of revenues, income (including income loss), [or] earnings (including earnings loss) . . . ." *Waterford Twp. Police v. Mattel, Inc.*, 321 F. Supp. 3d 1133, 1149 (C.D. Cal. 2018) (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)), *aff'd sub nom. Castro v. Mattel, Inc.*, 794 F. App'x 669 (9th Cir. 2020). To the extent Plaintiff argues the statement regarding "normalized claims" pertains to the then-present state of claims, and is thus unprotected by the PSLRA's safe harbor, *see In re*

*Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017), the SAC insufficiently demonstrates a quantifiable misstatement or facts demonstrating falsity.

For the reasons set forth above, the court finds the SAC adequately pleads a materially false misstatement or omission sufficient to survive the Motion.

*iii. Scienter*

Defendants contend Plaintiff fails to plead a strong inference of scienter because (1) HyreCar received "clean" audit opinions; (2) the SAC does not allege Defendants had knowledge of facts demonstrating their knowledge that certain statements were false; (3) HyreCar's escrow account with its second third party adjuster was not unusual; (4) HyreCar's executives' securities trades are more consistent with recognizing compensation; and (5) other allegations in the SAC are too conclusory. (Mot. at 19-25.) Plaintiff asserts (1) Defendants' later disclosures correcting HyreCar's under-accrual of insurance claims expenses; (2) confidential witness allegations; (3) the circumstances surrounding HyreCar's executives' stock sales; (4) Brogi's departure; and (5) HyreCar's size, all support finding a strong inference of scienter. (Opp. at 20-25.)

Scienter is a "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quoting *Tellabs*, 551 U.S. at 319)). A defendant who makes misrepresentations or omissions "either intentionally or with deliberate recklessness" acts with scienter. *See BofI Holding*, 977 F.3d at 787 (citation and internal quotation marks omitted); *see also* 15 U.S.C. § 78u-4(b)(2). "[D]eliberate recklessness is 'an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (second alteration in original) (emphasis removed) (quoting *Zucco Partners*, 552 F.3d at 991).

A private plaintiff bringing a claim for securities fraud must demonstrate a "strong inference" of scienter. *Tellabs*, 551 U.S. at 323-324; *see also* 15 U.S.C. § 78u-4(b)(2)(A). The court must "consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. A complaint "survive[s]" a defendant's motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *See id.*

Where a plaintiff "seek[s] to hold individuals and a company liable on a securities fraud theory," the plaintiff must "allege scienter with respect to each of the individual defendants." *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 607. However, the court may "impute scienter to individual defendants in some situations, for example, where . . . 'a company's public statements [are] so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication.'" *Id.* at 607-08 (quoting *Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 744 (9th Cir. 2008)). Where "'no individual allegation is sufficient'" to demonstrate a strong inference of scienter, a complaint adequately pleads scienter only if "'the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness'" under a holistic review. *See Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 (9th Cir. 2017) (quoting *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)).

a. *Later Corrective Disclosures*[4]

The SAC relies, in part, on allegations pertaining to HyreCar's later corrective disclosures regarding the $1.2 million in expenses related to insurance claims incurred prior to January 1, 2021, to establish scienter. In particular, the SAC references

---

[4] As a threshold matter, because the court declines to take judicial notice of the truth of the facts asserted in HyreCar's auditor's opinion, the court finds Defendants' arguments regarding HyreCar's "clean" audit opinion inapposite.

HyreCar's statements: (1) in its Q2 2021 10-Q, reported on August 10, 2021, that the company experienced "an increase of $5.2 million or 170.6% from $3.1 million recognized during the three months ended June 30, 2020" in costs of revenue "primarily driven up by additional insurance claims of $2.8 million of which approximately $1.2 million was attributed to one-off new developments on claims and incidental payments incurred prior to March 31, 2021 in excess of the reserves and accruals" some of which "resulted from settling claims incurred prior to March 1, 2021 under our previous insurance claims processing partner," (SAC ¶ 116; *see also id.* ¶ 114-15); and (2) in its 2021 10-K, reported on December 31, 2021, that at least $1.0 million of this amount related to "settling claims incurred prior to January 1, 2021, under our previous insurance claims processing partner in the second quarter of 2021 as we liquidated their claims portfolio," (*id.* ¶ 83 (emphasis removed)). Standing alone, the court notes "it is simply not enough to assume or implausibly infer that the defendants must have known about these issues in [previous reporting periods] based on later facts or developments." *See Twitter*, 29 F.4th at 621. However, the SAC also asserts that Defendants possessed certain information that made these disclosures false when made. If properly pleaded, "particularized allegations that defendants had actual access to the disputed information raise a strong inference of scienter." *Quality Sys.*, 865 F.3d at 1145 (cleaned up).

As is particularly relevant here, the SAC raises several allegations from confidential witnesses:

- CW10 was "in touch with HyreCar 'upper management'" and received approvals from "the operations director or vice president – and accounting," and further "indicated that HyreCar had access to Genoteq's system and could see what claims were ready to be approved." (SAC ¶¶ 70-71.)
- CW3 stated HyreCar would "have Genoteq members in our [company] meetings." (*Id.* ¶ 76.)

- CW5 recalled instances where managers would "say there were no refunds or rebates" which they "were told not to disclose that . . . if people called asking about their refund or rebate." (*Id.* ¶ 78.) The SAC alleges CW5 stated he was told this by "Anthony Rodriquez, who was the senior most manager on the operations team, and assistant director James Avery, who both remain at HyreCar." (*Id.* ¶ 79.)
- At the time CW12 was let go from Genoteq in March 2021, the SAC alleges CW12 reported that he "had over 300 claims" of which "80 [were] total loss claims that CW12 described as 'big payments.'" (*Id.* ¶ 102.)
- The SAC also alleges these accounts are bolstered by Better Business Bureau ("BBB") reviews from customers indicating HyreCar experienced delays in paying out insurance claims under Genoteq. (*See id.* ¶¶ 77-97.)

Overall, the court finds the SAC's allegations sufficient to contribute to a strong inference of scienter. The SAC plausibly alleges HyreCar's executives, especially Brogi, had access to Genoteq's claims processing software and awareness that HyreCar's insurance claims were more backlogged than it disclosed to the market prior to the August 10, 2021, corrective disclosure. Though there is a possibility that, as Defendants suggest, HyreCar's transition to a new third-party insurance adjuster resulted in HyreCar recognizing more claims as costs under ASC 450-20-25, at the pleading phase of the proceedings, the court finds the SAC plausibly alleges that issues in delays in claims processing persisted under Genoteq, the issues remained undisclosed to the market, and HyreCar and its executives had awareness of the issues. While the court does not find these allegations on their own establish the requisite "strong inference" of scienter, the court finds they can contribute to one when viewed holistically in light of the SAC's other allegations. *Cf. Zucco Partners*, 552 F.3d at 1000 (observing "general allegations about 'management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements' to create a strong inference of

scienter when these allegations are buttressed with 'detailed and specific allegations about management's exposure to factual information within the company'") (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)).

b. *Executives' Securities Trades*

"Unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter." *Quality Sys*, 865 F.3d at 1146 (cleaned up). However, "insider trading is suspicious only when it is 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.1989)), *superseded by statute on other grounds*. "To evaluate suspiciousness of stock sales, [courts] consider, *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).

Here, the SAC alleges the following sales of HyreCar stock by company executives: (1) Brogi sold 72,329 shares between May 20 and 24, 2021, and kept 130,400 shares; (2) Furnari sold 300,000 shares between July 21 and 23, 2021, and kept 393,207 shares; (3) Furnari's brother and HyreCar's Chief Business Development Officer sold 299,900 shares between July 21 and 23, 2021, and kept 369,907 shares; (4) the Chair of HyreCar's Board of Directors sold 50,000 HyreCar shares between May 24 and June 3, 2021, and kept 236,000 shares; and (5) HyreCar's COO sold 35,000 shares between May 19 and 20, 2021, and kept 167,365 shares. (SAC ¶¶ 155-59; Exhs. 22-27.) Accordingly, of their total holdings in HyreCar common stock, the executives sold 36% (Brogi), 43% (Furnari), 45% (Furnari's brother), 17% (the Chair of HyreCar's Board of Directors), and 17% (HyreCar's COO).

In a vacuum, these amounts are not insubstantial, but, as Defendants note, courts have found similar percentages of sales to be inadequate to demonstrate a strong inference of scienter. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (defendant's sales of 37% of defendant's total stock holdings during class period inadequate to sustain strong inference of scienter). The SAC alleges, however, that these trades amounted to $13 million in gross proceeds, $5.2 and $1.2 million of which went to Furnari and Brogi, respectively. (SAC ¶¶ 155-57.) *Cf. Oracle*, 380 F.3d 1226, 1232 (9th Cir. 2004) (noting courts should give "less weight" to the fact sales "may represent a small portion of the defendant's holdings" if the amount of money made from the sale is sufficiently high in magnitude). Moreover, when taken in conjunction with their timing and trading patterns, the court finds these sales support a strong inference of scienter. None of the executives had sold this quantity of stock before; indeed, Defendants do not argue the record demonstrates any of these individuals had previously sold any stock in HyreCar, but rather that a strong inference of scienter cannot follow because each only sold a minority portion of their holdings. (*See* Mot. at 23-25; Reply at 21-22.) However, each of these sales occurred within the time frame of approximately three months before HyreCar released its first alleged corrective disclosure in its Q2 2021 filing on August 10, 2021, and after the company reported its Q1 2021 results on May 13, 2021. Given the breadth of these trades across HyreCar's executives, their timing, and break from each individual's previous pattern of trading, the court finds they support a strong inference of scienter. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 939 (9th Cir. 2003) (holding timing and prior trading histories of defendants sufficiently unusual and suspicious to support strong inference of scienter where nine individuals' sales "occurred in succession over a three month period when America West officials were making optimistic statements regarding the company's financial outlook and reassuring analysts that [a pending] settlement agreement would have no economic effect" and "[n]one of the individual

defendants sold stocks during the twenty months preceding the ten month class period"). Although, on a percentage basis, the amount of stock sold by HyreCar's executives cuts against finding a strong inference of scienter, the court finds the sales timing and inconsistency with their prior trading patterns may contribute to such an inference when evaluating the SAC's allegations on a holistic basis. *See In re Questcor Sec. Litig.*, No, 2013 WL 5486762, at *16 (C.D. Cal. Oct. 1, 2013) (finding plaintiffs adequately alleged strong inference of scienter on a holistic basis where timing and consistency with prior trading history of stock sales was suspicious, and "the total value of the Class Period sales is substantial, [even though] the percentage of shares sold cuts against a strong inference of scienter").

c. *Violations of GAAP as Evidence of Scienter*

The "failure to follow GAAP, without more, does not establish scienter." *Dearborn Heights*, 856 F.3d at 621 (citations and internal quotation marks omitted). However, "significant violations of GAAP standards can provide evidence of scienter so long as they are pled with particularity." *Daou*, 411 F.3d at 1022 (citation omitted). While the court finds the SAC's allegations regarding HyreCar's failure to comply with GAAP do not rise to the level of scienter on their own under Ninth Circuit precedent, the court notes that the SAC alleges HyreCar and its high-level executives had access to Genoteq's claims database. However, the SAC does not allege that Brogi or Furnari were accountants or otherwise had personal knowledge that actions HyreCar took constituted GAAP violations, and Plaintiffs argue, consistent with the SAC's allegations, that the asserted Class Period "only relates to unaudited financials." (Mot. at 25; *see also* Reply at 18.) Accordingly, the court finds the mere fact the SAC alleges violations of GAAP does not contribute to a strong inference of scienter. *See Dearborn Heights,* 855 F. 3d at 621.

d. *Brogi's Departure*

The SAC also references Brogi's departure as supporting a strong inference of scienter. "[R]esignations, terminations, and other allegations of corporate reshuffling

may in some circumstances be indicative of scienter." *Zucco Partners*, 552 F.3d at 1002. However, "[w]here a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance itself in order for a resignation to be strongly indicative of scienter." *Id.* In this case, Plaintiff argues HyreCar announced Brogi's retirement "unexpectedly" on June 23, 2021, at age 56, effective two weeks prior to HyreCar replacing its insurance broker, (Opp. at 24 (citing SAC ¶¶ 23, 98, 160)); Defendant refutes this, noting the FAC previously alleged HyreCar replaced its insurance broker more than a year prior, on June 15, 2020, (Reply at 22 (citing FAC ¶ 184)).[5] Brogi retired approximately 48 days before HyreCar's 2021 Q-2 form was released, close in time to the August 10, 2021, disclosure. And, as discussed above, his high quantity of stock sales breaking with his previous pattern of holding his shares in HyreCar, is suspicious. However, the facts regarding his departure alleged in the SAC otherwise do not contribute to a strong inference of scienter. "Because of the lack of additional detail, the Court finds that the [] resignation 'add[s] [a] piece to the scienter puzzle' but cannot support scienter by itself." *Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *14 (N.D. Cal. Sept. 10, 2021) (quoting *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009)).

e. *HyreCar's Size and the "Core Operations Inference"*

---

[5] Defendants urge the court to treat Plaintiff's previous position as a binding judicial omission for omitting previously pleaded material that harms Plaintiff's case. (Reply at 22.) Some courts in this District have treated "allegations in operative pleadings [that] do not contradict earlier pleadings, but instead merely omit previously-pleaded material which harms a plaintiff's case" as "judicial admissions that a plaintiff has not cured." *Tikotzky v. Kai Data, LLC*, 2021 WL 3924757, at *4 (C.D. Cal. June 23, 2021) (citations omitted). Because the date on which HyreCar replaced its insurance broker is immaterial to the court's ultimate finding of a strong inference of scienter, the court will assume, for the purposes of the Motion, that June 15, 2020, is the correct date.

Finally, the SAC relies on HyreCar's size as a small company to support an inference of scienter and argues the "core operations inference" supports a finding of scienter. The "core-operations inference can be one relevant part of a complaint that raises a strong inference of scienter." *S. Ferry*, 542 F.3d at 784. The "core operations" inference has been described as "the principle that it may be inferred that facts critical to a business's 'core operations' or important transactions are known to key company officers." *See, e.g.*, *id.* at 781. However, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068 (citations omitted). Here, the SAC relevantly alleges that the insurance reserves constituted an important part of HyreCar's business and that HyreCar's executives had access to Genoteq's insurance claims database. Though the court does not find the "core operations inference" sufficient to sustain a strong inference of scienter, it may contribute to one. *See In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1078 (E.D. Wash. 2016) ("Reliance on the core operations inference must be accompanied, for example, by 'specific allegations about management's exposure to factual information within the company,' such as their actual monitoring of the data that was the subject of the fraud claim or detailed statements showing defendants' actual knowledge."). Similarly, the court does not find HyreCar's size as a company with 86 full time employees standing alone, (*see* SAC ¶¶ 151, 161), sustains a strong inference of scienter; however, HyreCar's relatively small size lends some support to the SAC's allegations concerning the involvement of Brogi and Furnari in the setting of insurance reserves, *see Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *12 (C.D. Cal. July 1, 2008) (finding allegations of scienter "persuasive" given company's "relatively small size" of 80-100 employees and allegations "regarding the officer defendants' considerable involvement with the company's generation and reporting of revenues").

f. *Conclusion*

Taken holistically, the court finds the SAC's allegations discussed above give rise to a strong inference of scienter. Defendants urge that HyreCar's switch to a new insurance adjuster was the more plausible inference to draw from its corrective disclosure of previously accrued insurance claims under its previous partner. However, the circumstances taken as a whole sufficiently demonstrate that Defendants acting with scienter is "cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *See Tellabs*, 551 U.S. at 322-24. Accordingly, the court **DENIES** Defendants' Motion to Dismiss Plaintiff's Section 10(b) and Rule 10b-5 claims.

2. Secondary Liability Under Section 20(a) of the Exchange Act

Defendants assert Plaintiff's Section 20(a) claim for secondary liability must be dismissed because the SAC fails to state a claim for primary violation of the Exchange Act. Plaintiff does not dispute Defendants' characterization of its Section 20(a) claims, but contends the SAC adequately alleges Section 10(b) and Rule 10b-5 claims against Defendants. (*See generally* Opp.)

A prima facie case under Section 20(a) consists of "(1) a primary violation of federal securities law and (2) that the defendant exercised actual power or control over the primary violator." *Am. W. Holding Corp.*, 320 F.3d at 945 (citation and internal quotation marks omitted). "[I]t is not necessary to show actual participation or the exercise of power; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." *Id.* (citation and internal quotation marks omitted). As relevant here, "Section 20(a) claims may be dismissed summarily, however, if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Zucco Partners*, 552 F.3d 981, 990 (9th Cir. 2009) (citations omitted).

As discussed above, the court finds the SAC sufficiently alleges violations of Section 10(b) and Rule 10b-5 against Defendants, including HyreCar. Plaintiff seeks to bring Section 20(a) claims against Brogi and Furnari as controlling persons of

HyreCar and alleges each occupied a high-level position, had ownership and contractual rights, and participated in HyreCar's operations and its SEC filings. (*See, e.g.*, SAC ¶ 197.) The SAC also includes allegations that, among others, Brogi and Furnari had access to HyreCar's reports, press releases, and filings, and were involved in its day-to-day management. (*See, e.g.*, *id.* ¶¶ 197-98.) Based on the fact that Defendant's challenge to Plaintiff's Section 20(a) claims rises and falls with the Section 10(b) and Rule 10b-5 violations alleged in the SAC, and considering the SAC's allegations as a whole, the court **DENIES** Defendants' motion to dismiss the SAC's Section 20(a) claims.

## IV. DISPOSITION

For the reasons set forth above, the court **DENIES** the Motion. Plaintiff shall file a motion for class certification within **ninety (90) days** of the date of this Order.

**IT IS SO ORDERED.**

DATED: December 5, 2022

Honorable Fred W. Slaughter
UNITED STATES DISTRICT JUDGE